# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF )
BROADCASTERS, )
                   )
              Petitioner, )     Case No. 24-1296
                   )
      v. )
                   )
FEDERAL COMMUNICATIONS )
COMMISSION and )
                   )
UNITED STATES OF AMERICA, )
                   )
             Respondents. )

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. § 706, 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342 and

2344, and Rule 15(a) of the Federal Rules of Appellate Procedure, the National

Association of Broadcasters ("NAB")[1] hereby petitions this Court for review of the

Federal Communications Commission's *Sponsorship Identification Requirements*

*for Foreign Government-Provided Programming*, Second Report and Order, MB

---

[1] NAB is a nonprofit trade association that advocates on behalf of free local radio
and television stations and broadcast networks before Congress, the Federal
Communications Commission ("Commission" or "FCC") and other federal
agencies, and the courts. NAB and its members actively participated in the
proceedings below.

Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) ("Order"). A synopsis of this Order was published in the Federal Register on July 16, 2024. *See* 89 Fed. Reg. 57775. A copy of the Order is attached to this Petition as Exhibit A.

This petition is timely filed within 60 days of its publication in the Federal Register. The Order is a final agency action that has significant and immediate adverse consequences for NAB and its members. NAB has associational standing because the association's members would otherwise have standing to sue in their own right; the interests they seek to protect are germane to the organization's purpose; and neither the claim asserted nor the relief requested requires the participation of NAB's individual members in the lawsuit. Venue lies with this Court pursuant to 28 U.S.C. § 2343.

The Order exceeds the FCC's authority under the Communications Act of 1934 ("Act") and violates the Administrative Procedure Act ("APA") and the First Amendment. First, the Order violates the APA by failing: (1) to follow mandatory-notice-and-comment procedures by extending the foreign sponsorship identification rule ("Rule") to certain short-form advertising that previously was expressly excluded from the Rule; (2) to amend the FCC's regulation to adopt the newly-expanded definition of terms, which was set forth only in the preamble; and (3) to give a reasoned explanation or provide any evidence supporting the need to alter the recently enacted Rule. Second, the Order contrary to the Act imposes

corroboration requirements on lessees (*i.e.*, speakers leasing airtime on broadcast stations for First Amendment-protected speech), when Congress has denied the Commission any power to regulate speakers, and prescribes diligence obligations on broadcasters that go beyond the statute. Third, by imposing specific burdens only on certain forms of advertising (political issue ads and paid public service announcements (PSAs)), the Order establishes an impermissible content-based regulation that ironically penalizes the most protected form of speech, even though the Commission never identified a single instance where a foreign governmental entity has purchased political or public service advertising on a broadcast licensee.

Under modifications to the FCC's sponsorship identification rules adopted in 2021, broadcasters must provide standardized on-air and online public inspection file disclosures identifying the foreign government involved if they ever air programming sponsored by foreign governmental entities pursuant to a lease. The Order limited the new Rule's application to "leases" of airtime to prevent its extension to situations without any evidence of foreign government sponsored programming.[2] The FCC specifically stated that the record did *not* show that advertisements were a source of unidentified foreign governmental programming and that "traditional, short-form advertising" did *not* constitute a lease.[3]

---

[2] 2021 Order, 36 FCC Rcd at 7716 ¶ 29.

[3] 2021 Order, 36 FCC Rcd at 7716 ¶¶ 28-29.

NAB and other affected parties sought review of only one limited aspect of the Rule requiring broadcasters to independently investigate whether lessees are foreign governmental entities. The Court agreed with the petitioners, holding that the investigation requirement exceeded the FCC's authority under Section 317 of the Act governing sponsorship identification.[4] In October 2022 the Commission proposed to refashion and expand the Rule's requirements by mandating that lessees and stations complete written certifications and requiring stations to upload those certifications into their online public inspection files.[5]

On June 10, 2024, the Commission released the current Order. It states for the first time that *only* political candidate advertising and advertising comporting with Section 73.1212(f) of the FCC's rules (i.e., advertising for commercial products and services) are exempt from the Rule. Order at ¶¶ 42-45, ¶ 47. The Order also makes express that, despite being "traditional, short-form advertising," political issue advertising by non-candidates, as well as paid PSAs, would now be subject to the Rule as "leases." The Order further requires broadcasters to complete written certifications that they have taken the diligence steps mandated in the Rule, including requesting that the innumerable entities regarded as "lessees" provide

---

[4] *Nat'l Ass'n of Broad., et al., v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022).

[5] *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, Second Notice of Proposed Rulemaking, 37 FCC Rcd 12004 (2022).

written certifications or otherwise document their status.[6] These suspect foreign government lessees include churches seeking to air their services, schools wanting to air sporting events, local businesses with programming related to their specific lines of business, and now those seeking to air advertisements on political issues.

The Order is contrary to law and the Constitution. The FCC's expansion of its Rule to cover advertising except for enumerated exemptions violates the APA. The Commission failed to give the public any notice of, and an opportunity to comment upon, the extension of the Rule to certain types of advertising, including on political issues. The Commission also failed to engage in reasoned decision-making, offering no evidence to support the Rule's expansion and drawing nonsensical distinctions between exempt and non-exempt advertising. In addition, the FCC did not even attempt to provide a rationale for changing course.

The Commission also lacks authority under the Act to impose corroboration requirements on lessees, via certifications or documentation of their status or otherwise, or to require that licensees demand such corroboration. While station licensees have specific, limited sponsorship identification obligations under Section 317, the FCC has no comparable authority over entities leasing airtime (or

_____

[6] Order at Appendix A, modified 47 C.F.R. §73.1212(j)(3). A lessee can either complete a certification that it is not a foreign governmental entity as defined in the Rule, or it can print screenshots showing that it does not appear in the Foreign Agents Registration Act database or FCC list of U.S.-based foreign media outlets.

advertising) on broadcast stations. And stations' reasonable diligence duties do not extend to demanding corroboration from lessees once they have received the information needed for the required sponsorship announcements, or making the inquiries the Rule demands.

Beyond exceeding the FCC's statutory authority, expanding the Rule to cover political issue advertising and paid PSAs (but not advertisements for commercial products and services) makes it a content-based regulation of speech contrary to the First Amendment. The Commission does not point to a single instance of a foreign governmental entity engaging in covert political or public service advertising on television or radio stations; indeed, the FCC's 2021 Order excluded advertising from the Rule's coverage due to the lack of any evidence that ads were a source of foreign government-sponsored programming. Concerns about foreign governmental content on social media and other online platforms – which the Rule does not attempt to reach – cannot justify burdening political speech on broadcast stations under any level of First Amendment scrutiny.

The Order imposes requirements contrary to the terms of the Act and that unreasonably and unnecessarily burden the operations, resources and programming arrangements of both broadcast licensees and the wide range of entities seeking to speak via radio and television stations across the country. NAB seeks relief from the Order on the grounds that it: (1) violates federal law, including, but not limited

to, the Constitution, the Communications Act of 1934, as amended, and the Administrative Procedure Act; (2) is arbitrary, capricious, and an abuse of discretion under 5 U.S.C. § 706; and (3) is otherwise contrary to law.

Accordingly, NAB respectfully requests that this Court hold unlawful, vacate, enjoin and set aside the Order and grant such additional relief as may be necessary and appropriate.

September 13, 2024

Respectfully submitted,

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
stephenkinnaird@paulhastings.com
*Attorney for Petitioner National Association of Broadcasters*

/s/ Rick Kaplan
Rick Kaplan
Jerianne Timmerman
Erin L. Dozier
NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street, SE
Washington, DC  20003

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF )
BROADCASTERS, )
)
)
Petitioner, )     Case No. 24-1296
)
v. )
)
FEDERAL COMMUNICATIONS )
COMMISSION and UNITED STATES )
OF AMERICA, )
)
Respondents. )

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C.

Circuit Rule 26.1, Petitioner National Association of Broadcasters ("NAB") states

as follows:

NAB is a nonprofit, incorporated association of radio and television stations.

It has no parent company, and has not issued any shares or debt securities to the

public; thus no publicly held company owns ten percent or more of its stock. As a

continuing association of numerous organizations operated for the purpose of

promoting the interests of its membership, the coalition is a trade association for

purposes of D.C. Circuit Rule 26.1.

September 13, 2024

Respectfully submitted,

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
stephenkinnaird@paulhastings.com

*Attorney for Petitioner National Association of Broadcasters*

/s/ Rick Kaplan
Rick Kaplan
Jerianne Timmerman
Erin Dozier
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, SE
Washington, DC  20003

# CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September, 2024, I caused copies of the foregoing Petition for Review and Corporate Disclosure Statement to be served upon the following parties in the manner indicated:

*By First Class Mail and*
*Electronic Mail*

P. Michele Ellison
General Counsel
Federal Communications Commission
45 L Street, NE
Washington, DC  20554
LitigationNotice@fcc.gov

*By First Class Mail*

Merrick Garland
Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530

 /s/ Rick Kaplan
Rick Kaplan

**EXHIBIT A**



of actions from review under Executive Order 12866, entitled "Regulatory Planning and Review" (58 FR 51735, October 4, 1993). Because this action has been exempted from review under Executive Order 12866, this action is not subject to Executive Order 13211, entitled "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355, May 22, 2001), or Executive Order 13045, entitled "Protection of Children from Environmental Health Risks and Safety Risks" (62 FR 19885, April 23, 1997). This action does not contain any information collections subject to OMB approval under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.,* nor does it require any special considerations under Executive Order 12898, entitled "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations" (59 FR 7629, February 16, 1994).

Since tolerances and exemptions that are established on the basis of a petition under FFDCA section 408(d), such as the tolerance exemption in this action, do not require the issuance of a proposed rule, the requirements of the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) do not apply.

This action directly regulates growers, food processors, food handlers, and food retailers, not States or Tribes. As a result, this action does not alter the relationships or distribution of power and responsibilities established by Congress in the preemption provisions of FFDCA section 408(n)(4). As such, EPA has determined that this action will not have a substantial direct effect on States or Tribal Governments, on the relationship between the National Government and the States or Tribal Governments, or on the distribution of power and responsibilities among the various levels of government or between the Federal Government and Indian Tribes. Thus, EPA has determined that Executive Order 13132, entitled "Federalism" (64 FR 43255, August 10, 1999), and Executive Order 13175, entitled "Consultation and Coordination with Indian Tribal Governments" (65 FR 67249, November 9, 2000), do not apply to this action. In addition, this action does not impose any enforceable duty or contain any unfunded mandate as described under Title II of the Unfunded Mandates Reform Act (2 U.S.C. 1501 *et seq.*).

This action does not involve any technical standards that would require EPA's consideration of voluntary consensus standards pursuant to section 12(d) of the National Technology Transfer and Advancement Act (15 U.S.C. 272 note).

## V. Congressional Review Act

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

## List of Subjects in 40 CFR Part 180

Environmental protection, Administrative practice and procedure, Agricultural commodities, Pesticides and pests, Reporting and recordkeeping requirements.

Dated: June 17, 2024.

**Edward Messina,**

*Director, Office of Pesticide Programs.*

Therefore, for the reasons stated in the preamble, EPA is amending 40 CFR chapter I as follows:

## PART 180—TOLERANCES AND EXEMPTIONS FOR PESTICIDE CHEMICAL RESIDUES IN FOOD

■ 1. The authority citation for part 180 continues to read as follows:

**Authority:** 21 U.S.C. 321(q), 346a and 371.

■ 2. Add § 180.1407 to subpart D to read as follows:

### § 180.1407 Gluconobacter cerinus strain BC18B and Hanseniaspora uvarum strain BC18Y; exemptions from the requirement of a tolerance.

Exemptions from the requirement of tolerances are established for residues of *Gluconobacter cerinus* strain BC18B and *Hanseniaspora uvarum* strain BC18Y in or on all food commodities when used in accordance with label directions and good agricultural practices.

[FR Doc. 2024–15376 Filed 7–15–24; 8:45 am]

**BILLING CODE 6560–50–P**

## GENERAL SERVICES ADMINISTRATION

### 41 CFR Part 102–76

**[FMR Case 2023–102–03; Docket No. GSA–FMR–2024–0012; Sequence No. 1]**

**RIN 3090–AK76**

### Federal Management Regulation; Accessibility Standard for Pedestrian Facilities in the Public Right-of-Way; Correction

**AGENCY:** Office of Acquisition Policy, General Services Administration (GSA).

**ACTION:** Final rule; correction.

**SUMMARY:** The General Services Administration (GSA) is issuing a correction to FMR Case 2023–102–03: Accessibility Standard for Pedestrian Facilities in the Public Right-of-Way. The document contained an incorrect docket number. This document contains the correct docket number.

**DATES:** Effective September 3, 2024.

**FOR FURTHER INFORMATION CONTACT:** Mr. Chris Coneeney, Director, Real Property Policy Division, Office of Government-wide Policy, at 202–208–2956 or *chris.coneeney@gsa.gov,* for clarification of content. For information pertaining to status or publication schedules, contact the Regulatory Secretariat Division at 202–501–4755 or *GSARegSec@gsa.gov.* Please cite FMR Case 2023–102–03.

**SUPPLEMENTARY INFORMATION:**

## Correction

In FR Doc. 2024–14424, in the **Federal Register** of July 3, 2024, at 89 FR 55072, correct the docket number in the third column to read "GSA–FMR–2024–0012".

