## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF BROADCASTERS, | ) ) ) | |
| Petitioner, | ) ) | Case No. 24-1296 |
| v. | ) ) | |
| FEDERAL COMMUNICATIONS COMMISSION and | ) ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Respondents. | ) | |

## UNDERLYING DECISION FROM WHICH APPEAL ARISES

Pursuant to the Court's order of September 13, 2024, Petitioner National Association of Broadcasters hereby files a copy of the underlying Federal Communications Commission order that is the subject of the above-captioned appeal. The order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, Second Report and Order, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024), is attached hereto as Exhibit A.

October 15, 2024

Respectfully submitted,

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
stephenkinnaird@paulhastings.com
*Attorney for Petitioner National Association of Broadcasters*

/s/ Richard Kaplan
Richard Kaplan
Jerianne Timmerman
Erin L. Dozier
NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street, SE
Washington, DC  20003

**CERTIFICATE OF SERVICE**

I, Richard Kaplan, hereby certify that on October 15, 2024, I filed the foregoing copy of the underlying decision with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the electronic CM/ECF system which will serve participants in this case who are registered CM/ECF users.

/s/ Richard Kaplan

Richard Kaplan
*Attorney for Petitioner National
Association of Broadcasters*

# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Sponsorship Identification Requirements for | **)** | MB Docket No. 20-299 |
| Foreign Government-Provided Programming | **)** | |
| | **)** | |

**SECOND REPORT AND ORDER**

**Adopted:  May 31, 2024**                    **Released:  June 10, 2024**

By the Commission:  Chairwoman Rosenworcel issuing a statement; Commissioner Carr dissenting in part and issuing a statement; Commissioner Simington dissenting and issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                                             Paragraph #

I.   INTRODUCTION ..................................................................................................................1
II.  BACKGROUND ....................................................................................................................4
III. DISCUSSION........................................................................................................................13
     A. Obtaining Information from Lessees ..............................................................................14
        1. Licensees Must Comply with One of Two Approaches...........................................17
        2. Leases Renewed Within A One-Year Period ...........................................................26
        3. Lack of Adequate Response from Lessee .................................................................28
        4. Recordkeeping Requirement .....................................................................................29
        5. Legal Authority .........................................................................................................31
     B. Application of Foreign Sponsorship Identification Requirements to Different Types of
        Programming...................................................................................................................41
        1. Advertisements for Commercial Goods and Services................................................42
        2. Political Candidate Advertisements; Issue Advertisements; Paid Public Service
           Announcements..........................................................................................................46
        3. Programming on Noncommercial and Educational Stations......................................51
        4. Religious and Locally Produced and/or Locally Distributed Programming .............52
        5. Programming on Stations with Section 325(c) Permits ............................................61
     C. Existing Leases ...............................................................................................................65
     D. Digital Equity and Inclusion ...........................................................................................66
IV. PROCEDURAL MATTERS....................................................................................................68
V.  ORDERING CLAUSES ..........................................................................................................71
Appendix A – Final Rules
Appendix B – Final Regulatory Flexibility Act Analysis
Appendix C – Approved Template for Licensee Certification
Appendix D – Approved Template for Lessee Certification

I.    **INTRODUCTION**

1.      This Second Report and Order (*Second R&O*) takes steps to ensure clear and reasonable foreign sponsorship identification rules.  In April 2021, the Commission issued a Report and Order (*First R&O*) adopting a requirement that radio and television stations broadcast clear disclosures for programming that is provided by a foreign governmental entity and set forth the procedures for exercising

reasonable diligence to determine whether such a disclosure is needed.[1]  The Commission took this action in response to reports that U.S. broadcast stations were transmitting undisclosed foreign governmental programming, against the backdrop of over ninety years of sponsorship identification regulations that ensure the public is informed when airtime has been purchased on broadcast stations in an effort to persuade audiences.[2]

2.       In this *Second R&O*, we address a ruling by the U.S. Court of Appeals for the District of Columbia Circuit that vacated one of the foreign sponsorship identification requirements established in the *First R&O*.[3]  We replace the vacated verification requirement with an approach that avoids the investigatory obligation on the part of licensees that was at issue in *NAB v. FCC*.  The new approach provides licensees with two options for demonstrating that they have met their duty of inquiry in seeking to obtain the information needed to determine whether the programming being provided by a lessee is sponsored by a foreign governmental entity.  Our adopted approach addresses concerns about burdens and complexity raised by commenters in response to the Second Notice of Proposed Rulemaking (*Second NPRM*).[4]

3.       Furthermore, in this order, we clarify that our foreign sponsorship identification rules do not apply to sales of advertising for commercial goods and services to the extent such programming falls within the exemption contained in section 73.1212(f) of our general sponsorship identification rules.[5]  In addition, we find that our foreign sponsorship identification rules will not apply to political candidate advertisements, but will apply to issue advertisements and paid public service announcements ("paid PSAs").  We also confirm that our rule changes do not alter our finding in the *First R&O* that

---

[1] *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, Report and Order, 36 FCC Rcd 7702 (2021) (*First R&O*).  The *First R&O* defined the term "foreign governmental entity" include those entities or individuals that would trigger a disclosure pursuant to the foreign sponsorship identification rules.  *Id.* at 7708-13, paras. 14-23.  This *Second R&O* retains the same definition of "foreign governmental entity" as that established in the *First R&O*.  *See infra* note 11 (providing the definition of the term "foreign governmental entity" as it appears in section 73.1212(j)(2) of our rules).

[2] *See, e.g.*, *First R&O*, 36 FCC Rcd at 7702-03, para. 1, n.1 (describing reports of undisclosed foreign government programming being transmitted over U.S. radio stations).  *See also Sponsorship Identification Requirements for Foreign Government-Provided Programming,* Notice of Proposed Rulemaking, 35 FCC Rcd 12099-105, paras. 1-11 (2020) (*First NPRM*) (describing the evolution of the statutory sponsorship identification requirements in section 317 of the Act and the Commission's implementing regulations); Beijing's Global Media Influence 2022, *Freedom House*, https://freedomhouse.org/country/united-states/beijings-global-media-influence/2022 (noting the role that broadcast media plays in Chinese foreign media strategy); Homeland Threat Assessment 2024, Office of Intelligence and Analysis, *U.S. Department of Homeland Security* at 6, https://www.dhs.gov/sites/default/files/2023-09/23_0913_ia_23-333-ia_u_homeland-threat-assessment-2024_508C_V6_13Sep23.pdf (noting that Russia likely will continue to use traditional media, in addition to other media, "to amplify pro-Kremlin narratives and conduct influence activities within the United States").  We note that the Commission's foreign sponsorship identification rules are leading to the filing of disclosures and, thus, providing greater transparency about the source of foreign government-provided programming.  *See, e.g.*, the KICU-TV disclosures in the Commission's online public inspection files, https://publicfiles.fcc.gov/tv-profile/KICU-TV/Foreign%20Government-Provided%20Programming%20Disclosures/b49ff051-115a-56e5-dc89-26bc7a359925, and the WKTB-CD disclosure in the Commission's online public inspection files, https://publicfiles.fcc.gov/tv-profile/WKTB-CD/Foreign%20Government-Provided%20Programming%20Disclosures/eec0ba4b-2571-d333-72de-8fd961d05872.

[3] *See National Association of Broadcasters, et al., v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022) (*NAB v. FCC*).  The ruling did not affect the remainder of the foreign sponsorship identification requirements adopted in the *First R&O.*

[4] Sponsorship Identification Requirements for Foreign Government-Provided Programming, MB Docket No. 20-299, Second Notice of Proposed Rulemaking, 37 FCC Rcd 12004 (2022) (Second NPRM).

[5] *See* 47 CFR § 73.1212(f); *see also* Petition for Clarification, MB Docket No. 20-299 (filed July 19, 2021) at 2-5 (seeking clarification that "the new foreign sponsorship ID rules do not apply when a station sells time to advertisers in the normal course of business, no matter the length of the advertisement").

noncommercial and educational broadcast stations (NCEs) are not likely to fall within the ambit of the foreign sponsorship identification rules.[6]  We decline to create an exemption from the rules for religious programming and locally produced and/or distributed programming.  We also conclude that, when a lessee and licensee enter into recurring leases for the same programming, the licensee will be required to exercise its reasonable diligence obligations under the rule only once per year with respect to that particular lessee and that particular programming.  With respect to the rule changes adopted today, we grandfather lease agreements already in effect at the time of the required compliance date for these newly-adopted modifications, determining that such leases will need to come into compliance either at the time of renewal or when the parties to the agreement enter into a new lease.  Finally, we clarify the obligations of section 325(c) permittees under the foreign sponsorship identification rules.

## II.      BACKGROUND

4.        Section 317 of the Communications Act and the Commission's implementing regulations under section 73.1212 have long required broadcast licensees to inform their audiences when programming is being aired in exchange for payment or compensation to the station.[7]  While section 310(a) of the Act prohibits foreign governments and their representatives from holding a broadcast license, there is no limitation on their ability to enter into a contract with the licensee of a station to air programming of their choosing, or even to lease the entire capacity of a radio or television station.[8]  In the *First R&O*, the Commission amended the then existing sponsorship identification rules by adding a requirement that licensees disclose the identity of any foreign governmental entities that lease time on their stations.[9]  The disclosure requirements apply to leased programming because the record in the underlying proceeding identified leased airtime as the primary means by which foreign governmental entities are accessing U.S. airwaves to persuade the American public without adequately disclosing the true sponsor.[10]  The *First R&O* defined "foreign governmental entity" using existing definitions, statutes, and regulations.[11]  The foreign sponsorship identification rules apply in two circumstances.  First, a

---

[6] *See First R&O*, 36 FCC Rcd at 7716, para. 29.

[7] 47 U.S.C. § 317; 47 CFR § 73.1212.  Section 317(a)(1) requires disclosure when a licensee receives "money, service or other valuable consideration" to air programming.  47 U.S.C. § 317(a)(1); *see* 47 CFR § 73.1212(a).  Consistent with section 317(a)(2), the Commission also requires disclosure when political programming or programming involving discussion of a controversial issue is furnished without monetary compensation as an inducement to air the programming.  *See* 47 U.S.C. § 317(a)(2); 47 CFR § 73.1212(d).

[8] 47 U.S.C. § 310(a).

[9] *See First R&O*, 36 FCC Rcd at 7713, para. 24 (stating that the Commission "will require a specific disclosure at the time of broadcast if material aired pursuant to the lease of time on the station has been sponsored, paid for, or, in the case of political program or any program involving the discussion of a controversial issue, if it has been furnished for free as an inducement to air by a foreign governmental entity"); *see also id.* at 7707-31, 7733-34, 7739-41, paras. 12-61, 66-68, Appx. A (establishing new rule sections 73.1212(j) and (k)).

[10] *Id.* at 7703-04, 7713-17, paras. 3, 24-31.

[11] Pursuant to section 73.1212(j)(2), the term "foreign governmental entity" "shall include governments of foreign countries, foreign political parties, agents of foreign principals, and United States-based foreign media outlets."  47 CFR § 73.1212(j)(2).  Subsections 73.1212(j)(2)(i)-(iv) of our rules state:

  (i)      The term "government of a foreign country" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA) (22 U.S.C. § 611(e));

  (ii)     The term "foreign political party" has the meaning given such term in the FARA (22 U.S.C. § 611(f));

  (iii)    The term "agent of a foreign principal" has the meaning given such term in the FARA (22 U.S.C. § 611(c)), and who is registered as such with the Department of Justice, and whose "foreign principal" is a "government of a foreign country," a "foreign political party," or directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a

(continued….)

prescribed disclosure is required when a foreign governmental entity has sponsored, paid for, or furnished programming that is aired on a radio or television station pursuant to a lease agreement.[12]  Second, if a foreign governmental entity provides the programming for free, or for nominal compensation, as an inducement to air the programming, the prescribed disclosure is required if the programming is political or involves discussion of a controversial issue.[13]

5.       The foreign sponsorship identification rules neither prevent nor restrict the broadcast of foreign government-provided programming, but rather, are intended solely to inform audiences about the source of any such programming so that they may be more informed and savvy consumers of the material.[14]  As the Commission stated in the *First R&O*, "[t]he principle that the public has a right to know the identity of those that solicit their support is a fundamental and long-standing tenet of broadcasting."[15]

6.       Section 317(c) of the Act requires licensees to exercise "reasonable diligence to obtain," from their employees and persons with whom they deal directly, information to enable the licensees to make the required sponsorship identification announcement.[16]  To satisfy this reasonable diligence standard with regard to foreign sponsorship identification, the current rules require a licensee to take each of the following actions, both when entering into a new lease agreement and renewing a lease agreement:

(1) Inform the lessee of the foreign sponsorship disclosure requirement.

(2) Ask the lessee whether it falls into any of the categories that would qualify it as a "foreign governmental entity."

(3) Ask the lessee whether it knows if any individual/entity further back in the chain of producing/distributing the programming to be aired qualifies as a foreign governmental entity and has provided some type of inducement to air the programming.

(4) Memorialize the above-listed inquiries and retain such memorialization in its records for the remainder of the license term or for one year, whichever is longer.[17]

(Continued from previous page) ————————————————

"government of a foreign country" or a "foreign political party" as defined in subsection 73.1212(j)(i) and (ii), and that is acting in its capacity as an agent of such "foreign principal;" and

(iv)      The term "United States-based foreign media outlet" has the meaning given such term in section 722(a) of the Communications Act of 1934 (47 U.S.C. § 624(a)).

[12] *See* 47 CFR § 73.1212(j)(1)(i) (requiring that foreign government-provided programming furnished consistent with section 73.1212(a) include the following disclosure: "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country].").

[13] *See* 47 CFR § 73.1212(j)(1)(i) (requiring the prescribed disclosure for foreign government-provided programming furnished consistent with section 73.1212(d)).

[14] *See First R&O*, 36 FCC Rcd at 7703, para. 2 (stating that the foreign sponsorship identification rules "seek to eliminate any potential ambiguity to the viewer or listener regarding the source of programming provided from foreign governmental entities"); *see also* 47 CFR § 73.1212(j)-(k).

[15] *First R&O*, 36 FCC Rcd at 7704-05, para. 5; *see also First NPRM*, 35 FCC Rcd at 12100-05, paras. 4-11 (recounting the history of the requirement that broadcasters identify the source of paid programming, which stretches back to the Radio Act of 1927, Pub. L. No. 69-632, 44 Stat. 1162, 1170 § 19 (repealed 1934)).

[16] 47 U.S.C. § 317(c).

[17] *See* 47 CFR § 73.1212(j)(3); *First R&O*, 36 FCC Rcd at 7719-26, paras. 35-45 (describing licensee's reasonable diligence requirements).  The Commission initially adopted an additional requirement that, as discussed in further detail below, has been vacated by the U.S. Court of Appeals for the District of Columbia Circuit.  *NAB v. FCC*, 39 F.4th at 820.

These requirements apply regardless of whether the programming is provided pursuant to a lease agreement for consideration under section 317(a)(1) or is provided for free or for nominal compensation under section 317(a)(2) and contains political programming or programming involving a controversial issue.[18]  The rules also apply to any programming broadcast pursuant to a section 325(c) permit.[19]

7.        While the reasonable diligence requirements of section 317(c) apply to licensees, section 507 of the Act imposes an obligation on those involved in the production and/or distribution of program matter for broadcast to communicate any information known to them about any money, service or other valuable consideration that any person has paid or agreed to pay for the inclusion of any matter as part of a program.[20]  In the *First R&O*, the Commission concluded that, consistent with section 507, "it is incumbent on a lessee to convey to the licensee its knowledge of any payment or consideration provided by, or unpaid programming received as an inducement from, an entity or individual that triggers the foreign sponsorship identification rules."[21]  The disclosure obligation extends beyond the lessee itself to any person connected with the production, preparation, or supply of the programming.[22]

8.        On July 19, 2021, the ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates (collectively, the Affiliates) filed a Petition for Clarification.[23]  The Affiliates assert that the exemption in the *First R&O* of "traditional, short-form advertising" from the foreign sponsorship identification rules creates confusion because the term has no established meaning in the broadcast industry.[24]  In their petition, the Affiliates argue that the Commission should clarify that the foreign sponsorship identification rules do not apply when a licensee "sells time to advertisers in the normal course of business, no matter the length of the advertisement."[25]

9.        On August 13, 2021, the National Association of Broadcasters (NAB), the Multicultural Media, Telecom and Internet Council (MMTC), and the National Association of Black Owned Broadcasters (NABOB) (collectively, Petitioners) filed a Petition for Review of the *First R&O* with the D.C. Circuit.[26]  Petitioners challenged the Commission's authority to impose one of the reasonable diligence requirements contained in the *First R&O*.  Specifically, in addition to the four reasonable diligence requirements listed above, the *First R&O* had required licensees to confirm the lessee's status, at the time of entering into a lease agreement and at renewal, by consulting the Department of Justice's (DOJ) Foreign Agent Registration Act (FARA) website and the Commission's semi-annual U.S.-based

---

[18] *See* 47 U.S.C. § 317(a)(1), (2); *First R&O*, 36 FCC Rcd at 7719-20, para. 35.  The Commission found that a broadcast station's multicast streams also are subject to the foreign sponsorship identification rules.  *First R&O*, 36 FCC Rcd at 7730, para. 56.

[19] *First R&O*, 36 FCC Rcd at 7733-34, paras. 66-68.

[20] 47 U.S.C. § 508(b)-(c); *see also First R&O*, 36 FCC Rcd at 7726-27, paras. 46-47.

[21] *First R&O*, 36 FCC Rcd at 7726, para. 46; *see also id.* at 7719, para. 34 (finding that section 507 applies to political programming and programming involving the discussion of a controversial issue provided by a foreign governmental entity for free, or for a nominal charge, as an inducement to air the programming).

[22] *First R&O*, 36 FCC Rcd at 7726-27, para. 47.

[23] *See* Petition for Clarification, MB Docket No. 20-299 (filed July 19, 2021).

[24] *Id.* at 3-4.

[25] *Id.* at 2; *see also* Meredith Corporation Comments at 1-3 (filed Sept. 2, 2021) (supporting the Petition for Clarification); Affiliates Comments at 2 (filed Sept. 2, 2021).

[26] Petition for Review, National Association of Broadcasters, Multicultural Media, Telecom and Internet Council, and National Association of Black Owned Broadcasters v. FCC, No. 21-1171 (D.C. Cir. filed Aug. 13, 2021).

foreign media outlets reports.[27]  On July 12, 2022, the D.C. Circuit vacated this verification requirement, holding that it exceeded the Commission's authority under section 317(c).[28]  The D.C. Circuit stated that section 317(c) imposes on licensees only "a duty of inquiry, not a duty of investigation."[29]  The court left in place the remaining four requirements needed to satisfy the statutory reasonable diligence standard.

10.      On October 6, 2022, the Commission released the *Second NPRM*, containing proposals to address the gap left by the D.C. Circuit's vacatur of the verification requirement contained in the foreign sponsorship identification rules.[30]  The *Second NPRM* proposed two alternatives to replace the vacated requirement that licensees independently confirm the lessee's status.  Under the first proposal, each licensee had to certify that it had informed its lessee of the foreign sponsorship identification rules and obtained, or sought to obtain, a certification from its lessee stating whether the lessee is or is not a "foreign governmental entity."[31]  In turn, the lessee would submit a certification in response to the licensee's request.[32]  To minimize compliance burdens, the Commission proposed that licensees and lessees use standardized certification language, as set forth in the *Second NPRM*.[33]  Consistent with the existing requirement that licensees upload into their online public inspection files (OPIFs) their lease agreements, the Commission tentatively concluded that licensees should upload both their own and their lessees' completed certifications into their OPIFs, along with the associated lease agreements.[34]

11.      The *Second NPRM* also contained a second proposal based on an approach raised during oral argument in *NAB v. FCC* as a possible alternative to the rule provision it ultimately vacated.[35]  Under this proposal, in lieu of the licensee independently confirming the lessee's status by checking the DOJ's FARA website, or the Commission's U.S.-based foreign media outlet reports site, the licensee would ask the lessee to provide screenshots showing the results of the lessee's search for its name on these sites.[36]  In addition, the *Second NPRM* also sought comment on the need to apply the proposals contained therein to section 325(c) permit holders.[37]  Finally, it provided another opportunity for comment on the Affiliates' Petition for Clarification regarding the treatment of advertisements.[38]

---

[27] *First R&O*, 36 FCC Rcd at 7719-20, 7722-26, paras. 35, 40-45.  Verification was not required if the lessee had already disclosed that it fell into one of the covered categories and/or that there was a separate need for a disclosure because an individual/entity further back in the chain of producing/transmitting the programming fell into one of the covered categories and had provided some form of service, consideration, or, in the case of political programming the programming itself, as an inducement to broadcast the programming.  *Id.* at 7720, para. 35.