**Mehul Parekh,**

*Acting Associate Administrator, Office of Government-wide Policy.*

[FR Doc. 2024–15372 Filed 7–15–24; 8:45 am]

**BILLING CODE 6820–14–P**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 73

**[MB Docket No. 20–299; FCC 24–61; FR ID 228169]**

### Sponsorship Identification Requirements for Foreign Government-Provided Programming

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) takes steps to ensure clear and reasonable foreign sponsorship identification rules, which require radio and television broadcast stations to inform audiences when programming aired pursuant to a lease of airtime on the station is sponsored by a foreign governmental entity. The document replaces a previous requirement of the rules with a new approach that provides licensees with two options for demonstrating that they have sought to obtain the information needed to determine whether the programming being provided by a lessee is sponsored

by a foreign governmental entity. The revised approach addresses concerns broadcasters had regarding the burdens and complexity of the rule and clarifies when the rule applies.

**DATES:** Amendatory instruction 2 (47 CFR 73.1212(j)(8) and (k)) is effective August 15, 2024, and amendatory instruction 3 (47 CFR 73.1212(j)(3)) is delayed indefinitely. The Commission will publish a document in the **Federal Register** announcing the effective date.

**FOR FURTHER INFORMATION CONTACT:** For additional information on this proceeding, please contact Radhika Karmarkar of the Media Bureau, Industry Analysis Division, *Radhika.Karmarkar@fcc.gov,* (202) 418–1523.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Second Report and Order (*Second R&O*), FCC 24–61, in MB Docket No. 20–299, adopted on May 31, 2024, and released on June 10, 2024. The complete text of this document is available electronically via the search function on the FCC's website at *https://docs.fcc.gov/public/attachments/FCC-24-61A1.pdf.*

## Synopsis

### I. Introduction

1. The *Second R&O* took steps to ensure clear and reasonable foreign sponsorship identification rules. In April 2021, the Commission issued a Report and Order (*First R&O*) (86 FR 32221, June 17, 2021) in the above-captioned proceeding adopting a requirement that radio and television stations broadcast clear disclosures for programming that is provided by a foreign governmental entity and set forth the procedures for exercising reasonable diligence to determine whether such a disclosure is needed. The Commission took this action in response to reports that U.S. broadcast stations were transmitting undisclosed foreign governmental programming, against the backdrop of over ninety years of sponsorship identification regulations that ensure the public is informed when airtime has been purchased on broadcast stations in an effort to persuade audiences.

2. In the *Second R&O,* the Commission addressed a ruling by the U.S. Court of Appeals for the District of Columbia Circuit, *National Association of Broadcasters, et al.,* v. *FCC,* 39 F.4th 817, 820 (D.C. Cir. 2022) (*NAB* v. *FCC*), that vacated one of the foreign sponsorship identification requirements established in the *First R&O.* The Commission replaced the vacated verification requirement with an approach that avoids the investigatory obligation on the part of licensees that was at issue in *NAB* v. *FCC.* The new approach provides licensees with two options for demonstrating that they have met their duty of inquiry in seeking to obtain the information needed to determine whether the programming being provided by a lessee is sponsored by a foreign governmental entity. The adopted approach addresses concerns about burdens and complexity raised by commenters in response to the second notice of proposed rulemaking (*Second NPRM*) (87 FR 68960, November 17, 2022) in the above-captioned proceeding.

3. Furthermore, in this order, the Commission clarified that its foreign sponsorship identification rules do not apply to sales of advertising for commercial goods and services to the extent such programming falls within the exemption contained in 47 CFR 73.1212(f) of its general sponsorship identification rules. In addition, the Commission found that its foreign sponsorship identification rules will not apply to political candidate advertisements, but will apply to issue advertisements and paid public service announcements ("paid PSAs"). It also confirmed that the rule changes do not alter its finding in the *First R&O* that noncommercial and educational broadcast stations (NCEs) are not likely to fall within the ambit of the foreign sponsorship identification rules. The Commission declined to create an exemption from the rules for religious programming and locally produced and/or distributed programming. It also concluded that, when a lessee and licensee enter into recurring leases for the same programming, the licensee will be required to exercise its reasonable diligence obligations under the rule only once per year with respect to that particular lessee and that particular programming. With respect to the adopted rule changes, the Commission grandfathered lease agreements already in effect at the time of the required compliance date for these newly-adopted modifications, determining that such leases will need to come into compliance either at the time of renewal or when the parties to the agreement enter into a new lease. Finally, the Commission clarified the obligations of section 325(c) permittees under the foreign sponsorship identification rules.

### II. Background

4. Section 317 of the Communications Act and the Commission's implementing regulations under 47 CFR 73.1212 have long required broadcast licensees to inform their audiences when programming is being aired in exchange for payment or compensation to the station. While section 310(a) of the Act prohibits foreign governments and their representatives from holding a broadcast license, there is no limitation on their ability to enter into a contract with the licensee of a station to air programming of their choosing, or even to lease the entire capacity of a radio or television station. In the *First R&O,* the Commission amended the then existing sponsorship identification rules by adding a requirement that licensees disclose the identity of any foreign governmental entities that lease time on their stations. The disclosure requirements apply to leased programming because the record in the underlying proceeding identified leased airtime as the primary means by which foreign governmental entities are accessing U.S. airwaves to persuade the American public without adequately disclosing the true sponsor.

5. The *First R&O* defined "foreign governmental entity" using existing definitions, statutes, and regulations. Pursuant to 47 CFR 73.1212(j)(2), the term "foreign governmental entity" "shall include governments of foreign countries, foreign political parties, agents of foreign principals, and United States-based foreign media outlets." Section 73.1212(j)(2)(i) through (iv) of the Commission's rules set out definitions for "government of a foreign country", "foreign political party", "agent of a foreign principal", and "United States-based foreign media outlet".

6. The foreign sponsorship identification rules apply in two circumstances. First, a prescribed disclosure is required when a foreign governmental entity has sponsored, paid for, or furnished programming that is aired on a radio or television station pursuant to a lease agreement. Section 73.1212(j)(1)(i) requires that foreign government-provided programming furnished consistent with § 73.1212(a) include the following disclosure: "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]." Second, if a foreign governmental entity provides the programming for free, or for nominal compensation, as an inducement to air the programming, the prescribed disclosure is required if the programming is political or involves discussion of a controversial issue.

7. The foreign sponsorship identification rules neither prevent nor restrict the broadcast of foreign government-provided programming, but rather, are intended solely to inform

audiences about the source of any such programming so that they may be more informed and savvy consumers of the material. As the Commission stated in the *First R&O,* "[t]he principle that the public has a right to know the identity of those that solicit their support is a fundamental and long-standing tenet of broadcasting."

8. Section 317(c) of the Act requires licensees to exercise "reasonable diligence to obtain," from their employees and persons with whom they deal directly, information to enable the licensees to make the required sponsorship identification announcement. To satisfy this reasonable diligence standard with regard to foreign sponsorship identification, the current rules under 47 CFR 73.1212(j)(3) require a licensee to take each of the following actions, both when entering into a new lease agreement and renewing a lease agreement:

(1) Inform the lessee of the foreign sponsorship disclosure requirement.

(2) Ask the lessee whether it falls into any of the categories that would qualify it as a "foreign governmental entity."

(3) Ask the lessee whether it knows if any individual/entity further back in the chain of producing/distributing the programming to be aired qualifies as a foreign governmental entity and has provided some type of inducement to air the programming.

(4) Memorialize the above-listed inquiries and retain such memorialization in its records for the remainder of the license term or for one year, whichever is longer.

These requirements apply regardless of whether the programming is provided pursuant to a lease agreement for consideration under section 317(a)(1) or is provided for free or for nominal compensation under section 317(a)(2) and contains political programming or programming involving a controversial issue. The rules also apply to any programming broadcast pursuant to a section 325(c) permit. The Commission initially adopted an additional requirement that, as discussed in further detail below, has been vacated by the U.S. Court of Appeals for the District of Columbia Circuit. *NAB* v. *FCC,* 39 F.4th at 820.

9. While the reasonable diligence requirements of section 317(c) apply to licensees, section 507 of the Act imposes an obligation on those involved in the production and/or distribution of program matter for broadcast to communicate any information known to them about any money, service or other valuable consideration that any person has paid or agreed to pay for the inclusion of any matter as part of a program. The disclosure obligation

extends beyond the lessee itself to any person connected with the production, preparation, or supply of the programming.

10. On July 19, 2021, the ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates (collectively, the Affiliates) filed a Petition for Clarification. The Affiliates assert that the exemption in the *First R&O* of "traditional, short-form advertising" from the foreign sponsorship identification rules creates confusion because the term has no established meaning in the broadcast industry. In their petition, the Affiliates argue that the Commission should clarify that the foreign sponsorship identification rules do not apply when a licensee sells time to advertisers in the normal course of business, regardless of the advertisement's length.

11. On August 13, 2021, the National Association of Broadcasters (NAB), the Multicultural Media, Telecom and internet Council (MMTC), and the National Association of Black Owned Broadcasters (NABOB) (collectively, Petitioners) filed a Petition for Review of the *First R&O* with the D.C. Circuit. Petitioners challenged the Commission's authority to impose one of the reasonable diligence requirements contained in the *First R&O.* Specifically, in addition to the four reasonable diligence requirements listed above, the *First R&O* had required licensees to confirm the lessee's status, at the time of entering into a lease agreement and at renewal, by consulting the Department of Justice's Foreign Agent Registration Act (FARA) website and the Commission's semi-annual U.S.-based foreign media outlets reports. On July 12, 2022, the D.C. Circuit vacated this verification requirement, holding that it exceeded the Commission's authority under section 317(c). *NAB* v. *FCC,* 39 F.4th at 820. The D.C. Circuit stated that section 317(c) imposes on licensees only a duty of inquiry and not a duty of investigation. The court left in place the remaining four requirements needed to satisfy the statutory reasonable diligence standard.

12. On October 6, 2022, the Commission released the *Second NPRM* containing proposals to address the gap left by the D.C. Circuit's vacatur of the verification requirement contained in the foreign sponsorship identification rules. The *Second NPRM* proposed two alternatives to replace the vacated requirement that licensees independently confirm the lessee's status. Under the first proposal, each licensee had to certify that it had

informed its lessee of the foreign sponsorship identification rules and obtained, or sought to obtain, a certification from its lessee stating whether the lessee is or is not a "foreign governmental entity." In turn, the lessee would submit a certification in response to the licensee's request. To minimize compliance burdens, the Commission proposed that licensees and lessees use standardized certification language, as set forth in the *Second NPRM.* Consistent with the existing requirement that licensees upload into their online public inspection files (OPIFs) their lease agreements, the Commission tentatively concluded that licensees should upload both their own and their lessees' completed certifications into their OPIFs, along with the associated lease agreements.

13. The *Second NPRM* also contained a second proposal based on an approach raised during oral argument in *NAB* v. *FCC* as a possible alternative to the rule provision it ultimately vacated. Under this proposal, in lieu of the licensee independently confirming the lessee's status by checking the Department of Justice's FARA website, or the Commission's U.S.-based foreign media outlet reports site, the licensee would ask the lessee to provide screenshots showing the results of the lessee's search for its name on these sites. In addition, the *Second NPRM* also sought comment on the need to apply the proposals contained therein to section 325(c) permit holders. Finally, it provided another opportunity for comment on the Affiliates' Petition for Clarification regarding the treatment of advertisements.

## III. Discussion

14. The Commission first determined that licensees must pursue one of two approaches to address the gap left by the D.C. Circuit's vacatur of the independent verification requirement. It then addressed questions raised in the record about the application of the foreign sponsorship identification rules to different types of broadcast programming. It then explained when licensees must comply with the newly-adopted requirements and grandfathers lease agreements already in existence at the time of the compliance date of the new rules for the duration of the lease term, determining that existing leases will have to comply with the new rules at the time of renewal or when the parties enter into a new agreement, whichever is earlier. It clarified that its foreign sponsorship identification rules will not apply to sales of advertising for commercial goods and services to the extent that such programming would

not otherwise be subject to the general sponsorship disclosure rules, as set forth in 47 CFR 73.1212(f). The Commission also found that the foreign sponsorship identification rules will not apply to political candidate advertisements. It did, however, determine that the foreign sponsorship identification rules will apply to issue advertisements and paid PSAs. It found that it is inconsistent with its goal of disclosing the source of foreign government-provided programming, and in some instances the First Amendment, to exclude from the ambit of its rules locally produced and/or locally distributed programming and religious programming. It also described how the requirements laid out in the *Second R&O* will apply to section 325(c) permit holders. Lastly, it found that its actions will not inhibit diverse entrants from participating in the broadcast media marketplace.

*A. Obtaining Information From Lessees*

15. The *Second R&O* gives broadcast licensees greater flexibility than proposed in the *Second NPRM* with respect to how they must seek to obtain from lessees the information needed to determine whether a foreign sponsorship disclosure is needed. Specifically, a licensee may choose between one of two options to comply with the rule. Neither of these two options imposes an investigatory duty upon licensees or holds them responsible for the truth of the information they obtain. Under the first option, both the licensee and the lessee must complete a written certification either using the standardized certification language contained in Appendices C and D of the *Second R&O*, and set forth below, or using their own language, as long as the certifications written in their own language contain the inquiries set out in 47 CFR 73.1212(j)(3), pursuant to the *First R&O.* Under the second option, the licensee must ask the lessee to provide screenshots showing the search results generated by the lessee's search for its own name on two Federal Government websites.

16. In all other respects, under this second option, the licensee must follow the other requirements contained in the existing foreign sponsorship identification rules. Consistent with the existing foreign sponsorship identification rules, the licensee must inform the lessee about the foreign sponsorship disclosure requirement, inquire whether the lessee is either a "government of a foreign country" or a "foreign political party," and inquire about the lessee's knowledge of anyone

further back in the chain of producing/ distributing the programming who qualifies as a "foreign governmental entity" and may have provided an inducement to air the programming such as to trigger the need for a foreign sponsorship disclosure. *See* 47 CFR 73.1212(j)(i) through (iii). Finally, also consistent with the existing foreign sponsorship identification rules, the licensee must memorialize those inquiries in some manner. Note, however, that the existing "memorialization" requirement has been moved from § 73.1212(j)(3)(v) of the Commission's rules to revised § 73.1212(j)(3)(iv), which replaces the vacated § 73.1212(j)(3)(iv).