[28] *NAB v. FCC*, 39 F.4th at 820.  To conform with the court's vacatur, we will delete the verification requirement from section 73.1212(j)(3).  *See* Appx. A.

[29] *NAB v. FCC*, 39 F.4th at 820 (stating that "[s]ection 317(c) 'is satisfied by appropriate inquiries made by the station to the party that pays it for the broadcast'") (quoting *Loveday v. FCC*, 707 F.2d 1443, 1449 (D.C. Cir. 1983)).  The court did not reach Petitioners' other arguments that the verification requirement violated the First Amendment and the Administrative Procedure Act (APA).  *Id.*

[30] *Second NPRM*, 37 FCC Rcd at 12005, para. 4.

[31] *Id.* at 12010, para. 14.

[32] Id.

[33] *Id.* at 12012-15, paras. 21-24.

[34] *Id.* at 12011-12, paras. 17-18.

[35] *Id.* at 12018, para. 31.

[36] Id.

[37] *Id.* at 12015-16, paras. 25-27.

[38] *Id.* at 12018-19, para. 32.

12.     In response to the *Second NPRM*, commenters filed four comments[39] and eight reply comments.[40]  While all commenters support the goal of foreign sponsorship disclosure, the commenters assert that the proposed requirements would be unduly burdensome and question the Commission's authority to impose them.

## III.    DISCUSSION

13.     Below we first determine that licensees must pursue one of two approaches to address the gap left by the D.C. Circuit's vacatur of the independent verification requirement.  We then address questions raised in the record about the application of the foreign sponsorship identification rules to different types of broadcast programming.  We then explain when licensees must comply with the requirements we adopt in the instant order and grandfather lease agreements already in existence at the time of the compliance date of the new rules for the duration of the lease term, determining that existing leases will have to comply with the new rules at the time of renewal or when the parties enter into a new agreement, whichever is earlier.  We clarify that our foreign sponsorship identification rules will not apply to sales of advertising for commercial goods and services to the extent that such programming would not otherwise be subject to the general sponsorship disclosure rules, as set forth in section 73.1212(f) of our rules.[41]  We also find that the foreign sponsorship identification rules will not apply to political candidate advertisements.  We do, however, determine that the foreign sponsorship identification rules will apply to issue advertisements and paid PSAs.  We find that it is inconsistent with our goal of disclosing the source of foreign government-provided programming, and in some instances the First Amendment, to exclude from the ambit of our rules locally produced and/or locally distributed programming and religious programming.  We also describe how the requirements laid out in this order will apply to section 325(c) permit holders.  Lastly, we find that our actions today will not inhibit diverse entrants from participating in the broadcast media marketplace.

### A.     Obtaining Information from Lessees

14.     We determine below to give broadcast licensees greater flexibility than proposed in the *Second NPRM* with respect to how they must seek to obtain from lessees the information needed to determine whether a foreign sponsorship disclosure is needed.  Specifically, a licensee may choose between one of two options to comply with the rule.  Neither of these two options imposes an investigatory duty upon licensees or holds them "responsible for the truth of the information they obtain."[42]  Under the first option, both the licensee and the lessee must complete a written certification

---

[39] The parties that filed comments are:  America's Public Television Stations, National Public Radio, Inc., and the Public Broadcasting Service (Public Broadcasters); National Association of Broadcasters and The Multicultural Media, Telecom & Internet Council (NAB/MMTC); Gray Television Licensee, LLC (Gray TV); and ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates (Affiliates).

[40] The parties that filed reply comments are:  American Broadcasting Companies, Inc., Fox Corporation, NBCUniversal Media, LLC, and Paramount Global (Networks); Affiliates; The E.W. Scripps Company (Scripps); Alpha Media USA LLC, Brazos Valley Communications, Ltd., Brazos Communications West, LLC, California Oregon Broadcasting, Inc., CNZ Communications, LLC, Cumulus Media, Entravision Communications Corporation, Estrella Media Inc., Latina Broadcasters of Daytona Beach, LLC, Nexstar Media Group, Inc., Red Apple Media, Inc., Salem Media Group, Inc., Victory Television Network, Inc., and Woodward Communications, Inc. (Alpha Media et al.); Audacy, Inc. and Beasley Media Group, Inc. (Audacy/Beasley); CMG Media Corporation (CMG); Coalition of Religious Programmers (Religious Programmers); and National Religious Broadcasters (Religious Broadcasters).  Because TechFreedom, a nonprofit think tank, filed reply comments after the deadline for replies, we will treat its filing as an ex parte filing.

[41] *See* 47 CFR § 73.1212(f); *see also* Petition for Clarification at 2-5 (seeking clarification that "the new foreign sponsorship ID rules do not apply when a station sells time to advertisers in the normal course of business, no matter the length of the advertisement").

[42] *See NAB v. FCC*, 39 F.4th at 820.

either using the standardized certification language contained in Appendices C and D of this order or using their own language, as long as the certifications written in their own language contain the inquiries set out in section 73.1212(j)(3), pursuant to the *First R&O*.[43] Under the second option, the licensee must ask the lessee to provide screenshots showing the search results generated by the lessee's search for its own name on two federal government websites (similar to the idea raised during oral argument before the D.C. Circuit in *NAB v. FCC*). In all other respects, under this second option, the licensee must follow the other requirements contained in the existing foreign sponsorship identification rules.[44]

15.     Given the concerns raised in the record about the burdens associated with the proposals in the *Second NPRM* to replace the independent verification requirement, the requirements adopted in the instant order offer licensees more flexibility by giving them a choice of approaches and by allowing them to devise their own certification language. Moreover, we reduce compliance burdens and make the new requirements easier to implement by offering simple certification templates. We also allow a licensee to inquire about a lessee's foreign governmental entity status only once a year when the lessee and programming are the same (e.g., weekly broadcasts of church services from the same church), assuming there is no change in the lessee's status and the lessee has not become aware of any change in the individuals/entities further back in the programming's production/distribution chain that would trigger the need for a foreign sponsorship disclosure.

16.     We decline to adopt several proposals to address concerns raised in the record about compliance costs and burdens. Although proposed in the *Second NPRM*, we conclude, in response to commenter concerns, that a licensee need not notify the Media Bureau when a lessee fails to respond to the licensee's queries. No commenter supported such a requirement. Although the *Second NPRM* proposed requiring licensees to retain certifications and screenshots in the licensees' OPIFs that are hosted by the Commission, we decline to adopt this proposal. Licensees may either file these records in their OPIFs or their internal files. Finally, we emphasize that if a lessee fails to respond, or fails to respond adequately, to the licensee's request for a certification or screenshots, the licensee is not prohibited from airing the program. Nevertheless, if a question arises later about whether a disclosure was needed, the licensee must be able to demonstrate, in the event of a fact-specific inquiry by the Commission, that it exercised reasonable diligence in seeking the information. As explained below, the requirements we adopt today are within our statutory authority and are consistent with the D.C. Circuit's ruling in *NAB v. FCC*.

## 1.     Licensees Must Comply with One of Two Approaches

17.     We will require licensees to comply with either one of the two approaches described below. Although licensees must choose one of these approaches, they need not choose the same approach for each lease or renewal agreement, even when the same lessee is involved. Compliance with one of these two approaches must be at the time of entering into any new lease agreement or renewing an existing lease agreement, unless the once-a-year exception described below applies.[45]

---

[43] 47 CFR § 73.1212(j)(3).

[44] Consistent with the existing foreign sponsorship identification rules, the licensee must inform the lessee about the foreign sponsorship disclosure requirement, inquire whether the lessee is either a "government of a foreign country" or a "foreign political party," and inquire about the lessee's knowledge of anyone further back in the chain of producing/distributing the programming who qualifies as a "foreign governmental entity" and may have provided an inducement to air the programming such as to trigger the need for a foreign sponsorship disclosure. *See* 47 CFR § 73.1212(j)(i)-(iii). Finally, also consistent with the existing foreign sponsorship identification rules, the licensee must memorialize those inquiries in some manner. We note, however, that the existing "memorialization" requirement has been moved from section 73.1212(j)(3)(v) of our rules to revised section 73.1212(j)(3)(iv), which replaces the vacated section 73.1212(j)(3)(iv). *See* Appx. A.

[45] NAB asks that we consider an approach akin to the Commission's advertising nondiscrimination requirement. Letter from Erin Dozier, Senior Vice President and Deputy General Counsel, NAB, to Marlene H. Dortch,

(continued....)

18.    *Certification Option*.  One option available to licensees is the use of certifications, as described below.  We find that the certification option fills the gap left by the D.C. Circuit's vacatur of licensee's requirement to conduct an independent check, by helping to ensure the credibility of the sponsorship information provided by the lessee in response to the licensee's inquiries.[46]  For those who would prefer not to pursue the screenshot option discussed below, the certification approach has the benefit of providing an alternative means of verification.  Moreover, certifications have the value of reminding lessees of the foreign sponsorship identification rules and ensuring that they provide above board sponsorship information to broadcasters.

19.    In response to commenter concerns, we have streamlined significantly the certification proposal contained in the *Second NPRM*.  Under our adopted certification option, both a licensee and a lessee must complete a certification reflecting the communications and inquiries required under the existing rules.[47]  However, unlike our proposal in the *Second NPRM*, which would have required prescribed certification language, licensees and lessees will have the option either to use the streamlined standardized certification language set forth in Appendices C and D or to use language created by the parties.  In response to commenters' concerns about the complexity of the certification language proposed in the *Second NPRM*,[48] we have simplified the standardized certifications substantially.  Rather than the

---

(Continued from previous page) ————————————————

Secretary, FCC, MB Docket No. 20-299, at 1 (filed June 14, 2023).  Every eight years, broadcasters must certify in their license renewal applications that their advertising sales contracts contain nondiscrimination clauses.  *Promoting Diversification of Ownership in the Broadcasting Services, et al.*, MB Docket No. 07-294 et al., Report and Order, 23 FCC Rcd 5922, 5941-42, paras. 49-50 (2008).  We reject the suggestion to apply a similar approach here by requiring certifications of compliance with the foreign sponsorship identification rules only at the time of a licensee's renewal application.  We find that permitting a certification of compliance every eight years would make it too difficult for the Commission to assess a licensee's reasonable diligence in a particular case where a question arises regarding whether a disclosure was required.  Moreover, we believe that requiring certification or screenshot documentation for every lease agreement will highlight to both licensees and lessees the importance of this requirement.

[46] *See* NAB/MMTC Comments at 20 (asserting that it is "unclear how using FCC-specified language in certifications, obtaining revised certifications, or placing them in stations' online public inspection files would fill any alleged gap in the rules resulting from the D.C. Circuit's decision or would make the FCC's rules more effective in identifying foreign governmental propaganda").

[47] Licensees often include in their lease agreements terms and conditions requiring compliance with Commission rules and requirements.  *See, e.g.*, Time Brokerage Agreement between Salem Communications Holding Corporation and the programmer Healthy by Nature for the lease of airtime on station KDIZ-AM in Golden Valley, Minnesota, as of August 23, 2022, https://publicfiles.fcc.gov/am-profile/KDIZ/Time%20Brokerage%20Agreements/62568b0a-2f57-f3ef-d54a-4e020398362c (KDIZ-AM Agreement) (stipulating that the lessee's programming "shall meet in all material respects" the requirements of the Communications Act and of all applicable Commission rules, regulations, and policies).  *Id.* at 2-3.  Moreover, the KDIZ-AM Agreement specifically addresses the foreign sponsorship identification rules and provides that "[t]he broadcast of any programming provided or sponsored by a 'foreign governmental entity' as defined in 47 C.F.R. Section 73.1212(j) is prohibited unless approved in advance by the Station's General Manager and accompanied by the announcement required by 47 C.F.R. Section 73.1212(j), and unless Programmer timely provides Licensee the documentation required by 47 C.F.R. Sections 73.1212(j)(6) and 73.7326(e)(19) for the Station's online public inspection file folder marked 'Foreign Government-Provided Programming Disclosures.'"  *Id.* at 3.  Further, the agreement includes certification language that closely tracks the obligations imposed by the Commission in the *First R&O*.  *Id*. at 6-8, 14-15.

[48] Commenters argue that the Commission's proposed certification language would be too complex and legalistic for most station employees and programming lessees to understand.  *See* NAB/MMTC Comments at 43-44 (arguing that the numerous statutory and regulatory references contained within the proposed certification language require "a level of legal understanding and analysis that . . . non-lawyers reading certifications do not have and should not reasonably be expected to perform"); Audacy/Beasley Reply at 3-5 (asserting that the proposed certification language is unclear and not even understandable); Religious Broadcasters Reply at 2 (positing that "the complex

(continued….)

two and a half page certifications proposed in the *Second NPRM*, we have now developed one-page templates for the licensee and lessee certifications, based on a straightforward and familiar "check box" format.  While the templates do include citations to the legal sources defining the various categories of foreign governmental entities, we anticipate that most licensee and lessee employees will be able to complete the forms quickly and readily, based upon their existing knowledge and understanding.  We emphasize that the lessee is being asked to sign a certification regarding *its own status*.  The lessee should already know if it is a registered FARA agent, or is listed as a U.S.-based foreign media outlet on the Commission's website, because these registrations/listings are self-reported.[49]  Similarly, a lessee should already know if it is a government of a foreign country or a foreign political party.  With regard to those further back in the chain of producing and/or distributing the programming, the lessee is being asked only about its actual knowledge at the time it signs the certification.  We emphasize that it is highly unlikely that either licensee or lessee should have to engage in any type of research to respond to the queries contained in the certifications.  We also note that these are the same inquiries the Commission adopted in the *First R&O*, only formatted now as a certification.

20.     If licensees and lessees prefer not to use the Commission's templates, they may use their own certification language, provided that language addresses the points listed in section 73.1212(j)(3)(i)-(iii) of our current rules.[50]  Several commenters expressed concerns that licensees already have developed their own certifications based on the existing foreign sponsorship identification rules and that revising these certifications would be costly.[51]  We are persuaded that self-generated certifications can fulfill our certification requirements provided these certifications contain the information and inquiries currently required by the foreign sponsorship identification rules.  Specifically, a licensee's certification should confirm that the licensee:

> (1) informed the lessee of the foreign sponsorship disclosure requirement;
>
> (2) asked the lessee whether it falls into any of the categories that would qualify it as a "foreign governmental entity;"
>
> (3) asked the lessee whether it knows if any individual/entity further back in the chain of producing and/or distributing the programming to be aired qualifies as a foreign governmental entity and has provided some type of inducement to air the programming;
>
> (4) sought a written certification in response from the lessee; and
>
> (5) obtained the necessary information for a disclosure if one is required.

A lessee's certification should convey the information needed to determine whether a disclosure is

---

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
standardized certification language itself may ultimately deter potential lessees from entering into leasing arrangements").

[49] *See* 22 U.S.C. § 612(a) (providing that "[n]o person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required . . . unless he is exempt from registration under the provisions of this subchapter"); *see also* 47 U.S.C. § 624 (requiring each U.S.-based foreign media outlet to submit a report to the Commission regarding its relationship with its foreign principal).

[50] 47 CFR § 73.1212(j)(3)(i)-(iii).

[51] *See* Religious Broadcasters Reply at 2 (arguing that if the Commission requires standardized certification language, then station owners "will have wasted time and resources that have already been spent developing certification language and must expend staff time in explaining the new FCC rules to lessees and obtaining updated certification[s]"); CMG Reply at 3-4 (positing that the cost of a second round of compliance would be significant and without benefit after "CMG staff spent hundreds of hours under the current rules identifying agreements and collecting certifications"); NAB/MMTC Comments at 19-23 (stating that the proposed rule changes would impose substantial and unnecessary burdens on stations and lessees within a short time frame and claiming that existing online systems, such as Wide Orbit, used by some broadcasters for certifications, would need to be redesigned).

required and the information needed for a broadcast disclosure if one is required.[52]

21.    Regardless of whether the Commission's templates or a licensee's and lessee's own certifications are used, both the licensee's and lessee's certifications must be dated and signed by an employee or other representative of the entity who can attest to the fact that these actions were taken.[53] Because these certification requirements encapsulate the extant information and inquiry requirements adopted in the *First R&O*,[54] it is unlikely that any preexisting certification language that licensees have employed will require much revision, if any.

22.    *Screenshot Option.*  As an alternative to the certification option, licensees may choose to ask their lessees for screenshots of lessees' search results of two federal government websites.  This option essentially replaces the verification requirement that the D.C. Circuit vacated, with the key difference being that the lessee conducts the searches instead of the licensee.  The D.C. Circuit determined that it was beyond the scope of section 317(c) to require a licensee to independently verify a lessee's statement that the lessee was not listed in the DOJ's FARA database as a FARA agent or in the Commission's U.S.-based foreign media outlet reports.  Consequently, consistent with the hypothetical raised during oral argument before the D.C. Circuit in *NAB v. FCC*, we now determine that licensees may ask their lessees to perform those searches and provide screenshots of the search results.[55]  Hence, instead of asking the lessee to provide a responsive certification regarding its status, a licensee exercising this option would ask, consistent with our current foreign sponsorship identification rules, whether the lessee is a registered FARA agent or is listed in the Commission's U.S.-based foreign media outlet report.  If the lessee responds "no," the licensee would then ask the lessee to provide screenshots showing the results of lessee's searches of both of these websites.[56]  As discussed below, licensees choosing this option must still comply with all other aspects of the current rule, as they have been required to do since the compliance date of the *First R&O*.[57]  Moreover, consistent with the *First R&O*, we encourage licensees to include in their lease agreements a requirement for lessees to provide notice of any change in status so as to trigger the need for a foreign sponsorship disclosure.

23.    Some commenters have objected to the screenshot approach based on erroneous assumptions about what such a search requires.  NAB's claim that the accuracy of the search results "depends on using search terms with exact names, abbreviations, or acronyms" and that lessees "would have to train themselves to navigate the FARA databases" suggests the FARA searches are intricate

---

[52] *See* 47 CFR § 73.1212(j)(1) (stating what information needs to be in a foreign sponsorship disclosure).

[53] Moreover, irrespective of whether a licensee chooses to use our template certification language or their own language, as stated in the *First R&O*, we "strongly encourage licensees to include a provision in their lease agreements requiring the lessee to notify the licensee about any change in the lessee's status such as to trigger our foreign sponsorship identification rules."  *First R&O,* 36 FCC Rcd at 7702, para. 44.

[54] *See id.* at 7719-20, paras. 35-36; *see also* 47 CFR § 73.1212(j)(3)(i)-(iii).

[55] Oral Argument in *NAB v. FCC*, beginning at 7:05, 24:07, https://www.cadc.uscourts.gov/recordings/ recordings2021.nsf/BBAF4A6ABFCFB734852588220055C0EF/$file/21-1171.mp3.  Specifically, the court asked NAB's counsel whether, rather than requiring a licensee to verify a lessee's status by checking the DOJ FARA and Commission websites, the Commission could accomplish its goal by requiring a lessee that states it is not a "foreign governmental entity" to provide a screenshot of the relevant FARA page showing that its name is not listed there.  *Id.*  In response, NAB's counsel stated "Absolutely.  They could have imposed that kind of obligation on lessees . . . ."  *Id.*

[56] *See* https://www.fcc.gov/united-states-based-foreign-media-outlets, which identifies the outlets that filed with the Commission in response to the National Defense Authorization Act for Fiscal Year 2019 (NDAA).  The NDAA requires U.S.-based foreign media outlets to submit reports every six months to the Commission regarding the outlets' relations to their foreign principals.

[57] See supra note 44.

explorations.[58]  On the contrary, the FARA searches are simple name searches, initiated by merely entering a name in a search box.  As with the requirement that the D.C. Circuit vacated, if the name search does not generate any results, "no further search is needed."[59]

24.        Moreover, we emphasize that lessees are looking for their *own names*.  A lessee is not doing a FARA database search to *learn* whether it is registered, such as to necessitate experimenting with different iterations of its name.  A lessee, or someone within lessee's organization, would know whether it is a FARA registrant, or U.S.-based foreign media outlet.  As such, the lessee will only be providing screenshots if, in response to licensee's queries, the lessee states that it is neither a FARA agent nor a U.S.-based foreign media outlet.  In short, the name search only entails confirming that the lessee's status is neither a FARA registrant or a U.S.-based foreign media outlet.[60]

25.        Similarly, NAB's claims about the U.S.-based foreign media outlet reports – i.e., that "[i]t would be Kafkaesque to require thousands of lessees each to make copies of Commission reports and send them to each of their station lessors for every single lease and lease renewal to prove their absence from the report, when no such listed entities exist" – distort what actually is required to demonstrate compliance.[61]  Our website lists the names of all the entities that have reported as U.S.-based foreign media outlets, and all that is required is a screenshot of this list to show whether the lessee's name appears on the list at the time of the licensee's required inquiries.  No searches or copying of multiple Commission reports are required, as the list appears on our U.S.-based foreign media outlet webpage.[62]

## 2.        Leases Renewed Within A One-Year Period

26.        In response to several commenters' request that we clarify the scope of the term "lease,"[63] we affirm our position in the *First R&O* that the term applies to any agreement, written or not, where a licensee grants to another party the right to program on its station in exchange for some form of consideration.[64]  The term applies irrespective of the terms or duration of the agreement, and regardless of whether the parties label or view the agreement as a time brokerage agreement, a local marketing agreement, or something else.[65]  Therefore, an agreement is not excluded from our definition of "lease"

---

[58] *See* NAB/MMTC Comments at 13.