17. Given the concerns raised in the record about the burdens associated with the proposals in the *Second NPRM* to replace the independent verification requirement, the requirements adopted in the *Second R&O* offer licensees more flexibility by giving them a choice of approaches and by allowing them to devise their own certification language. Moreover, the Commission reduced compliance burdens and made the new requirements easier to implement by offering simple certification templates. It also allowed a licensee to inquire about a lessee's foreign governmental entity status only once a year when the lessee and programming are the same (*e.g.,* weekly broadcasts of church services from the same church), assuming there is no change in the lessee's status and the lessee has not become aware of any change in the individuals/entities further back in the programming's production/distribution chain that would trigger the need for a foreign sponsorship disclosure.

18. The Commission declined to adopt several proposals contained in the *Second NPRM* in order to address concerns raised in the record about compliance costs and burdens. First, a licensee need not notify the Media Bureau when a lessee fails to respond to the licensee's queries. Second, licensees will not be required to retain certifications and screenshots in the licensees' OPIFs that are hosted by the Commission. Licensees may either file these records in their OPIFs or in their internal files. Finally, if a lessee fails to respond, or fails to respond adequately, to the licensee's request for a certification or screenshots, the licensee is not prohibited from airing the program. Nevertheless, if a question arises later about whether a disclosure was needed, the licensee must be able to demonstrate, in the event of a fact-specific inquiry by the Commission, that it exercised reasonable diligence in seeking the information. As explained

below, the newly-adopted requirements are within the Commission's statutory authority and are consistent with the D.C. Circuit's ruling in *NAB* v. *FCC.*

1. Licensees Must Comply With One of Two Approaches

19. Licensees will be required to comply with either one of the two approaches described below. Although licensees must choose one of these approaches, they need not choose the same approach for each lease or renewal agreement, even when the same lessee is involved. Compliance with one of these two approaches must be at the time of entering into any new lease agreement or renewing an existing lease agreement, unless the once-a-year exception described below applies. The Commission rejected a suggestion to require certifications of compliance with the foreign sponsorship identification rules only at the time of a licensee's renewal application.

20. *Certification Option.* One option available to licensees is the use of certifications, as described below. The Commission found that the certification option fills the gap left by the D.C. Circuit's vacatur of a licensee's requirement to conduct an independent check, by helping to ensure the credibility of the sponsorship information provided by the lessee in response to the licensee's inquiries. For those who would prefer not to pursue the screenshot option discussed below, the certification approach has the benefit of providing an alternative means of verification. Moreover, certifications have the value of reminding lessees of the foreign sponsorship identification rules and ensuring that they provide above board sponsorship information to broadcasters.

21. The Commission streamlined significantly the certification proposal contained in the *Second NPRM.* Under the adopted certification option, both a licensee and a lessee must complete a certification reflecting the communications and inquiries required under the existing rules. Licensees and lessees will have the option either to use the streamlined standardized certification language set forth in Appendices C and D of the *Second R&O,* and set forth below, or to use language created by the parties. Rather than the two and a half page certifications proposed in the *Second NPRM,* the Commission developed one-page templates for the licensee and lessee certifications, based on a straightforward and familiar "check box" format. While the templates do include citations to the legal sources

defining the various categories of foreign governmental entities, most licensee and lessee employees should be able to complete the forms quickly and readily, based upon their existing knowledge and understanding. The lessee is being asked to sign a certification regarding its own status. The lessee should already know if it is a registered FARA agent, or is listed as a U.S.-based foreign media outlet on the Commission's website, because these registrations/listings are self-reported. Similarly, a lessee should already know if it is a government of a foreign country or a foreign political party. With regard to those further back in the chain of producing and/or distributing the programming, the lessee is being asked only about its actual knowledge at the time it signs the certification. It is highly unlikely that either licensee or lessee should have to engage in any type of research to respond to the queries contained in the certifications. These are the same inquiries the Commission adopted in the *First R&O,* only formatted now as a certification.

22. If licensees and lessees prefer not to use the Commission's templates, they may use their own certification language, provided that language addresses the points listed in 47 CFR 73.1212(j)(3)(i) through (iii). Several commenters expressed concerns that licensees already have developed their own certifications based on the existing foreign sponsorship identification rules and that revising these certifications would be costly. The Commission is persuaded that self-generated certifications can fulfill its certification requirements provided these certifications contain the information and inquiries currently required by the foreign sponsorship identification rules. Specifically, a licensee's certification should confirm that the licensee:

(1) informed the lessee of the foreign sponsorship disclosure requirement;

(2) asked the lessee whether it falls into any of the categories that would qualify it as a "foreign governmental entity;"

(3) asked the lessee whether it knows if any individual/entity further back in the chain of producing and/or distributing the programming to be aired qualifies as a foreign governmental entity and has provided some type of inducement to air the programming;

(4) sought a written certification in response from the lessee; and

(5) obtained the necessary information for a disclosure if one is required.

A lessee's certification should convey the information needed to determine whether a disclosure is required and the information needed for a broadcast disclosure if one is required.

23. Regardless of whether the Commission's templates or a licensee's and lessee's own certifications are used, both the licensee's and lessee's certifications must be dated and signed by an employee or other representative of the entity who can attest to the fact that these actions were taken. Irrespective of whether a licensee chooses to use the template certification language or its own language, licensees are encouraged to include a provision in their lease agreements requiring the lessee to notify the licensee about any change in the lessee's status such as to trigger the foreign sponsorship identification rules. Because these certification requirements encapsulate the extant information and inquiry requirements adopted in the *First R&O,* it is unlikely that any preexisting certification language that licensees have employed will require much revision, if any.

24. *Screenshot Option.* As an alternative to the certification option, licensees may choose to ask their lessees for screenshots of lessees' search results of two Federal Government websites. This option essentially replaces the verification requirement that the D.C. Circuit vacated, with the key difference being that the lessee conducts the searches instead of the licensee. The D.C. Circuit determined that it was beyond the scope of section 317(c) to require a licensee to independently verify a lessee's statement that the lessee was not listed in the Department of Justice's FARA database as a FARA agent or in the Commission's U.S.-based foreign media outlet reports. Consequently, consistent with the hypothetical raised during oral argument before the D.C. Circuit in *NAB v. FCC,* the Commission now determined that licensees may ask their lessees to perform those searches and provide screenshots of the search results. Hence, instead of asking the lessee to provide a responsive certification regarding its status, a licensee exercising this option would ask, consistent with the current foreign sponsorship identification rules, whether the lessee is a registered FARA agent or is listed in the Commission's U.S.-based foreign media outlet reports. If the lessee responds "no," the licensee would then ask the lessee to provide screenshots showing the results of lessee's searches of both of these websites. As discussed below, licensees choosing this option must still comply with all other aspects of the current rule, as they have been required to do since the compliance date of the *First R&O.* Moreover, consistent with the

*First R&O,* licensees are encouraged to include in their lease agreements a requirement for lessees to provide notice of any change in status so as to trigger the need for a foreign sponsorship disclosure.

25. Some commenters have objected to the screenshot approach based on erroneous assumptions about what such a search requires. The FARA searches are simple name searches, initiated by merely entering a name in a search box. As with the requirement that the D.C. Circuit vacated, if the name search does not generate any results, no further search is needed. If the name search does generate results, the broadcaster's duty is to exercise reasonable diligence to ascertain whether the lessee is subject to a disclosure requirement—precisely what the statute requires.

26. Moreover, lessees are looking for their own names. A lessee is not doing a FARA database search to learn whether it is registered, such as to necessitate experimenting with different iterations of its name. A lessee, or someone within lessee's organization, would know whether it is a FARA registrant, or U.S.-based foreign media outlet. As such, the lessee will only be providing screenshots if, in response to licensee's queries, the lessee states that it is neither a FARA agent nor a U.S.-based foreign media outlet. In short, the name search only entails confirming that the lessee's status is neither a FARA registrant or a U.S.-based foreign media outlet. The FARA database has different search fields. The FARA website provides for an "Active Registrants" search link, and the Commission recommends that lessees use this link because its rules only cover those FARA agents who are currently registered on the Department of Justice FARA site.

27. Similarly, the Commission's website lists the names of all the entities that have reported as U.S.-based foreign media outlets, and all that is required to show whether the lessee's name appears on the list at the time of the licensee's required inquiries. No searches or copying of multiple Commission reports are required, as the list appears on the Commission's U.S.-based foreign media outlet web page. Lessees need only go to the following link at the time of entering into a lease agreement or at renewal and take one photo: *https://www.fcc.gov/united-states-based-foreign-media-outlets.*

### 2. Leases Renewed Within a One-Year Period

28. In response to several commenters' request that the Commission clarify the scope of the

term "lease," the Commission affirmed its position in the *First R&O* that the term applies to any agreement, written or not, where a licensee grants to another party the right to program on its station in exchange for some form of consideration. The term applies irrespective of the terms or duration of the agreement, and regardless of whether the parties label or view the agreement as a time brokerage agreement, a local marketing agreement, or something else. Therefore, an agreement is not excluded from the definition of "lease" for purposes of the foreign sponsorship identification rules merely because it is an informal, short term, and/or week-to-week type of agreement. The Commission addressed the rules' applicability to certain types of programming, but it clarified that applicability of the rules is not determined by the title, terms, or duration of an agreement.

29. Nevertheless, in response to commenter concerns about frequently having to repeat the certification/ screenshot process for short term leases, the Commission concluded that, where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, the licensee need only exercise its reasonable diligence obligations, including the certification or screenshot process, once per year. This modification of the proposals contained in the *Second NPRM* addresses concerns raised in the record about the burdens associated with the production of multiple certifications/screenshots over a limited period of time when the lease concerns both the same lessee and same programming. An example of what is meant by "same lessee" and "same programming" in this context would be House of Worship X leasing time for the live broadcast of its weekly religious service, every Sunday from 11 a.m. till 12 p.m. While the specific broadcasts would differ week to week, the lessee would continue to be House of Worship X and the program would be its live religious service broadcast. By contrast, if House of Worship X decides to use its regular time slot to provide something other than its weekly religious service— *e.g.*, a panel discussion with various civic leaders—that would be considered different programming that would not fall within the one year exemption, and, thus, would require licensee and lessee to engage in the reasonable diligence requirements laid out in the Commission's rules.

### 3. Lack of Adequate Response From Lessee

30. The Commission decided not to adopt the notification requirement proposed in the *Second NPRM* that proposed to require licensees to notify the Media Bureau about a lessee's failure to respond. The Commission recognized that there may be instances when, despite a licensee's efforts to comply with the foreign sponsorship identification rules, a lessee may fail to respond, or may fail to respond adequately, to a licensee's queries or request for a certification/screenshots. Thus, if a licensee does not obtain a response, or obtains an inadequate response, from the lessee to its reasonable diligence inquiries, it may continue to air the lessee's programming and will not be required to report such non-responses to the Commission. If, however, it is determined at a later date that the programming should have included a foreign sponsorship disclosure, the Commission may conduct a fact-specific inquiry to determine whether the licensee met its obligation under section 317(c) to "exercise reasonable diligence to obtain" the necessary information, such as by not making further inquiry of the lessee.

### 4. Recordkeeping Requirement

31. Licensees must retain all of their certifications and screenshots for the length of the license term or one year, whichever is longer, pursuant to the record retention requirement contained in 47 CFR 73.1212(j)(3)(v). As noted above, under the screenshot approach, licensees must still comply with the pre-existing requirement to inform lessees of the foreign sponsorship identification rules, pursuant to § 73.1212(j)(3)(i), and make the inquiries contained in § 73.1212(j)(3)(ii) through (iii) of the rules. Also, consistent with the pre-existing rules, under the screenshot approach a licensee must still memorialize in some way its compliance with § 73.1212(j)(i) through (iii).

32. Although the *Second NPRM* proposed that licensees retain the certifications and screenshots in their OPIFs, based on commenter concerns, the Commission was persuaded that licensees should have greater flexibility regarding the manner in which these documents are stored. Licensees must already upload their lease agreements into their OPIFs, along with records of any foreign sponsorship identification disclosures. As a result, the public already has a mechanism to determine which programs are provided by foreign

governmental entities. Thus, the Commission found it reasonable to respond to commenter concerns by providing more flexibility regarding retention of the certifications and screenshots than initially proposed. Hence, licensees must retain their certifications and/or screenshots, along with documentation of inquiries that accompany the screenshots, but may elect to do so in either their own OPIFs or in their internal files, provided that licensees make such documents available to the Commission promptly upon request.

### 5. Legal Authority

33. The newly-adopted regulations are consistent with the Act and the court's decision in *NAB* v. *FCC*. The Commission declined to address challenges by commenters to the existing rules not under review in the *Second NPRM*. Commenters' challenges to the Commission's authority fall into two categories. First, a number of commenters sought to reopen issues already decided in the *First R&O* under the guise of challenging the Commission's authority to implement the proposals at issue in the *Second NPRM*. As discussed in more detail below, the Commission previously established in the *First R&O* that licensees must inform their lessees about the foreign sponsorship identification rules and inquire about the status of lessees and those further back in the chain of production and distribution of programming. These issues were not the subject of the *Second NPRM*. Second, commenters also challenged the Commission's authority to adopt the specific proposals contained in the *Second NPRM*. Below, the Commission first declined to address challenges to those issues previously settled in the *First R&O* before addressing challenges to the Commission's authority to establish the requirements established in the *Second R&O*.