[59] *First R&O*, 36 FCC Rcd at 7722, para. 41.  If the name search does generate results, the broadcaster's duty is to "exercise reasonable diligence" to ascertain whether the lessee is subject to a disclosure requirement – precisely what the statute requires.  47 CFR § 73.1212(j)(3); 47 U.S.C. § 317(c).

[60] We recognize that the FARA database has different search fields.  The FARA website provides for an "Active Registrants" search link, and we recommend that lessees use this link because our rules only cover those FARA agents who are currently registered on the DOJ FARA site.  *See* 47 CFR § 73.1212(j)(2)(iii); *see also* https://efile.fara.gov/ords/fara/f?p=1381:17:1606120366722.  As the search features on the FARA website are designed to assist in determining who is registered as a FARA agent, we assume that the website will continue to maintain a search field akin to the "Active Registrants" field we identify here.  We appreciate NAB/MMTC's comment that the appearance of one's name as a registered agent in the FARA website is not determinative of whether the lessee is acting in its capacity as a FARA agent when leasing time on a licensee's station, but we believe it is reasonable to presume a lessee that is registered would be able to explain whether it is acting in its capacity as an agent with regard to the transaction at hand.  *See* NAB/MMTC Comments at 12.

[61] NAB/MMTC Comments at 13.

[62] Lessees need only go to the following link at the time of entering into a lease agreement or at renewal and take one photo: https://www.fcc.gov/united-states-based-foreign-media-outlets.

[63] *See, e.g.*, NAB/MMTC Comments at 33-43, Gray TV Comments at 10-13; Networks Reply at 3-6; Scripps Reply at 4-6; Alpha Media et al. Reply at 6-10; CMG Reply at 2-3; Audacy/Beasley Reply at 7.

[64] *First R&O*, 36 FCC Rcd at 7715-16, paras. 27-28; *see also* 47 U.S.C. § 317(a).

[65] As the Commission stated in the *First R&O*:

for purposes of the foreign sponsorship identification rules merely because it is an informal, short term, and/or week-to-week type of agreement. We address below the rules' applicability to certain types of programming, but we clarify that applicability of the rules is not determined by the "title, terms, or duration" of an agreement.[66]

27. Nevertheless, in response to commenter concerns about frequently having to repeat the certification/screenshot process for short term leases,[67] we conclude that, where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, the licensee need only exercise its reasonable diligence obligations, including the certification or screenshot process, once per year. This modification of the proposals contained in the *Second NPRM* addresses concerns raised in the record about the burdens associated with the production of multiple certifications/screenshots over a limited period of time when the lease concerns both the same lessee and same programming.[68]

### 3. Lack of Adequate Response from Lessee

28. We have decided not to adopt the notification requirement proposed in the *Second NPRM* that proposed to require licensees to notify the Media Bureau about a lessee's failure to respond.[69] No commenters supported a notification requirement, and some raised concerns about such a requirement placing licensees in an enforcement-type role.[70] We appreciate the concerns raised by commenters.

---

(Continued from previous page)

[T]he disclosure requirements we adopt today apply to leasing agreements, regardless of what those agreements are called, how they are styled, and whether they are reduced to writing. We recognize that leasing agreements within the broadcast industry may be known by different designations. The terms time brokerage agreement (TBA) and local marketing agreement (LMA) are used interchangeably to describe contractual arrangements whereby a party other than the licensee, i.e., a brokering party, programs time on a broadcast station, oftentimes also selling the advertising during such time and retaining the proceeds. Such leasing agreements may be for either discrete blocks of time (for example, two hours every day from 4 PM to 6 PM) or for the complete broadcast capacity of the station (i.e., 24 hours a day, seven days a week). The agreements can be for the duration of a single day or for a term of years. Regardless of the title, terms, or duration of such an agreement, the purpose of such a contractual agreement is to give one party — the brokering party or programmer — the right and obligation to program the station licensed to the other party — the licensee or broadcaster. In this manner, the programmer is able to program a radio or television station that it does not own or hold the license to operate.

*First R&O*, 36 FCC Rcd at 7715, para. 27 (citations omitted).

[66] *Id.* See Section III.B. for a discussion of the types of programming to which the rules apply.

[67] *See* NAB/MMTC Comments at 22, 37, 44 (highlighting the short duration, minimal renumeration, and financial constraints associated with most agreements between licensees and religious programmers, or local programmers); *see also* Religious Programmers Reply at 11-13 (asserting that, given the week-to-week lease arrangements that religious programmers often enter into due to financial constraints, their programming will be at a competitive disadvantage relative to commercial paid-programming); Gray TV Comments at 12-13 (noting that "Gray [TV]'s arrangements with religious programmers are typically confirmed on a weekly basis . . .").

[68] An example of what we mean by "same lessee" and "same programming" in this context would be House of Worship X leasing time for the live broadcast of its weekly religious service, every Sunday from 11:00 am till 12:00 pm. While the specific broadcasts would differ week to week, the lessee would continue to be House of Worship X and the program would be its live religious service broadcast. By contrast, if House of Worship X decides to use its regular time slot to provide something other than its weekly religious service – e.g., a panel discussion with various civic leaders – that would be considered different programming that would not fall within the one year exemption, and, thus, would require licensee and lessee to engage in the reasonable diligence requirements laid out in the Commission's rules.

[69] *Second NPRM*, 37 FCC Rcd at 12010-11, para. 16.

[70] *See* Audacy/Beasley Reply at 3-4 (arguing that broadcasters have no statutory duty to serve as "enforcers or informants" that would justify a requirement that they notify the Media Bureau if a lessee fails to certify as to its status as a foreign governmental entity).

Moreover, we also recognize that there may be instances when, despite a licensee's efforts to comply with the foreign sponsorship identification rules, a lessee may fail to respond, or may fail to respond adequately, to a licensee's queries or request for a certification/screenshots. Thus, if a licensee does not obtain a response, or obtains an inadequate response, from the lessee to its reasonable diligence inquiries, it may continue to air the lessee's programming and will not be required to report such non-responses to the Commission. If, however, it is determined at a later date that the programming should have included a foreign sponsorship disclosure, the Commission may conduct a fact-specific inquiry to determine whether the licensee met its obligation under section 317(c) to "exercise reasonable diligence to obtain" the necessary information, such as by not making further inquiry of the lessee.[71]

### 4. Recordkeeping Requirement

29. We find that licensees must retain all of their certifications and screenshots for the length of the license term or one year, whichever is longer, pursuant to the record retention requirement contained in subsection 73.1212(j)(3)(v) of our rules. As noted above, under the screenshot approach, licensees must still comply with the pre-existing requirement to inform lessees of the foreign sponsorship identification rules, pursuant to subsection 73.1212(j)(3)(i), and make the inquiries contained in subsections 73.1212(j)(3)(ii)-(iii) of the rules. Also, consistent with the pre-existing rules, under the screenshot approach a licensee must still memorialize in some way its compliance with subsections 73.1212(j)(i)-(iii).[72]

30. Although the *Second NPRM* proposed that licensees should retain the certifications and screenshots in their OPIFs, based on commenter concerns,[73] we are persuaded that licensees should have greater flexibility regarding the manner in which these documents are stored. Licensees must already upload their lease agreements into their OPIFs,[74] along with records of any foreign sponsorship identification disclosures.[75] As a result, the public already has a mechanism to determine which programs are provided by foreign governmental entities. Thus, we find it is reasonable to respond to commenter concerns by providing more flexibility regarding retention of the certifications and screenshots than initially proposed. Hence, licensees must retain their certifications and/or screenshots, along with documentation of inquiries that accompany the screenshots, but may elect to do so in either their own OPIFs[76] or in their internal files, provided that licensees make such documents available to the Commission promptly upon request. Consistent with the tentative conclusion in the *Second NPRM*, we find that a recordkeeping requirement is necessary to provide "an efficient and transparent means of verifying compliance" with our certification and screenshot requirements.[77] Given our decision that

---

[71] *See, e.g.*, *Loveday*, 707 F.2d at 1459 (providing that further inquiry might be required when "a challenger makes so strong a circumstantial case that someone other the named sponsor is the real sponsor").

[72] *See supra* note 44.

[73] *See* NAB/MMTC Comments at 19-20, 45-47 (providing objections to the proposed OPIF recordkeeping requirement); Gray TV Comments at 9 (arguing that an OPIF recordkeeping requirement would increase compliance costs and burdens for broadcasters); TechFreedom Reply at 6-8 (claiming that an OPIF recordkeeping requirement would be "an unmitigated disaster"); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1 (filed Mar. 14, 2024); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1 (filed Mar. 22, 2024) (NAB Mar. 22, 2024 *Ex Parte*).

[74] 47 CFR § 73.3526(e).

[75] 47 CFR §§ 73.1212(j)(7), 73.3526(e)(19).

[76] We note here that the OPIF system, although hosted by the Commission, is maintained by broadcast stations. *See* Media Bureau, FCC, *The Public and Broadcasting* 28 (2021).

[77] *Second NPRM*, 37 FCC Rcd at 12011, para. 17.

documentation need not be placed in the OPIF, we do not further address arguments against uploading the certifications and screenshots into the OPIF.[78]

### 5.    Legal Authority

31.        We find that the regulations we adopt today are consistent with the Act and the court's decision in *NAB v. FCC.*  We also decline to address challenges by commenters to the existing rules not under review in this *Second NPRM.*  Commenters' challenges to our authority fall into two categories. First, a number of commenters seek to reopen issues already decided in the *First R&O* under the guise of challenging our authority to implement the proposals at issue in the *Second NPRM.*  As discussed in more detail below, the Commission previously established in the *First R&O* that licensees must inform their lessees about the foreign sponsorship identification rules and inquire about the status of lessees and those further back in the chain of production and distribution of programming.  These issues were not the subject of the *Second NPRM.*  Second, commenters also challenge the Commission's authority to adopt the specific proposals contained in the *Second NPRM.*  Below, we first decline to address challenges to those issues previously settled in the *First R&O* before addressing challenges to our authority to establish the requirements established in the instant order.

32.        *Challenges to Previously Settled Issues in the First R&O.*  More than two years after the Commission adopted the foreign sponsorship identification rules, and after themselves challenging a portion of those rules in court, NAB/MMTC now dispute various requirements that are fundamental to the foreign sponsorship identification rules that the Commission established in the *First R&O.*  For example, NAB/MMTC contest the requirement that licensees must inform their lessees of the foreign sponsorship identification rules—a rule established in the *First R&O.*[79]  Similarly, NAB/MMTC now challenge the previously established requirement that a licensee inquire of its lessee whether it has knowledge of anyone further back in the chain of producing/distributing the programming who qualifies as a foreign governmental entity and has provided some type of inducement to air the programming.[80]

---

[78] *See* NAB/MMTC Comments at 45-47 (arguing that an OPIF filing requirement for all certifications serves neither the goals of the foreign sponsorship rules nor the public file rules); Gray TV Comments at 9-10 (contending that an OPIF filing requirement for all certifications would fail "to advance—and indeed directly interfere[] with—the goals underlying either the FSID rules and the public file rules"); Networks Reply at 9 (predicting that the OPIF filing requirement for all certifications would create "unintended circumstances that do not effectively advance [the Commission's] goals").  While we disagree with commenters' assertions that retaining the certifications/screenshots does not comport with the goals of the OPIF, which is to keep all relevant broadcaster documents in one easily accessible location and available to the public, we have chosen to modify our proposal here to provide greater flexibility to broadcasters under these unique circumstances.

[79] NAB/MMTC assert that "broadcasters do not have any duty to inform lessees of regulatory requirements . . . [,]" and, thus, they urge the Commission to "strike the requirements placing upon the broadcaster the duties of '[i]nforming the lessee of the foreign sponsorship disclosure requirement in section (j) above.'"  NAB/MMTC Comments at 8; *but see First NPRM*, 35 FCC Rcd at 12124, para. 49 (asking "[w]hat else might the licensee do to ensure that the brokering party and those from whom this entity receives programming are aware of the disclosure obligation?"); *First R&O*, 36 FCC Rcd at 7720-21, para. 38 (stating that as "a threshold matter, we expect the licensee to convey clearly to the prospective lessee that there is a Commission disclosure requirement regarding foreign government-provided programming"); 47 CFR § 73.1212(j)(3)(i) (stating that the licensee must inform the lessee about the foreign sponsorship disclosure requirement).

[80] *See* NAB/MMTC Comments at 7 (claiming that "the *proposed* rules would require licensees to inquire whether the lessee is aware of any individual/entity further back in the chain of production or distribution of the programming that may qualify as a foreign governmental entity and has provided compensation . . . ") (emphasis added).  These are not, however, newly "proposed" rules, as this inquiry requirement was proposed in the *First NPRM* and codified in the *First R&O.  See First NPRM*, 35 FCC Rcd at 12125, para. 49 (asking whether "it is reasonable to require that the licensee will inquire whether the brokering party and *any entity from whom the brokering party receives programming* qualifies as a 'foreign governmental entity'") (emphasis added); *First R&O*, 36 FCC Rcd at 7719, 7721, paras. 35, 39; 47 CFR § 73.1212(j)(3)(iii) (establishing the requirement that a licensee should inquire of its lessee whether the lessee knows if anyone involved in the production or distribution of the

(continued….)

The Commission sought comment on these requirements in the *First NPRM* and adopted them in the *First R&O* without reopening them in the *Second NPRM*, in which we made clear that we only intended to address the issues vacated by the Court. We decline to revisit additional issues here with respect to the existing rules.[81] If NAB/MMTC wished to challenge such authority, they had the opportunity to do so in the earlier administrative proceeding and in the *NAB v. FCC* litigation, and should have done so then.

33. The *Second NPRM* never suggested that the issues NAB/MMTC seeks to reopen were under consideration in the instant proceeding. If anything, the *Second NPRM* spoke of the obligations to inform and make inquiries as established requirements.[82] The questions posed in the *Second NPRM* regarding the Commission's authority concerned the authority to establish the requirements proposed in *that* NPRM and no other.[83] Nothing in the *Second NPRM* suggested that the Commission intended to re-evaluate a licensee's duty to inform its lessee of the foreign sponsorship identification rules and make certain inquiries of the lessee.

34. *Compliance with Section 317 of the Act.* We conclude that we have ample authority to implement the certification and screenshot requirements established in this order based on section 317 of the Act. The certification and screenshot options described above fit squarely within the *NAB v. FCC* court's determination that section 317(c) "imposes a duty of inquiry, not a duty of investigation."[84] Licensees' certifications consist of nothing more than a reduction to written form of those inquiry requirements established in the *First R&O* and codified at section 73.1212(j)(3).[85] These inquiries are directed to the lessee and concern lessee's *own status* and its knowledge of those further back in the chain of producing/distributing the programming.[86] The screenshot alternative laid out in this order retains in place all the previously established requirements, except for the vacated verification requirement. The

---

programming that will be aired pursuant to the lease, or a sub-lease, qualifies as a foreign governmental entity and has provided some type of inducement to air the programming). Similarly, at this late juncture, NAB/MMTC also contest the previously established requirement that lessees must inform their licensees about their knowledge of *any* payments (or other valuable consideration) associated with the programming such as to trigger a disclosure under the foreign sponsorship identification rules. *See* NAB/MMTC Comments at 8 (stating that "[a]lthough NAB and MMTC did not initially closely examine the FCC's view that it had the power to regulate lessee disclosures, more careful statutory analysis reveals that the Commission lacks such power"). *But see First NPRM*, 35 FCC Rcd at 12125, para. 51 (stating that "consistent with the statute, we believe that it is incumbent on brokers to disclose to the licensee their knowledge of any payment provided by, or unpaid programming received as an inducement from, one of the entities or individuals that trigger the sponsorship identification requirement laid out in this NPRM"); *First R&O*, 36 FCC Rcd at 7726, para. 46 (stating that "we adopt the tentative conclusion contained in the NPRM that . . . impose a duty on the broker/lessee to inform the licensee to the extent it is aware of any payments . . . associated with the programming such as to trigger a disclosure").

[81] *See Second NPRM*, 37 FCC Rcd at 12009, para. 12 (noting that with the *Second NPRM* the Commission sought to strengthen the foreign sponsorship identification rules due to the gap left by the D.C. Circuit's vacatur).

[82] *See id.* (stating that "the foreign sponsorship identification rules require licensees to notify their lessees of the disclosure requirement pertaining to foreign government-provided programming at the time of entering into a lease agreement or at renewal of such an agreement" and that "the licensee must inquire whether the lessee is a foreign governmental entity and if the lessee is aware of any individual/entity further back in the chain of production or distribution of the programming . . .").

[83] *See, e.g., id.* at 12016-17, para. 28 (commencing at section titled "Proposed Certification Requirement Is Consistent with the Act and *NAB v. FCC*," in which the Commission provides an analysis and its tentative conclusion regarding its authority to impose a certification requirement).

[84] *NAB v. FCC*, 39 F.4th at 820.

[85] 47 CFR § 73.1212(j)(3).

[86] This requirement is consistent with NAB/MMTC's own statement that "the disclosure duties are narrowly limited to information that the supplier knows or that has been disclosed to it." NAB/MMTC Comments at 10.

only difference being that previously, if the lessee stated it was not a U.S.-based foreign media outlet, or a FARA agent, the licensee had to verify this answer by reviewing the DOJ's FARA database and the Commission's U.S.-based foreign media outlet report. In lieu of this, the licensee will now ask the lessee for screenshots depicting its search results of the DOJ's FARA database and the Commission's U.S.-based foreign media outlet report.

35. NAB/MMTC argues that licensees only have a duty to inquire.[87] Our rules require only that a licensee inquire of the lessee (i.e., the program's sponsor); they do not make licensees "responsible for the truth of the information they obtain" from lessees by imposing independent investigatory or other obligations.[88] With regard to a licensee's certification option, we are merely requiring that the inquiry be in written form. And, consistent with the court's determination that the statute is narrowly drawn, the requirements adopted in the instant order allow licensees to carry leased programming even in the absence of actually *obtaining* foreign sponsorship information from the lessee. However, in such situations, if a question arises later about whether a disclosure was needed, the licensee must be able to demonstrate, in the event of a fact-specific inquiry by the Commission, that it exercised reasonable diligence in seeking the information. The rules we are adopting here will help identify the types of effort necessary for licensees' to demonstrate reasonable diligence in carrying out their "duty of inquiry." Hence, we determine that section 317 gives us ample authority to require licensees to ask their lessees for certifications or screenshots in order to determine whether a foreign sponsorship disclosure is needed.[89]

36. We disagree with NAB/MMTC's view that section 317(b), when read in the context of the entirety of sections 317 and 507, as well as the legislative history associated with the passage of these provisions, suggests that section 317(b) should be read as a brake on the licensee's duty to make inquiries pursuant to section 317(c).[90] Unlike section 317(c), which imposes an obligation upon licensees to exercise reasonable diligence to obtain information, section 317(b) imposes an obligation on the station to air an appropriate disclosure if it receives a report that payments were made to employees, or persons involved in the production or preparation of the program, in regard to material included in the programming to be broadcast by the station.[91] We do not interpret section 317(b) to be a limit on the inquiries the licensee must make pursuant to section 317(c). Moreover, NAB/MMTC's interpretation would contravene our mandate under section 317(e) "to carry out" the statute's provisions.[92]

37. *Compliance with Administrative Procedure Act (APA).* We have clearly and consistently articulated that licensees' responsibilities as trustees of the nation's airwaves include sponsorship identification based on the fundamental "principle that the public has the right to know whether the

---

[87] *See id.* at 6. We note that NAB/MMTC's assertion contradicts its own statement two sentences later that "[t]he Commission may prescribe what counts as reasonable diligence to obtain information, but may not require that information or certifications actually be obtained from a lessee." *Id.*; *see also* Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1-2 (filed Mar. 7, 2024) (arguing that the Commission lacks statutory authority to require broadcasters to obtain anything, including certifications, from lessees). Our new regulations do not mandate that a licensee obtain a certification from its lessee, but do require a licensee to ask its lessee for certifications/screenshots as a way of responding to the licensee's inquiries.

[88] *NAB v.* FCC, 39 F.4th at 820 (emphasis added).

[89] NAB/MMTC argues that the Commission also lacks the power to impose certification or screenshot requirements on lessees. NAB/MMTC Comments at 8-14. But the revised rule imposes no requirements on lessees. Rather, it requires licensees to request a certification or screenshots from lessees.