34. *Challenges to Previously Settled Issues in the First R&O.* More than two years after the Commission adopted the foreign sponsorship identification rules, and after themselves challenging a portion of those rules in court, two commenters filing jointly disputed various requirements that are fundamental to the foreign sponsorship identification rules that the Commission established in the *First R&O.* For example, they contested the requirement that licensees must inform their lessees of the foreign sponsorship identification rules—a rule established in the *First R&O.* Similarly, they challenged the previously established

requirement that a licensee inquire of its lessee whether it has knowledge of anyone further back in the chain of producing/distributing the programming who qualifies as a foreign governmental entity and has provided some type of inducement to air the programming. The Commission sought comment on these requirements in the first notice of proposed rulemaking (85 FR 74955, November 24, 2020) and adopted them in the *First R&O* without reopening them in the *Second NPRM*, in which the Commission made clear that it only intended to address the issues vacated by the Court. The Commission declined to revisit additional issues with respect to the existing rules. If commenters wished to challenge such authority, they had the opportunity to do so in the earlier administrative proceeding and in the *NAB* v. *FCC* litigation, and should have done so then.

35. The *Second NPRM* never suggested that the issues the commenters seek to reopen were under consideration in the instant proceeding. If anything, the *Second NPRM* spoke of the obligations to inform and make inquiries as established requirements. The questions posed in the *Second NPRM* regarding the Commission's authority concerned the authority to establish the requirements proposed in the *Second NPRM* and no other. Nothing in the *Second NPRM* suggested that the Commission intended to re-evaluate a licensee's duty to inform its lessee of the foreign sponsorship identification rules and make certain inquiries of the lessee.

36. *Compliance with Section 317 of the Act.* The Commission has ample authority to implement the certification and screenshot requirements established in the *Second R&O* based on section 317 of the Act. The certification and screenshot options described above fit squarely within the *NAB* v. *FCC* court's determination that section 317(c) imposes a duty of inquiry, and not a duty of investigation. Licensees' certifications consist of nothing more than a reduction to written form of those inquiry requirements established in the *First R&O* and codified at 47 CFR 73.1212(j)(3). These inquiries are directed to the lessee and concern the lessee's own status and its knowledge of those further back in the chain of producing/distributing the programming. The screenshot alternative retains in place all the previously established requirements, except for the vacated verification requirement. The only difference being that previously, if the lessee stated it was not a U.S.-based foreign media outlet, or a FARA agent, the licensee

had to verify this answer by reviewing the Department of Justice's FARA database and the Commission's U.S.-based foreign media outlet report. In lieu of this, the licensee will now ask the lessee for screenshots depicting its search results of the Department of Justice's FARA database and the Commission's U.S.-based foreign media outlet report.

37. Commenters argue that licensees only have a duty to inquire. The Commission's rules require only that a licensee inquire of the lessee (*i.e.,* the program's sponsor); they do not make licensees responsible for the truth of the information they obtain from lessees by imposing independent investigatory or other obligations. With regard to a licensee's certification option, it is merely required that the inquiry be in written form. And, consistent with the court's determination that the statute is narrowly drawn, the newly-adopted requirements allow licensees to carry leased programming even in the absence of actually obtaining foreign sponsorship information from the lessee. However, in such situations, if a question arises later about whether a disclosure was needed, the licensee must be able to demonstrate, in the event of a fact-specific inquiry by the Commission, that it exercised reasonable diligence in seeking the information. The newly-adopted rules will help identify the types of effort necessary for licensees to demonstrate reasonable diligence in carrying out their duty of inquiry. Hence, section 317 gives the Commission ample authority to require licensees to ask their lessees for certifications or screenshots in order to determine whether a foreign sponsorship disclosure is needed.

38. The Commission disagreed with the view that section 317(b), when read in the context of the entirety of sections 317 and 507, as well as the legislative history associated with the passage of these provisions, suggests that section 317(b) should be read as a brake on the licensee's duty to make inquiries pursuant to section 317(c). Unlike Section 317(c), which imposes an obligation upon licensees to exercise reasonable diligence to obtain information, section 317(b) imposes an obligation on the station to air an appropriate disclosure if it receives a report that payments were made to employees, or persons involved in the production or preparation of the program, in regard to material included in the programming to be broadcast by the station. The Commission does not interpret section 317(b) to be a limit on the inquiries the licensee must make pursuant to section 317(c). Moreover,

commenters' interpretation would contravene the Commission's mandate under section 317(e) to carry out the statute's provisions.

39. *Compliance with Administrative Procedure Act (APA).* The Commission has clearly and consistently articulated that licensees' responsibilities as trustees of the nation's airwaves include sponsorship identification based on the fundamental principle that the public has the right to know whether the broadcast material has been paid for and by whom. Commenters assert that the proposed rules violate the APA, that the Commission has only identified a few instances of foreign government sponsored programming, and that one of the stations cited is no longer airing such programming. These assertions miss the point that almost by definition when foreign governmental sponsorship is undisclosed, neither the Commission nor the American public will know about it. Moreover, Federal agencies have authority for ''precautionary or prophylactic responses to perceived risks'' based on documented abuses. *See Chamber of Commerce of U.S.* v. *SEC,* 412 F.3d 133, 141 (D.C. Cir. 2005) (quoting *Certified Color Mfrs. Ass'n* v. *Mathews,* 543 F.2d 284, 296 (D.C. Cir. 1976)). Furthermore, foreign governments are continuing to disseminate programming over U.S. broadcast media and, thus, there is a continued need for robust foreign sponsorship identification rules. Hence, it is reasonable to conclude that the reports of foreign government attempts to disseminate programming via broadcast television and radio call for targeted action to ensure audiences are aware when a foreign government or its representatives are seeking to persuade the American public. Regardless of the number of reported instances of undisclosed foreign government-provided programming, Congress and the Commission have consistently expressed their strong interest in the identification of foreign government sponsored programming on the airwaves.

40. In response to commenters' concerns that the rules proposed in the *Second NPRM* would be overly burdensome for broadcasters, the Commission emphasized how limited its action is in the *Second R&O.* It replaced the vacated name search requirement with a certification requirement and an alternative screen shot approach, which is essentially the name search requirement in a form that comports with the statute as interpreted by the D.C. Circuit in *NAB* v. *FCC.* The Commission also has significantly modified its initial proposals with

regard to these new rules. As discussed above, the standardized certification language appended to the *Second R&O* has been reduced significantly and now provides a simple check-box format. Additionally, application of the Commission's standardized certification language is now one of two options available to licensees. Similarly, in response to commenter objections about uploading certifications and other documentation to their OPIFs, the Commission decided to permit licensees to instead maintain this documentation in their private files if they choose.

41. Moreover, in response to commenter concerns about having to repeat the certification or screenshot requirements on a weekly basis for religious programmers, many of whom may not have the resources to enter into long-term leases, the Commission modified the frequency with which the certification/screenshot process must be conducted for such leases. Similarly, concerns about uploading documents associated with short term leases to the OPIFs have been addressed by permitting licensees to retain their certifications/screenshots in their internal files. With regard to the argument that new requirements would further complicate or burden existing business relationships, the Commission grandfathered existing leases until they are either up for renewal or the parties enter into a new lease. Finally, the Commission decided not to adopt the *Second NPRM*'s proposal to have licensees report to the Commission when lessees have failed to respond to licensee requests for certifications/ screenshots.

42. Thus, the reasonable diligence requirements are tailored appropriately to accomplish the goal of ensuring the accurate detection and disclosure of foreign government-provided programming while also mitigating the burden of compliance on broadcasters. Transparency regarding the source of broadcast programming, particularly foreign government-provided programming, gives broadcast audiences the information they need to fully appreciate the programming. Moreover, an expectation of transparency regarding the source of programming also enhances audience trust in broadcast programming overall—unlike other media, broadcast audiences can feel confident that either their programming is provided by their local licensee, or the source of other programming is being disclosed. The Commission's careful tailoring executes a balanced approach, minimizing the overall burden of compliance on broadcasters while concurrently

supporting the objectives of accurate detection and disclosure, so as to ensure that the American broadcast audience is informed about the source of its programming.

*B. Application of Foreign Sponsorship Identification Requirements to Different Types of Programming*

43. The Commission clarified that its foreign sponsorship identification requirements will not apply to advertising for commercial products or services to the extent such advertising falls within the exemption established in 47 CFR 73.1212(f). It also clarified that the foreign sponsorship identification rules will not apply to political candidate advertisements. It did, however, determine that the foreign sponsorship identification rules will apply to issue advertisements and paid PSAs. It also confirmed that the rule changes contained in the *Second R&O* do not alter its finding in the *First R&O* that the foreign sponsorship identification rules should not apply to noncommercial and educational broadcast stations (NCEs). The Commission declined to create an exemption from its foreign sponsorship identification rules for religious programming and locally produced and/ or distributed programming. It also addressed the application of its rules to section 325(c) permit holders.

1. Advertisements for Commercial Goods and Services

44. The Commission clarified that its long-standing sponsorship identification requirements for advertising for commercial products or services, as currently set out in 47 CFR 73.1212(f), also apply in the context of foreign sponsorship identification. Accordingly, the Commission dismissed the Petition for Clarification as moot because it addressed the issues raised in that petition in the *Second R&O*. It recognized that the use of the term "traditional, short-form advertising" in the *First R&O* inadvertently created unnecessary confusion about the application of the foreign sponsorship identification rules. While the intention behind using the term may have been to provide greater clarity, due to the resulting confusion, the Commission reversed its previous decision to use that term and relied instead on the well-established exemption from sponsorship disclosure contained in 47 CFR 73.1212(f).

45. Section 73.1212(f) provides that in the case of broadcast matter advertising commercial products or services, an announcement stating the sponsor's corporate or trade name, or the name of

the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification, shall be deemed sufficient for the purpose of § 73.1212 and only one such announcement need be made at any time during the course of the broadcast.

46. If broadcast matter for a commercial product or service meets the requirements for a disclosure exemption under 47 CFR 73.1212(f), the licensee need not make the inquiries contained in 47 CFR 73.1212(j), nor is the licensee required to air the disclosure set forth in 47 CFR 73.1212(j)(1)(i). For an advertisement to fall under the commercial exemption provisions of 47 CFR 73.1212(f), it must include the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification. By clarifying that the foreign sponsorship identification rules do not trump the pre-existing sponsorship identification rules for advertising, the Commission addressed the concerns raised by commenters about the terminology used in the *First R&O* with regard to advertising.

47. The *Second NPRM* sought comment on whether to establish a "safe harbor" for advertisements of a certain length. Based on the record, the Commission found that it is better not to place any minimum or maximum time limit on the broadcast matter that is subject to the exemption established in 47 CFR 73.1212(f). Rather, the Commission was persuaded to follow long-standing Commission precedent that distinguishes programming that is entitled to the disclosure exemption provided by § 73.1212(f). This clarification should address the questions that arose in response to the Commission's use of the term "short-form advertising" in the *First R&O*. With this additional clarification about the applicability of § 73.1212(f), the Commission addressed the concerns raised in the record about the length of various advertisements.

48. The Commission noted, however, that its foreign sponsorship identification rules continue to apply to any broadcast matter that does not fit within § 73.1212(f). Just as the general sponsorship identification requirements contained in § 73.1212 apply to programming that does not fall within the exemption of § 73.1212(f), so too will the foreign sponsorship identification requirements apply to such programming. Thus, to the extent foreign government-provided programming is not for a commercial

product or service that includes the sponsor's corporate or trade name, and would not otherwise be entitled to the disclosure exemption provided by § 73.1212(f), the licensee must engage in the inquiries and other steps laid out in § 73.1212(j).

2. Political Candidate Advertisements; Issue Advertisements; Paid Public Service Announcements

49. In addition to the commercial products and services exemption discussed above, the Commission exempted from the foreign sponsorship identification requirements the purchase of broadcast time by or on behalf of legally qualified candidates or their authorized committees pursuant to section 315 of the Act ("political candidate advertisements"). Political candidate advertisements, as used herein, refers to "uses" of broadcast stations by legally qualified candidates and are governed primarily by section 315 of the Act, which subjects such uses to specific disclosure requirements. Section 315(b)(2)(C) requires that a television advertisement from a legally qualified candidate include, at the end, a clearly identifiable photographic or similar image of the candidate, and a clearly readable printed statement, identifying the candidate and stating that the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast. Section 315(b)(2)(D) requires that a radio advertisement from a legally qualified candidate include, at the end, a personal audio statement by the candidate that identifies the candidate and the office the candidate is seeking, and indicates that the candidate has approved the broadcast. *See* 47 U.S.C. 315(b)(2)(C) and (D).

50. The *Second NPRM* sought comment on the scope of the advertising exemption adopted in the *First R&O*, and several parties in response asked whether advertisements paid by or on behalf of legally qualified candidates or their authorized committees would be subject to the requirements of the foreign sponsorship identification rules. The Commission recognized that there are statutory restrictions as well as Federal Election Commission rules prohibiting contributions to Federal, state, and local candidates by "foreign nationals," a term that is defined to include certain of the entities covered by its foreign sponsorship identification rules, specifically a "government of a foreign country" and a "foreign political party." *See* Federal Election Commission, 11 CFR 110.20(b) and (c); Department of Justice, 52 U.S.C. 30121(a). Because of these restrictions,

the likelihood that political candidate advertisements would require disclosures under the foreign sponsorship identification rules is greatly limited. Accordingly, the Commission was persuaded to exempt political candidate advertisements from the foreign sponsorship identification requirements.