[90] *See id.* at 7 (asserting that "[a] broadcaster only has a duty to make an announcement if it receives a report 'required by Section 508 of this title'").

[91] 47 U.S.C. § 317(b).

[92] 47 U.S.C. § 317(e).

broadcast material has been paid for and by whom."[93] NAB/MMTC asserts that the proposed rules violate the APA, arguing that we have "failed to show a rational connection between facts on the ground and the policies . . . proposed." [94] NAB/MMTC claims we have only identified "a tiny number of instances" of "foreign government sponsored programming[,]" and one of the "station[s] cited in the [*First R&O*] . . . as airing foreign propaganda is in fact no longer doing so."[95] These assertions miss the point that almost by definition when foreign governmental sponsorship is *undisclosed*, neither we nor the American public will know about it. Moreover, federal agencies have authority for "precautionary or prophylactic responses to perceived risks" based on documented abuses.[96] Furthermore, foreign governments are *continuing* to disseminate programming over U.S. broadcast media and, thus, there is a continued need for ensuring that we have robust foreign sponsorship identification rules.[97] Hence, it is reasonable for us to conclude that the reports of foreign government attempts to disseminate programming via broadcast television and radio call for targeted action to ensure audiences are aware when a foreign government or its representatives are seeking to persuade the American public. Regardless of the number of reported instances of undisclosed foreign government-provided programming, Congress[98] and the Commission have consistently expressed their strong interest in the identification of foreign government sponsored programming on the airwaves.[99]

38. In response to commenters' concerns that the rules proposed in the *Second NPRM* would be overly burdensome for broadcasters, we emphasize how limited our action is in this order.[100] We are replacing the vacated name search requirement with a certification requirement and an alternative screenshot approach, which is essentially the name search requirement in a form that comports with the statute as interpreted by the D.C. Circuit in *NAB v. FCC*. We also note that we have significantly modified our initial proposals with regard to these new rules. For example, NAB/MMTC criticizes what

---

[93] Advertising Council Request for Declaratory Ruling or Waiver Concerning Sponsorship Identification Rules, Order, 17 FCC Rcd 22616, 22620, para. 15 (2002) (citations omitted).

[94] NAB/MMTC Comments at 32-33 (objecting to the Commission's "further sweeping mandates" regarding the program leasing process and required certifications from licensees and lessees).

[95] *Id.* Using similar reasoning in support of its argument that all commercial advertising and faith-based programming should be exempted, NAB/MMTC asserts that the rules, as applied to these programming types, are arbitrary and capricious in contravention of the APA. *Id.* at 34-35, 39-40. Other commenters make similar APA-related arguments. *See* Gray TV Comments at 5-7 (arguing that the Commission has failed to identify facts "demonstrating that enhanced requirements are needed to address an actual regulatory problem"); Alpha Media et al. Reply at 5-6 (arguing that without further evidence of a regulatory problem, the *Second NPRM* proposals to the foreign sponsorship identification rules would "run afoul of the [APA's] reasoned decision-making requirements").

[96] *See Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 141 (D.C. Cir. 2005) (quoting *Certified Color Mfrs. Ass'n v. Mathews*, 543 F.2d 284, 296 (D.C. Cir. 1976)).

[97] *See supra* note 2.

[98] *See, e.g.*, Press Release, Congresswoman Anna G. Eshoo, Rep. Eshoo Applauds FCC Foreign Sponsorship Identification Rules (Mar. 15, 2022), https://eshoo.house.gov/media/press-releases/rep-eshoo-applauds-fcc-foreign-sponsorship-identification-rules.

[99] *See First NPRM*, 35 FCC Rcd at 12100-05, paras. 4-11 (highlighting the long history of Congress' and the Commission's involvement in establishing rules for sponsorship identification on broadcast programming); *see also FCC Warns About Broadcast of Controversial Foreign Matter Without Indicating Foreign Sponsorship*, Public Notice, 40 FCC 136 (1962) (articulating that the "[A]ct further places an obligation on Commission licensees to exercise reasonable diligence to obtain, from those with whom they deal directly in connection with any program, information to enable them to make the required announcement").

[100] *See, e.g.*, NAB/MMTC Comments at 32-33 (arguing that the proposals under the *Second NPRM* would create unnecessary burdens for broadcasters, including the revision of existing leasing processes and uploading of certifications in their public files). NAB/MMTC also argue that the existing rule is unduly burdensome. *Id.* at 14-19. We decline to address arguments related to the existing rules. *See supra* paras. 32-33.

it describes as "lengthy certifications containing [Commission]-specified language."[101]  As discussed above, the standardized certification language appended to this order has been reduced significantly and now provides a simple check-box format.  Additionally, application of the Commission's standardized certification language is now one of two options available to licensees.  Similarly, in response to commenter objections about uploading certifications and other documentation to their OPIFs,[102] we have decided to permit licensees to instead maintain this documentation in their private files if they choose.

39.      Moreover, in response to commenter concerns about having to repeat the certification or screenshot requirements on a weekly basis for religious programmers, many of whom may not have the resources to enter into long-term leases,[103] we have modified the frequency with which the certification/screenshot process must be conducted for such leases.[104]  Similarly, concerns about uploading documents associated with short term leases to the OPIFs have been addressed by permitting licensees to retain their certifications/screenshots in their internal files.[105]  With regard to NAB/MMTC's argument that new requirements "would further complicate (i.e., burden) existing business relationships," we have grandfathered existing leases until they are either up for renewal or the parties enter into a new lease.[106]  Finally, we decided not to adopt the *Second NPRM*'s proposal to have licensee's report to us when lessees have failed to respond to licensee requests for certifications/screenshots.

40.      Thus, we have tailored our reasonable diligence requirements appropriately to accomplish our goal of ensuring the accurate detection and disclosure of foreign government-provided programming while also mitigating the burden of compliance on broadcasters.  Transparency regarding the source of broadcast programming, particularly foreign government-provided programming, gives broadcast audiences the information they need to fully appreciate the programming.  Moreover, an expectation of transparency regarding the source of programming also enhances audience trust in broadcast programming overall—unlike other media, broadcast audiences can feel confident that either their programming is provided by their local licensee, or the source of other programming is being disclosed.  Our careful tailoring in the instant order executes a balanced approach, minimizing the overall burden of compliance on broadcasters while concurrently supporting the objectives of accurate detection and disclosure, so as to ensure that the American broadcast audience is informed about the source of its programming.

**B.       Application of Foreign Sponsorship Identification Requirements to Different Types of Programming**

41.      Below, we clarify that our foreign sponsorship identification requirements will not apply to advertising for commercial products or services to the extent such advertising falls within the exemption established in section 73.1212(f) of our rules.[107]  We also clarify that the foreign sponsorship identification rules will not apply to political candidate advertisements.  We do, however, determine that the foreign sponsorship identification rules will apply to issue advertisements and paid PSAs.  In addition, we confirm that the rule changes contained in the instant order do not alter our finding in the *First R&O* that the foreign sponsorship identification rules should not apply to noncommercial and educational

---

[101] NAB/MMTC Comments at 32.

[102] *Id.* at 19-20, 45-47; Gray TV Comments at 9-10.

[103] Gray TV Comments at 12-13.

[104] *See supra* para. 27.

[105] Gray TV Comments at 12-13.  We emphasize that independent of our foreign sponsorship identification rules, licensees have a separate obligation, pursuant to section 73.3526(e)(14) of our rules, to file *all* of their leases in their OPIF.

[106] NAB/MMTC Comments at 23.  *See infra* Section III.C.

[107] 47 CFR § 73.1212(f).

broadcast stations (NCEs).[108]  We decline to create an exemption from our foreign sponsorship identification rules for religious programming and locally produced and/or distributed programming.  We also address the application of our rules to section 325(c) permit holders.

### 1.    Advertisements for Commercial Goods and Services

42.    We clarify here that the Commission's long-standing sponsorship identification requirements for advertising for commercial products or services, as currently set out in section 73.1212(f) of our rules, also apply in the context of foreign sponsorship identification.[109]  We recognize that the use of the term "traditional, short-form advertising" in the *First R&O*[110] has inadvertently created unnecessary confusion about the application of the foreign sponsorship identification rules.[111]  While the intention behind using the term may have been to provide greater clarity, due to the resulting confusion, we reverse the Commission's previous decision to use that term and rely instead on the well-established exemption from sponsorship disclosure contained in section 73.1212(f) of our rules.

43.    Section 73.1212(f) states that:

"In the case of broadcast matter advertising commercial products or services, an announcement stating the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification, shall be deemed sufficient for the purpose of this section and only one such announcement need be made at any time during the course of the broadcast."

44.    If broadcast matter for a commercial product or service meets the requirements for a disclosure exemption under section 73.1212(f), the licensee need not make the inquiries contained in section 73.1212(j) of our rules, nor is the licensee required to air the disclosure set forth in section 73.1212(j)(1)(i).  For an advertisement to fall under the commercial exemption provisions of 73.1212(f), it must include the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification.[112]  By clarifying

---

[108] *First R&O*, 36 FCC Rcd at 7716, para. 29.

[109] *See* Alpha Media et al. Reply at 7 (noting that the existing sponsorship identification rules at section 73.1212(f) already require a clear indication of the sponsor of any advertisement); *see also* Petition for Clarification at 5 ("For now, it is enough that the Commission clarify that traditional broadcast advertisements of any length are subject to the basic disclosure requirements Section 73.1212 [sic] but not the enhanced requirements of the new rules.").  We dismiss the Petition for Clarification as moot because we have addressed the issues raised in that petition in this *Second R&O*.

[110] *First R&O*, 36 FCC Rcd at 7715-16, para. 28.

[111] *See* Audacy/Beasley Reply at 7 (claiming that the term "traditional short-form advertising" is vague and uncertain); Petition for Clarification at 2 ("The Affiliates Associations are concerned, however, about possible interpretations of the term 'traditional short-form advertising,' which is not defined in the *Report and Order*, and therefore seek clarity regarding the coverage of the rules.  Specifically, the Affiliates Associations are concerned that the term 'traditional short-form advertising' could be read narrowly, leaving various common forms of broadcast advertising subject to the new rules."); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 4-5 (filed Mar. 11, 2024) (NAB Mar. 11, 2024 *Ex Parte*) (arguing that use of the term "traditional short-form advertising" would lead to problems); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 5 n.13 (filed Mar. 21, 2024) (NAB Mar. 21, 2024 *Ex Parte*) (arguing that the term "traditional, short-form" advertising caused confusion among broadcasters); *see also* Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 2 (filed Mar. 3, 2023) (seeking an exclusion for advertisements for commercial products or services).

[112] 47 CFR § 73.1212(f).

that our foreign sponsorship identification rules do not trump the pre-existing sponsorship identification rules for advertising for commercial products or services, we address the concerns raised by commenters about the terminology used in the *First R&O* with regard to advertising.[113]

45.     The *Second NPRM* sought comment on whether to establish a "safe harbor" for advertisements of a certain length.[114]  Based on the record, we find that it is better not to place any minimum or maximum time limit on the broadcast matter that is subject to the exemption established in section 73.1212(f) of our rules.  Rather, we are persuaded to follow long-standing Commission precedent that distinguishes programming that is entitled to the disclosure exemption provided by section 73.1212(f).[115]  We believe that this clarification should address the questions that arose in response to our use of the term "short-form advertising" in the *First R&O*.[116]  With this additional clarification about the applicability of section 73.1212(f), we believe that we have addressed the concerns raised in the record about the length of various advertisements.

## 2.     Political Candidate Advertisements; Issue Advertisements; Paid Public Service Announcements

46.     In addition to the commercial products and services exemption discussed above, we exempt from the foreign sponsorship identification requirements the purchase of broadcast time by or on behalf of legally qualified candidates or their authorized committees pursuant to section 315 of the Act ("political candidate advertisements").[117]  The *Second NPRM* sought comment on the scope of the

---

[113] *See* NAB/MMTC Comments at 34; Gray TV Comments at 11-12; Affiliates Comments at 4; Audacy/Beasley Reply at 7; CMG Reply at 2-3; Scripps Reply at 4-5; Networks Reply at 6.

[114] *Second NPRM*, 37 FCC Rcd at 12018-19, para. 32.

[115] In determining whether it is appropriate for a licensee to rely on the section 73.1212(f) exemption from broadcast sponsorship identification in particular instances, the paramount concern is ensuring that the presentation does not, in the absence of such identifications, create viewer or listener ambiguity or confusion as to whether the item is sponsored, or by whom.  *See Sinclair Broadcast Group, Inc.*, Notice of Apparent Liability for Forfeiture, 32 FCC Rcd 10853, 10865-68, paras. 28-35 and n.84 (2017) (where the Commission considered and rejected applying a downward adjustment to the proposed forfeitures for 79 30-minute long-form programs sponsored by Huntsman Cancer Institute, which included incomplete sponsorship announcements that did not sufficiently identify Huntsman as the sponsor), *resolved by settlement*, Consent Decree, 35 FCC Rcd 5877 (2020).  In *Sinclair Broadcast Group, Inc.*, the Commission rejected the licensee's argument that identifications were unnecessary due to the section 73.1212(f) exemption, citing the case's factual background as even more problematic than an earlier precedent where reliance on the 73.1212(f) identification exemption was also unsuccessfully sought by a broadcaster, noting that "[i]n contrast [to *Jacor*], Sinclair's long-form programs were not merely 60 seconds long, but 30 minutes long, and could not be considered 'clear' commercials as Sinclair itself claimed they were part of a [cancer educational awareness campaign]."  *Sinclair Broadcast Group, Inc.*, 32 FCC Rcd at 10867, para. 35 n.84.  *See also Jacor Broadcasting of Colorado, Inc.*, Memorandum Opinion and Order and Forfeiture Order, 12 FCC Rcd 9969, 9969-70, paras. 2-3 (1997) (rejecting the licensee's argument that the section 73.1212(f) exemption applied, and affirming the Mass Media Bureau's finding that, in an advertisement promoting the commercial services and attractions of a tourist town, the area services and attractions were "not obviously intertwined in the public mind" with the actual sponsor, the Chamber of Commerce, so as to obviate listener confusion as to the sponsor's identity).

[116] *See* Affiliates Comments at 1-2 (noting that while the Commission clarified that the foreign sponsorship identification rules do not apply to "traditional, short-form advertising," such a category is not defined by the Commission's rules); NAB/MMTC Comments at 34 (noting that the inclusion of qualifiers "traditional" and "short-form" in reference to advertising has created substantial confusion among broadcasters).

[117] Political candidate advertisements, as used herein, refers to "uses" of broadcast stations by legally qualified candidates and are governed primarily by section 315 of the Act, which subjects such uses to specific disclosure requirements.  Section 315(b)(2)(C) requires that a television advertisement from a legally qualified candidate include, at the end, a clearly identifiable photographic or similar image of the candidate, and a clearly readable printed statement, identifying the candidate and stating that the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast.  Section 315(b)(2)(D) requires that a radio advertisement

(continued….)

advertising exemption adopted in the *First R&O*,[118] and several parties in response have asked whether advertisements paid by or on behalf of legally qualified candidates or their authorized committees would be subject to the requirements of the foreign sponsorship identification rules.[119]  We recognize that there are statutory restrictions as well as Federal Election Commission rules prohibiting contributions to federal, state, and local candidates by "foreign nationals," a term that is defined to include certain of the entities covered by our foreign sponsorship identification rules, specifically a "government of a foreign country" and a "foreign political party."[120]  Because of these restrictions, the likelihood that political candidate advertisements would require disclosures under the foreign sponsorship identification rules is greatly limited.  Accordingly, we are persuaded to exempt political candidate advertisements from the foreign sponsorship identification requirements.

47.    However, issue advertisements and paid PSAs will be subject to the foreign sponsorship identification rules.  For purposes of these rules, and consistent with the Act and the Commission's rules, we clarify that issue advertisements are defined as any paid political matter or matter involving the discussion of a controversial issue of public importance, regardless of the length of the programming.[121]  As noted above, we have specifically exempted advertisements made by or on behalf of legally qualified candidates for public office or their authorized committees, and as such they will not be considered issue advertisements.  Our exemption from the foreign sponsorship identification rules for political candidate advertisements is based largely on the fact that foreign nationals are prohibited from making contributions to political candidates.  Moreover, section 315 of the Act provides a level of transparency regarding the source of funding for political candidate advertising that is not available with issue advertising and paid PSAs because section 315 requires political candidates themselves to state that their authorized committee has paid for the advertisement and that the candidate approves the advertisement.[122]  While NAB notes that foreign nationals also are prohibited from funding certain types of issue advertisements related to elections,[123] our definition of issue advertisements for purposes of these rules is broader in scope than the advertisements that NAB references in that our definition encompasses issue advertisements unrelated to elections.  Therefore, we cannot be as assured of foreign noninvolvement with respect to issue advertisements.  Rather than adopt a definition that attempts to parse the different types of issue

---

(Continued from previous page)

from a legally qualified candidate include, at the end, a personal audio statement by the candidate that identifies the candidate and the office the candidate is seeking, and indicates that the candidate has approved the broadcast.  *See* 47 U.S.C. § 315(b)(2)(C) and (D).

[118] *Second NPRM*, 37 FCC Rcd at 12018-19, para. 32.

[119] *See* NAB Mar. 11, 2024 *Ex Parte* at 5 and NAB Mar. 21, 2024 *Ex Parte* at 5 (arguing that political advertising in the form of candidate and/or issue advertisements, and paid public service announcements, should not be considered leases); Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1 (filed Mar. 22, 2024) (arguing that the Commission should exempt all advertisements from the foreign sponsorship identification rules in order to not inadvertently include political advertisements within the scope of the definition of "leases").

[120] *See* Federal Election Commission, 11 C.F.R. § 110.20(b) (prohibiting foreign nationals from directly or indirectly contributing or donating to any federal, state or local election) and 11 C.F.R. § 110.20(c) (prohibiting foreign nationals from contributing or donating to a political committee of a political party); Department of Justice, 52 U.S.C. § 30121(a) (prohibiting foreign nationals from contributing or donating to federal, state or local elections).

[121] *See* 47 U.S.C. § 317(a)(2); 47 CFR § 73.1212(e).

[122] *See supra* note 117.

[123] Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 3-4 n.14 (filed May 17, 2024) (NAB May 17, 2024 Legal Authority *Ex Parte*) (citing Federal Election Commission, *Foreign Nationals*, https://www.fec.gov/help-candidates-and-committees/foreign-nationals/; 52 U.S.C. § 30121; 11 CFR § 110.20).

advertisements, and to ensure maximum transparency for viewers and listeners, we will apply the foreign sponsorship identification rules to all issue advertisements and paid PSAs.

48.     We reject NAB's argument that the rules should not cover paid PSAs and issue advertising because the "entire scope of this proceeding is, and has always been, about leases, and not advertisements."[124]  As reflected in the *First R&O*, our definition of "lease" for purposes of the foreign sponsorship disclosure requirements includes "any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by another party in return for some form of compensation."[125]  This definition is sufficiently broad to cover issue advertising and paid PSAs within the scope of the rules.  This is a point that regulated entities well understood, as reflected in the filing of a Petition for Clarification.[126]  Certainly, paid PSAs and issue advertising could be used by foreign governmental entities to access U.S. airwaves to persuade the American public.  Thus, ensuring that audiences are accurately informed when foreign governmental entities sponsor issue advertisements and paid PSAs is equally important as it is in the case of other types of paid programming.  Indeed, section 317 of the Act recognizes the heightened concern about the source of issue advertisements, providing that the Commission shall not be precluded from requiring that an appropriate announcement shall be made at the time of the broadcast of any political program or program involving the discussion of any controversial issue for which any material was furnished as an inducement to the broadcast of such program.[127]  As such, it follows that such advertising should also be vetted for the possible inclusion of material provided by a foreign governmental entity.[128]

---

[124] *See* Letter from Erin Dozier, Senior Vice President & Deputy General Counsel, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1 (filed May 6, 2024) (NAB May 6, 2024 *Ex Parte*); Letter from Erin Dozier, Senior Vice President & Deputy General Counsel, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1-2 (filed May 10, 2024).

[125] *First R&O*, 36 FCC Rcd at 7715, para. 28.

[126] *See* Petition for Clarification at 5 (stating that "[f]or now, it is enough that the Commission clarify that traditional broadcast advertisements of any length are subject to the basic disclosure requirements [of] Section 73.1212 but not the enhanced requirements of the new rules"); *but see* Letter from Timothy Nelson, Brooks Pierce, Counsel for ABC Television Affiliates Association and NBC Television Affiliates, and on behalf of Jason Rademacher, Counsel for FBC Television Affiliates Association and CBS Television Network Affiliates, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1-3 (filed May 13, 2024) (arguing that the Commission's application of the foreign sponsorship identification rules to issue advertisements and PSAs would not be a foreseeable outcome of the clarification sought in the petition); Letter from Julia Ambrose, Brooks Pierce, Counsel for ABC Television Affiliates Association and NBC Television Affiliates, and on behalf of Jason Rademacher, Counsel for FBC Television Affiliates Association and CBS Television Network Affiliates, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1 (filed May 20, 2024) (Affiliates May 20, 2024 *Ex Parte*) (objecting to the idea that the Petition for Clarification could serve as a basis for applying the rules to various types of advertising, such as PSAs); Letter from Julia Ambrose, Brooks Pierce, Counsel for ABC Television Affiliates Association and NBC Television Affiliates, and on behalf of Jason Rademacher, Counsel for FBC Television Affiliates Association and CBS Television Network Affiliates, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1 (filed May 21, 2024) (Affiliates May 21, 2024 *Ex Parte*) (echoing the concerns of the Affiliates May 20, 2024 *Ex Parte*).