51. However, issue advertisements and paid PSAs will be subject to the foreign sponsorship identification rules. For purposes of these rules, and consistent with the Act and the Commission's rules, the Commission clarified that issue advertisements are defined as any paid political matter or matter involving the discussion of a controversial issue of public importance, regardless of the length of the programming. *See* 47 U.S.C. 317(a)(2); 47 CFR 73.1212(e). As noted above, the Commission specifically exempted advertisements made by or on behalf of legally qualified candidates for public office or their authorized committees, and as such they will not be considered issue advertisements. Its exemption from the foreign sponsorship identification rules for political candidate advertisements is based largely on the fact that foreign nationals are prohibited from making contributions to political candidates. Moreover, section 315 of the Act provides a level of transparency regarding the source of funding for political candidate advertising that is not available with issue advertising and paid PSAs because section 315 requires political candidates themselves to state that their authorized committee has paid for the advertisement and that the candidate approves the advertisement. While foreign nationals also are prohibited from funding certain types of issue advertisements, the Commission's definition of issue advertisements for purposes of these rules is broader in scope in that its definition encompasses issue advertisements unrelated to elections. Therefore, the Commission cannot be as assured of foreign noninvolvement with respect to issue advertisements. Rather than adopt a definition that attempts to parse the different types of issue advertisements, and to ensure maximum transparency for viewers and listeners, the Commission applied the foreign sponsorship identification rules to all issue advertisements and paid PSAs.

52. As reflected in the *First R&O*, the Commission's definition of "lease" for purposes of the foreign sponsorship disclosure requirements includes "any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by

another party in return for some form of compensation." This definition is sufficiently broad to cover issue advertising and paid PSAs within the scope of the rules. This is a point that regulated entities well understood, as reflected in the filing of a Petition for Clarification. Certainly, paid PSAs and issue advertising could be used by foreign governmental entities to access U.S. airwaves to persuade the American public. Thus, ensuring that audiences are accurately informed when foreign governmental entities sponsor issue advertisements and paid PSAs is equally important as it is in the case of other types of paid programming. Indeed, section 317 of the Act recognizes the heightened concern about the source of issue advertisements, providing that the Commission shall not be precluded from requiring that an appropriate announcement shall be made at the time of the broadcast of any political program or program involving the discussion of any controversial issue for which any material was furnished as an inducement to the broadcast of such program. As such, it follows that such advertising should also be vetted for the possible inclusion of material provided by a foreign governmental entity.

53. The Commission's decision to make the foreign sponsorship identification rules applicable to issue advertisements and paid PSAs falls within the scope of this proceeding. In the *Second NPRM*, the Commission sought comment on "what criteria the Commission might adopt to distinguish between advertising and programming arrangements for the lease of airtime in a way that does not jeopardize the Commission's goals in this proceeding." Additionally, it sought, and received, comment on whether there are "key characteristics that could assist in distinguishing advertising spots from a lease of airtime on a station. . . ." In considering the key characteristics for political candidate advertisements, the Commission determined that the risk of influence by a "government of a foreign country" and a "foreign political party" is minimal. Therefore, such advertisements will be exempt from the foreign sponsorship identification rules. In contrast, as noted above, issue advertisements and paid PSAs do not share those same characteristics. Issue advertisements and paid PSAs cover a wide range of subject matter and are purchased by a wide range of sponsors. As such, there is a risk that contributions to such programming might have been made by foreign governmental entities.

54. Broadcasters allege that applying the rules to issue advertisements and paid PSAs will result in costly burdens that will discourage political advertisers from using traditional media by, among other things, slowing down transaction times for advertisements that rely on quick turnaround times, requiring that signatures be obtained, and necessitating training for advertising sales staff. This order alleviated a number of the proposed requirements contained in the *Second NPRM,* which broadcasters cited to as examples of burdens that would adversely impact them in the context of issue advertisements and paid PSAs. For example, this order significantly simplified and shortened the Commission's standardized certification templates, while also allowing broadcasters to use their own certification language should they choose to do so. Based on concerns raised in the record, the certification requirement contained in this order does not require licensees to obtain "signed certifications" as was proposed in the *Second NPRM,* but rather states that if a licensee does not obtain a response, or obtains an inadequate response to its reasonable diligence inquiries, it may continue to air the programming. To the extent that broadcasters are concerned about whether obtaining signed certifications might delay their ability to meet their current OPIF filing requirements under the political advertising rules, this order allows broadcasters to file their foreign sponsorship identification documentation in their own records. To the extent that broadcasters wish to keep all such documentation in their OPIFs, they need only supplement their OPIF file after receiving the certifications or screenshots. Therefore, the modifications made in this order to the proposals contained in the *Second NPRM* address many of the concerns identified by broadcasters regarding the application of the foreign sponsorship identification rules to issue advertisements and paid PSAs. The Commission concluded that the benefits of applying the foreign sponsorship identification rules to issue advertisements and paid PSAs outweigh the burdens associated with complying with the rules.

3. Programming on Noncommercial and Educational Stations

55. The Commission confirmed that the *Second R&O* does not alter its prior finding that the foreign sponsorship identification rules should not apply to NCEs. The Commission prohibits NCEs from receiving compensation in exchange for broadcasting programs (*i.e.,* leased programming). Because the foreign sponsorship identification rules apply only to leased programming, the Commission concluded in the *First R&O* that any NCEs in compliance with the prohibition should not fall within the ambit of the foreign sponsorship identification requirements. The *First R&O* explained that NCE stations will rarely, if ever, face the need to address the foreign sponsorship disclosure rules given the limitations on their ability to engage in leasing arrangements. The Commission confirmed that none of the newly-adopted rule modifications in the *Second R&O* has any effect on its previous conclusion.

3. Religious and Locally Produced and/or Locally Distributed Programming

56. The Commission declined to adopt commenters' request to create exemptions from the new foreign sponsorship identification rule requirements for certain types of programming. The Commission declined to revisit the existing rule requirements for the reasons set forth above. Commenters argued that the Commission should narrow the definition of "lease" by granting exemptions for certain categories of programming, specifically religious programming and locally produced and/or locally distributed programming. The Commission found that creating the requested exemption for religious programming would not be content-neutral. Additionally, the mere fact that programming is locally produced and/or locally distributed does not signify that the programming lacks material provided by a foreign governmental entity, such that there should be a blanket carveout for locally produced and/or distributed programming from the new foreign sponsorship identification rule requirements.

57. The Commission recognized that religious programming and locally produced and/or locally distributed programming play a vital role in supporting local communities. Just as important as having access to such programming is knowing the true source of the programming. Commenters made two arguments in favor of their requested exemptions. First, they asserted that these exemptions are justified because, based on their inquiries to date, they have not found any foreign governmental entities sponsoring religious programming or locally produced and/or locally distributed programming. Second, commenters claimed that the new foreign sponsorship identification rule requirements are so burdensome that, ultimately, they will lead to a reduction in religious and locally produced and/or locally distributed programming.

58. With regard to the first argument, the Commission emphasized that a prevalence of foreign propaganda on radio and television stations is not a prerequisite to Commission action. Furthermore, providing a consistent set of rules for all leased programming streamlines the process of compliance for licensees and closes the door to any attempt to exploit loopholes that might arise from these exemptions. In addition, the argument that there is a lack of foreign government-provided "propaganda" on religious or locally produced and distributed programming misses the aim of the Commission's rules. The foreign sponsorship identification rules are intended to notify the public when the source of the programming is a foreign governmental entity. Therefore, as a general principle of law, the content of the broadcast matter for purposes of these rules is irrelevant, and the issue of "propaganda" bears no weight.

59. On the issue of burdens, as described above, the new rule requirements are limited in scope, and the Commission modified significantly the proposals contained in the *Second NPRM* to address many of the burden concerns noted by commenters. The newly-adopted requirements do not seek to favor or disfavor any particular type of programming. The rules do not prohibit any form of programming, but do seek to ensure that broadcast audiences are aware of the source of foreign government-provided programming. The Commission determined that the new rule requirements should be applied to all broadcast licensees, to fulfill its existing statutory duty to inquire about the source of programming, which contains no exemption for religious programming lessees or any other designation. It also determined that the new rules are a minimal extension of the long-standing sponsorship identification rules and in no way burden broadcasters' choice of leased programming or chill editorial discretion in favor of more sophisticated programmers.

60. Some commenters contended that the new rule requirements will make it more expensive for licensees to air religious and locally produced and/or distributed programming. Citing *Washington Post* v. *McManus,* 944 F.3d 506 (4th Cir. 2019), they assert that the new rule requirements equate to "putting a thumb on the scale against a particular type of speech in the competitive market . . ." in violation of the First Amendment. The Commission

found the *McManus* case to be inapposite because that case involved the singling out of "one particular topic of speech—campaign-related speech," whereas the new rule requirements apply equally to all forms of speech and are not content-based.

61. In a similar vein, some commenters contended that the new rule requirements violate religious programmers' rights to freedom of speech under the Supreme Court's 2018 decision in *National Institute of Family and Life Advocates (NIFLA)* v. *Becerra,* 138 S.Ct. 2361 (2018). In that case, the Supreme Court held that to protect the petitioners' rights to freedom of speech, disclosure requirements must not be unduly burdensome, remedy a harm that is purely hypothetical, or extend more broadly than reasonably necessary. The Commission found this case, imposing a medical disclosure requirement, to be inapposite because the type of disclosure the Commission requires is wholly content-neutral. The *Becerra* case involved a content-based disclosure requirement, which was found to be an impermissible regulation of speech because the required disclosures in that case altered the content of petitioners' speech by requiring them to post information contrary to the messages they wished to convey. By contrast, the new requirements do not alter the content of the programming, nor do they prohibit or limit the ability of the licensee or lessee to air the programming or to convey whatever message is intended. The public has a legitimate interest in knowing the source of programming that is furnished by a foreign governmental entity, and broadcasters have demonstrated for years their capability of airing similar disclosures for programming sponsored by U.S. lessees. As described below, public awareness of the source of broadcast programming is a long-recognized compelling government interest, and the modifications the Commission has made in response to commenter concerns ensure that its rules are narrowly tailored.

62. The new foreign sponsorship identification rule requirements comport with the strictures of the First Amendment of the U.S. Constitution. The rules at issue here are content-neutral—they apply to broadcast programming provided by any foreign governmental entity, regardless of the nature of the programming or whether the entity's interests are directly at odds with the United States. Accordingly, with respect to broadcasters, the disclosure requirements in question are subject to review under "heightened

rational basis," the less rigorous standard applied to content-neutral restrictions on that medium, and thus, as explained below, will be upheld if reasonably tailored to satisfy a substantial government interest. Even assuming, that intermediate scrutiny applies, the new rules satisfy review under this standard. As set forth below, the Commission determined that the government's interest in ensuring that audiences are accurately informed when foreign governmental entities sponsor broadcast programming is substantial and the rules are both "reasonably tailored" to further that interest.

63. The Commission's application of section 317 for over eighty years, as well as Congress's 1960 amendments thereto, demonstrate a strong interest in requiring accurate sponsorship identification. Complete and accurate disclosure regarding the source of programming is critical to allowing audiences to determine the reliability and credibility of the information they receive. The Commission considers such transparency to be a critical part of broadcasters' public interest obligation to use the airwaves with which they are entrusted to benefit their local communities. Rather than abridging broadcasters' freedom of speech rights, disclosure of sponsorship promotes First Amendment and Communications Act goals by enhancing viewers' ability to assess the substance and value of foreign government-provided programming, thus promoting an informed public and improving the quality of public discourse. The new requirements further the government's interest by ensuring that licensees have met their duty of inquiry and thereby will ensure accurate sponsorship identification.

64. The Commission believes the newly-adopted foreign sponsorship identification rule requirements will be evaluated under, and will fully withstand, the scrutiny applied to content-neutral restrictions on broadcasters. Notably, the rules do not ban any type of speech but merely require a procedure for documenting reasonable diligence inquiries in support of the factual disclosure of the source of certain of programming. Given this content-neutral function, the existing tailoring, and the Commission's strong objective of accurate detection and disclosure of foreign government-provided programming, the rules comply with the First Amendment as they are reasonably tailored to satisfy substantial government interests. And even if a court were to apply intermediate scrutiny, as opposed to heightened rational basis, the revised

rules still would withstand such a stricter form of judicial review. The Commission has repeatedly stated the importance of promulgating rules that are substantially related to the agency's objective of ensuring that audiences are informed about the source of programming provided by foreign governmental entities. Ultimately, regardless of whether rational heightened basis or intermediate scrutiny is applied, the Commission concluded that its new foreign sponsorship identification rule requirements satisfy the First Amendment.

4. Programming on Stations With Section 325(c) Permits

65. As explained in the *Second NPRM,* "a section 325(c) permit is required when an entity produces programming in the United States but, rather than broadcasting the programming from a U.S.-licensed station, transmits or delivers the programming from a U.S. studio to a non-U.S. licensed station in a foreign country for broadcast by the foreign station into the United States." 47 U.S.C. 325(c). In the *First R&O,* the Commission added paragraph (k) to § 73.1212, which makes section 325(c) permittees subject to foreign sponsorship identification requirements. In the *Second NPRM,* the Commission explained that given the nature of the section 325(c) permits, pursuant to 47 U.S.C. 73.1212(k), the foreign sponsorship identification disclosure requirements apply to any programming permitted to be delivered to foreign broadcast stations under an authorization pursuant to section 325(c) of the Act if the material has been: (i) sponsored by a foreign governmental entity; (ii) paid for by a foreign governmental entity; (iii) furnished for free by a foreign governmental entity to the section 325(c) permit holder as an inducement to air the material on the foreign station; or (iv) provided by the section 325(c) permit holder to the foreign station where the section 325(c) permit holder is a foreign governmental entity. Where the section 325(c) permit holder itself is a foreign governmental entity, the disclosure requirements apply to all programming provided by the permit holder to a foreign station.