[127] 47 U.S.C. § 317(a)(2).

[128] In this regard, we note that NAB states that stations currently rely on standardized forms developed by NAB for their political broadcasting agreements.  *See* NAB May 6, 2024 *Ex Parte* at 2, n.5 (citing to NAB's "Political Broadcast Agreement Form for Non-Candidate/Issue Advertisements").  The existence of these forms, and presumably broadcasters' familiarity with when to use them, should simplify the process of complying with the certification option contained in this order.  The standardized form could easily be modified to insert the required inquiries, or broadcasters could append certifications or a request for screenshots, as necessary.  Contrary to NAB's assertions, there is no conflict between the diligence standards applied in this order with regard to the certifications and what NAB states is the diligence standard in the political broadcasting context.  *See id.* at 4 (asking how "the conflicting diligence standards for political advertising and foreign sponsorship identification [would] work

(continued….)

49.    Our decision to make the foreign sponsorship identification rules applicable to issue advertisements and paid PSAs falls within the scope of this proceeding.[129]  In the *Second NPRM*, we sought comment on "what criteria the Commission might adopt to distinguish between advertising and programming arrangements for the lease of airtime in a way that does not jeopardize the Commission's goals in this proceeding."[130]  Additionally, we sought, and received, comment on whether there are "key characteristics that could assist in distinguishing advertising spots from a lease of airtime on a station . . . ."[131]  In considering the key characteristics for political candidate advertisements, we determine that the risk of influence by a "government of a foreign country" and a "foreign political party" is minimal.  Therefore, such advertisements will be exempt from the foreign sponsorship identification rules.  In contrast, as noted above, issue advertisements and paid PSAs do not share those same characteristics.  Issue advertisements and paid PSAs cover a wide range of subject matter and are purchased by a wide range of sponsors.  As such, there is a risk that contributions to such programming might have been made by foreign governmental entities.

50.    Broadcasters allege that applying the rules to issue advertisements and paid PSAs will result in costly burdens that will discourage political advertisers from using traditional media by, among other things, slowing down transaction times for advertisements that rely on quick turnaround times, requiring that signatures be obtained, and necessitating training for advertising sales staff.[132]  We note that this order alleviates a number of the proposed requirements contained in the *Second NPRM*, which broadcasters cite to as examples of burdens that would adversely impact them in the context of issue advertisements and paid PSAs.  For example, this order significantly simplifies and shortens the Commission's standardized certification templates, while also allowing broadcasters to use their own certification language should they choose to do so.[133]  Based on concerns raised in the record, the certification requirement contained in this order does not require licensees to obtain "signed certifications" as was proposed in the *Second NPRM*, but rather states that if a licensee does not obtain a response, or obtains an inadequate response to its reasonable diligence inquiries, it may continue to air the programming.[134]  To the extent that broadcasters are concerned about whether obtaining signed certifications might delay their ability to meet their current OPIF filing requirements under the political advertising rules, we note that, unlike the proposal in the *Second NPRM*, this order allows broadcasters to

---

(Continued from previous page) ─────────────
together").  Similar to what NAB states occurs in the political advertising context, this order does not require broadcasters to "obtain" anything, rather only to make the appropriate inquiries.  *See id.*; *see also supra* para. 28.

[129] *See* NAB May 6, 2024 *Ex Parte* at 5 (asserting that addressing the issue of political advertising, which NAB has raised in multiple ex partes in this proceeding, is somehow beyond the scope of this proceeding).

[130] *Second NPRM*, 37 FCC Rcd at 12018-19, para. 32.

[131] *Id.*

[132] *See, e.g.*, Letter from Rick Kaplan, Chief Legal Officer and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 2-6 (filed May 17, 2024) (NAB May 17, 2024 Burdens *Ex Parte*); Letter from Jason Rademacher, Cooley, Counsel for FBC Television Affiliates Association and CBS Television Network Affiliates, and on behalf of Timothy Nelson and Julia Ambrose, Counsel for ABC Television Affiliates Association and NBC Television Affiliates, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1-2 (filed May 16, 2024); Affiliates May 20, 2024 *Ex Parte* at 1-2; Affiliates May 21, 2024 *Ex Parte* at 1-2.

[133] *See* NAB May 17, 2024 Burdens *Ex Parte* at 4 (stating that appending the certification contained in the *Second NPRM* "would triple the number of words on the [PB-19] form").

[134] *See supra* para. 26; *see also* NAB May 17, 2024 Burdens *Ex Parte* at 3-4 (stating that requiring broadcasters to "obtain signed certifications from advertisers" would be a "major and unprecedented change" and noting that the PB-19 is frequently not signed).

file their foreign sponsorship identification documentation in their own records.[135]  To the extent that broadcasters wish to keep all such documentation in their OPIFs, they need only supplement their OPIF file after receiving the certifications or screenshots.  We find that the modifications made in this order to the proposals contained in the *Second NPRM* address many of the concerns identified by broadcasters regarding the application of the foreign sponsorship identification rules to issue advertisements and paid PSAs.  In fact, the foreign sponsorship identification requirements contained in this order are very similar to what NAB itself has suggested should be the requirement.  NAB states: "To the extent any such rule is justified, the Commission should simply require broadcasters to add to their standard inquiry the question whether the person who paid for or furnished the leased programming (or, in the case of any political program or any program involving the discussion of a controversial issue, furnished the programming or materials at no or nominal charge as an inducement to the broadcast of such program) is a foreign governmental entity, and, if so, from what country."[136]  The Commission's model certification template for lessees to complete, attached as Appendix D, contains only three questions.  The first question asks the lessee to tick off in check-box format whether it is a "foreign governmental entity."  The second question asks the lessee if it was provided any inducement to air the programming, and the third asks the lessee to provide the information needed for the broadcaster to air the required disclosure.  Based on the above, we conclude that the benefits of applying the foreign sponsorship identification rules to issue advertisements and paid PSAs outweigh the burdens associated with complying with the rules.

### 3.    Programming on Noncommercial and Educational Stations

51.    We confirm that this *Second R&O* does not alter our prior finding that the foreign sponsorship identification rules should not apply to NCEs.  Public Broadcasters ask us to confirm this position.[137]  As Public Broadcasters state, the Commission prohibits NCEs from receiving compensation in exchange for broadcasting programs (i.e., leased programming).[138]  Because the foreign sponsorship identification rules apply only to leased programming, we concluded in the *First R&O* that any NCEs in compliance with the prohibition "should not fall within the ambit of the foreign sponsorship identification requirements."[139]  The *First R&O* explained that, "given limitations on the ability of NCE stations to engage in leasing arrangements, we expect that NCE stations will rarely, if ever, face the need to address our foreign sponsorship disclosure rules."[140]  We confirm that none of the rule modifications we adopt today in this *Second R&O* has any effect on our previous conclusion.

### 4.    Religious and Locally Produced and/or Locally Distributed Programming

52.    We decline to adopt commenters' request to create exemptions from the new foreign sponsorship identification rule requirements for certain types of programming.[141]  NAB/MMTC and other commenters argue that we should narrow the definition of "lease" by granting exemptions for certain categories of programming, specifically religious programming and locally produced and/or locally

---

[135] *See* NAB May 17, 2024 Burdens *Ex Pa*rte at 4 (stating that, because a broadcaster has only one business day to place information about an advertising order in its OPIF, any delay associated with getting the foreign sponsorship identification certification might delay compliance with political advertising rules).

[136] *See* NAB May 17, 2024 Legal Authority *Ex Pa*rte at 9.

[137] *See* Public Broadcasters Comments at 2-3 (expressing concern that NCEs could be swept up by the rules accidentally simply by using innocuous content, such as stock video footage or audio from a foreign tourism board).

[138] *See id.* at 2; *see also* 47 CFR § 73.621(d) (providing that a "noncommercial educational television station may broadcast programs produced by or at the expense of, or furnished by persons other than the licensee, if no other consideration than the furnishing of the program and the costs incidental to its production and broadcast are received by the licensee"); 47 CFR § 73.503(c) (providing a parallel rule for noncommercial educational radio stations).

[139] *First R&O*, 36 FCC Rcd at 7716, para. 29, n.87.

[140] *Id.* at 7716, para. 29.

[141] We decline to revisit the existing rule requirements for the reasons set forth above.  *See supra* paras. 32-33.

distributed programming.[142]  We find that creating the requested exemption for religious programming would not be content-neutral.  Additionally, the mere fact that programming is locally produced and/or locally distributed does not signify that the programming lacks material provided by a foreign governmental entity, such that there should be a blanket carveout for locally produced and/or distributed programming from the new foreign sponsorship identification rule requirements.

53.　　We recognize that religious programming and locally produced and/or locally distributed programming play a vital role in supporting local communities.[143]  Just as important as having access to such programming is knowing the true source of the programming.  Commenters make two arguments in favor of their requested exemptions.  First, they assert that these exemptions are justified because, based on their inquiries to date, they have not found any foreign governmental entities sponsoring religious programming or locally produced and/or locally distributed programming.[144]  Second, commenters claim that our new foreign sponsorship identification rule requirements are so burdensome that, ultimately, they will lead to a reduction in religious and locally produced and/or locally distributed programming.[145]

54.　　With regard to the first argument, we emphasize that "a wave of foreign propaganda on radio and television stations"[146] is not a prerequisite to Commission action, and "[a]n agency need not suffer the flood before building the levee."[147]  Furthermore, providing a consistent set of rules for all leased programming streamlines the process of compliance for licensees and closes the door to any attempt to exploit loopholes that might arise from these exemptions.[148]

---

[142] NAB/MMTC Comments at 38-41; Gray TV Comments at 12; Affiliates Reply at 2-3, 4; Scripps Reply at 5; Alpha Media et al. Reply at 6-7; Audacy/Beasley Reply at 7; CMG Reply at 3; Religious Programmers Reply at 3, 16;  Religious Broadcasters Reply at 1-2, 4; NAB Mar. 11, 2024 *Ex Parte* at 1-4.

[143] *See* NAB/MMTC Comments at 36 (highlighting the value of locally based programming); Gray TV Comments at 12 (noting how programming featuring local houses of worship provides an important public service to viewers); Alpha Media et al. Reply at 8 (recognizing the value of programming featuring local houses of worship); Religious Programmers Reply at Exh. 1 (providing the declaration of a pastor who attests to the strong ties between the broadcast of his church's programming and the local community).

[144] NAB/MMTC Comments at 39-40; Gray TV Comments at 12; Scripps Reply at 5-6; Alpha Media et al. Reply at 8; Audacy/Beasley Reply at 7; *see also* Letter from Bishop L. Spenser Smith, The Impact Nation Fellowship Church, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1 (filed Feb. 2, 2023) (Smith *Ex Parte*); Letter from Gloria Cooks, Music Ministries, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 20-299, at 1-2 (filed Jan. 30, 2023) (Cooks *Ex Parte*).

[145] *See, e.g.,* NAB/MMTC Comments at 22, 37, 44 (highlighting the short duration, minimal renumeration, and financial constraints associated with most agreements between licensees and religious programmers, or local programmers); CMG Reply at 3 (contending that the rules will further add to administrative costs associated with local programming and thus will reduce offerings of local programming); Religious Broadcasters Reply at 2 (arguing that the rules will make it more difficult for religious programmers to find broadcasting platforms); Religious Programmers Reply at 11-13 (asserting that, given the week-to-week lease arrangements that religious programmers often enter into due to financial constraints, their programming will be at a competitive disadvantage relative to commercial paid-programming); Smith *Ex Parte* at 1-2; Cooks *Ex Parte* at 1-2.

[146] Brief for the United States at 36, *NAB v. FCC*, 39 F.4th 817 (D.C. Cir. 2022) (No. 21-1171), https://www.fcc.gov/document/brief-fed-respts-nab-v-fcc (quoting Petitioners' Opening Brief 43).

[147] *Stilwell v. Off. Of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).

[148] Scripps and NAB/MMTC contend there is a lack of foreign government-provided "propaganda" on religious or locally produced and distributed programming.  Scripps Reply at 5-6; NAB/MMTC Comments at 39.  However, this argument misses the aim of our rules.  The foreign sponsorship identification rules are intended to notify the public when the source of the programming is a foreign governmental entity.  Therefore, as a general principle of law, the content of the broadcast matter for purposes of these rules is irrelevant, and the issue of "propaganda" bears no weight.

55.     On the issue of burdens, as described above, the new rule requirements are limited in scope, and we have modified significantly the proposals contained in the *Second NPRM* to address many of the burden concerns noted by commenters.  Contrary to NAB/MMTC and Gray TV's assertions, the requirements adopted in this order do not seek to favor or disfavor any particular type of programming.[149]  Our rules do not prohibit any form of programming, but do seek to ensure that broadcast audiences are aware of the source of foreign government-provided programming.[150]

56.     The Religious Programmers contend that our new rule requirements will make it more expensive for licensees to air religious and locally produced and/or distributed programming.  Citing *Washington Post v. McManus*,[151] the Religious Programmers assert that our new rule requirements equate to "putting a thumb on the scale against a particular type of speech in the competitive market . . . "[152] in violation of the First Amendment.  We find the *McManus* case to be inapposite because that case involved the singling out of "one particular topic of speech" based on its content,[153] which is not presented by the rules we adopt here.[154]

57.     In a similar vein, Religious Broadcasters contend that our new rule requirements violate religious programmers' rights to freedom of speech under the Supreme Court's 2018 decision in *National Institute of Family and Life Advocates (NIFLA) v. Becerra*.[155]  In that case, the Supreme Court held that to protect the petitioners' rights to freedom of speech, disclosure requirements must not be unduly burdensome, remedy a harm that is purely hypothetical, or extend more broadly than reasonably

---

[149] *See* NAB/MMTC Comments at 25 (arguing that "[b]eyond chilling speech, the existing and proposed rules also burden religious exercise under the First Amendment"); Gray TV Comments at 8 (arguing that the certification requirements "could also cause broadcasters to forego relationships with suppliers of programming that they view as delivering highly valuable content to viewers—including religious programming []—in favor of programming that they view as less responsive to viewer needs or that can be obtained more easily from sophisticated parties that are familiar with the FSID rules").

[150] NAB/MMTC also asserts in the context of arguing for an exemption for religious programming that our foreign sponsorship identification rules, as applied to religious programming, violate the PRA.  NAB/MMTC Comments at 40, n.76.  According to NAB/MMTC, because "there is no evidence that religious programming leases may contain foreign propaganda," the information collections associated with the foreign sponsorship identification rules do not meet the PRA standard of being "necessary for the proper performance of the functions of the Commission."  *Id.*  We have determined, however, that our new rule requirements should be applied to all broadcast licensees, to fulfill our existing statutory duty to inquire about the source of programming, which contains no exemption for religious programming lessees or any other designation.  We also have determined that the new rules are a minimal extension of the long-standing sponsorship identification rules and in no way burden broadcasters' choice of leased programming or chill editorial discretion in favor of more sophisticated programmers.  The Office of Management and Budget (OMB) will consider the new rule requirements under the PRA standards, including whether the information collection requirements are "necessary for the proper performance of the functions of the [Commission], including whether the information shall have practical utility …," *see* 44 U.S.C. § 3508, separately in the PRA review process.  Moreover, we note that our current foreign sponsorship identification rules received OMB approval pursuant to the PRA.

[151] *Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019).

[152] *See* Religious Programmers Reply at 13-14 (citing *McManus*).

[153] *McManus*, 944 F.3d at 513.

[154] In fact, the adoption of commenters' approach *would make* our rules content-based, by only applying the rules to non-religious programming.  In addition, the *McManus* court distinguished newspapers from broadcasters, noting that the "broadcast industry has always held a distinctive place in First Amendment law on the ground that '[b]roadcast frequencies are a scarce resource [that] must be portioned out among applicants.'"  *McManus*, 944 F.3d at 519 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)).

[155] *See* Religious Broadcasters Reply at 3 (citing *National Institute of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2367 (2018) (*NIFLA v. Becerra*)).

necessary.[156] We find this case, imposing a medical disclosure requirement, to be inapposite. We find that Religious Broadcasters' comparison to *Becerra* is substantively misplaced because the type of disclosure we require is wholly content-neutral. The *Becerra* case involved a content-based disclosure requirement, which was found to be an impermissible regulation of speech because the required disclosures in that case altered the content of petitioners' speech by requiring them to post information contrary to the messages they wished to convey.[157] By contrast, our new requirements do not alter the content of the programming, nor do they prohibit or limit the ability of the licensee or lessee to air the programming or to convey whatever message is intended. The public has a legitimate interest in knowing the source of programming that is furnished by a foreign governmental entity, and broadcasters have demonstrated for years their capability of airing similar disclosures for programming sponsored by U.S. lessees. As described below, public awareness of the source of broadcast programming is a long-recognized compelling government interest, and the modifications we have made in response to commenter concerns ensure that our rules are narrowly tailored.[158]

58.    The new foreign sponsorship identification rule requirements we adopt today comport with the strictures of the First Amendment of the U.S. Constitution. The rules at issue here are content-neutral—they apply to broadcast programming provided by any foreign governmental entity, regardless of whether the entity's interests are directly at odds with the United States.[159] Accordingly, with respect to broadcasters, the disclosure requirements in question are subject to review under "heightened rational basis," the less rigorous standard applied to content-neutral restrictions on that medium, and thus, as explained below, will be upheld if reasonably tailored to satisfy a substantial government interest.[160]

---

[156] *NIFLA v. Becerra,* 138 S.Ct. at 2377.

[157] *Id.* at 2378.

[158] Religious Broadcasters also contend that our new rule requirements contravene the strictures of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb3(a), which prohibits federal agencies from substantially burdening "a person's exercise of religion even if the burden results from a rule of general applicability, except" when the government action "is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." *See* Religious Broadcasters Reply at 3 (quoting 42 U.S.C. § 2000bb *et seq*.). As described above, the principle that the public has a right to know the identity of those that solicit their support is a long-standing tenet of broadcast regulation, and the rules we adopt today are merely an extension of the sponsorship identification rules that have been in place for decades.

[159] *See Turner Broad. Sys. Inc. v. FCC,* 512 U.S. 622, 658 (1994) (speaker-based laws are suspect "when they reflect the Government's preference for the substance of what the favored speakers have to say [or aversion to what the disfavored speakers have to say]"). We disagree with NAB's assertion that our differentiation between political candidate advertisements and issue advertisements is a content-based distinction that violates the First Amendment. *See* NAB May 6, 2024 *Ex Parte* at 5 (arguing that "any attempt to delineate between 'candidate' ads and 'issue' ads would violate the First Amendment as a content-based restriction on speech"). Contrary to NAB's assertion, we distinguish between political candidate advertisements and issue advertisements/paid PSAs not based on their content but instead based on the different regulatory regimes applicable to these different advertisements. *See supra* para. 46 (explaining that federal law limits contributions by foreign nationals in connection with political candidate advertisements and that political candidate advertisements are subject to existing statutory on-air disclosure requirements set forth in section 315 of the Act).

[160] *Ruggiero v. FCC,* 317 F.3d 239, 247 (D.C. Cir. 2003) (en banc) (explaining that this standard represents a middle ground "between . . . minimal scrutiny . . . and . . . intermediate scrutiny . . ."). Even if the regulations here were found to be content based, they would be subject to the lesser standard of intermediate scrutiny. *See League of Women Voters,* 468 U.S. at 380-81 (invalidating under the First Amendment a statute forbidding any non-commercial educational station that receives a grant from the Corporation for Public Broadcasting to "engage in editorializing"). While a content-based regulation of speech is typically subject to strict scrutiny, the Supreme Court has described First Amendment review of broadcast regulation as "less rigorous" than in other contexts based on the spectrum scarcity rationale. *See Turner,* 512 U.S. at 637 (citing *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 388-89 (1969); *see also League of Women Voters,* 468 U.S. at 377 ("our cases have taught that, given spectrum scarcity, those who are granted a license to broadcast must serve in a sense as fiduciaries for the public by presenting

(continued….)

Even assuming that intermediate scrutiny applies, we conclude that our new rules satisfy review under this standard. As set forth below, we determine that the government's interest in ensuring that audiences are accurately informed when foreign governmental entities sponsor broadcast programming is substantial and the rules are both "reasonably tailored" to further that interest.