66. In the *Second NPRM,* the Commission noted that applying foreign sponsorship identification disclosures to programs permitted to be delivered to foreign broadcast stations under an authorization pursuant to section 325(c) of the Act aims to level the playing field between programming aired by non-U.S. and U.S. broadcasters in the same

geographic area within the United States and to eliminate any potential loophole in the regulatory framework with respect to the identification of foreign government-provided programming that may result from this proceeding.

67. In the *Second NPRM*, the Commission further stated that the foreign sponsorship identification rules apply to all programming provided by a section 325(c) permit holder to a foreign broadcast station, regardless of whether the programming is provided as part of a lease agreement or through some other arrangement. As explained, "[i]n the context of section 325(c) permits, leasing of airtime is not a relevant prerequisite for application of the foreign sponsorship identification rules because section 325(c) permit holders' foreign broadcast arrangements can be struck in various ways, not just through the leasing of airtime, under the laws of foreign countries." The Commission further explained that in this context, "[its] rules ensure that no material provided by a permit holder that is a foreign governmental entity is broadcast into the United States through the use of section 325(c) permits without the appropriate disclosures." To provide greater clarity regarding the application of these disclosure requirements in the context of programming subject to a section 325(c) permit, the Commission proposed to modify § 73.1212(k) and sought comment on these proposed changes and clarifications. The Commission also sought comment on the need to apply the reasonable diligence requirements proposed in the *Second NPRM* to section 325(c) permit holders given that they presumably have direct knowledge of whether they are a foreign governmental entity. The Commission noted that, regardless, "even if a permit holder is not itself a foreign governmental entity, the disclosure requirements apply to any part of its programming that is sponsored, paid for, or furnished for free by a foreign governmental entity either directly to the permit holder or to an entity farther back in the content production chain." To address such situations, the Commission sought comment on whether section 325(c) permit holders should be required to exercise reasonable diligence to determine when a disclosure is needed. In addition, the Commission sought comment on whether section 325(c) permit holders should be required to place the certifications that were proposed in the *Second NPRM*, or other due diligence documentation, in the International Bureau Filing System (IBFS) and if so, for how long.

68. No comments were submitted in response to the *Second NPRM* regarding the programming on stations with 325(c) permits. Accordingly, the Commission adopted the proposed changes and clarifications proposed in the *Second NPRM*. It reconfirmed that it is the responsibility of the section 325(c) permit holder to ensure that the foreign station broadcasts the disclosure where required along with the programming provided by the permit holder. The Commission reminded section 325(c) permit holders that they are obligated to place copies of any disclosures made, along with required related information as described in § 73.1212(k), in the publicly available International Communications Filing System (ICFS).

*C. Existing Leases*

69. Any lease agreements that are entered into, or that are renewed, on or after the effective date of the revisions to § 73.1212(j)(3) adopted in the *Second R&O* must comply with those requirements. Commenters asked that the Commission grandfather all lease agreements already in place at the time that the new rules go into effect. The Commission agreed with commenters and determined that the newly-adopted rule modifications will apply only to new leases and renewals of existing leases entered into on or after the effective date for these rule modifications. The Commission therefore declined to adopt its proposal in the *Second NPRM* to apply the modified rule to existing lease agreements with a six-month grace period for compliance.

*D. Digital Equity and Inclusion*

70. The Commission maintains a continuing effort to advance digital equity for all, including people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality. As such, in the *Second NPRM* the Commission sought comment on whether any of the proposals discussed therein might promote or inhibit advances in diversity, equity, inclusion, and accessibility. While not specifically responding to the request for comment on Digital Equity and Inclusion, some commenters argued that a certification requirement has the effect of discouraging diverse entrants by burdening local marketing agreements (LMAs) and time brokerage agreements (TBAs). Given the adopted revisions to the proposed rules in order to resolve claimed burdens, the Commission found that its actions will not inhibit diverse

entrants from participating in the broadcast media marketplace.

71. The *Second R&O* furthers the Commission's ongoing commitment to advance digital equity by simplifying its compliance procedures, which will minimize any possibility that the foreign sponsorship identification rules will discourage the participation of small programmers, including minority-owned programmers, as some commenters have asserted. Further, the *Second R&O* adopts regulations that are content-neutral and that apply to all broadcasters and lessees equally, and will not inhibit advances in diversity, equity, inclusion, and accessibility.

**IV. Procedural Matters**

72. *Regulatory Flexibility Act.* As required by the Regulatory Flexibility Act of 1980 (RFA), as amended, an Initial Regulatory Flexibility Certification was incorporated into the *Second NPRM*. See 5 U.S.C. 603. The RFA, see 5 U.S.C. 601 *et seq.*, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREA), Public Law 104–121, Title II, 110 Stat. 857 (1996). The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996. Pursuant to the RFA, the Commission's Final Regulatory Flexibility Certification relating to the *Second R&O* is below. See 5 U.S.C. 604.

73. *Paperwork Reduction Act.* The *Second R&O* may contain new or revised information collection requirements subject to the Paperwork Reduction Act of 1995, Public Law 104–13 (44 U.S.C. 3501–3520) (PRA). All such new or modified information collection requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding. In addition, the Commission notes that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), it previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. The Commission assessed the effects of the certification and screenshot requirement on licensees, and it found that the modifications in the *Second R&O* impose a minimal, justifiable burden on small entities.

74. *Congressional Review Act.* The Commission has determined, and Administrator of the Office of

Information and Regulatory Affairs, OMB, concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of the *Second R&O* to Congress and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

## V. Final Regulatory Flexibility Act Analysis

75. As required by the Regulatory Flexibility Act of 1980, 5 U.S.C. 603, as amended (RFA), an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Second NPRM,* released in October 2022. The Commission sought written public comment on the proposals in the *Second NPRM,* including comment on the IRFA. The Commission received no comments addressing the IRFA. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA. *See* 5 U.S.C. 604.

*A. Need for, and Objectives of, the Report and Order*

76. On April 22, 2021, the Commission released the *First R&O* adopting a requirement that radio and television broadcast station licensees transmit clear disclosures for programming that is provided by a foreign governmental entity. The *First R&O* also established procedures that licensees must follow to determine whether such a disclosure is required. The Commission promulgated these foreign sponsorship identification rules in response to reports of undisclosed foreign government programming being transmitted by U.S. broadcast stations. The Commission's rules established a definition of "foreign governmental entity" based on existing definitions, statutes, and regulations. The Commission's requirements apply to leased programming because the record in the underlying proceeding identified leased airtime as the primary means by which foreign governmental entities are accessing U.S. airwaves to persuade the American public without adequately disclosing the true sponsor. The Commission promulgated the foreign sponsorship identification rules based on a fundamental and long-standing tenet of broadcast regulation; namely, that the public has a right to know the identity of those soliciting their support.

77. On July 19, 2021, the ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates (collectively, the "Affiliates") filed a Petition for Clarification. The Affiliates assert that the exemption in the *First R&O* of "traditional, short-form advertising" from the foreign sponsorship identification rules creates confusion because the term has no established meaning in the broadcast industry.

78. On August 13, 2021, the National Association of Broadcasters (NAB) and two public interest groups (collectively, the "Petitioners") filed a Petition for Review of the Commission's *First R&O* with the U.S. Court of Appeals for the District of Columbia Circuit challenging the Commission's authority to impose one of the reasonable diligence requirements contained in the *First R&O.* Specifically, the *First R&O* required a licensee to confirm whether its lessee is a "foreign governmental entity," at the time of entering into a lease agreement and at renewal, by consulting the Department of Justice's Foreign Agent Registration Act (FARA) website and the semi-annual U.S.-based foreign media outlets reports.

79. On July 12, 2022, the D.C. Circuit vacated this verification requirement, holding that it exceeded the Commission's authority under section 317(c) of the Communications Act. The court left in place the remaining four requirements needed to satisfy the statutory reasonable diligence standard. Pursuant to these requirements, a broadcast licensee must at the time of entering into a new lease agreement, or at renewal:

(1) Inform the lessee of the foreign sponsorship disclosure requirement.

(2) Ask the lessee whether it falls into any of the categories that would qualify it as a "foreign governmental entity."

(3) Ask the lessee whether it knows if any individual/entity further back in the chain of producing/distributing the programming to be aired qualifies as a foreign governmental entity and has provided some type of inducement to air the programming.

(4) Memorialize the above-listed inquiries and retain such memorialization in its records for the remainder of the license term or for one year, whichever is longer.

80. On October 6, 2022, the Commission released its *Second NPRM,* which contained proposals to address the gap left in the foreign sponsorship identification rules by the D.C. Circuit's vacatur of the independent verification requirement. In addition, the *Second NPRM* gave interested parties the opportunity to comment on the pending Petition for Clarification "regarding the applicability of the foreign sponsorship identification rules to advertisements sold by local broadcast stations" and the application of the *Second NPRM's* proposals to section 325(c) permit holders.

81. The *Second R&O* replaces the vacated verification requirement with an approach that allows a licensee to choose between one of two options to comply with its statutory "reasonable diligence" requirement. Although licensees must choose one of these approaches, they need not choose the same approach for each lease or renewal agreement, even when the same lessee is involved. Compliance with one of these two approaches must be at the time of entering into any new lease agreement or renewing an existing lease agreement, unless the once-a-year exception described below applies. Under the first option, both the licensee and the lessee must complete a written certification either using the standardized certification language contained in Appendices C and D of the *Second R&O,* and set forth below, or using their own language, as long as the certifications written in their own language contain the information and inquiry requirements set out in § 73.1212(j)(3)(i) through (iii) of the Commission's rules, pursuant to the *First R&O.*

82. Under the second option, instead of asking the lessee to provide a responsive certification regarding its status, a licensee exercising this option would ask, consistent with the Commission's current foreign sponsorship identification rules, whether the lessee is a registered FARA agent, or is listed in the Commission's U.S.-based foreign media outlet report. If the lessee responds "no," the licensee would then ask the lessee to provide screenshots showing the results of lessee's searches of both of these websites. *See https://www.fcc.gov/ united-states-based-foreign-media-outlets,* which identifies the outlets that filed with the Commission in response to the National Defense Authorization Act for Fiscal Year 2019 (NDAA). The NDAA requires U.S.-based foreign media outlets to submit reports every six months to the Commission regarding the outlets' relations to their foreign principals. Licensees choosing this option must still comply with all other aspects of the current rule, as they have been required to do since the compliance date of the *First R&O.* Specifically, consistent with the existing foreign sponsorship identification rules, the licensee must inform the lessee about the foreign sponsorship disclosure requirement; inquire whether the lessee is either a "government of a foreign country" or a "foreign political party[;]" and inquire about the lessee's knowledge of anyone further back in the chain of producing/distributing the

programming who qualifies as a "foreign governmental entity" and may have provided an inducement to air the programming such as to trigger the need for a foreign sponsorship disclosure. *See* 47 CFR 73.1212(j)(3)(i) through (iii). Finally, also consistent with the existing foreign sponsorship identification rules, the licensee must memorialize those inquiries in some manner. *See* 47 CFR 73.1212(j)(3)(v).

83. Although proposed in the *Second NPRM,* in response to commenter concerns, the *Second R&O* determines that a licensee need not notify the Commission's Media Bureau when a lessee fails to respond to the licensee's queries. If, however, it is determined at a later date that the programming should have included a foreign sponsorship disclosure, the Commission may conduct a fact-specific inquiry to determine whether the licensee met its obligation under section 317(c) to "exercise reasonable diligence to obtain" the necessary information, such as by not making further inquiry of the lessee. Further, although the *Second NPRM* proposed requiring licensees to retain the certifications and screenshots in the licensees' own online public inspection file (OPIF), the *Second R&O* gives licensees more flexibility in deciding where to retain these records. Pursuant to the *Second R&O,* licensees may either file these records in their OPIF or retain these records in their internal files, as long as the documents are made available to the Commission promptly upon request. Licensees must retain all of their certifications and screenshots, along with a memorialization of inquiries accompanying the screenshots for the length of the license term or one year, whichever is longer.

84. In response to commenter concerns about frequently having to repeat the certification/screenshot process for short term leases, the *Second R&O* concludes that, where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, the licensee need only exercise its reasonable diligence obligations, including the certification or screenshot process, once per year. This modification of the proposals contained in the *Second NPRM* addresses concerns raised in the record about the burdens associated with the production of multiple certifications/ screenshots over a limited period of time when the lease concerns both the same lessee and same programming. The *Second R&O* provides an example of what is meant by "same lessee" and "same programming" in this context. An example of what is meant by "same

lessee" and "same programming" in this context would be House of Worship X leasing time for the live broadcast of its weekly religious service, every Sunday from 11 a.m. till 12 p.m. While the specific broadcasts would differ week to week, the lessee would continue to be House of Worship X and the program would be its live religious service broadcast. By contrast, if House of Worship X decides to use its regular time slot to provide something other than its weekly religious service—*e.g.,* a panel discussion with various civic leaders—that would be considered different programming that would not fall within the one year exemption, and, thus, would require licensee and lessee to engage in the reasonable diligence requirements laid out in the Commission's rules.