59. The Commission's application of section 317 for over eighty years, as well as Congress's 1960 amendments thereto, demonstrate a strong interest in requiring accurate sponsorship identification.[161] Complete and accurate disclosure regarding the source of programming is critical to allowing audiences to determine the reliability and credibility of the information they receive.[162] We consider such transparency to be a critical part of broadcasters' public interest obligation to use the airwaves with which they are entrusted to benefit their local communities. Rather than abridging broadcasters' freedom of speech rights, we find that disclosure of sponsorship promotes First Amendment and Communications Act goals by enhancing viewers' ability to assess the substance and value of foreign government-provided programming, thus promoting an informed public and improving the quality of public discourse.[163] Our new requirements further the government's interest by ensuring that licensees have met their duty of inquiry and thereby will ensure accurate sponsorship identification.

60. In the instant order, we have also modified the proposals contained in the *Second NPRM* to address concerns raised in the record.[164] We have simplified the proposed certification requirement, by providing a shorter model certification template that follows a familiar check-box approach and by allowing licensees to use their own certifications, as long as those certifications include the information and queries laid out in the *First R&O*. In addition, licensees may choose whether to use either the certification or screenshot approach. Moreover, as noted above, in response to commenter concerns about having to frequently repeat the reasonable diligence process for short term leases, in those situations where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, we will require the licensee to only exercise its reasonable diligence obligations, including the certification/screenshot process, once per year. We believe the new foreign sponsorship identification rule requirements that we adopt today will be evaluated under, and will fully withstand, the scrutiny applied to content-neutral restrictions on broadcasters. Notably, our rules do not ban any type of speech but merely require a procedure for documenting reasonable diligence inquiries in support of the factual disclosure of the source of certain programming. Given this content-neutral function, the existing

(Continued from previous page) ─────────────────
'those views and voices which are representative of [their] community and which would otherwise, by necessity, be barred from the airwaves') (quoting *Red Lion*, 395 U.S. at 389). Some judges have, however, questioned the validity of the scarcity doctrine as justification for less rigorous First Amendment scrutiny of content-based regulation of broadcasters. *Cf. FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 532-535 (2009) (Thomas, J., concurring) (questioning the validity of *Red Lion*).

[161] *First R&O*, 36 FCC Rcd at 7703, para. 3 (stating the Commission properly balances "considerations of the First Amendment with the need for consumers to be sufficiently informed as to the origin of material broadcast on stations licensed on their behalf in the public interest").

[162] *First NPRM*, 35 FCC Rcd at 12127-29, paras. 55-57.

[163] *Id.* We note that Congress has recognized the critical importance of accuracy and transparency with regard to foreign government-provided programming in a number of contexts, including by its recent action extending the national security concerns underlying FARA to require the Commission to provide annual reports on U.S.-based foreign media outlets, defined by reference to FARA's foreign agent definitions, airing programming in the United States. *See* 47 U.S.C. § 624. Further, as explained in the *First NPRM,* foreign governments increasingly are making use of U.S. airwaves to promote their policies and viewpoints to the American public, thereby making the government's interest in accuracy and transparency regarding broadcast of foreign government-provided programming even more compelling. *First NPRM*, 35 FCC Rcd at 12128, para. 56.

[164] For example, in response to commenter concerns, the requirements imposed in this order do not require licensees to upload their certifications/screenshots to their OPIFs and the frequency with which certifications/screenshots must be obtained have also been modified for short-term leases. *See supra* paras. 27, 30.

tailoring, and our strong objective of accurate detection and disclosure of foreign government-provided programming, our rules comply with the First Amendment as they are reasonably tailored to satisfy substantial government interests.[165]  And even if a court were to apply intermediate scrutiny, as opposed to heightened rational basis, we believe that our revised rules still would withstand such a stricter form of judicial review.  The Commission has repeatedly stated the importance of promulgating rules that are substantially related to the agency's objective of ensuring that audiences are informed about the source of programming provided by foreign governmental entities.[166]  Ultimately, regardless of whether rational heightened basis or intermediate scrutiny is applied, we conclude that our new foreign sponsorship identification rule requirements satisfy the First Amendment.

### 5. Programming on Stations with Section 325(c) Permits

61.     As explained in the *Second NPRM*, "a section 325(c) permit is required when an entity produces programming in the United States but, rather than broadcasting the programming from a U.S.-licensed station, transmits or delivers the programming from a U.S. studio to a non-U.S. licensed station in a foreign country for broadcast by the foreign station into the United States."[167]  In the *First R&O*, we added paragraph (k) to section 73.1212, which makes section 325(c) permittees subject to foreign sponsorship identification requirements.[168]  In the *Second NPRM*, we explained that given the nature of the section 325(c) permits, pursuant to section 73.1212(k) of our rules, the foreign sponsorship identification disclosure requirements apply to any programming permitted to be delivered to foreign broadcast stations under an authorization pursuant to section 325(c) of the Act if the material has been: (i) sponsored by a foreign governmental entity; (ii) paid for by a foreign governmental entity; (iii) furnished for free by a foreign governmental entity to the section 325(c) permit holder as an inducement to air the material on the foreign station; or (iv) provided by the section 325(c) permit holder to the foreign station where the section 325(c) permit holder is a foreign governmental entity.[169]  Where the section 325(c) permit holder itself is a foreign governmental entity, the disclosure requirements apply to all programming provided by the permit holder to a foreign station.[170]

62.     In the *Second NPRM*, we noted that applying foreign sponsorship identification disclosures to programs permitted to be delivered to foreign broadcast stations under an authorization pursuant to section 325(c) of the Act aims to level the playing field between programming aired by non-U.S. and U.S. broadcasters in the same geographic area within the United States and to eliminate any

---

[165] *See, e.g., Sorrell v. IMS Health*, 564 U.S. 552, 563-64 (2011).  Our foreign sponsorship identification rules do not act as a ban on any type of programming nor prohibit participation in public discussion; rather, the rules merely require a factual statement regarding the sponsor of the programming.  *See Virginia Pharmacy Bd v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 (1976) (defining "content-neutral" speech regulations as "those that are justified without reference to the content of the regulated speech").

[166] *See First R&O*, 36 FCC Rcd at 7734-35, para. 69 (stating that the Commission has a "compelling" interest in ensuring broadcast audiences are informed about programming sponsored by foreign governmental entities and that the adopted reasonable diligence requirements are narrowly tailored and the least restrictive means of accomplishing that interest); *see also First NPRM*, 35 FCC Rcd at 12127, para. 55 (arguing that the adopted requirements would satisfy any level of scrutiny under the First Amendment).

[167] *Second NPRM*, 37 FCC Rcd at 12015, para. 25; *see also* 47 U.S.C. § 325(c).  Section 325(c) of the Act states: "No person shall be permitted to locate, use, or maintain a radio broadcast studio or other place or apparatus from which or whereby sound waves are converted into electrical energy, or mechanical or physical reproduction of sound waves produced, and caused to be transmitted or delivered to a radio station in a foreign country for the purpose being broadcast from any radio station there having a power output of sufficient intensity and/or being so located geographically that its emissions may be received consistently in the United States, without first obtaining a permit from the Commission upon proper application therefor."

[168] *First R&O*, 36 FCC Rcd at 7733-34, 7740, paras. 66-68, Appx. A.

[169] *Second NPRM*, 37 FCC Rcd at 12015, para. 25; 47 CFR § 73.1212(k).

[170] *Second NPRM*, 37 FCC Rcd at 12015, para. 25.

potential loophole in our regulatory framework with respect to the identification of foreign government-provided programming that may result from this proceeding.[171]

63.     In the *Second NPRM*, we further stated that the foreign sponsorship identification rules apply to all programming provided by a section 325(c) permit holder to a foreign broadcast station, regardless of whether the programming is provided as part of a lease agreement or through some other arrangement.[172]  As we explained, "[i]n the context of section 325(c) permits, leasing of airtime is not a relevant prerequisite for application of the foreign sponsorship identification rules because section 325(c) permit holders' foreign broadcast arrangements can be struck in various ways, not just through the leasing of airtime, under the laws of foreign countries."[173]  We further explained that in this context, "our rules ensure that no material provided by a permit holder that is a foreign governmental entity is broadcast into the United States through the use of section 325(c) permits without the appropriate disclosures."[174]  To provide greater clarity regarding the application of these disclosure requirements in the context of programming subject to a section 325(c) permit, we proposed to modify section 73.1212(k) and sought comment on these proposed changes and clarifications.[175]  We also sought comment on the need to apply the reasonable diligence requirements proposed in the *Second NPRM* to section 325(c) permit holders given that they presumably have direct knowledge of whether they are a foreign governmental entity.[176]  We noted that, regardless, "even if a permit holder is not itself a foreign governmental entity, the disclosure requirements apply to any part of its programming that is sponsored, paid for, or furnished for free by a foreign governmental entity either directly to the permit holder or to an entity farther back in the content production chain."[177]  To address such situations, we sought comment on that section 325(c) permit holders should be required to exercise reasonable diligence to determine when a disclosure is needed.  In addition, we sought comment on whether section 325(c) permit holders should be required to place the certifications that were proposed in the *Second NPRM*, or other due diligence documentation, in the International Bureau Filing System (IBFS) and if so, for how long.[178]

64.     We received no comments in response to the *Second NPRM* regarding the programming on stations with 325(c) permits.  Accordingly, we will adopt the proposed changes and clarifications proposed in the *Second NPRM*.  We reconfirm that it is the responsibility of the section 325(c) permit holder to ensure that the foreign station broadcasts the disclosure where required along with the programming provided by the permit holder.  We remind section 325(c) permit holders that they are obligated to place copies of any disclosures made, along with required related information as described in section 73.1212(k), in the publicly available International Communications Filing System (ICFS).

## C.     Existing Leases

65.     Any lease agreements that are entered into, or that are renewed, on or after the effective date of the revisions to section 73.1212(j)(3) adopted in this *Second R&O* must comply with those requirements.  Commenters ask that we grandfather all lease agreements already in place at the time that the new rules go into effect.[179]  NAB/MMTC states that any "lessee that has already certified it is not a

[171] *Id.* at para. 26.  *See also First NPRM*, 35 FCC Rcd at 12126, para. 53.

[172] *Second NPRM*, 37 FCC Rcd at 12016, para. 26.

[173] Id.

[174] Id.

[175] Id.

[176] *Id.* at 12016, para. 27.

[177] *Id.*

[178] Id.

[179] NAB/MMTC Comments at 23, n.34; Gray TV Comments at 7-8; CMG Reply at 4.

foreign governmental entity should not have to do so again unless or until it enters a new lease."[180] We agree with NAB/MMTC and have determined that the rule modifications we adopt today will apply only to new leases and renewals of existing leases entered into on or after the effective date for these rule modifications. We therefore decline to adopt our proposal in the *Second NPRM* to apply the modified rule to existing lease agreements with a six-month grace period for compliance.[181]

### D.   Digital Equity and Inclusion

66.   The Commission maintains a continuing effort to advance digital equity for all, including people of color, persons with disabilities, persons who live in rural or Tribal areas, and others who are or have been historically underserved, marginalized, or adversely affected by persistent poverty or inequality. As such, in the *Second NPRM* we sought comment on whether any of the proposals discussed therein might promote or inhibit advances in diversity, equity, inclusion, and accessibility.[182] While not specifically responding to our request for comment on Digital Equity and Inclusion, NAB/MMTC argues that a certification requirement has the effect of discouraging diverse entrants by burdening LMAs and TBAs.[183] Given the revisions to the proposed rules we adopt herein in order to resolve claimed burdens, we find that our actions today will not inhibit diverse entrants from participating in the broadcast media marketplace.

67.   This *Second R&O* furthers our ongoing commitment to advance digital equity by simplifying our compliance procedures, which will minimize any possibility that the foreign sponsorship identification rules will discourage the participation of small programmers, including minority-owned programmers, as some commenters have asserted. Further, this order adopts regulations that are content-neutral and that apply to all broadcasters and lessees equally, and will not inhibit advances in diversity, equity, inclusion, and accessibility.

## IV.   PROCEDURAL MATTERS

68.   *Regulatory Flexibility Act*. As required by the Regulatory Flexibility Act of 1980 (RFA), as amended,[184] an Initial Regulatory Flexibility Certification was incorporated into the *Second NPRM*. Pursuant to the RFA,[185] the Commission's Final Regulatory Flexibility Certification relating to this *Second R&O* is attached as Appendix B.

69.   *Paperwork Reduction Act*. This *Second R&O* may contain new or revised information collection requirements subject to the Paperwork Reduction Act of 1995, Public Law 104-13 (44 U.S.C. §§ 3501-3520) (PRA). All such new or modified information collection requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. §3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. In this present document, we have assessed the effects of the certification and screenshot requirement on licensees, and we find that the modifications in this order impose a minimal, justifiable burden on small entities.

---

[180] NAB/MMTC Comments at 23, n.34.

[181] *See Second NPRM*, 37 FCC Rcd at 12012, para. 20.

[182] *Id.* at 12019, para. 33.

[183] *See* NAB/MMTC Comments at 41-43.

[184] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601 *et seq.*, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996). The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996.

[185] *See* 5 U.S.C. § 604.

70.     *Congressional Review Act*.  The Commission has determined, and Administrator of the Office of Information and Regulatory Affairs, OMB, concurs, that this rule is "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this *Second R&O* to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

## V.     ORDERING CLAUSES

71.     Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in sections 1, 2, 4(i), 4(j), 303(r), 307, 317, and 325(c) of the Communications Act, 47 U.S.C. §§ 151, 152, 154(i), 154(j), 303(r), 307, 317, and 325(c) this *Second R&O* **IS ADOPTED**.

72.     **IT IS FURTHER ORDERED** that the Petition for Clarification filed by ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates **IS DISMISSED AS MOOT**.

73.     **IT IS FURTHER ORDERED** that this *Second R&O* **SHALL BE EFFECTIVE** 30 days after publication in the Federal Register, except that the revisions to section 73.1212(j)(3) of the Commission's rules, 47 CFR § 73.1212(j)(3), which may contain new or modified information collection requirements, will not be required until the Office of Management and Budget completes review of any information collection requirements that the Media Bureau determines is required under the Paperwork Reduction Act.  The Commission further directs the Media Bureau to announce the effective date for the revisions to section 73.1212(j)(3) by subsequent Public Notice.

74.     **IT IS FURTHER ORDERED** that the Commission's Office of the Secretary, Reference Information Center, **SHALL SEND** a copy of this *Second R&O*, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

75.     **IT IS FURTHER ORDERED** that Office of the Managing Director, Performance Program Management, **SHALL SEND** a copy of this *Second R&O* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION


Marlene H. Dortch
Secretary

# APPENDIX A

## Final Rules

### PART 73 – RADIO BROADCAST SERVICES

1.      The authority citation for part 73 continues to read as follows:

AUTHORITY: 47 U.S.C. 154, 155, 301, 303, 307, 309, 310, 334, 336, 339.

2.      Delayed indefinitely, amend § 73.1212 by revising the introductory text of paragraph (j)(3), paragraph (j)(3)(iv), and paragraph (j)(3)(v) to read as follows:

### § 73.1212 Sponsorship identification; list retention; related requirements.

\* \* \* \* \*

(j) \* \* \*

(3) The licensee of each broadcast station shall exercise reasonable diligence to ascertain whether the foreign sponsorship disclosure requirements in paragraph (j)(1) of this section apply at the time of the lease agreement and at any renewal thereof, or apply within a one-year period if the lessee and the programming remain unchanged, including:

\* \* \* \* \*

(iv) Memorializing that the licensee has complied with the requirements in paragraphs (j)(3)(i) through (iii) of this section and has sought to obtain a response from the lessee with the information needed to determine if a disclosure is necessary, and if one is necessary, the information needed to make the disclosure, either:

    (A) by executing a written certification attesting to the licensee's compliance and by seeking a written certification from the lessee; or

    (B) by complying with the information requirement contained in paragraph (j)(3)(i) of this section and by asking the lessee to provide screenshots of its searches of the Department of Justice's FARA website and the Commission's semi-annual U.S.-based foreign media outlets reports, in the event that lessee has stated it is neither a FARA agent nor a U.S.-based foreign media outlet, and asking lessee to provide other information needed to make such a determination (i.e., asking lessee whether it falls into the categories listed in paragraphs (j)(2)(i) and (j)(2)(ii) of this section that are not covered by the request for screenshots), and by making a record of the licensee's compliance efforts; and

(v) Retaining the documentation in the licensee's records for the remainder of the then-current license term or one year, whichever is longer, so as to respond to any future Commission inquiry.

\* \* \* \* \*

3.      Effective 30 days after publication in the Federal Register, amend § 73.1212 by adding paragraph (j)(8) and by revising paragraph (k) to read as follows:

\* \* \* \* \*

(j) \* \* \*

  (8) The requirements contained in paragraph (j) of this section shall not apply to "uses" of broadcast stations by legally qualified candidates pursuant to 47 U.S.C. § 315.

(k) Where any material delivered to foreign broadcast stations under an authorization pursuant to section 325(c) of the Communications Act (47 U.S.C. § 325(c)) has been sponsored by a foreign governmental entity; paid for by a foreign governmental entity; furnished for free by a foreign governmental entity to the section 325(c) permit holder as an inducement to air the material on the foreign station; or provided by the section 325(c) permit holder to the foreign station where the section 325(c) permit holder is a foreign governmental entity, the material must include, at the time of broadcast, the following disclosure, in conformance with the terms of paragraphs (j)(4) through (6): "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]." A section 325(c) permit holder shall ensure that the foreign station will broadcast the disclosures along with the material and shall place copies of the disclosures required along with the name of the program to which the disclosures were appended in the International Communications Electronic Filing System (ICFS) under the relevant ICFS section 325(c) permit file. The filing must state the date and time the program aired. In the case of repeat airings of the program, those additional dates and times should also be included. Where an aural announcement was made, its contents must be reduced to writing and placed in the ICFS in the same manner. The section 325(c) permit holder shall exercise reasonable diligence to ascertain whether the foreign sponsorship disclosure requirements of paragraphs (j)(1) and (j)(4) through (6) apply to any material delivered to a foreign broadcast station, including obtaining from its employees, and from other persons with whom it deals directly in connection with any matter for broadcast, and in the same manner prescribed for broadcast stations in paragraph (j)(3), information to enable the permit holder to include the announcement required by this section; memorializing its conduct of such reasonable diligence; and retaining such documentation in its records for either the remainder of the then-current permit term or one year, whichever is longer, so as to respond to any future Commission inquiry. The term "foreign governmental entity" shall have the meaning set forth in paragraph (j)(2).

**APPENDIX B**

**Final Regulatory Flexibility Act Analysis**

1.      As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Second Notice of Proposed Rulemaking (*Second NPRM*), released in October 2022.[2]  The Federal Communications Commission (Commission) sought written comment on the proposals in the *Second NPRM*, including comment on the IRFA.  The Commission received no comments addressing the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

### A.      Need for, and Objectives of, the Report and Order

2.      On April 22, 2021, the Commission released a Report and Order (*First R&O*) adopting a requirement that radio and television broadcast station licensees transmit clear disclosures for programming that is provided by a foreign governmental entity.  The *First R&O* also established procedures that licensees must follow to determine whether such a disclosure is required.[4]  The Commission promulgated these foreign sponsorship identification rules in response to reports of undisclosed foreign government programming being transmitted by U.S. broadcast stations.[5]  The Commission's rules established a definition of "foreign governmental entity" based on existing definitions, statutes, and regulations.[6]  The Commission's requirements apply to leased programming because the record in the underlying proceeding identified leased airtime as the primary means by which foreign governmental entities are accessing U.S. airwaves to persuade the American public without adequately disclosing the true sponsor.  The Commission promulgated the foreign sponsorship identification rules based on a fundamental and long-standing tenet of broadcast regulation; namely, that the public has a right to know the identity of those soliciting their support.

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] Sponsorship Identification Requirements for Foreign Government-Provided Programming, MB Docket No. 20-299, Second Notice of Proposed Rulemaking, 37 FCC Rcd 12004 (2022) (Second NPRM).

[3] *See* 5 U.S.C. § 604.

[4] Sponsorship Identification Requirements for Foreign Government-Provided Programming, Report and Order, 36 FCC Rcd 7702 (2021) (First R&O).

[5] *See e.g.*, *id.* at 7702-03, para. 1 and n.1.

[6] Pursuant to section 73.1212(j)(2), the term "foreign governmental entity" "shall include governments of foreign countries, foreign political parties, agents of foreign principals, and United States-based foreign media outlets."  47 CFR § 73.1212(j)(2).  Subsections 73.1212(j)(2)(i)-(iv) of our rules, in turn, state:

(i) The term "government of a foreign country" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(e));

(ii) The term "foreign political party" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(f));

(iii) The term "agent of a foreign principal" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(c)), and who is registered as such with the Department of Justice, and whose "foreign principal" is a "government of a foreign country," a "foreign political party," or directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a "government of a foreign country" or a "foreign political party" as defined in paragraphs (j)(2)(i) and (ii) of this section, and that is acting in its capacity as an agent of such "foreign principal";

(iv) The term "United States-based foreign media outlet" has the meaning given such term in section 722(a) of the Communications Act of 1934 (47 U.S.C. § 624(a)).