85. The *Second R&O* reconfirms the finding from the *First R&O* that the foreign sponsorship identification rules should not apply to noncommercial and educational stations (NCEs). The *Second R&O* also clarifies that the foreign sponsorship identification requirements will not apply to advertising for commercial products or services to the extent such advertising falls within the exemption established in § 73.1212(f) of the Commission's rules. The *Second R&O* also clarifies that the foreign sponsorship identification rules will not apply to political candidate advertisements. The *Second R&O,* however, determines that the foreign sponsorship identification rules will apply to issue advertisements and paid PSAs. The *Second R&O* declines to adopt commenters' request to create exemptions from the foreign sponsorship identification rules for religious programming and locally produced and/or locally distributed programming. The *Second R&O* finds that creating an exemption for religious programming would not be content-neutral. Additionally, the *Second R&O* determines that the mere fact that programming is locally produced and/or locally distributed does not signify that the programming lacks material provided by a foreign governmental entity, such that there should be a blanket carveout for locally produced and/or distributed programming from the foreign sponsorship identification rules.

86. The requirements adopted in both the *First R&O* and *Second R&O* will also apply to section 325(c) permit holders. However, because section 325(c) permit holders do not have OPIFs, they will file their foreign sponsorship disclosures in the publicly available International Communications Filing System (ICFS).

*B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA*

87. There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

*C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration*

88. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments. 5 U.S.C. 604(a)(3). The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

*D. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply*

89. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein. The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act (SBA). A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA. Below, the Commission provides a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

90. *Television Broadcasting.* This industry is comprised of "establishments primarily engaged in broadcasting images together with sound." *See* U.S. Census Bureau, 2017 NAICS Definition, "515120 Television Broadcasting," *https://www.census.gov/naics/?input=515120&year=2017&details=515120.* These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public. These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or

from external sources. The SBA small business size standard for this industry classifies businesses having $41.5 million or less in annual receipts as small. 13 CFR 121.201, NAICS Code 515120 (as of 10/1/22 NAICS Code 516120). 2017 U.S. Census Bureau data indicate that 744 firms in this industry operated for the entire year. Of that number, 657 firms had revenue of less than $25,000,000. Based on this data the Commission estimates that the majority of television broadcasters are small entities under the SBA small business size standard.

91. As of September 30, 2023, there were 1,377 licensed commercial television stations. Broadcast Station Totals as of September 30, 2023, Public Notice, DA 23–921 (rel. Oct. 3, 2023) (October 2023 Broadcast Station Totals PN), *https://docs.fcc.gov/public/ attachments/DA-23-921A1.pdf*. Of this total, 1,258 stations (or 91.4%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission estimates as of September 30, 2023, there were 383 licensed NCE television stations, 380 Class A TV stations, 1,889 LPTV stations and 3,127 TV translator stations. The Commission, however, does not compile and otherwise does not have access to financial information for these television broadcast stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard. Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of these television station licensees, the Commission presumes that all of these entities qualify as small entities under the above SBA small business size standard.

92. *Radio Broadcasting.* This industry is comprised of "establishments primarily engaged in broadcasting aural programs by radio to the public." *See* U.S. Census Bureau, 2017 NAICS Definition, "515112 Radio Stations," *https://www.census.gov/naics/?input= 515112&year=2017&details=515112*. Programming may originate in their own studio, from an affiliated network, or from external sources. The SBA small business size standard for this industry classifies firms having $41.5 million or less in annual receipts as small. U.S. Census Bureau data for 2017 show that 2,963 firms operated in this industry during that year. Of this number, 1,879 firms operated with revenue of less than

$25 million per year. Based on this data and the SBA's small business size standard, the Commission estimates a majority of such entities are small entities.

93. The Commission estimates that as of September 30, 2023, there were 4,452 licensed commercial AM radio stations and 6,670 licensed commercial FM radio stations, for a combined total of 11,122 commercial radio stations. Of this total, 11,120 stations (or 99.98%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition. In addition, the Commission estimates that as of September 30, 2023, there were 4,263 licensed NCE FM radio stations, 1,978 low power FM (LPFM) stations, and 8,928 FM translators and boosters. The Commission however does not compile, and otherwise does not have access to financial information for these radio stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard. Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of radio station licensees, the Commission presumes that all of these entities qualify as small entities under the above SBA small business size standard.

94. The Commission notes, however, that in assessing whether a business concern qualifies as "small" under the above definition, business (control) affiliations must be included. "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has the power to control both." 13 CFR 21.103(a)(1). Its estimate, therefore, likely overstates the number of small entities that might be affected by the Commission's action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies. In addition, another element of the definition of "small business" requires that an entity not be dominant in its field of operation. The Commission is unable at this time to define or quantify the criteria that would establish whether a specific radio or television broadcast station is dominant in its field of operation. Accordingly, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and is therefore possibly over-inclusive. An additional element of the definition of "small

business" is that the entity must be independently owned and operated. Because it is difficult to assess these criteria in the context of media entities, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and similarly may be over-inclusive.

*E. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities*

95. The *Second R&O* gives licensees the choice between one of two options to comply with their statutory "reasonable diligence" requirement. Although licensees must choose one of these approaches, they need not choose the same approach for each lease or renewal agreement, even when the same lessee is involved. Compliance with one of these two approaches must be at the time of entering into any new lease agreement or renewing an existing lease agreement, unless the once-a-year exception described below applies. Under the first option, both the licensee and the lessee must complete a written certification either using the standardized certification language contained in Appendices C and D of the *Second R&O*, and set forth below, or using their own language, as long as the certifications written in their own language contain the information and inquiry requirements set out in § 73.1212(j)(3)(i) through (iii) of the Commission's rules, pursuant to the *First R&O*. Specifically, a licensee's certification should:

(1) inform the lessee of the foreign sponsorship disclosure requirement;

(2) ask the lessee whether it falls into any of the categories that would qualify it as a "foreign governmental entity;"

(3) ask the lessee whether it knows if any individual/entity further back in the chain of producing and/or distributing the programming to be aired qualifies as a foreign governmental entity and has provided some type of inducement to air the programming;

(4) seek a written certification in response from the lessee; and

(5) obtain the necessary information for a disclosure if one is required.

96. A lessee's certification should convey the information needed to determine whether a disclosure is required and the information needed for a broadcast disclosure if one is required. *See* 47 CFR 73.1212(j)(1).

97. Regardless of whether the Commission's templates or a licensee's and lessee's own certifications are used, both the licensee's and lessee's certifications must be dated and signed by an employee or other representative

of the entity who can attest to the fact that these actions were taken.

98. Under the second option, instead of asking the lessee to provide a responsive certification regarding its status, a licensee exercising this option would ask, consistent with the Commission's current foreign sponsorship identification rules, whether the lessee is a registered FARA agent or is listed in the Commission's U.S.-based foreign media outlet report. If the lessee responds "no," the licensee would then ask the lessee to provide screenshots showing the results of lessee's searches for its own name on both of these websites. The FARA website provides for an "Active Registrants" search link, and the *Second R&O* recommends that lessees use this link because the Commission's rules only cover those FARA agents who are currently registered on the Department of Justice FARA site. In response to concerns raised in the record about having to input "exact names" into the search feature, the *Second R&O* emphasizes that lessees are looking for their *own names*. A lessee is not doing a FARA database search to *learn* whether it is registered such as to necessitate experimenting with different iterations of its name. A lessee, or someone within lessee's organization, would know whether it is a FARA registrant, or U.S.-based foreign media outlet. As such, the lessee will only be providing screenshots if, in response to licensee's queries, the lessee states that it is neither a FARA agent nor a U.S.-based foreign media outlet.

99. With regard to searches of the Commission's U.S.-based foreign media outlet site, the Commission's website lists the names of all the entities that have reported as U.S.-based foreign media outlets, and all that is required is a screenshot of this list to show whether the lessee's name appears on the list at the time of the licensee's required inquiries. Licensees choosing this option must still comply with all other aspects of the current rule, as they have been required to do since the compliance date of the *First R&O*. Specifically, consistent with the existing foreign sponsorship identification rules, the licensee must inform the lessee about the foreign sponsorship disclosure requirement; inquire whether the lessee is either a "government of a foreign country" or a "foreign political party[;]" and inquire about the lessee's knowledge of anyone further back in the chain of producing/distributing the programming who qualifies as a "foreign governmental entity" and may have provided an inducement to air the programming such as to trigger the need

for a foreign sponsorship disclosure. Moreover, consistent with the certification option, a licensee should also ask the lessee to update it if there has been a change in the lessee's status or the status of anyone further back in the chain of producing/distributing the programming so as to trigger the need for a foreign sponsorship disclosure. Finally, also consistent with the existing foreign sponsorship identification rules, the licensee must memorialize those inquiries in some manner.

100. Although proposed in the *Second NPRM*, in response to commenter concerns, the *Second R&O* determines that a licensee need not notify the Commission's Media Bureau when a lessee fails to respond to the licensee's queries. If, however, it is determined at a later date that the programming should have included a foreign sponsorship disclosure, the Commission may conduct a fact-specific inquiry to determine whether the licensee met its obligation under section 317(c) of the Communications Act to "exercise reasonable diligence to obtain" the necessary information, such as by not making further inquiry of the lessee. Further, although the *Second NPRM* proposed requiring licensees to retain the certifications and screenshots in the licensees' own OPIF, the *Second R&O* gives licensees more flexibility in deciding where to retain these records. Pursuant to the *Second R&O*, licensees may either file these records in their OPIF or retain these records in their internal files, as long as the documents are made available to the Commission promptly upon request. Licensees must retain all of their certifications and screenshots, along with memorialization of inquiries accompanying the screenshots for the length of the license term or one year, whichever is longer.

101. In response to commenter concerns about frequently having to repeat the certification/screenshot process for short term leases, the *Second R&O* concludes that, where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, the licensee need only exercise its reasonable diligence obligations, including the certification or screenshot process, once per year. This modification of the proposals contained in the *Second NPRM* addresses concerns raised in the record about the burdens associated with the production of multiple certifications/screenshots over a limited period of time when the lease concerns both the same lessee and lease.

102. The *Second R&O* reconfirms the finding from the *First R&O* that the foreign sponsorship identification rules

should not apply to NCEs. The *Second R&O* also clarifies that the foreign sponsorship identification requirements will not apply to advertising for commercial products or services to the extent such advertising falls within the exemption established in § 73.1212(f) of the Commission's rules. The *Second R&O* declines to adopt commenters' request to create exemptions from the foreign sponsorship identification rules for religious programming and locally produced and/or locally distributed programming. The *Second R&O* finds that creating an exemption for religious programming would not be content-neutral. Additionally, the *Second R&O* determines that the mere fact that programming is locally produced and/or locally distributed does not signify that the programming lacks material provided by a foreign governmental entity, such that there should be a blanket carveout for locally produced and/or distributed programming from the foreign sponsorship identification rules.

103. The requirements adopted in both the *First R&O* and *Second R&O* will also apply to section 325(c) permit holders. However, because section 325(c) permit holders do not have OPIFs, they will file their foreign sponsorship disclosures in the publicly available International Communications Filing System (ICFS).

104. Any lease agreements that are entered into, or that are renewed, on or after the date that the Media Bureau publishes in the **Federal Register** an announcement that the Office of Management and Budget (OMB) has completed any review required under the Paperwork Reduction Act of the rule modifications contained in the *Second R&O* must comply with the requirements laid out in the *Second R&O*. Based on commenter concerns about having to redo work associated with existing leases that comply with the current foreign sponsorship identification rules, the Commission determines that the rule modifications contained in the *Second R&O* will apply only to new leases and renewals of existing leases entered into on or after the required compliance date for those rule modifications. The *Second R&O* directs the Commission's Media Bureau to announce the compliance date for the new rules via public notice and to revise § 73.1212 of the rules accordingly.

*F. Steps Taken To Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered*

105. The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the

significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected[.]'' 5 U.S.C. 604(a)(6).

106. The *Second R&O* carefully considers the concerns raised by commenters, a number of which may represent, or themselves be, small entities. In response to commenter concerns about burdens, the *Second R&O* gives licensees greater flexibility than initially proposed in the *Second NPRM* to determine how best to comply with the inquiry memorialization requirement. In response to commenter concerns that the standardized certification language proposed in the *Second NPRM* was too lengthy, complex, and full of legalese, the *Second R&O* greatly reduces the length and complexity of the standardized language and now employs a simple check-box approach. The *Second R&O* allows licensees to use their own certification language in response to comments expressing concerns about licensees that already have developed their own certifications based on the existing foreign sponsorship identification rules and for whom revising these certifications would be costly. The inquiries that must be contained in the self-generated certifications align with the requirements contained in the *First R&O* and, thus, previous certifications that are consistent with that order may not need to be modified. Finally, the *Second R&O* also offers a licensee the option to not use certifications at all, but to instead seek from its lessee screenshots of the lessee's search of two Federal websites to demonstrate whether the lessee's name appears on the sites, as well as requiring the licensee to memorialize some additional queries, pursuant to the *First R&O*, made to a lessee.

107. The *Second NPRM* proposed that licensees should retain all certifications in their OPIFs. However, in response to commenter concerns about this requirement, the *Second R&O* merely requires licensees to retain copies of certifications and screenshots in their personal files, with the option of uploading the documentation into their OPIF if they choose. The certification and screenshot requirements adopted in the *Second R&O* apply only to new leases and renewals of existing leases entered into on or after the required compliance date for the rule modifications. In response to

commenter concerns about having to redo work associated with existing leases that comply with the current foreign sponsorship identification rules, the *Second R&O* determines that the rule modifications contained in the *Second R&O* will apply only to new leases and renewals of existing leases entered into on or after the required compliance date for those rule modifications. In response to some commenters' concerns regarding the unique economic challenges of applying the rules to short-term recurring leases, the *Second R&O* concludes that, where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, the licensee need only exercise its reasonable diligence obligations, including the certification or screenshot process, once per year. In light of concerns raised in the record regarding the proposal that licensees report to the Commission instances in which lessees fail to respond to licensee queries, the *Second R&O* determines that the licensee need not notify the Media Bureau about a licensee's failure to respond and may still choose air the programming.