3.        On July 19, 2021, the ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates (collectively, the "Affiliates") filed a Petition for Clarification.[7]  The Affiliates assert that the exemption in the *First R&O* of "traditional, short-form advertising" from the foreign sponsorship identification rules creates confusion because the term has no established meaning in the broadcast industry.[8]

4.        On August 13, 2021, the National Association of Broadcasters (NAB) and two public interest groups (collectively, the "Petitioners") filed a Petition for Review of the Commission's *First R&O* with the U.S. Court of Appeals for the District of Columbia Circuit challenging the Commission's authority to impose one of the reasonable diligence requirements contained in the *First R&O*.[9]  Specifically, the *First R&O* required a licensee to confirm whether its lessee is a "foreign governmental entity," at the time of entering into a lease agreement and at renewal, by consulting the Department of Justice's (DOJ) Foreign Agent Registration Act (FARA) website and the Commission's semi-annual U.S.-based foreign media outlets reports.[10]

5.        On July 12, 2022, the D.C. Circuit vacated this verification requirement, holding that it exceeded the Commission's authority under section 317(c) of the Communications Act.[11]  The court left in place the remaining four requirements needed to satisfy the statutory reasonable diligence standard. Pursuant to these requirements, a broadcast licensee must at the time of entering into a new lease agreement, or at renewal:

(1) Inform the lessee of the foreign sponsorship disclosure requirement.

(2) Ask the lessee whether it falls into any of the categories that would qualify it as a "foreign governmental entity."

(3) Ask the lessee whether it knows if any individual/entity further back in the chain of producing/distributing the programming to be aired qualifies as a foreign governmental entity and has provided some type of inducement to air the programming.

(4) Memorialize the above-listed inquiries and retain such memorialization in its records for the remainder of the license term or for one year, whichever is longer.[12]

6.        On October 6, 2022, the Commission released its *Second NPRM*, which contained proposals to address the gap left in the foreign sponsorship identification rules by the D.C. Circuit's vacatur of the independent verification requirement.  In addition, the *Second NPRM* gave interested parties the opportunity to comment on the pending Petition for Clarification "regarding the applicability

---

[7] *See* Petition for Clarification, MB Docket No. 20-299 (filed July 19, 2021) (Petition for Clarification).

[8] *Id.* at 2.  *See* Meredith Corporation Comments at 3 (filed Sept. 2, 2021) (supporting the Petition for Clarification); *see also* Affiliates Comments at 2 (filed Sept. 2, 2021) (supporting the Petition for Clarification).

[9] Petition for Review, the National Association of Broadcasters, the Multicultural Media, Telecom and Internet Council, and the National Association of Black Owned Broadcasters v. FCC, No. 21-1171 (D.C. Cir. filed Aug. 13, 2021).

[10] *First R&O*, 36 FCC Rcd at 7719-20, 7722-26, paras. 35, 40-45.  Verification was not required if the lessee had already disclosed that it fell into one of the covered categories and/or that there was a separate need for a disclosure because an individual/entity further back in the chain of producing/transmitting the programming fell into one of the covered categories and had provided some form of service, consideration, or, in the case of political programming the programming itself, as an inducement to broadcast the programming.  *Id.* at 7722, para. 40.

[11] *National Association of Broadcasters, et al., v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022) (*NAB v. FCC*).  To conform with the court's vacatur, we will delete the verification requirement from section 73.1212(j)(3).  *See* Appx. A.

[12] *See* 47 CFR § 73.1212(j)(3); *First R&O*, 36 FCC Rcd at 7719-26, paras. 35-45 (describing all of a licensee's reasonable diligence requirements).

of the foreign sponsorship identification rules to advertisements sold by local broadcast stations" and the application of the *Second NPRM*'s proposals to section 325(c) permit holders.[13]

7.        The *Second R&O* replaces the vacated verification requirement with an approach that allows a licensee to choose between one of two options to comply with its statutory "reasonable diligence" requirement.[14]  Although licensees must choose one of these approaches, they need not choose the same approach for each lease or renewal agreement, even when the same lessee is involved.  Compliance with one of these two approaches must be at the time of entering into any new lease agreement or renewing an existing lease agreement, unless the once-a-year exception described below applies.  Under the first option, both the licensee and the lessee must complete a written certification either using the standardized certification language contained in Appendices C and D of the *Second R&O* or using their own language, as long as the certifications written in their own language contain the information and inquiry requirements set out in subsections 73.1212(j)(3)(i)-(iii) of the Commission's rules, pursuant to the *First R&O*.[15]

8.        Under the second option, instead of asking the lessee to provide a responsive certification regarding its status, a licensee exercising this option would ask, consistent with the Commission's current foreign sponsorship identification rules, whether the lessee is a registered FARA agent, or is listed in the Commission's U.S.-based foreign media outlet report.  If the lessee responds "no," the licensee would then ask the lessee to provide screenshots showing the results of lessee's searches of both of these websites.[16]  Licensees choosing this option must still comply with all other aspects of the current rule, as they have been required to do since the compliance date of the *First R&O*.  Specifically, consistent with the existing foreign sponsorship identification rules, the licensee must inform the lessee about the foreign sponsorship disclosure requirement; inquire whether the lessee is either a "government of a foreign country" or a "foreign political party[;]" and inquire about the lessee's knowledge of anyone further back in the chain of producing/distributing the programming who qualifies as a "foreign governmental entity" and may have provided an inducement to air the programming such as to trigger the need for a foreign sponsorship disclosure.[17]  Finally, also consistent with the existing foreign sponsorship identification rules, the licensee must memorialize those inquiries in some manner.[18]

9.        Although proposed in the *Second NPRM*, in response to commenter concerns, the *Second R&O* determines that a licensee need not notify the Commission's Media Bureau when a lessee fails to respond to the licensee's queries.  If, however, it is determined at a later date that the programming should have included a foreign sponsorship disclosure, the Commission may conduct a fact-specific inquiry to determine whether the licensee met its obligation under section 317(c) to "exercise reasonable diligence to obtain" the necessary information, such as by not making further inquiry of the lessee.  Further, although the *Second NPRM* proposed requiring licensees to retain the certifications and screenshots in the licensees' own online public inspection file (OPIF), the *Second R&O* gives licensees more flexibility in deciding where to retain these records.  Pursuant to the *Second R&O*, licensees may either file these

---

[13] *Second NPRM*, 37 FCC Rcd at 12015-16, paras. 25-27.

[14]  Section 317(c) of the Communications Act requires licensees to exercise "reasonable diligence to obtain," from their employees and persons with whom they deal directly, information to enable the licensees to make the required sponsorship identification announcement.  47 U.S.C. § 317(c).

[15] 47 CFR § 73.1212(j)(3)(i)-(iii).

[16] *See* https://www.fcc.gov/united-states-based-foreign-media-outlets, which identifies the outlets that filed with the Commission in response to the National Defense Authorization Act for Fiscal Year 2019 (NDAA).  The NDAA requires U.S.-based foreign media outlets to submit reports every six months to the Commission regarding the outlets' relations to their foreign principals.

[17] *See* 47 CFR § 73.1212(j)(3)(i)-(iii).

[18] *See* 47 CFR § 73.1212(j)(3)(v).

records in their OPIF or retain these records in their internal files, as long as the documents are made available to the Commission promptly upon request. Licensees must retain all of their certifications and screenshots, along with a memorialization of inquiries accompanying the screenshots for the length of the license term or one year, whichever is longer.

10.     In response to commenter concerns about frequently having to repeat the certification/screenshot process for short term leases, the *Second R&O* concludes that, where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, the licensee need only exercise its reasonable diligence obligations, including the certification or screenshot process, once per year. This modification of the proposals contained in the *Second NPRM* addresses concerns raised in the record about the burdens associated with the production of multiple certifications/screenshots over a limited period of time when the lease concerns both the same lessee and same programming.[19]

11.     The *Second R&O* reconfirms the finding from the *First R&O* that the foreign sponsorship identification rules should not apply to noncommercial and educational stations (NCEs). The *Second R&O* also clarifies that the foreign sponsorship identification requirements will not apply to advertising for commercial products or services to the extent such advertising falls within the exemption established in section 73.1212(f) of the Commission's rules.[20] The *Second R&O* also clarifies that the foreign sponsorship identification rules will not apply to political candidate advertisements. The *Second R&O*, however, determines that the foreign sponsorship identification rules will apply to issue advertisements and paid PSAs. The *Second R&O* declines to adopt commenters' request to create exemptions from the foreign sponsorship identification rules for religious programming and locally produced and/or locally distributed programming. The *Second R&O* finds that creating an exemption for religious programming would not be content-neutral. Additionally, the *Second R&O* determines that the mere fact that programming is locally produced and/or locally distributed does not signify that the programming lacks material provided by a foreign governmental entity, such that there should be a blanket carveout for locally produced and/or distributed programming from the foreign sponsorship identification rules.

12.     The requirements adopted in both the *First R&O* and *Second R&O* will also apply to section 325(c) permit holders. However, because section 325(c) permit holders do not have OPIFs, they will file their foreign sponsorship disclosures in the publicly available International Communications Filing System (ICFS).

---

[19] The *Second R&O* provides an example of what is meant by "same lessee" and "same programming" in this context. An example of what is meant by "same lessee" and "same programming" in this context would be House of Worship X leasing time for the live broadcast of its weekly religious service, every Sunday from 11:00 am till 12:00 pm. While the specific broadcasts would differ week to week, the lessee would continue to be House of Worship X and the program would be its live religious service broadcast. By contrast, if House of Worship X decides to use its regular time slot to provide something other than its weekly religious service – e.g., a panel discussion with various civic leaders – that would be considered different programming that would not fall within the one year exemption, and, thus, would require licensee and lessee to engage in the reasonable diligence requirements laid out in the Commission's rules.

[20] Section 73.1212(f) states that:

"In the case of broadcast matter advertising commercial products or services, an announcement stating the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification, shall be deemed sufficient for the purpose of this section and only one such announcement need be made at any time during the course of the broadcast."

47 CFR § 73.1212(f).

    **B.**       **Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

    13.      There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

    **C.**       **Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

    14.      Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.[21]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

    **D.**       **Description and Estimate of the Number of Small Entities to Which the Rules Will Apply**

    15.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein.[22]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[23]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act (SBA).[24]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[25]  Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

    16.      *Television Broadcasting*.  This industry is comprised of "establishments primarily engaged in broadcasting images together with sound."[26]  These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[27]  These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule.  Programming may originate in their own studio, from an affiliated network, or from external sources.  The SBA small business size standard for this industry classifies businesses having $41.5 million or less in annual receipts as small.[28]  2017 U.S. Census Bureau data indicate that 744 firms in this industry operated for the entire year.[29]  Of that number, 657 firms had revenue of less than $25,000,000.[30]  Based on this data we

---

[21] 5 U.S.C. § 604(a)(3).

[22] *Id.* § 604(a)(4).

[23] *Id.* § 601(6).

[24] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[25] *See* 15 U.S.C. § 632.

[26] *See* U.S. Census Bureau, *2017 NAICS Definition, "515120 Television Broadcasting*," https://www.census.gov/naics/?input=515120&year=2017&details=515120.

[27] Id.

[28] 13 CFR § 121.201, NAICS Code 515120 (as of 10/1/22 NAICS Code 516120).

[29] U.S. Census Bureau, 2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017, Table ID: EC1700SIZEREVFIRM, NAICS Code 515120,

(continued….)

estimate that the majority of television broadcasters are small entities under the SBA small business size standard.

17.     As of September 30, 2023, there were 1,377 licensed commercial television stations.[31]  Of this total, 1,258 stations (or 91.4%) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates as of September 30, 2023, there were 383 licensed NCE television stations, 380 Class A TV stations, 1,889 LPTV stations and 3,127 TV translator stations.[32]  The Commission, however, does not compile and otherwise does not have access to financial information for these television broadcast stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard.  Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of these television station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

18.     *Radio Broadcasting.*  This industry is comprised of "establishments primarily engaged in broadcasting aural programs by radio to the public."[33]  Programming may originate in their own studio, from an affiliated network, or from external sources.[34]  The SBA small business size standard for this industry classifies firms having $41.5 million or less in annual receipts as small.[35]  U.S. Census Bureau data for 2017 show that 2,963 firms operated in this industry during that year.[36]  Of this number, 1,879 firms operated with revenue of less than $25 million per year.[37]  Based on this data and the SBA's small business size standard, we estimate a majority of such entities are small entities.

19.     The Commission estimates that as of September 30, 2023, there were 4,452 licensed commercial AM radio stations and 6,670 licensed commercial FM radio stations, for a combined total of

---

(Continued from previous page) ──────────────────

https://data.census.gov/cedsci/table?y=2017&n=515120&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[30] *Id.*  The available U.S. Census Bureau data do not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[31] *Broadcast Station Totals as of September 30, 2023*, Public Notice, DA 23-921 (rel. Oct. 3, 2023) (*October 2023 Broadcast Station Totals PN*), https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf.

[32] *Id.*

[33] *See* U.S. Census Bureau, *2017 NAICS Definition, "515112 Radio Stations,*" https://www.census.gov/naics/?input=515112&year=2017&details=515112.

[34] Id.

[35] *See* 13 CFR § 121.201, NAICS Code 515112 (as of 10/1/22 NAICS Code 516110).

[36] See U.S. Census Bureau, 2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017, Table ID: EC1700SIZEREVFIRM, NAICS Code 515112,

https://data.census.gov/cedsci/table?y=2017&n=515112&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.  We note that the US Census Bureau withheld publication of the number of firms that operated for the entire year.

[37] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue in the individual categories for less than $100,000, and $100,000 to $249,999 to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in these categories).  Therefore, the number of firms with revenue that meet the SBA size standard would be higher that noted herein.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

11,122 commercial radio stations.[38]  Of this total, 11,120 stations (or 99.98 %) had revenues of $41.5 million or less in 2022, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Database (BIA) on October 4, 2023, and therefore these licensees qualify as small entities under the SBA definition.  In addition, the Commission estimates that as of September 30, 2023, there were 4,263 licensed NCE FM radio stations, 1,978 low power FM (LPFM) stations, and 8,928 FM translators and boosters.[39]  The Commission however does not compile, and otherwise does not have access to financial information for these radio stations that would permit it to determine how many of these stations qualify as small entities under the SBA small business size standard.  Nevertheless, given the SBA's large annual receipts threshold for this industry and the nature of radio station licensees, we presume that all of these entities qualify as small entities under the above SBA small business size standard.

20.     We note, however, that in assessing whether a business concern qualifies as "small" under the above definition, business (control) affiliations must be included.[40]  Our estimate, therefore, likely overstates the number of small entities that might be affected by our action, because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, another element of the definition of "small business" requires that an entity not be dominant in its field of operation.  We are unable at this time to define or quantify the criteria that would establish whether a specific radio or television broadcast station is dominant in its field of operation.  Accordingly, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and is therefore possibly over-inclusive.  An additional element of the definition of "small business" is that the entity must be independently owned and operated.  Because it is difficult to assess these criteria in the context of media entities, the estimate of small businesses to which the rules may apply does not exclude any radio or television station from the definition of a small business on this basis and similarly may be over-inclusive.

E.     **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

21.     The *Second R&O* gives licensees the choice between one of two options to comply with their  statutory "reasonable diligence" requirement.[41]  Although licensees must choose one of these approaches, they need not choose the same approach for each lease or renewal agreement, even when the same lessee is involved.  Compliance with one of these two approaches must be at the time of entering into any new lease agreement or renewing an existing lease agreement, unless the once-a-year exception described below applies.  Under the first option, both the licensee and the lessee must complete a written certification either using the standardized certification language contained in Appendices C and D of the *Second R&O* or using their own language, as long as the certifications written in their own language contain the information and inquiry requirements set out in subsections 73.1212(j)(3)(i)-(iii) of the Commission's rules, pursuant to the *First R&O*.[42]  Specifically, a licensee's certification should:

(1) inform the lessee of the foreign sponsorship disclosure requirement;

(2) ask the lessee whether it falls into any of the categories that would qualify it as a "foreign governmental entity;"

---

[38] *October 2023 Broadcast Station Totals PN*, https://docs.fcc.gov/public/attachments/DA-23-921A1.pdf.

[39] *Id.*

[40] "[Business concerns] are affiliates of each other when one concern controls or has the power to control the other or a third party or parties controls or has the power to control both." 13 CFR § 21.103(a)(1).

[41] Section 317(c) of the Communications Act requires licensees to exercise "reasonable diligence to obtain," from their employees and persons with whom they deal directly, information to enable the licensees to make the required sponsorship identification announcement.  47 U.S.C. § 317(c).

[42] 47 CFR § 73.1212(j)(3).

(3) ask the lessee whether it knows if any individual/entity further back in the chain of producing and/or distributing the programming to be aired qualifies as a foreign governmental entity and has provided some type of inducement to air the programming;

(4) seek a written certification in response from the lessee; and

(5) obtain the necessary information for a disclosure if one is required.

22.    A lessee's certification should convey the information needed to determine whether a disclosure is required and the information needed for a broadcast disclosure if one is required.[43]

23.    Regardless of whether the Commission's templates or a licensee's and lessee's own certifications are used, both the licensee's and lessee's certifications must be dated and signed by an employee or other representative of the entity who can attest to the fact that these actions were taken.

24.    Under the second option, instead of asking the lessee to provide a responsive certification regarding its status, a licensee exercising this option would ask, consistent with the Commission's current foreign sponsorship identification rules, whether the lessee is a registered FARA agent or is listed in the Commission's U.S.-based foreign media outlet report.  If the lessee responds "no," the licensee would then ask the lessee to provide screenshots showing the results of lessee's searches for its own name on both of these websites.[44]  The FARA website provides for an "Active Registrants" search link, and the *Second R&O* recommends that lessees use this link because the Commission's rules only cover those FARA agents who are currently registered on the DOJ FARA site.[45]  In response to concerns raised in the record about having to input "exact names" into the search feature, the *Second R&O* emphasizes that lessees are looking for their *own names*.  A lessee is not doing a FARA database search to *learn* whether it is registered such as to necessitate experimenting with different iterations of its name.  A lessee, or someone within lessee's organization, would know whether it is a FARA registrant, or U.S.-based foreign media outlet.  As such, the lessee will only be providing screenshots if, in response to licensee's queries, the lessee states that it is neither a FARA agent nor a U.S.-based foreign media outlet.

25.    With regard to searches of the Commission's U.S.-based foreign media outlet site, the Commission's website lists the names of all the entities that have reported as U.S.-based foreign media outlets, and all that is required is a screenshot of this list to show whether the lessee's name appears on the list at the time of the licensee's required inquiries.  Licensees choosing this option must still comply with all other aspects of the current rule, as they have been required to do since the compliance date of the *First R&O*.  Specifically, consistent with the existing foreign sponsorship identification rules, the licensee must inform the lessee about the foreign sponsorship disclosure requirement; inquire whether the lessee is either a "government of a foreign country" or a "foreign political party[;]" and inquire about the lessee's knowledge of anyone further back in the chain of producing/distributing the programming who qualifies as a "foreign governmental entity" and may have provided an inducement to air the programming such as

---

[43] *See* 47 CFR § 73.1212(j)(1) (stating what information needs to be in a foreign sponsorship disclosure).

[44] *See* https://www.fcc.gov/united-states-based-foreign-media-outlets, which identifies the outlets that filed with the Commission in response to the National Defense Authorization Act for Fiscal Year 2019 (NDAA).  The NDAA requires U.S.-based foreign media outlets to submit reports every six months to the Commission regarding the outlets' relations to their foreign principals.

[45] *See* 47 CFR § 73.1212(j)(2)(iii); *see also* https://efile.fara.gov/ords/fara/f?p=1381:17:1606120366722.  As the search features on the FARA website are designed to assist in determining who is registered as a FARA agent, the *Second R&O* assumes that the website will continue to maintain a search field akin to the "Active Registrants" field we identify here.  The *Second R&O* recognizes that the appearance of one's name as a registered agent in the FARA website is not determinative of whether the lessee is acting in its capacity as a FARA agent when leasing time on a licensee's station, but finds it reasonable to presume a lessee that is registered would be able to explain whether it is acting in its capacity as an agent with regard to the transaction at hand.

to trigger the need for a foreign sponsorship disclosure.[46]  Moreover, consistent with the certification option, a licensee should also ask the lessee to update it if there has been a change in the lessee's status or the status of anyone further back in the chain of producing/distributing the programming so as to trigger the need for a foreign sponsorship disclosure.  Finally, also consistent with the existing foreign sponsorship identification rules, the licensee must memorialize those inquiries in some manner.[47]

26.      Although proposed in the *Second NPRM*, in response to commenter concerns, the *Second R&O* determines that a licensee need not notify the Commission's Media Bureau when a lessee fails to respond to the licensee's queries.  If, however, it is determined at a later date that the programming should have included a foreign sponsorship disclosure, the Commission may conduct a fact-specific inquiry to determine whether the licensee met its obligation under section 317(c) of the Communications Act to "exercise reasonable diligence to obtain" the necessary information, such as by not making further inquiry of the lessee.  Further, although the *Second NPRM* proposed requiring licensees to retain the certifications and screenshots in the licensees' own OPIF, the *Second R&O* gives licensees more flexibility in deciding where to retain these records.  Pursuant to the *Second R&O*, licensees may either file these records in their OPIF or retain these records in their internal files, as long as the documents are made available to the Commission promptly upon request.  Licensees must retain all of their certifications and screenshots, along with memorialization of inquiries accompanying the screenshots for the length of the license term or one year, whichever is longer.