*G. Report to Congress*

108. The Commission will send a copy of the *Second R&O,* including this FRFA, in a report to Congress pursuant to the Congressional Review Act. 5 U.S.C. 801(a)(1)(A). In addition, the Commission will send a copy of the *Second R&O,* including the FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.

# VI. Ordering Clauses

109. Accordingly, *it is ordered* that, pursuant to the authority contained in sections 1, 2, 4(i), 4(j), 303(r), 307, 317, and 325(c) of the Communications Act, 47 U.S.C. 151, 152, 154(i), 154(j), 303(r), 307, 317, and 325(c) the *Second R&O is adopted.*

110. *It is further ordered* that the Petition for Clarification filed by ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates *is dismissed as moot.*

111. *It is further ordered* that the *Second R&O shall be effective* August 15, 2024, except that the revisions to § 73.1212(j)(3) of the Commission's rules, 47 CFR 73.1212(j)(3), which may contain new or modified information collection requirements, will not be required until the Office of Management and Budget completes review of any information collection requirements that the Media Bureau determines is

required under the Paperwork Reduction Act. The Commission further directs the Media Bureau to announce the effective date for the revisions to § 73.1212(j)(3) by subsequent Public Notice.

112. *It is further ordered* that the Commission's Office of the Secretary, Reference Information Center, *shall send* a copy of the *Second R&O,* including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

113. *It is further ordered* that Office of the Managing Director, Performance Program Management, *shall send* a copy of the *Second R&O* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. 801(a)(1)(A).

# VII. Approved Templates

*Approved Template for Licensee Certification*

Name of Licensee: _____
Name of Lessee: _____
Name of Program: _____
Nature of Lease: New:_____
Renewal:_____

_____ Licensee informed Lessee that FCC regulations require that a disclosure accompany programming that is sponsored, paid for, or furnished by a foreign governmental entity.

_____ Licensee asked Lessee whether Lessee is a foreign governmental entity. A foreign governmental entity can be a foreign government, a foreign political party, an agent of a foreign principal, or a U.S.-based foreign media outlet.[1]

---

[1] *See* 47 CFR 73.1212(j). If more information is needed regarding the definition of a foreign governmental entity, see the FCC's rules at 47 CFR 73.1212(j)(2)(i) through (iv), which provide that:

(i) The term ''government of a foreign country'' has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. 611(e);

(ii) The term ''foreign political party'' has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. 611(f);

(iii) The term ''agent of a foreign principal'' has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. 611(c)), and who is registered as such with the Department of Justice, and whose ''foreign principal'' is a ''government of a foreign country,'' a ''foreign political party,'' or directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a ''government of a foreign country'' or a ''foreign political party'' as defined in subsection 73.1212(j)(2)(i) and (ii), and that is acting in its capacity as an agent of such ''foreign principal;'' and

(iv) The term ''United States-based foreign media outlet'' has the meaning given such term in section
Continued

_____Licensee asked Lessee whether it knows if any individual/entity in the chain of producing or distributing the programming is a foreign governmental entity and has provided some type of inducement to air the programming.[2]

_____Licensee sought from Lessee a written response certifying Lessee's answers. Lessee did_____ did not_____ provide a written certification.

_____If applicable, Licensee obtained from Lessee the information needed to add the following disclosure to Lessee's programming: "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]."

On behalf of Licensee, I certify that the above statements are accurate.

_____
Name and Position

_____
Signature

_____
Date

*Approved Template for Lessee Certification*

*Name of Licensee:* _____
*Name of Lessee:* _____
*Name of Program:* _____
Nature of Lease: New_____
Renewal: _____
1. Lessee is a foreign governmental entity. A foreign governmental entity can be a foreign government, a foreign political party, an agent of a foreign principal, or a U.S.-based foreign media outlet [3] Yes:_____
No: _____

_____
[2] If the programming is political in nature, or involves the discussion of a controversial issue, the FCC disclosure requirements apply even if no compensation or payment, other than the programming itself, was provided as an inducement to air the program.

[3] *See* 47 CFR 73.1212(j). If more information is needed regarding the definition of a foreign governmental entity, see the FCC's rules at 47 CFR 73.1212(j)(2)(i) through (iv), which provide that:

(i) The term "government of a foreign country" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. 611(e);

(ii) The term "foreign political party" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. 611(f);

(iii) The term "agent of a foreign principal" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. 611(c)), and who is registered as such with the Department of Justice, and whose "foreign principal" is a "government of a foreign country," a "foreign political party," or

_____If Yes, Lessee is an entity of the country of_____.
2. Lessee knows of an individual/entity in the chain of producing or distributing the programming that is a foreign governmental entity and has provided some type of inducement to air the programming.[4] Yes: _____
No:_____
_____If Yes, the name of the individual/ entity is_____.
_____If Yes, the name of the country is_____.
3. If applicable, Lessee has provided Licensee with the information needed to append the following disclosure to lessee's programming, consistent with the FCC's rules at 47 CFR 73.1212(j)(1)(i):

"The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]."

On behalf of Lessee, I certify that the above statements are accurate.

_____
Name and Position

_____
Signature

_____
Date

## List of Subjects in 47 CFR Part 73

Radio, Reporting and recordkeeping requirements, Television.

Federal Communications Commission.

**Katura Jackson,**
*Federal Register Liaison Officer.*

## Final Rules

For the reasons discussed in the preamble, the Commission amends 47 CFR part 73 as follows:

## PART 73—RADIO BROADCAST SERVICES

■ 1. The authority citation for part 73 continues to read as follows:

_____
directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a "government of a foreign country" or a "foreign political party" as defined in subsection 73.1212(j)(2)(i) and (ii), and that is acting in its capacity as an agent of such "foreign principal;" and

(iv) The term "United States-based foreign media outlet" has the meaning given such term in Section 722(a) of the Communications Act of 1934 (47 U.S.C. 624(a)).

[4] If the programming is political in nature, or involves the discussion of a controversial issue, the FCC disclosure requirements apply even if no compensation or payment, other than the programming itself, was provided as an inducement to air the program.

**Authority:** 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

■ 2. Effective August 15, 2024, amend § 73.1212 by adding paragraph (j)(8) and revising paragraph (k) to read as follows:

### § 73.1212  Sponsorship identification; list retention; related requirements.

\*    \*    \*    \*    \*

(j) \* \* \*
(8) The requirements contained in this paragraph (j) shall not apply to "uses" of broadcast stations by legally qualified candidates pursuant to 47 U.S.C. 315.

(k) Where any material delivered to foreign broadcast stations under an authorization pursuant to section 325(c) of the Communications Act (47 U.S.C. 325(c)) has been sponsored by a foreign governmental entity; paid for by a foreign governmental entity; furnished for free by a foreign governmental entity to the section 325(c) permit holder as an inducement to air the material on the foreign station; or provided by the section 325(c) permit holder to the foreign station where the section 325(c) permit holder is a foreign governmental entity, the material must include, at the time of broadcast, the following disclosure, in conformance with the terms of paragraphs (j)(4) through (6) of this section: "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]." A section 325(c) permit holder shall ensure that the foreign station will broadcast the disclosures along with the material and shall place copies of the disclosures required along with the name of the program to which the disclosures were appended in the International Communications Electronic Filing System (ICFS) under the relevant ICFS section 325(c) permit file. The filing must state the date and time the program aired. In the case of repeat airings of the program, those additional dates and times should also be included. Where an aural announcement was made, its contents must be reduced to writing and placed in the ICFS in the same manner. The section 325(c) permit holder shall exercise reasonable diligence to ascertain whether the foreign sponsorship disclosure requirements of paragraphs (j)(1) and (4) through (6) of this section apply to any material delivered to a foreign broadcast station, including obtaining from its employees, and from other persons with which it deals directly in connection with any matter for broadcast, and in the same manner prescribed for broadcast stations in paragraph (j)(3) of this section, information to enable the permit holder

to include the announcement required by this section; memorializing its conduct of such reasonable diligence; and retaining such documentation in its records for either the remainder of the then-current permit term or one year, whichever is longer, so as to respond to any future Commission inquiry. The term *foreign governmental entity* shall have the meaning set forth in paragraph (j)(2) of this section.

■ 3. Delayed indefinitely, further amend § 73.1212 by revising paragraphs (j)(3) introductory text and (j)(3)(iv) and (v) to read as follows:

### § 73.1212   Sponsorship identification; list retention; related requirements.

\* \* \* \* \*

(j) \* \* \*

(3) The licensee of each broadcast station shall exercise reasonable diligence to ascertain whether the foreign sponsorship disclosure requirements in paragraph (j)(1) of this section apply at the time of the lease agreement and at any renewal thereof, or apply within a one-year period if the lessee and the programming remain unchanged, including:

\* \* \* \* \*

(iv) Memorializing that the licensee has complied with the requirements in paragraphs (j)(3)(i) through (iii) of this section and has sought to obtain a response from the lessee with the information needed to determine if a disclosure is necessary, and if one is necessary, the information needed to make the disclosure, either:

(A) By executing a written certification attesting to the licensee's compliance and by seeking a written certification from the lessee; or

(B) By complying with the information requirement contained in paragraph (j)(3)(i) of this section and by asking the lessee to provide screenshots of its searches of the Department of Justice's FARA website and the Commission's semi-annual U.S.-based foreign media outlets reports, in the event that lessee has stated it is neither a FARA agent nor a U.S.-based foreign media outlet, and asking lessee to provide other information needed to make such a determination (*i.e.,* asking lessee whether it falls into the categories listed in paragraphs (j)(2)(i) and (ii) of this section that are not covered by the request for screenshots), and by making a record of the licensee's compliance efforts; and

(v) Retaining the documentation in the licensee's records for the remainder of the then-current license term or one year, whichever is longer, so as to respond to any future Commission inquiry.

\* \* \* \* \*

[FR Doc. 2024–15259 Filed 7–15–24; 8:45 am]
**BILLING CODE 6712–01–P**

---

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

### 50 CFR Part 648

**[Docket No.: 240314–0080; RTID 0648–XE110]**

### Fisheries of the Northeastern United States; Atlantic Sea Scallop Fishery; Closure of the Area I, Area II, and New York Bight Scallop Access Areas to General Category Individual Fishing Quota Scallop Vessels

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; closure.

**SUMMARY:** NMFS announces that the Area I, Area II, and New York Bight Scallop Access Areas are closed to Limited Access General Category Individual Fishing Quota scallop vessels for the remainder of the 2024 fishing year. Regulations require this action once it is projected that 100 percent of trips allocated to the Limited Access General Category Individual Fishing Quota scallop vessels for the Area I, Area II, and New York Bight Scallop Access Areas will be taken. This action is intended to prevent the number of trips in the Area I, Area II, and New York Bight Scallop Access Areas from exceeding what is allowed under the Atlantic Sea Scallop Fishery Management Plan.

**DATES:** Effective 0001 hr local time, July 13, 2024, through March 31, 2025.

**FOR FURTHER INFORMATION CONTACT:** Travis Ford, Fishery Policy Analyst, (978) 281–9233.

**SUPPLEMENTARY INFORMATION:** Regulations governing fishing activity in the Sea Scallop Access Areas can be found in 50 CFR 648.59 and 648.60. These regulations authorize vessels issued a valid Limited Access General Category (LAGC) Individual Fishing Quota (IFQ) scallop permit to fish in the Area I, Area II, and New York Bight Scallop Access Areas under specific conditions, including a total of 856 trips, combined, that may be taken during the 2024 fishing year. Section 648.59(g)(3)(iii) requires NMFS to close an Access Area to LAGC IFQ permitted

vessels for the remainder of the fishing year once it determines that the allocated number of trips for the fishing year are projected to be taken.

NMFS is required to monitor LAGC IFQ quota at a trip basis. The best scientific information available shows that July 13, 2024, is the appropriate date to close the areas given the current trip count, and likely mathematical extrapolations of trip counts until the closure date. We have taken into account that upon announcement of this closure, vessels are able to declare into the fishery before the closure date. LAGC IFQ scallop vessels provided trip declarations for fishing in the Area I, Area II, and New York Bight Scallop Access Areas to NMFS through the Vessel Monitoring System. NMFS performed a projection analysis using fishing effort data and determined that 856 trips would likely be taken by July 13, 2024.

Therefore, in accordance with § 648.59(g)(3)(iii), NMFS is closing the Area I, Area II, and New York Bight Scallop Access Areas to all LAGC IFQ scallop vessels as of July 13, 2024. No vessel issued an LAGC IFQ permit may fish for, possess, or land scallops in or from the Area I, Area II, or New York Bight Scallop Access Areas after 0001 hr local time, July 13, 2024. Any LAGC IFQ vessel that has declared into the Area I, Area II, or New York Bight Scallop Access Areas scallop fishery, complies with all trip notification and observer requirements, and crossed the Vessel Monitoring System demarcation line on the way to the area before 0001 hr, July 13, 2024, may complete its trip without being subject to this closure. This closure is in effect for the remainder of the 2024 scallop fishing year, through March 31, 2025.

### Classification

NMFS issues this action pursuant to section 305(d) of the Magnuson-Stevens Fishery Conservation and Management Act. This action is required by 50 CFR part 648, which was issued pursuant to section 304(b), and is exempt from review under Executive Order 12866.

Pursuant to 5 U.S.C. 553(b)(B), there is good cause to waive prior notice and an opportunity for public comment on this action, as notice and comment would be impracticable and contrary to the public interest. The Area I, Area II, and New York Bight Scallop Access Areas opened for the 2024 fishing year on April 1, 2024. This closure is not discretionary under § 648.59(g)(3)(iii); NMFS must close the areas once when it determines the trip allocation will be reached. This closure ensures that LAGC IFQ scallop vessels do not take