27.      In response to commenter concerns about frequently having to repeat the certification/screenshot process for short term leases, the *Second R&O* concludes that, where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, the licensee need only exercise its reasonable diligence obligations, including the certification or screenshot process, once per year.  This modification of the proposals contained in the *Second NPRM* addresses concerns raised in the record about the burdens associated with the production of multiple certifications/screenshots over a limited period of time when the lease concerns both the same lessee and lease.[48]

28.      The *Second R&O* reconfirms the finding from the *First R&O* that the foreign sponsorship identification rules should not apply to NCEs.  The *Second R&O* also clarifies that the foreign sponsorship identification requirements will not apply to advertising for commercial products or services to the extent such advertising falls within the exemption established in section 73.1212(f) of the Commission's rules.[49]  The *Second R&O* declines to adopt commenters' request to create exemptions

---

[46] *See* 47 CFR § 73.1212(j)(3)(i)-(iii).

[47] *See* Appx. A.

[48] The *Second R&O* provides an example of what is meant by "same lessee" and "same programming" in this context.  An example of what is meant by "same lessee" and "same programming" in this context would be House of Worship X leasing time for the live broadcast of its weekly religious  service, every Sunday from 11:00 am till 12:00 pm.  While the specific broadcasts would differ week to week, the lessee would continue to be House of Worship X and the program would be its live religious service broadcast.  By contrast, if House of Worship X decides to use its regular time slot to provide something other than its weekly religious service – e.g., a panel discussion with various civic leaders – that would be considered different programming that would not fall within the one year exemption, and, thus, would require licensee and lessee to engage in the reasonable diligence requirements laid out in the Commission's rules.

[49] Section 73.1212(f) states that:

"In the case of broadcast matter advertising commercial products or services, an announcement stating the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification, shall be deemed sufficient for the purpose of this section and only one such announcement need be made at any time during the course of the broadcast."

47 CFR § 73.1212(f).

from the foreign sponsorship identification rules for religious programming and locally produced and/or locally distributed programming. The *Second R&O* finds that creating an exemption for religious programming would not be content-neutral. Additionally, the *Second R&O* determines that the mere fact that programming is locally produced and/or locally distributed does not signify that the programming lacks material provided by a foreign governmental entity, such that there should be a blanket carveout for locally produced and/or distributed programming from the foreign sponsorship identification rules.

29.     The requirements adopted in both the *First R&O* and *Second R&O* will also apply to section 325(c) permit holders. However, because section 325(c) permit holders do not have OPIFs, they will file their foreign sponsorship disclosures in the publicly available International Communications Filing System (ICFS).

30.     Any lease agreements that are entered into, or that are renewed, on or after the date that the Media Bureau publishes in the Federal Register an announcement that the Office of Management and Budget (OMB) has completed any review required under the Paperwork Reduction Act of the rule modifications contained in the *Second R&O* must comply with the requirements laid out in the *Second R&O*. Based on commenter concerns about having to redo work associated with existing leases that comply with the current foreign sponsorship identification rules, the Commission determines that the rule modifications contained in the *Second R&O* will apply only to new leases and renewals of existing leases entered into on or after the required compliance date for those rule modifications. The *Second R&O* directs the Commission's Media Bureau to announce the compliance date for the new rules via public notice and to revise section 73.1212 of the rules accordingly.

## F.     Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

31.     The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected[.]"[50]

32.     The *Second R&O* carefully considers the concerns raised by commenters, a number of which may represent, or themselves be, small entities. In response to commenter concerns about burdens, the *Second R&O* gives licensees greater flexibility than initially proposed in the *Second NPRM* to determine how best to comply with the inquiry memorialization requirement. In response to commenter concerns that the standardized certification language proposed in the *Second NPRM* was too lengthy, complex, and full of legalese, the *Second R&O* greatly reduces the length and complexity of the standardized language and now employs a simple check-box approach.[51] The *Second R&O* allows licensees to use their own certification language in response to comments expressing concerns about licensees that already have developed their own certifications based on the existing foreign sponsorship identification rules and for whom revising these certifications would be costly. The inquiries that must be contained in the self-generated certifications align with the requirements contained in the *First R&O* and, thus, previous certifications that are consistent with that order may not need to be modified. Finally, the *Second R&O* also offers a licensee the option to not use certifications at all, but to instead seek from its lessee screenshots of the lessee's search of two federal websites to demonstrate whether the lessee's name appears on the sites, as well as requiring the licensee to memorialize some additional queries, pursuant to the *First R&O*, made to a lessee.

33.     The *Second NPRM* proposed that licensees should retain all certifications in their OPIFs.

---

[50] 5 U.S.C. § 604(a)(6).

[51] *Second NPRM*, 37 FCC Rcd at 12012-15, paras. 21-24. The new standardized language, which significantly varies in both its length and complexity from the language proposed in the *Second NPRM*, comprises two pages of questions in a straightforward check-box format.

However, in response to commenter concerns about this requirement,[52] the *Second R&O* merely requires licensees to retain copies of certifications and screenshots in their personal files, with the option of uploading the documentation into their OPIF if they choose.  The certification and screenshot requirements adopted in the *Second R&O* apply only to new leases and renewals of existing leases entered into on or after the required compliance date for the rule modifications.[53]  In response to commenter concerns about  having to redo work associated with existing leases that comply with the current foreign sponsorship identification rules, the *Second R&O* determines that the rule modifications contained in the *Second R&O* will apply only to new leases and renewals of existing leases entered into on or after the required compliance date for those rule modifications.  In response to some commenters' concerns regarding the unique economic challenges of applying the rules to short-term recurring leases,[54] the *Second R&O* concludes that, where a licensee and the same lessee enter into recurring leases for the same programming over a one year period, the licensee need only exercise its reasonable diligence obligations, including the certification or screenshot process, once per year.  In light of concerns raised in the record regarding the proposal that licensees report to the Commission instances in which lessees fail to respond to licensee queries,[55] the *Second R&O* determines that the licensee need not notify the Media Bureau about a licensee's failure to respond and may still choose air the programming.[56]

### G. Report to Congress

34.     The Commission will send a copy of the *Second R&O*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[57]  In addition, the Commission will send a copy of the *Second R&O*, including the FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.  A copy of the *Second R&O* and FRFA (or summaries thereof) will also be published in the *Federal Register*.[58]

---

[52] *See* NAB/MMTC Comments at 15, 19-20, 45-47 (providing objections to the proposed OPIF recordkeeping requirement); Gray TV Comments at 9 (arguing that an OPIF recordkeeping requirement would increase compliance costs and burdens for broadcasters); TechFreedom Reply at 6-8 (claiming that an OPIF recordkeeping requirement would be "an unmitigated disaster").

[53] For all new agreements and renewals, the *Second R&O* requires licensees and lessees to comply with the established requirements immediately upon publication in the Federal Register of an announcement by the Media Bureau that OMB has completed any required review under the PRA.

[54] *See* Gray TV Comments at 12-13 (stating that its arrangements with religious programmers in particular are typically confirmed on a weekly basis, in part because such programmers do not have financial resources to purchase blocks of time under long-term contracts, and that it is burdensome to complete the verification process on a weekly basis.

[55] *See* Audacy/Beasley Reply at 3-4 (arguing that broadcasters have no statutory duty to serve as "enforcers or informants" that would justify a requirement that they notify the Media Bureau if a lessee fails to certify as to its status as a foreign governmental entity).

[56] The *Second R&O* recognizes that there may be instances when, despite a licensee's efforts to comply with the foreign sponsorship identification rules, a lessee may refuse to respond to a licensee's queries or request for a certification/screenshots.

[57] 5 U.S.C. § 801(a)(1)(A).

[58] *See id.* § 604(b).

**APPENDIX C**

**Approved Template for Licensee Certification**

Name of Licensee:      _____

Name of Lessee:       _____

Name of Program:     _____

Nature of Lease:       New _____     Renewal: _____

\_\_\_\_\_ Licensee informed Lessee that FCC regulations require that a disclosure accompany programming that is sponsored, paid for, or furnished by a foreign governmental entity.

\_\_\_\_\_ Licensee asked Lessee whether Lessee is a foreign governmental entity.  A foreign governmental entity can be a foreign government, a foreign political party, an agent of a foreign principal, or a U.S.-based foreign media outlet.[1]

\_\_\_\_\_ Licensee asked Lessee whether it knows if any individual/entity in the chain of producing or distributing the programming is a foreign governmental entity and has provided some type of inducement to air the programming.[2]

\_\_\_\_\_ Licensee sought from Lessee a written response certifying Lessee's answers.  Lessee did \_\_\_\_\_ did not \_\_\_\_\_ provide a written certification.

\_\_\_\_\_ If applicable, Licensee obtained from Lessee the information needed to add the following disclosure to Lessee's programming: "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]."

On behalf of Licensee, I certify that the above statements are accurate.

_____      _____      _____

Name and Position                    Signature                              Date

---

[1] *See* 47 CFR § 73.1212(j).  If more information is needed regarding the definition of a foreign governmental entity, see the FCC's rules at 47 CFR § 73.1212(j)(2)(i)-(iv), which provide that:

(i)  The term "government of a foreign country" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611(e);

(ii)  The term "foreign political party" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611(f);

(iii)  The term "agent of a foreign principal" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(c)), and who is registered as such with the Department of Justice, and whose "foreign principal" is a "government of a foreign country," a "foreign political party," or directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a "government of a foreign country" or a "foreign political party" as defined in subsection 73.1212(j)(2)(i) and (ii), and that is acting in its capacity as an agent of such "foreign principal;" and

(iv)  The term "United States-based foreign media outlet" has the meaning given such term in Section 722(a) of the Communications Act of 1934 (47 U.S.C. § 624(a)).

[2] If the programming is political in nature, or involves the discussion of a controversial issue, the FCC disclosure requirements apply even if no compensation or payment, other than the programming itself, was provided as an inducement to air the program.

**APPENDIX D**

**Approved Template for Lessee Certification**

Name of Licensee:　_____
Name of Lessee:　_____
Name of Program:　_____
Nature of Lease:　New _____　　Renewal: _____

1.　　Lessee is a foreign governmental entity.  A foreign governmental entity can be a foreign government, a foreign political party, an agent of a foreign principal, or a U.S.-based foreign media outlet[1]　Yes: \_\_\_\_\_　　　　No: \_\_\_\_\_

　　　　　If Yes, Lessee is an entity of the country of _____.

2.　　Lessee knows of an individual/entity in the chain of producing or distributing the programming that is a foreign governmental entity and has provided some type of inducement to air the programming.[2]　　　　Yes: \_\_\_\_\_　　　　No: \_\_\_\_\_

　　　　　If Yes, the name of the individual/entity is _____.

　　　　　If Yes, the name of the country is _____.

3.　　If applicable, Lessee has provided Licensee with the information needed to append the following disclosure to lessee's programming, consistent with the FCC's rules at 47 CFR § 73.1212(j)(1)(i):

　　　　　"The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]."

On behalf of Lessee, I certify that the above statements are accurate.


_____　　_____　_____

Name and Position　　　　　　　　　　　Signature　　　　　　　　　　　　Date

---

[1] *See* 47 CFR § 73.1212(j).  If more information is needed regarding the definition of a foreign governmental entity, see the FCC's rules at 47 CFR § 73.1212(j)(2)(i)-(iv), which provide that:

(i)  The term "government of a foreign country" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611(e);

(ii)  The term "foreign political party" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611(f);

(iii)  The term "agent of a foreign principal" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(c)), and who is registered as such with the Department of Justice, and whose "foreign principal" is a "government of a foreign country," a "foreign political party," or directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a "government of a foreign country" or a "foreign political party" as defined in subsection 73.1212(j)(2)(i) and (ii), and that is acting in its capacity as an agent of such "foreign principal;" and

(iv)  The term "United States-based foreign media outlet" has the meaning given such term in Section 722(a) of the Communications Act of 1934 (47 U.S.C. § 624(a)).

[2] If the programming is political in nature, or involves the discussion of a controversial issue, the FCC disclosure requirements apply even if no compensation or payment, other than the programming itself, was provided as an inducement to air the program.

**STATEMENT OF**
**CHAIRWOMAN JESSICA ROSENWORCEL**

Re:     *Sponsorship Identification Requirements for Foreign Government-Provided Programming*,
         Second Report and Order, MB Docket No. 20-299.

The principle that the public has a right to know the identity of those who use the public airwaves is a long-standing tenet of broadcasting.  Today we clarify our rules for broadcasters by establishing a process to inform consumers when what they hear or see over the air has been provided by a foreign government.  Our action today is about supporting transparency and democratic values.  For instance, if a foreign government (like the Chinese government) pays to broadcast programming or campaign advertising, a disclosure is required at the time it is aired (simply saying it is from the Chinese government).  As listeners, viewers, and citizens this is something we are entitled to know.

STATEMENT OF
COMMISSIONER BRENDAN CARR, DISSENTING IN PART

Re:  *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, Second
Report and Order, MB Docket No. 20-299.

In 2021, the FCC unanimously adopted rules for broadcast television stations to identify and disclose "leases" of airtime sponsored by foreign governments.[1]  The 2021 rules contained an exception for "short-form advertisements," which were deemed to fall outside the meaning of "lease."  On appeal, the D.C. Circuit vacated a separate portion of the 2021 rules that required broadcasters to affirmatively investigate potential foreign sponsors.[2]  Today's Order fixes that defect—lawfully so, in my view.  If the Order were limited to correcting this narrow issue on remand, I would have supported it in full.

But this Order goes further.  It changes the 2021 definition of "lease" by eliminating the "short-form advertisement" exception.  The Order now requires broadcasters to comply with the foreign sponsorship rule for all third-party use of airtime, with two key exceptions: (1) political candidate advertisements; and (2) advertisements that meet the commercial exemption provisions in section 73.1212(f) of our rules.

In my view, the FCC did not provide fair notice that it might redefine "lease" in this fundamental way.  After the 2021 rules were adopted, broadcast interests filed a petition seeking clarification on the meaning of "short-form advertisement."[3]  The petition asked for a clearer and less burdensome definition, not for the FCC to eliminate the exception altogether.  A single paragraph in the *Second NPRM* seeks comment on this petition.[4]  As that paragraph makes clear, the FCC did not contemplate eliminating the "short-form advertisement" carveout.  And to my knowledge, no party in this proceeding asked the FCC to do so.  Adopting rule changes nobody could have reasonably anticipated is a textbook example of unfair surprise.

This was avoidable.  If the FCC wanted to consider rule changes that were not teed up in the *Second NPRM*, it could have shored up the record through a Further Notice or a supplemental Public Notice.  The FCC did not do so here.  So, while this Order fixes one legal infirmity highlighted at the D.C. Circuit, it creates new problems that may require us to revisit our foreign sponsorship rules in a future proceeding following another appeal.  I approve in part and dissent in part.

---

[1] Sponsorship Identification Requirements for Foreign Government-Provided Programming, Report and Order, 36 FCC Rcd 7702 (2021).

[2] *NAB v. FCC*, 39 F.4th 817 (D.C. Cir. 2022).

[3] *See* Petition for Clarification, MB Docket No. 20-299 (filed July 19, 2021).

[4] Sponsorship Identification Requirements for Foreign Government-Provided Programming, Second Notice of Proposed Rulemaking, 37 FCC Rcd 12004, para. 32 (2022).

## STATEMENT OF
## COMMISSIONER NATHAN SIMINGTON, DISSENTING

Re:     *Sponsorship Identification Requirements for Foreign Government-Provided Programming,*
Second Report and Order, MB Docket No. 20-299.

Letting Americans know when a foreign government has leased time on American airwaves is a good thing.  That's why I voted to approve the Commission's first cut at these rules back in 2021.  In the implementing Report and Order, we indicated that:

> "In describing a lease of time, however, we do not mean to suggest that traditional, short-form advertising time constitutes a lease of airtime for [the purposes of foreign sponsorship identification]."

Ha-ha.  Just kidding.  Apparently, according to today's decision: not only *yes*, we *did* mean that traditional, short-form advertising constitutes a "lease of airtime" for these purposes, but regulatees *knew that we meant that they did* when they asked us to clarify the bounds of the exemption.  (By now, "clarify" is the Commission's euphemism for doing whatever it wants, precedent be damned.)  This is, of course, news to the regulatees, who maybe recently drew inspiration in their understanding of whether the Commission considers short-form advertising the same as a lease of airtime from the Second NPRM in this proceeding, in which we sought comment:

> ". . . on whether experience with these rules has provided licensees or others with additional insight regarding the issues raised in the Petition and specifically what criteria the Commission might adopt to *distinguish between advertising and programming arrangements for the lease of airtime* in a way that does not jeopardize the Commission's goals in this proceeding." (Emphasis mine.)

What did we mean by this?  I do not know.  Maybe no one does.  I *do* know that spontaneous self-reversal is an Administrative Procedure Act violation, though.  We have nowhere noticed that, by the terms "lease of airtime" and "short-form advertising" we meant the *exact opposite* of what we said in 2021 *and* 2022.

But, not to worry, regulatees, because though yes, lease of airtime *does* include short-form advertising, you can seek shelter under the rocksteady safe harbors the Commission has invented in the last few weeks.  And what are those?

First: any ad for a commercial good or service, provided that the ad is constructed in such a way as to satisfy the Commission's definition for a commercial advertisement.  (Incidentally: though a "lease of airtime" is definitionally *not* short-form advertising and we have prior acknowledged as much, why does the Commission not now consider it important for Americans to know whether, for instance, the PRC has purchased broadcast advertising on behalf of TikTok?  A head scratcher!  To be clear, I am not here *endorsing* the idea that commercial advertisements on *any* platform should *ever* require foreign sponsorship identification, I am merely acknowledging that the rules we enunciate today fail even to meet our own half-baked policy justifications.)

Second: any ad purchased by a legally qualified candidate for office or their authorized committees (so-called "political candidate advertisements").  Notably, part of our justification for this carveout—besides, presumably, the fact that a fair few of them have taken a constitutional oath of office or have bled in service to our country which may render the question of whether their ad was furnished by a foreign agent insulting—is that:

"We recognize that there are statutory restrictions as well as Federal Election Commission rules prohibiting contributions to federal, state, and local candidates by "foreign nationals," a term that is defined to include certain of the entities covered by our foreign sponsorship identification rules, specifically a "government of a foreign country" and a "foreign political party." Because of these restrictions, the likelihood that political candidate advertisements would require disclosures under the foreign sponsorship identification rules is greatly limited. Accordingly, we are persuaded to exempt political candidate advertisements from the foreign sponsorship identification requirements."

Okay. Well, as the Commission discovered when crafting this safe harbor, those same FEC prohibitions pertain to a category of issue advertisements *mentioning* candidates for office called "electioneering communications." Will *those* ads enjoy a safe harbor for identical reasons? No! But don't worry, it's a distinction *with* a difference, we swear:

"While NAB notes that foreign nationals also are prohibited from funding certain types of issue advertisements related to elections, our definition of issue advertisements for purposes of these rules is broader in scope than the advertisements that NAB references in that our definition encompasses issue advertisements unrelated to elections. Therefore, we cannot be as assured of foreign noninvolvement with respect to issue advertisements. Rather than adopt a definition that attempts to parse the different types of issue advertisements, and to ensure maximum transparency for viewers and listeners, we will apply the foreign sponsorship identification rules to all issue advertisements and paid PSAs."

This is senseless. To ensure maximum transparency for viewers and listeners, we *are* requiring foreign sponsorship identification for a subset of issue ads *already covered by the same FEC rules* prohibiting foreign sponsorship that we deemed justification to exclude candidate ads from foreign sponsorship identification? Huh? I am astonished that an already discursive item, we could not draw one further distinction, if only to create justificatory consistency *within the same item*. I gather that consistency is the sort of thing a reviewing court might look upon favorably—especially in a proceeding where we've already been successfully appealed—but hey, what do I know?

I thought, and still think, we should require foreign sponsorship identification to leases of air time. Since this item now has practically nothing to do with that, I dissent.