# UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

NATIONAL ASSOCIATION OF BROADCASTERS, *Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents*.

_____

On Petition for Review from the Federal Communications Commission

_____

## INITIAL BRIEF OF PETITIONER

_____

Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
stephenkinnaird@paulhastings.com

Richard Kaplan
Jerianne Timmerman
Erin L. Dozier
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, SE
Washington, DC  20003
(202) 429-5430
rkaplan@nab.org
jtimmerman@nab.org
edozier@nab.org

December 10, 2024

*Counsel for Petitioner National
Association of Broadcasters*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner the National Association of Broadcasters ("NAB") submits this certificate as to parties, rulings, and related cases.

**A.    Parties and *Amici*.** Because this case involves direct review of a final agency action, the requirement to furnish a list of parties, intervenors, and *amici* that appeared below is inapplicable. This case involves the following parties:

(i)    **Petitioner:** National Association of Broadcasters.

(ii)    **Respondents:** Federal Communications Commission and the United States of America.

(iii)    **Intervenors and *Amici*:** None.

**B.    Ruling Under Review.** The final agency action under review is *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, Second Report and Order, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) (JA__-__), published in the Federal Register on July 16, 2024. *See* 89 Fed. Reg. 57775 (JA__-__).

**C.    Related Cases.** This case has not previously been before this Court or any other court.

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioner NAB states as follows:

NAB is a nonprofit, incorporated association of radio and television stations. It has no parent company, and has not issued any shares or debt securities to the public; thus, no publicly held company owns ten percent or more of its stock. As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, the coalition is a trade association for purposes of D.C. Circuit Rule 26.1.

/s/ Stephen B. Kinnaird

Stephen B. Kinnaird
*Counsel for Petitioner*

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENTS ...................................... ii

GLOSSARY ................................................................................... ix

JURISDICTION ............................................................................... 1

STATUTES AND REGULATIONS ......................................................... 1

STATEMENT OF THE ISSUES ............................................................ 1

INTRODUCTION ............................................................................. 2

STATEMENT OF THE CASE ............................................................... 6

SUMMARY OF ARGUMENT .............................................................. 17

STANDING ..................................................................................... 22

ARGUMENT .................................................................................... 22

   I.   Standard of Review ............................................................... 23

   II.  The Extension of the Foreign Sponsorship Identification Rules to Non-Candidate Political Advertising and Paid PSAs Is Unlawful ..................... 24

      A.  The Commission Failed to Fulfill Notice-and-Comment Obligations in Expanding the Definition of "Lease" to Include Non-Candidate Political Advertising and Paid PSAs ................................. 25

          1.  The Second NPRM Sought Comment Only on a Pending Clarification Request Relating to the Length of Advertisements ......................................................... 26

          2.  The Final Rules Are Not the Logical Outgrowth of the Second NPRM ............................................................ 30

      B.  The Commission Has Failed to Give a Reasoned Explanation for the New Rules .................................................. 36

      C.  The Commission's Content-Based Regulations That Discriminate Against Non-Candidate Political Advertising and Paid PSAs Violate the First Amendment ........................................ 42

   III.  The Commission Lacks the Statutory Authority to Impose Inquiry-And-Corroboration Requirements on Content Providers Who Lease Airtime .... 50

A.   Section 317 of the Communications Act Does Not Authorize the Commission to Require Broadcasters to Demand Corroboration from Lessees .................................................................................................50

B.   The Commission Lacks Statutory Authority to Impose Inquiry-And-Corroboration Requirements Regarding Inducements Paid to Others in the Production and Distribution Chain ...................................................54

C.   The Commission Lacks Statutory Authority to Impose Corroboration Requirements on Lessees.....................................................................57

CONCLUSION .........................................................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[1]

**Page(s)**

CASES

*Allina Health Servs. v. Sebelius*,\*
 746 F.3d 1102 (D.C. Cir. 2014)...................................................................25, 31

*Am. Libr. Ass'n v. FCC*,
 401 F.3d 489 (D.C. Cir. 2005)...................................................................22

*Buckley v. Valeo*,
 424 U.S. 1 (1976)...................................................................43

*Chesapeake Climate Action Network v. EPA*,
 952 F.3d 310 (D.C. Cir. 2020)...................................................................33

*CSX Transp., Inc. v. Surface Transp. Bd.*,\*
 584 F.3d 1076 (D.C. Cir. 2009)...................................................................31, 32, 33

*Daimler Trucks North America LLC v. EPA*,
 737 F.3d 95 (D.C. Cir. 2013)...................................................................32

*Environmental Integrity Project v. EPA*,\*
 425 F.3d 992 (D.C. Cir. 2005)...................................................................30, 32, 34

*FCC v. Fox Televisions Stations, Inc.*,\*
 556 U.S. 502 (2009)...................................................................36, 39

*Federal Election Comm'n v. Cruz*,\*
 596 U.S. 289 (2022)...................................................................42, 43

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.*,
 551 U.S. 449 (2007)...................................................................43

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
 407 F.3d 1250 (D.C. Cir. 2005)...................................................................33

*Loper Bright Enters. v. Raimondo*,
 144 S. Ct. 2244 (2024)...................................................................23

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,\*
    463 U.S. 29 (1983) ..................................................................24, 36, 37

*Nat. Res. Def. Council, Inc. v. U.S.E.P.A.*,
    824 F.2d 1146 (D.C. Cir. 1987) .........................................................55

*National Association of Broadcasters v. FCC*,\*
    39 F.4th 817 (D.C. Cir. 2022) ................................... 2, 4, 9, 15, 23, 28, 51, 52, 57

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    909 F.2d 1519 (D.C. Cir. 1990) .........................................................58

*Nat'l Lifeline Assoc. v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) .........................................................33

*Reed v. Town of Gilbert*,\*
    576 U.S. 155 (2015) ..................................................................45, 46

*Reno-Sparks Indian Colony v. U.S. E.P.A.*,
    336 F.3d 899 (9th Cir. 2003) ............................................................23

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017) ..........................................................25

*Sierra Club v. E.P.A.*,\*
    705 F.3d 458 (D.C. Cir. 2013) ..........................................................56

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ..........................................................39

*TikTok, Inc. v. Garland*,
    No. 21-1113, 2024 WL 4996719 (Dec. 6, 2024) ...............................45

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) .........................................................................46

**STATUTES**

5 U.S.C.
    § 553.................................................................................................25
    § 706...........................................................................................23, 36
    § 706(2)(A) ......................................................................................23

22 U.S.C.

 § 614(a) ...................................................................38
 § 614(b) ...................................................................38
 § 618(a)(1) .............................................................38

28 U.S.C.

 § 2342(1) ...................................................................1
 § 2344 .........................................................................1

47 U.S.C.

 § 315 ..............................................................13, 41
 § 315(b) ...................................................................41
 § 317(a)(1) ...............................................6, 26, 50
 § 317(a) ...........................................................51, 56
 § 317(b) ..................................................6, 50, 55, 56
 § 317(c) ................................ 6, 8, 21, 51, 52, 55, 56
 § 317(e) ..........................................................51, 57, 58
 § 508(c) ...................................................................58

52 U.S.C.

 § 30101(9), (17) ......................................................41
 § 30104(f)(3) ...........................................................41
 § 30109 ...................................................................41
 § 30121 ..............................................................12, 41

Administrative Procedure Act........... 1, 2, 6, 9, 12, 17, 23, 24, 25, 31, 32, 33, 35, 55

Communications Act of 1934 ...............................4, 6, 7, 13, 50

Section 722 of the Communications Act .........................7, 15, 49, 53, 57

Federal Election Campaign Act .............................12, 13, 14, 19

Foreign Agents Registration Act ...................... 7, 8, 15, 38, 49, 53, 54, 57

Foreign Missions Act ............................................................7

**REGULATIONS**

11 C.F.R. § 110.20 ...............................................12, 41

47 C.F.R. § 73.1212(d) ..............................................49

§ 73.1212(e) ...............................................................................49

§ 73.1212(f).........................................................................11, 13

§ 73.1212(j) (2021) ......................................................................7

§ 73.1212(j)(1)(i)...................................................................40, 54

§ 73.1212(j)(1)(ii) (2021) ..........................................................26

§ 73.1212(j)(2) .............................................................................7

§ 73.1212(j)(3)(iv)(A) ................................................................15

§ 73.1212(j)(3)(iv)(B) .....................................................15, 16, 53

89 Fed. Reg. 57775 (July 16, 2024)........................................................1

87 Fed. Reg. 68960 (Nov. 17, 2022)......................................................31

## LEGISLATIVE MATERIALS

Statement Before the Office of Management and Budget, OMB Control
       Numbers 3060-0174 and 3060-0214 (Mar. 3, 2022), available at:
       https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202201
       -3060-012 ..............................................................................40

## CONSTITUTIONAL PROVISIONS

First Amendment...................................... 1, 4, 6, 9, 12, 19, 20, 42, 43, 44, 46, 47, 50

## OTHER AUTHORITIES

FCC, *United States-Based Foreign Media Outlets*,
       https://www.fcc.gov/united-states-based-foreign-media-outlets (last
       updated Nov. 14, 2024).......................................................53

GAO, *Foreign Disinformation: Defining and Detecting Threats* (Sept. 26,
       2024), https://www.gao.gov/assets/gao-24-107600.pdf ...................38

*With Sanctions Enforced, It's The End for Radio Sputnik on U.S. Stations*
       (Oct. 17, 2024), https://www.insideradio.com/free/with-sanctions-
       enforced-it-s-the-end-for-radio-sputnik-on-u-s-stations/article_cc2c01a2-
       8c59-11ef-938d-8fbe3755db75.html ...................................38

# GLOSSARY

| | |
|---|---|
| **2021 Order** | Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd 7702 (2021) |
| **APA** | Administrative Procedure Act |
| **Act** | Communications Act of 1934, as amended |
| **DOJ** | Department of Justice |
| **FARA** | Foreign Agents Registration Act |
| **FCC or Commission** | Federal Communications Commission |
| **FECA** | Federal Election Campaign Act |
| **JA** | Joint Appendix |
| **MMTC** | Multicultural Media, Telecom and Internet Council, Inc. |
| **NAB** | National Association of Broadcasters |
| **Order** | Second Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) |
| **PSA** | public service announcement |
| **Second NPRM** | Second Notice of Proposed Rulemaking, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 37 FCC Rcd 12004 (2022) |

## JURISDICTION

The Order under review, Second Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) ("Order") (JA__-__), is a final rule published in the Federal Register on July 16, 2024. *See* 89 Fed. Reg. 57775 (JA__-__). The FCC's jurisdiction rests on the Communications Act of 1934, 47 U.S.C. § 317. This Court's jurisdiction rests on 28 U.S.C. §§ 2342(1) and 2344. The petition for review was timely filed on September 13, 2024.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are reprinted in the separately bound Addendum.

## STATEMENT OF THE ISSUES

1.      Whether the Commission's Order extending the foreign-sponsor identification regulations to non-candidate political advertising and paid public service announcements ("PSAs") is unlawful because (1) the Commission violated the notice-and-comment requirements of the Administrative Procedure Act ("APA"); (2) the Order is arbitrary and capricious; and (3) the Order violates the First Amendment.

2.      Whether the Commission lacked the statutory authority to impose the Order's inquire-and-corroborate requirements.

# INTRODUCTION

In *National Association of Broadcasters v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022), NAB challenged and this Court vacated a portion of the Commission's foreign-sponsor identification rules insofar as they imposed *ultra vires* requirements that broadcast licensees investigate the veracity of program sponsors' representations.

The Commission has failed to comply with the law once again in issuing unnecessary new foreign-sponsor identification rules. It dramatically expanded the reach of the rules without giving the public notice of the changes and an opportunity to comment upon them, in violation of the APA. The 2021 rules applied solely to leases. A lease is an arrangement by which a licensee sells a block of time for another person to program, and is distinct from advertising. The Commission drew this distinction precisely because for broadcast matter other than leases—including specifically advertisements—there was *no* evidence of any foreign governmental sponsorship. But now the Commission has done an about-face; it redefined a "lease" of airtime to include all advertising on broadcast stations unless exempt, and then it exempted only commercial and candidate political advertising, but not non-candidate political advertising and paid PSAs.[1]

---

[1] While broadcasters collectively air millions of hours of free PSAs, some PSAs are sponsored. As examples, a hospital might sponsor PSAs concerning a health

The final rules radically increase the burdens on lessees, advertisers, and broadcasters by sweeping in hundreds of thousands of new transactions, including advertising spots, under the foreign-sponsor identification regime. As two Commissioners noted in dissent, the final rules are not a logical outgrowth of the FCC's second rulemaking notice, which had only asked for public comment on a pending clarification request about the *length* of advertisements excluded from the rules.

The expansion of the rules is also substantively unlawful. The Order is arbitrary and capricious because the Commission never acknowledged, much less justified, its change of the definition of a "lease" of airtime. Moreover, the Commission still has no evidence of any foreign governmental sponsorship of any form of advertising, including political advertising. The lack of such evidence was the reason for the wholesale exclusion of traditional, short-form advertising from the prior rules, and the Commission never explained why its analysis changed. The Commission has also adopted arbitrary distinctions. It excludes candidate electoral advertising from the rules' requirements because federal law prohibits foreign nationals from making contributions to support candidate advertising, but

---

issue, and some state and local government entities sponsor PSAs (such as a state highway or transportation department sponsoring PSAs to encourage seatbelt use, or an elections department sponsoring PSAs to explain available voting methods).

illogically includes non-candidate electoral advertising even though federal law likewise prohibits foreign nationals from making expenditures to support that type of advertising. For similar reasons, the Order violates the First Amendment. It imposes content-based regulation on the most highly protected forms of speech (including electoral speech and issue advocacy) and is subject to strict scrutiny. The Commission has no compelling interest in regulating speech without actual evidence of harm, and here there is none; conjecture about the possibility of undisclosed foreign governmental sponsorship does not suffice. And the burdensome and ineffectual requirements of the Order are not the least restrictive means of achieving whatever interest the Commission has.

Finally, the new rules, as applied to all leases, are *ultra vires*. This Court held that Section 317 of the Communications Act only imposes upon broadcast licensees a duty of inquiry regarding the information needed for a sponsorship announcement, and "[n]othing more," *NAB,* 39 F.4th at 820; the Commission cannot require broadcasters also to demand corroboration from lessees in the form of self-certifications or screenshots proving that the lessees are not listed in government databases as foreign governmental entities. The Commission also cannot impose affirmative inquire-and-corroborate requirements regarding possible foreign governmental involvement in the production and distribution chain; that subject matter is outside Section 317. Finally, the Commission only has

rulemaking power over broadcast licensees; the Commission has no authority to require lessees to make certifications or investigate government databases to corroborate that they are not foreign governmental entities.

In its actions, the Commission essentially ignored the undisputed benefits of leased programming arrangements. *See* Comments of NAB and MMTC, MB Docket No. 20-299 (Jan. 9, 2023), at 36-43 (NAB/MMTC Comments) (JA__). A wide range of entities enter into leases with local stations, including individuals, schools, sports teams/leagues, small businesses, and houses of worship, enabling them to share their informational, entertainment, promotional, or religious messages with local viewers or listeners. *Id.*[2] Leases also enable broadcasters to provide niche programming to underserved audiences where it would not otherwise be economically feasible to do so, *id.* at 42-43 (JA__), and many leases (*e.g.*, those for airing church services) involve very little remuneration to stations. *Id.* at 37, n. 73 (JA__). Almost no lessees are foreign governmental entities, but the FCC's rules nonetheless require extensive diligence for *every lease* to ensure that the impossible or at least highly improbable has not occurred. Now, by extending

---

[2] *See also, e.g.,* Reply Comments of a Coalition of Religious Programmers, MB Docket No. 20-299 (Jan. 24, 2023) at 4-7, Exhibits 1-4 (JA__); Letter from Charles "Chip" Howard, Host of Chip Howard's Sports Talk, to Marlene H. Dortch, MB Docket No. 20-299 (Dec. 2, 2022) (JA__) (discussing lessees' reliance on broadcast stations to disseminate their messages).

the rules' coverage to include certain political advertising and paid PSAs, the Order brings exponentially more broadcast material within the rules' scope—and from sources just as unlikely to have foreign governmental sponsors, including federal, state, and local governments sponsoring PSAs or citizens' groups supporting local candidates. Accordingly, Petitioner requests that this Court set aside the Order as contrary to the APA, the Communications Act, and the First Amendment.

## STATEMENT OF THE CASE

The Communications Act requires broadcasters to identify on air the name of the person that has paid a station for the broadcast of any matter. *See* 47 U.S.C. § 317(a)(1). If the station receives reports required by federal law that payments have been made to others to broadcast programming, or to include matter in such programming, the station must likewise announce the payor. *Id.* § 317(b). A broadcaster must "exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement" required. *Id.* § 317(c).

On April 22, 2021, the Commission modified its sponsorship identification rules to address the handful of occasions where foreign governmental entities have paid U.S. broadcasters to air foreign propaganda. To bring more transparency to

this very limited practice, the FCC required broadcasters to provide standardized on-air announcements specifically identifying the foreign governmental entity involved, and the country represented, if programming is sponsored by a foreign governmental entity pursuant to a lease of time. 47 C.F.R. § 73.1212(j) (2021).[3] Consistent with industry practice, the Commission characterized the term "lease" as "constitut[ing] any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by another party in return for some form of compensation," and then proceeded to state that "[i]n describing a lease of time, . . . the Commission does not mean to suggest that traditional, short-form advertising time constitutes a lease of airtime for these purposes." *Id.* ¶ 28 (JA__). The Commission explained that the lease limitation ensured that the rules did not extend to "situations where there is no evidence of foreign government sponsored programming." *Id.* ¶ 29 (JA__). The 2021 Order further stated that "the record does not demonstrate that advertisements … are a significant source of unidentified foreign sponsored programming." *Id.*

---

[3] A foreign governmental entity is defined as: 1) a "government of a foreign country" as defined by the Foreign Agents Registration Act ("FARA"); 2) a "foreign political party" as defined by FARA; 3) an "agent of a foreign principal" under FARA; 4) a "foreign mission" under the Foreign Missions Act; or 5) a "U.S. based foreign media outlet" under Section 722 of the Communications Act that has registered with the Commission. 47 C.F.R. § 73.1212(j)(2).

While the Commission does not typically define the steps necessary to meet the "reasonable diligence" standard set forth in Section 317(c) of the Act, the 2021 Order explained that all broadcasters must take the following steps when initiating or renewing a lease: (i) inform the lessee of the foreign-sponsorship disclosure requirement; (ii) inquire of the lessee whether it qualifies as a "foreign governmental entity"; (iii) inquire of the lessee whether it knows of a foreign governmental entity in the production or distribution chain that has provided inducement to air the programming; (iv) independently confirm the lessee's status by consulting the Department of Justice's FARA website and the Commission's U.S.- based foreign media outlets reports for the lessee's name; and (v) memorialize the above-listed inquiries and investigations to respond to any future Commission inquiry. *See* 2021 Order ¶¶ 38-43, 48 (JA__, __).

In July 2021, certain network affiliates associations (collectively, the Affiliates) filed a Petition for Clarification urging the Commission to clarify that the definition of "lease" in the 2021 Order excludes all advertising, regardless of the length of the advertisement. *See* ABC Television Affiliates Association et al., Petition for Clarification, MB Docket No. 20-299 (July 19, 2021) (JA__-__). The Affiliates stated that use of the phrase "traditional, short-form advertising," which the Commission distinguished from leasing, could cause confusion among

8

broadcasters since "short-form" did not have an established meaning. *Id.* at 3-4 (JA__). The Commission did not act on the petition.

In August 2021, NAB and others petitioned this Court to review the 2021 Order. The petition did not object to the requirement that broadcasters disclose with uniform language foreign government-sponsored programming, but instead challenged only the diligence obligations imposed by the 2021 Order as violating Section 317, the APA, and the First Amendment. On July 12, 2022, the Court unanimously agreed with NAB that the 2021 Order's requirement that broadcasters independently investigate their lessees' representations by searching government databases exceeded the Commission's authority under Section 317 of the Act. *NAB*, 39 F.4th at 820.

In October 2022, the Commission issued a second rulemaking notice seeking comment on proposals to refashion its diligence standards to, among other things, require lessees and stations to complete written certifications or other corroboration of the lessee's status as a foreign governmental entity. Second Notice of Proposed Rulemaking, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 37 FCC Rcd 12004 ¶¶ 4, 12-20 (2022) ("Second NPRM") (JA __). It also sought comment on the Affiliates' petition to clarify that all advertising be excluded from the rules, and asked "what criteria the Commission might adopt to distinguish between advertising and

programming arrangements for the lease of airtime." *Id.* ¶ 32 (JA __). The FCC

asked whether there were "key characteristics" that would help make this

distinction, "such as duration, content, editorial control, or differences in the nature

of the contractual relationship between the licensee and the entity that purchases an

advertising spot versus leasing airtime for programming." *Id.* Nothing in the

Second NPRM sought comment on expanding application of the foreign-sponsor

identification rules to specific categories of "traditional, short-form advertising," or

even hinted that there would be implications for any form of political advertising.

NAB filed comments opposing the proposed rules. *See* NAB/MMTC

Comments (JA__). Given the lack of any evidence that foreign governments had

ever attempted to air foreign propaganda through advertisements of any length,

NAB urged the Commission to clarify that all advertising, regardless of length or

format, is not subject to the foreign sponsorship identification rules. NAB also

asked the Commission to narrow the application of its rules to exclude leases

involving religious and locally originated programming. *Id.* at 33-45 (JA__). NAB

further explained that the Commission lacked authority to impose the proposed

corroboration requirements. *Id.* at 10-13 (JA __). While many commenters

supported NAB's positions, none supported the Commission's proposed expansion

of the diligence requirements or otherwise expressed concerns about unidentified

foreign government-sponsored content on broadcast stations.

On February 21, 2024, the FCC Chairwoman circulated a non-public draft order among all the FCC Commissioners for a vote by the full Commission. NAB representatives participated in meetings with legal advisors to the Commissioners to urge them to adopt NAB's proposals. From those discussions, NAB gathered that, rather than simply granting the Affiliates' petition and clarifying that all advertising was exempt from the foreign sponsorship rules, the circulated order would adopt an entirely new view of the broadcast material to which the rule applies, exempting *only* commercial advertising that meets an existing exemption from all sponsorship identification requirements.[4]

Upon learning of this apparent significant departure from the Second NPRM, NAB scrambled to assess the implications of the FCC's new direction, and held additional meetings at the eleventh hour urging the Commission to ensure that the new rules did not (inadvertently or intentionally) treat material such as political advertising, including candidate and/or issue ads, paid PSAs, or any other form of advertising as "leases" for purposes of its foreign-sponsor identification rules.

---

[4] *See* 47 C.F.R. § 73.1212(f), which states: "In the case of broadcast matter advertising commercial products or services, an announcement stating the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification, shall be deemed sufficient for the purpose of this section and only one such announcement need be made at any time during the course of the broadcast."

NAB observed that political advertising is governed by its own complex statutory and regulatory system and would create implementation problems; no record evidence contradicted the Commission's prior conclusion that advertising was not a significant source of undisclosed foreign-sponsored programming; and so extending the rules would exceed the FCC's statutory authority and violate the APA and the First Amendment. Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (Mar. 21, 2024) at 5-6 (JA__); Letter to Marlene H. Dortch, FCC Secretary, from Erin L. Dozier, NAB, MB Docket No. 20-299 (Apr. 25, 2024) (JA__); Letter to Marlene H. Dortch, FCC Secretary, from Erin L. Dozier, NAB, MB Docket No. 20-299 (May 6, 2024) (JA__); Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (May 17, 2024) (JA__); Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (May 17, 2024) (JA__). NAB specifically explained that long-standing Federal Election Campaign Act ("FECA") prohibitions on foreign nationals paying for electoral communications made it extremely unlikely that foreign governmental entities would sponsor any political advertising. *Id*. at 3-4 & n.14 (JA__), *citing* 52 U.S.C. § 30121; 11 C.F.R. § 110.20.

On June 10, 2024, the Commission released the Order. Even though it had previously distinguished leases from advertising, the Commission now recast its

definition of leasing as including all advertising unless exempt. Order ¶ 48 (JA\_\_).

Rather than distinguishing leasing from all traditional short-form advertising, as it did in 2021, the Commission now asserted that leases included wide swaths of traditional, short-form advertising. Indeed, it determined that only advertising comporting with the pre-existing 47 C.F.R. § 73.1212(f) exemption from the sponsorship identification rules (i.e., ads for commercial goods and services) and ads run by political candidates would be outside the scope of its foreign sponsorship identification rules. *Id.* ¶¶ 42-45 (JA\_\_). On the latter exclusion, the Commission explained that FECA already prohibits foreign nationals from making contributions to political candidates, and that Section 315 of the Communications Act requires federal candidates wanting to qualify for favorable advertising rates to state that their authorized committee has paid for the ad and that the candidate approves the ad (i.e., "stand by your ad" requirements). Order ¶¶ 46-47 & n.117 (JA\_\_), citing 47 U.S.C. § 315(b)(2)(C) and (D).[5]

The Commission, however, expressly subjected paid PSAs and what the Commission called "political issue advertisements" to the foreign-sponsor identification rules. It defined political issue advertisements "as any paid political

---

[5] The Order incorrectly implies that "stand by your ad" disclosures are mandatory for all candidates. *Id*. Rather, Section 315 applies only to federal candidates, and the disclosures are required only if candidates wish to obtain the benefit of the lowest unit rate for advertising.

matter or matter involving the discussion of a controversial issue of public importance, regardless of the length of the programming," but excluding "advertisements made by or on behalf of legally qualified candidates for public office or their authorized committees." Order ¶ 47 (JA__). This broad category includes not only conventional issue advocacy (*e.g.*, advertisements advocating Medicare reform without referencing elections or candidates), but also all electoral advertising run by non-candidates to support or oppose candidates (*e.g.*, ads run by unaffiliated political action committees and other entities and groups for and against federal, state or local candidates). The Commission acknowledged that FECA bars foreign nationals from making electoral expenditures on behalf of candidates, just as it bars foreign nationals from making contributions to support candidates' own advertising. *Id.* But the Commission ruled that since it was defining non-candidate electoral advertising to be a subset of issue advertisements, and "our definition encompasses issue advertisements unrelated to elections" that are not subject to such prohibitions, it would subject all issue advertisements, so defined, to its foreign-sponsor identification rules. *Id.* The Commission flatly denied that expanding the rules to political and other advertising was beyond the scope of the proceeding due to a lack of notice, would be unduly burdensome, or lacked justification despite the absence of any evidence that foreign governmental entities sponsor any form of advertising. Order ¶¶ 48-50 (JA__). The Commission

also refused to exempt leases for religious or locally originated programming from its foreign-sponsor identification rules. Order ¶¶ 52-59 (JA__).

Finally, despite this Court's ruling that Section 317 imposed only a duty of inquiry to obtain the information needed to make the statutorily mandated sponsorship announcements, *NAB*, 39 F.4th at 820, the Commission imposed new requirements that the licensee demand, and the lessee provide, corroboration of whether foreign governmental entities leased the air time or are known to have been involved in the production or distribution of the leased programming. To meet this standard, a lessee must either: (i) complete and provide to the broadcaster a certification of the accuracy of its foreign governmental status and whether it knows if any foreign governmental entity in the production or distribution chain has induced the inclusion of any matter in the programing, Order, Appendix A, modified 47 C.F.R. § 73.1212(j)(3)(iv)(A) (JA__), or (ii) if the lessee has stated that it is *not* a foreign governmental entity, search for its own name in each of the two governmental databases that were part of the original broadcaster diligence standard vacated by this court (the Department of Justice's FARA database and the FCC's section 722 website listing U.S.-based foreign media outlets), print screenshots of the search results, and provide them to the broadcaster. Order, Appendix A, modifying 47 C.F.R. § 73.1212(j)(3)(iv)(B) (JA__). The licensee must also seek from a lessee supplying screenshots unspecified "other

information" to corroborate that the lessee is not the government of a foreign country or a foreign political party, because those categories of foreign governmental entities would not be addressed by the screenshots. *Id.*

The Order includes certification templates for licensees and lessees to use for the first corroboration option. Order, Appendices C and D (JA__-__). Those templates highlight the complexity of what the rule requires of licensees and lessees—both of which are commonly non-lawyers.[6] The templates reference definitions in four separate parts of the U.S. Code as well as the Commission's regulation. Order, Appendices C and D (JA__). The Commission rejected NAB's arguments that the self-certification and corroboration requirements exceed the Commission's statutory authority. Order ¶¶ 34-36 (JA__). The Commission required such diligence to be conducted for each new lease and each lease renewal, although not more than once per year. Order ¶ 27 and Appendix A, modified 47 C.F.R. §73.1212(j)(3) (JA__, __).

Two of the five Commissioners dissented from the Order or parts thereof. Commissioner Brendan Carr objected that the Commission had changed the definition of leasing, and subjected previously excluded non-candidate political advertising and paid PSAs to the foreign-governmental-sponsor identification

---

[6] While large broadcasting organizations have legal staffs, that is not true of many radio and television broadcasters.

requirements, without adhering to its notice-and-comment obligations. Statement of Commissioner Brendan Carr, Dissenting in Part ("Carr Statement") (JA__). Commissioner Nathan Simington likewise objected that the Commission had violated the APA's notice-and-comment requirements. He also objected to the Order's extension to non-candidate electoral advertising. He observed that it was "senseless" for the Commission to exclude candidate electoral advertising because the federal prohibition on foreign national involvement eliminated the risk of foreign governmental sponsorship, but include non-candidate electoral advertising that is subject to the same prohibition. Statement of Commissioner Nathan Simington, Dissenting ("Simington Statement") (JA__).

## SUMMARY OF ARGUMENT

The Order must be set aside, for multiple reasons.

1.     The Order's extension of the foreign-sponsor identification rules to non-candidate political advertising and paid PSAs is unlawful. First, the Commission violated the APA by not giving the public notice of, and an opportunity to comment on, this extension. In the existing rule, the Commission had defined leasing as it is commonly understood as any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by another party in return for some form of compensation. This plainly, and the Commission noted expressly, does not include traditional, short-

form advertising. In the Second NPRM, the Commission never suggested it was changing that definition. It instead asked only whether advertising of any duration should not be considered leasing (programming a "block of broadcast time"), and what criteria would distinguish leasing from advertising. The final rule, however, now treats all advertising, including 30- and 60-second spots, as leasing unless exempted. The final rule is not a logical outgrowth of the Second NPRM; no reasonable commenter could have discerned that the Commission was considering such an idiosyncratic and counterintuitive definition of leasing, much less an exemption for commercial and candidate political advertising, but not for non-candidate political advertising and paid PSAs.

Second, the Order is arbitrary and capricious because the Commission failed to give a reasoned explanation that accounts for its change of policy. The Commission originally restricted the rules to leasing and excluded advertising because there was no evidence of foreign governmental sponsorship of advertising of any kind; the only (scant) evidence of foreign sponsorship of broadcasting involved multi-hour leasing of blocks of time to air programming at a handful of local stations. There is still *no evidence* of foreign governmental sponsorship of advertising generally or political advertising or paid PSAs specifically, and yet the Commission now subjects all non-candidate political advertising and paid PSAs to the diligence rules.

Furthermore, the categorical distinctions the Commission drew make no sense. The Commission acknowledged that the same justification it gave for excluding candidate political advertising—the low risk of foreign governmental sponsorship given the statutory prohibition of foreign national involvement under FECA—applies to electoral advertising run by non-candidates. Yet the Commission proceeded to group together both non-candidate electoral advertising and issue advocacy not referencing elections/candidates into a defined category of "issue advertisements" for purposes of its expanded foreign-sponsor identification rules; observed that FECA does not prohibit foreign national involvement in the whole category; and therefore declared the right to regulate all so-called issue advertisements. The Commission's regulation of non-candidate electoral advertising is simply an artifact of its decision to group this speech with other speech in its definition of "issue advertisements." That kind of bootstrapping is not reasoned agency decision-making.

Third, the Order violates the First Amendment. The Order is a content-based regulation that burdens speech based on the speaker (candidates versus non-candidates) and the content (political "issue advertising" and paid PSAs versus all other advertising), and ironically regulates political speech that receives the highest constitutional protection. The Order is thus subject to strict scrutiny, which it cannot satisfy.

Before burdening protected speech, the government must produce actual evidence of harm that the regulation rectifies; conjecture about possible harm from political advertising or paid PSAs, which is all the Commission offers, is not enough. Indeed, the Commission has acknowledged that there is little risk of harm where federal election law bars foreign national involvement; that is true of non-candidate electoral advertising, and so the Commission has no compelling interest in regulating that speech. The Commission cannot manufacture a compelling interest by defining a broad category of "issue advertisements" that includes non-candidate electoral advertising; identifying other parts of that category where allegedly there is greater risk of foreign governmental involvement; and then asserting the right to regulate the entire self-defined category. Finally, the regulation is not narrowly tailored, much less the least restrictive means of serving any regulatory interest. The vast majority of lessees and covered political and public service advertisers are indisputably not foreign governmental entities. Putting the entire universe of lessees and covered advertisers through the paces of corroboration in hundreds of thousands of transactions based on the bare possibility that a foreign-governmental needle might be found in the haystack does not pass First Amendment muster. Moreover, because the Commission's chosen corroboration methods are highly unlikely to detect any surreptitious foreign governmental sponsorship, the Order fails the narrow tailoring requirement.

2.     The inquire-and-corroborate requirements of the Order also exceed the Commission's statutory authority as to all leases. Section 317(c) requires broadcast licensees to exercise reasonable diligence to obtain information from lessees; this Court has held the statute imposes a duty of inquiry only. Section 317 does not authorize corroboration requirements. Moreover, because the overwhelming majority of lessees are indisputably not foreign governmental entities, and the corroboration requirements are ineffective at uncovering any such entities, they are no part of the "reasonable diligence" commanded by the statute.

In all events, the Commission lacks authority to impose an inquire-and-corroborate requirement regarding the participation of foreign governmental entities in the production or distribution chain. Reasonable diligence need only be exercised to discover information necessary to make the announcements required by statute, and the broadcaster has no affirmative duty to ascertain or announce such facts.

Finally, the Commission only has rulemaking authority to impose requirements on broadcasters; it has no authority whatsoever to impose certification or other corroboration requirements on content providers who lease airtime for their constitutionally protected speech.

## STANDING

NAB is a nonprofit trade association that advocates on behalf of local radio and television stations and broadcast networks before Congress, the Commission, other federal agencies, and the courts. NAB and its members actively participated in the rulemaking. *See* NAB Declaration ¶¶ 1-2 (Add. 1-2).

NAB has associational standing. "Associations … have representational standing if: (1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). NAB's members would otherwise have standing to sue in their own right. Many NAB members lease airtime for programming and sell advertising spots for non-candidate political advertising and paid PSAs. The Order's requirements of inquiry and corroboration apply to all broadcasters that lease programming and air issue advertisements and paid PSAs; the unlawful Order injures NAB's member broadcasters by compelling action and the expenditure of resources and violates their statutory and constitutional rights. *See* NAB Declaration ¶¶ 3-4 (Add. 2-3). Because NAB advocates for the appropriate regulatory treatment of its members, the interests it seeks to protect here are germane to NAB's purpose. *See id.* ¶ 5 (Add. 3). Because the Order's requirements

apply uniformly to all broadcasters that lease programming, neither the claim asserted nor the relief requested requires participation by any of NAB's individual members. *See id.* ¶ 6 (Add. 3). This Court previously entertained a challenge from NAB and other organizations to the earlier version of the foreign-governmental-sponsor identification rules based on similar representations of associational standing. *See National Association of Broadcasters v. FCC*, 39 F.4th 817 (D.C. Cir. 2022).

## ARGUMENT

## I.      Standard of Review

Under the APA, this Court reviews whether an agency's rulemaking was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," *id.* § 706, performing those functions using "independent judgment" without deference to the Commission. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). A court of appeals "reviews de novo the agency's decision not to follow the APA's notice and comment procedures. The agency is not entitled to deference because complying with the notice and comment provisions when required by the APA is not a matter of agency choice." *Reno-Sparks Indian Colony v. U.S. E.P.A.*, 336 F.3d 899, 909 n.11 (9th Cir. 2003) (cleaned up).

In applying the arbitrary-and-capricious standard, this Court examines whether the Commission has engaged in reasoned analysis, reviewing "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

## II.   The Extension of the Foreign Sponsorship Identification Rules to Non-Candidate Political Advertising and Paid PSAs Is Unlawful

The Commission's extension of the foreign-sponsor identification rules to political advertising by non-candidates and paid PSAs is unlawful, for multiple reasons. First, the Commission has violated the APA by failing to follow mandatory notice-and-comment procedures in so extending the foreign-sponsor identification rules. Second, the Commission has acted arbitrarily and capriciously by failing to give a reasoned explanation for expanding the rules' coverage. Third, by imposing burdens only on certain forms of advertising (non-candidate political advertising and paid PSAs), the rules are an impermissible content-based regulation that ironically penalizes the most protected form of speech, even though the Commission has never identified a single instance where a foreign governmental entity has purchased political advertising or PSAs from a broadcast licensee.

## A. The Commission Failed to Fulfill Notice-and-Comment Obligations in Expanding the Definition of "Lease" to Include Non-Candidate Political Advertising and Paid PSAs

The Commission has violated the notice-and-comment requirements of the APA. When an agency proposes or amends a substantive rule, it must follow the procedures set out in 5 U.S.C. § 553. The agency must publish a notice of proposed rulemaking in the Federal Register, *id.* § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of comments, which the agency must consider." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 331 (D.C. Cir. 2017) (cleaned up) (citing § 553(c)). "An agency may promulgate a rule that differs from a proposed rule only if the final rule is a logical outgrowth of the proposed rule. A final rule is a logical outgrowth if affected parties should have anticipated that the relevant modification was possible." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014) (cleaned up).

The Commission here violated the APA by failing to give the public any notice of, and an opportunity to comment upon, (1) the extension of the foreign sponsorship rules to all advertising unless exempted, and (2) the exemption of only commercial advertising and political candidate advertising, but not non-candidate political advertising and paid PSAs.

### 1. The Second NPRM Sought Comment Only on a Pending Clarification Request Relating to the Length of Advertisements

By statute, a broadcast station must announce the sponsor of "[a]ll matter broadcast" for which the station receives or demands payment. 47 U.S.C. § 317(a)(1). In 2021, the Commission required a specific announcement of the sponsor and the country represented if a program was provided by a foreign governmental entity, but only "[w]here the material broadcast … has been aired *pursuant to the lease of time* on the station …." 47 C.F.R. § 73.1212(j)(1)(ii) (2021) (emphasis added).

The Commission adopted the lease requirement to narrow the applicability of the foreign-sponsor identification requirements. The Commission's original notice of proposed rulemaking had proposed to apply the special disclosure requirements to all broadcast matter within the ambit of Section 317(a). First Notice of Proposed Rulemaking, *In the Matter of Sponsorship Identification Requirements for Foreign Government-Provided Programming*, MB Docket No. 20-299, ¶ 11 (Oct. 16, 2020) (JA__). But in promulgating the 2021 final rules, the Commission decided "to narrow [its] focus to address specifically those circumstances in which a foreign governmental entity is programming a U.S. broadcast station pursuant to the lease of airtime." 2021 Order ¶ 24 (JA__).

In the 2021 Order, the Commission characterized the term "lease" as "constitut[ing] any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by another party in return for some form of compensation," clarifying that "[i]n describing a lease of time, … the Commission does not mean to suggest that traditional, short-form advertising time constitutes a lease of airtime for these purposes." *Id.* ¶ 28 (JA__). Indeed, the industry has always understood leasing and advertising sales to be wholly different transactions. Leasing, as the Commission's definition indicated, enables a lessee to purchase a block of airtime for its programming, in contrast to the broadcast licensee's selling of advertising spots within or adjacent to its own or third-party programming.

The Commission justified narrowing the foreign-sponsor identification rules to apply only to leases because that would "ensure that the new disclosure obligations do not extend to situations where there is *no evidence* of foreign government sponsored programming." *Id.* ¶ 29 (emphasis added) (JA_). It noted that "the record does not demonstrate that *advertisements* . . . are a significant source of unidentified foreign sponsored programming." *Id.* (emphasis added). Moreover, the handful of broadcast stations airing foreign government-sponsored programming were doing so pursuant to leases. *Id.* ¶¶ 1-4, 25 (JA__). The FCC further reasoned that its rules would prevent foreign governments and their

representatives, which are barred from holding a U.S. broadcast license, from leasing time on a station without disclosure. *Id.* ¶ 26 (JA__), *citing* 47 U.S.C. § 310(a).

After this Court vacated part of the 2021 Order for imposing *ultra vires* investigation requirements on broadcasters, *NAB*, 39 F.4th at 820, the Commission proposed new rules in October 2022 that substituted corroboration requirements in the form of self-certifications or database screenshots for the invalidated investigation requirements. Second NPRM ¶ 4 (JA__). Critically, the Commission did not propose to alter the limitation of the foreign-sponsor identification requirements to leases of airtime, nor did it propose to alter the definition of "lease" as excluding traditional, short-term advertising.

The FCC's only mention of advertising in its Second NPRM concerned a pending clarification request about the length of advertisements. After issuance of the 2021 Order, certain network affiliates associations ("the Affiliates") had petitioned for "clarification regarding the applicability of the new foreign sponsorship identification rules to advertisements sold by local broadcast stations." ABC Television Affiliates Association et al., Petition for Clarification, MB Docket No. 20-299 (July 19, 2021) at 1 (JA__-__). The Affiliates noted that the Commission had distinguished leasing from "traditional, short-form advertising," but there was no definitive meaning of the term in the industry, which sells

advertising of varying lengths. *Id.* at 3 (JA__). The Affiliates advocated "that the Commission clarify its intention by explicitly confirming that the new rules do not apply to advertisements of any length." *Id.* at 4 (JA__). The Commission did not act on the Affiliates' petition before this Court vacated the 2021 Order in part.

In the Second NPRM, the Commission asked for comment pertaining to the question that the Affiliates had raised of excluding all advertising of any length from the foreign-governmental-sponsor rules. Second NPRM ¶ 11 (JA__). The Commission reported that "[i]n their petition, the Affiliates recommended that the foreign sponsorship identification rules not apply when a licensee sells time to advertisers in the normal course of business, no matter the length of the advertisement." *Id.* (JA__). The Commission also asked "what criteria the Commission might adopt to distinguish between advertising and programming arrangements for the lease of airtime in a way that does not jeopardize the Commission's goals in this proceeding." *Id.* ¶ 32 (JA__). It invited comment on the "key characteristics that could assist in distinguishing advertising spots from a lease of airtime on a station, such as duration, content, editorial control, or differences in the nature of the contractual relationship between the licensee and the entity that purchases an advertising spot versus leasing airtime for programming." *Id.* The Commission also inquired whether a safe harbor (such as a

presumption that any advertising of less than two minutes is short-form advertising) would be beneficial. *Id.*

### 2. The Final Rules Are Not the Logical Outgrowth of the Second NPRM

Contrary to the Commission's claims, Order ¶ 49 (JA__), those inquiries did not inform the public that the Commission was considering changing the definition of "lease" to now include all advertising unless exempted, and then exempting only commercial goods and services and political candidate advertising. The Second NPRM only addressed whether all advertising (as opposed to "traditional, short form advertising") should be excluded from the rule, and the criteria for differentiating advertising from leasing. Nothing in the Second NPRM put the public on notice that the Commission contemplated applying the rules to non-candidate political advertising and paid PSAs.

The final rules are not the logical outgrowth of the Second NPRM, and thus do not satisfy the Commission's notice-and-comment obligations. "[A] reasonable commenter must be able to trust an agency's representations about which particular aspects of its proposal are open for consideration." *Environmental Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005). "A final rule qualifies as a logical outgrowth if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject

*during the notice-and-comment period.*" *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009) (cleaned up and emphasis added).

It is telling that not a single commenter addressed the contours of the final rules during the comment period, even though broadcasters would have been highly interested in avoiding the extraordinary new burdens the final rules entailed. *Allina Health*, 746 F.3d at 1108 (no logical outgrowth where reversal of policy "would doubtless have triggered an avalanche of comments"). Here, the comment period closed on December 19, 2022, and the reply comment period on January 3, 2023. FCC, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 87 Fed. Reg. 68960 (Nov. 17, 2022). But the only filings contesting the vast expansion of the rules (and cited by the Commission) were ex parte notices hurriedly filed by NAB and other broadcast groups in Spring 2024, after rumors of the proposed changes began to swirl.[7] The APA is not satisfied by a rumor mill. Not only were broadcasters deprived of notice of the contemplated changes and the opportunity to establish a proper record opposing them, but, absent Federal Register notice, the Commission never heard from private citizens,

---

[7] *See supra* at 11-12; Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (May 17, 2024) (JA__) at 1 (noting that NAB was "hearing whispers" of the changes in the rules and complaining of prejudice to it and others from lack of public notice); Order ¶¶ 46-50 & nn. 119-136 (citing ex parte letters on political advertising requirements from 2024) (JA__).

public interest organizations, political parties or action committees, or advertising companies and brokers that might have provided highly relevant input on the changed rules before they were adopted. *See Daimler Trucks North America LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) ("Notice of agency action is crucial to ensure that agency regulations are tested via exposure to diverse public comment, to ensure fairness to affected parties, and to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.") (cleaned up).

This circumstance parallels other cases in which this Court has found that the final rule was not the logical outgrowth of the noticed proposed rule. "[A] final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX*, 584 F.3d at 1080 (cleaned up). This includes circumstances in which "the proposed rule gave no indication that the agency was considering a different approach, and the final rule revealed that the agency had completely changed its position." *Id.* at 1081. In *Environmental Integrity Project*, this Court found no logical outgrowth where the agency, as here, "repudiate[d] its proposed interpretation and adopt[ed] its inverse." 425 F.3d at 998. And, in *CSX*, this Court found that a regulation permitting benchmark data from four-year samples of rail rates was not the logical

outgrowth of a proposed rule for using one-year samples. The NPRM "nowhere even hinted that the Board might consider expanding the number of years from which comparison groups could be derived," and the public could not have anticipated "which particular aspects of the Board's proposal were open for consideration." *CSX*, 584 F.3d at 1082 (cleaned up). Similarly, in *National Lifeline Association v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019), the Commission originally proposed to exclude towns with a population of over 10,000 from a tribal subsidy program, but the final rule excluded "urbanized areas" or "urban clusters" of over 25,000 population, which would have thereby denied subsidies to residents of small towns of less than 10,000 population found within those areas and clusters. *Id.* at 1116. Since the Commission did not put the public on notice that small towns could be excluded from the subsidy program, it violated the APA. *Id.; see also Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 320-21 (D.C. Cir. 2020) (no logical outgrowth where EPA did not propose setting emission standards based on best performing sources); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260-61 (D.C. Cir. 2005) (final rule capping maximum air velocity for mine ventilation not a logical outgrowth of proposed rule setting minimum air velocity).

The final rule here was a *volte face* in which the Commission "repudiate[d] its proposed interpretation [in the Second NPRM] and adopt[ed] its inverse."

*Environmental Integrity Project*, 425 F.3d at 998. The Second NPRM, like the 2021 Order, expressly treated leasing as distinct from advertising, and only asked whether all advertising regardless of length should be excluded, or what criteria could be used to differentiate advertising from leasing. Second NPRM ¶ 32 (JA__). The Commission never notified the public it was considering taking a completely different approach in its 2024 rules, whereby all advertising is leasing unless the Commission exempts it as unlikely to be sponsored by foreign governmental entities. *See* Order ¶ 48 (JA__) (claiming that the definition of leasing "is sufficiently broad to cover issue advertising and paid PSAs" but declining to exempt those categories from the rules because they allegedly "could be used by foreign governmental entities to access U.S. airwaves to persuade the American public"); *id.* ¶ 44 (JA__) (exempting commercial advertising); *id.* ¶ 46 (JA__) (exempting political candidate advertising because it is unlikely to be sponsored by foreign governmental entities).

Furthermore, the Commission failed in its obligation to identify "which particular aspects of its proposal are open for consideration." *Environmental Integrity Project*, 425 F.3d at 998. The public had no inkling that the Commission was considering defining all political issue advertising and paid PSAs as "leases" subject to the rules—even 30-second or 60-second spots that are indubitably traditional, short-form advertising previously excluded from their reach, and that

have never been considered leases by the industry. And it had no idea that the Commission was considering exempting political candidate advertising but no other kind of political advertising.

The Commission should have heeded Commissioners Brendan Carr and Nathan Simington, who dissented because of the Commission's failure to satisfy its notice-and-comment obligations. Commissioner Carr noted that the Order "changes the 2021 definition of 'lease' by eliminating the 'short-form advertisement' exception." Carr Statement (JA__). "[T]he FCC did not provide fair notice that it might redefine 'lease' in this fundamental way." *Id*. The Affiliates had asked for "a clearer and less burdensome definition" of the advertising exception, "not to eliminate the exception altogether." *Id.* And the Second NPRM "did not contemplate eliminating the 'short-form advertisement' carveout." *Id.* Accordingly, the Commission was obligated to issue a further or supplemental notice of rulemaking, but did not. *Id.* Commissioner Simington put it more bluntly: the Commission has "nowhere noticed that, by the terms 'lease of airtime' and 'short-form advertising' we meant the *exact opposite* of what we said in 2021 and 2022." Simington Statement (JA__). "[S]pontaneous self-reversal is an Administrative Procedure Act violation." *Id.*

**B.    The Commission Has Failed to Give a Reasoned Explanation for the New Rules**

The Commission also failed to engage in reasoned decision-making, and its extension of the rules must be set aside as arbitrary and capricious. 5 U.S.C. § 706. When the Commission changes course, it has a duty to explain why it abandoned its prior position. Here, the Commission did not even *acknowledge* that it was changing the definition of "lease," and the reason for excluding advertising in the 2021 Order—that there is no evidence of significant foreign governmental sponsorship of advertising—still holds. Moreover, the Commission offered no evidence to support the expansion of the rules, and the distinctions it drew between exempt and non-exempt advertising make no sense.

For a rule to survive judicial scrutiny under the arbitrary-and-capricious standard, the agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. And the agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, the Commission acted arbitrarily and capriciously by not even acknowledging that it was changing the definition of leases "in [a] fundamental way," Carr Statement (JA___), to "mean[] the *exact opposite*" of its previous

definition, Simington Statement (JA_). In defining leases in the 2021 Order, the Commission stated that "we do not mean to suggest that traditional, short-form advertising time constitutes a lease of airtime for these purposes." 2021 Order ¶ 28 (JA__). While there is ambiguity as to the metes and bounds of the term "traditional, short-form advertising," the Commission and the entire industry understood under any reading that, for example, all traditional 30- and 60-second advertising spots were not leases. As the Commission explained in the 2021 Order, the purpose of leasing agreements "is to give one party—the brokering party or programmer—the right and obligation to program the station licensed to the other party—the licensee or broadcaster," with the lessee "often times also selling the advertising during such [leased] time and retaining the proceeds." 2021 Order ¶ 21 (JA__). Advertising spots are not programming. For the Commission to declare now that all advertising sales are leases of airtime unless exempted is simply an arbitrary and unexplained about-face.

The Commission also failed to "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As an initial matter, the Commission has provided only scant evidence of *any* leased programming sponsored by foreign governments, which has only ever been identified on a handful of local stations out of the 12,000-plus commercial radio and TV stations across the country, *see* Order ¶ 1 & n.2 (JA__), even before

Russia's Radio Sputnik disappeared from the two full power radio stations previously airing it. *With Sanctions Enforced, It's The End for Radio Sputnik on U.S. Stations* (Inside Radio, Oct. 17, 2024), https://www.insideradio.com/free/with-sanctions-enforced-it-s-the-end-for-radio-sputnik-on-u-s-stations/article_cc2c01a2-8c59-11ef-938d-8fbe3755db75.html. The principal risk of foreign disinformation is on the Internet and in particular social media. *See* GAO, *Foreign Disinformation: Defining and Detecting Threats*, GAO-24-107600, at 1-2 (Sept. 26, 2024), https://www.gao.gov/assets/gao-24-107600.pdf. Nor is undisclosed foreign sponsorship of broadcasting likely. FARA requires agents of foreign governments to register with the Department of Justice and disclose their representation of the foreign principal in any broadcast information they provide, at pain of criminal sanction, *see* 22 U.S.C. §§ 614(a)-(b), 618(a)(1), which protects against surreptitious foreign propaganda on the airwaves.

Most importantly, there is not an iota of evidence that any foreign governmental entity ever purchased political ads or paid for PSAs on broadcast stations. Rather than gather and evaluate actual evidence, the Commission resorted to conjecture: "Certainly, paid PSAs and issue advertising could be used by foreign governmental entities to access U.S. airwaves to persuade the American public." Order ¶ 48 (JA__), ¶ 49 (JA__) ("there is a risk that contributions to such [non-candidate political advertising] programming might have been made by foreign

governmental entities"). "Though an agency's predictive judgments ... are entitled to deference ... deference to such ... judgments must be based on some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (cleaned up). The Commission rejoins that "'[a]n agency need not suffer the flood before building the levee,'" Order ¶ 54 (JA__) (quoting *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009)), but there must at least be rational, evidence-based grounds for predicting the flood. One does not build a levee for an anticipated trickle.

Furthermore, "a reasoned explanation is needed for disregarding facts and circumstances that underlay … the prior policy." *Fox Television Stations*, 556 U.S. at 516. The 2021 Order limited the reach of the foreign-sponsor identification rules to leases and excluded advertising (including political advertising) to "ensure that the new disclosure obligations do not extend to situations where there is no evidence of foreign government sponsored programming." 2021 Order ¶ 28 (JA__). There is still *no* such evidence. The Commission does not explain why the lack of such evidence justified excluding all traditional, short-form advertising from the rules in 2021 but not in 2024.

By not inquiring into the extent of the problem or the risk, the Commission also did not rationally assess whether the significant burdens of this dramatic regulatory expansion were warranted. The Commission had (under)estimated that

the 2021 Order as applying to approximately 5,500 leases a year.[8] But whatever the number of leases, extending the burdensome, universal inquire-and-corroborate regime to political issue advertising and paid PSAs sweeps in additional transactions numbering in the hundreds of thousands in election years.[9] The Commission never evaluated whether that was justified, or whether less burdensome regulation would have been adequate (for example, simply notifying lessees that if they are foreign governmental entities, the advertising had to include the special announcement prescribed in 47 C.F.R. § 73.1212(j)(1)(i)).

Finally, the Commission's rationale for exempting some advertising and not others does not hold water. The Commission stated that the "exemption from the foreign sponsorship identification rules for political candidate advertisements is based largely on the fact that foreign nationals are prohibited from making

---

[8] See FCC Supporting Statement Before the Office of Management and Budget, OMB Control Numbers 3060-0174 and 3060-0214 (Mar. 3, 2022) at 7-8, n. 7, available at: https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202201-3060-012.

[9] Although data on the number of transactions involved is not in the administrative record because of the lack of notice, NAB recently searched the FCC's online public inspection file database and found that 290,517 files identified as "non-candidate issue ads" have been uploaded by radio and television stations in 2024 as of December 6, 2024 (and since an advertising order may cover multiple advertising spots, the number of actual ads is far larger). The number of paid PSAs is unknown.

contributions to political candidates." Order ¶ 47 (JA__). But political ads run by non-candidates to support or oppose candidates are subject to the *same* prohibition. Foreign nationals cannot make expenditures to influence an election, expenditures expressly advocating the election or defeat of a candidate, or electioneering communications mentioning a candidate in specified periods before an election. *See* 52 U.S.C. § 30121; § 30101(9), (17); § 30104(f)(3); *see also* 11 C.F.R. §110.20; Order ¶ 47 & n.120 (JA__). These provisions are subject to both civil and criminal enforcement. *See* 52 U.S.C. § 30109. The Commission made no inquiries and did no investigating to determine if the candidate versus non-candidate distinction was justified. As Commissioner Simington pointed out, a substantial portion of third-party political advertising supports candidates and is already illegal if paid for by foreign nationals; thus, the Commission has created categorical distinctions that are nonsensical. Simington Statement (JA__).

The Commission also relied on the transparency of Section 315, 47 U.S.C. § 315, that purportedly "requires political candidates themselves to state that their authorized committee has paid for the advertisement and that the candidate approves the advertisement. Order ¶ 47 (JA__). But Section 315 applies only to candidates for federal office, and only those seeking a preferred advertising rate, 47 U.S.C. § 315(b); it does not support the categorical lines the Commission drew.

The Commission also did not investigate the many issues that arise from sweeping certain forms of advertising into the rules: *e.g.*, for example, the improbability that highly regulated political action committees who place issue ads would be foreign governmental entities or solicit programming from such entities; the utility of these inquiries given other notice requirements; the confusion and delay inherent in advertisers and broadcasters dealing with multiple disclosure regimes; the exacerbation of problems with compliance that already exist; the competitive effects on broadcasters of onerous compliance requirements that do not apply to pay TV, satellite radio, or social media rivals in the advertising market; and the possible deterrence of speech because of excessive paperwork. *See* Letter to Marlene Dortch, FCC Secretary, from Erin L. Dozier, NAB, MB Docket No. 20-299 (May 6, 2024) (JA__). The record does not justify the rules' extension to non-candidate political advertising and paid PSAs.

**C.** **The Commission's Content-Based Regulations That Discriminate Against Non-Candidate Political Advertising and Paid PSAs Violate the First Amendment**

The Order also violates the First Amendment. The First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Federal Election Comm'n v. Cruz*, 596 U.S. 289, 302 (2022) (cleaned up). The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its

appearance," and has "consistently rejected attempts to restrict campaign speech based on other legislative aims." *Id.* at 305. "However well intentioned such proposals may be, the First Amendment … prohibits such attempts to tamper with the '*right of citizens to choose who shall govern them,*'" *id.* at 306 (cleaned up), and safeguards issue advocacy as well as electioneering, *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 474 (2007). "The First Amendment right to speak one's mind on all public institutions includes the right to engage in vigorous advocacy no less than abstract discussion." *Buckley v. Valeo*, 424 U.S. 1, 48 (1976) (cleaned up).

The first constitutional flaw of the Order is that the Commission establishes no need to extend the foreign government sponsorship rules to non-candidate political advertising (which includes express advocacy for or against candidates by third parties and political action committees) and paid PSAs. The threshold question—under any constitutional standard—is whether the government has established that the speech restriction prevents actual harm. "Because the Government is defending a restriction on speech as necessary to prevent an anticipated harm, it must do more than simply posit the existence of the disease sought to be cured. It must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *Cruz*, 596 U.S. at 307 (internal citation omitted). The Courts have "never accepted mere conjecture as

adequate to carry a First Amendment burden." *Id.* As noted above, the Commission cannot point to a single instance in which a foreign governmental entity has engaged in undisclosed political or public service advertising on broadcast television and/or radio; indeed, in the 2021 Order, the Commission excluded advertising from the rules' coverage because "the record does not demonstrate that advertisements … are a significant source of unidentified foreign sponsored programming." 2021 Order ¶ 29 (JA__).

The Order identifies no change in that regard. That may be because, as noted above, federal law prohibits foreign nationals—including foreign governmental entities—from participating in any person's election-related activities or providing substantial assistance to elections (including independent expenditures promoting candidates, which are now needlessly covered by the FCC's revised rules). *See supra* at 41. Not only is it illegal, but the political fallout if political ads were ever to be disclosed as paid by foreign governmental entities ensures little risk of this conjectural harm.

Even if the Commission's rules addressed any actual harm, they cannot withstand constitutional scrutiny. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face'

draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted). A rule distinguishing advertising based on its content—whether it contains a political or public service message as opposed to a commercial one, or election of a third person instead of the advertiser—is clearly content-based, and thus subject to strict scrutiny, even if the Commission had no illicit motive. *Id.* at 165-66, 170-71. Indeed, in *Reed*, the Supreme Court found that a content-based sign ordinance that regulated political signs more stringently than other forms of signs failed strict scrutiny. *Id.* at 169. The Commission misses the mark in stating that "[t]he rules at issue here are content-neutral" because "they apply to broadcast programming provided by any foreign governmental entity, regardless of whether the entity's interests are directly at odds with the United States." Order ¶ 58 (JA__). The rules regulate speech based on its content: they impose burdensome corroboration requirements on non-candidate political ads and paid PSAs, but not candidate ads or commercial advertising. This is not a content-neutral regulation that "'is justified without reference to the content of the regulated speech.'" *See TikTok, Inc. v. Garland*, No. 21-1113, 2024 WL 4996719, at *12 (Dec. 6, 2024) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576

U.S. at 171. Because there is no actual problem of foreign governmental entities

sponsoring political issue advertising or paid PSAs on broadcast stations, there is

by definition no compelling interest justifying the FCC's revised regulations. But

the modifications adopted in the Order would also not be narrowly tailored because

they fail to "advance the State's compelling interest through the least restrictive

means." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015). The Order's

elaborate certification measures are entirely unnecessary, and as discussed in the

next section, ineffective. *Infra* at 52-54. Given the absence of any evidence of

foreign government sponsors of political advertising or paid PSAs, the

Commission has not established the need for any special corroboration of denials

of foreign governmental entity status or involvement in the production of political

issue ads or paid PSAs. Even if there were, ordinary due diligence—whereby the

broadcaster could inquire of the persons with whom it deals whether any foreign

governmental entity paid for or furnished the advertisement—would suffice.

Especially given the lack of established harm, the First Amendment does not

permit the Commission to impose burdensome corroboration requirements on

broadcasters' transactions with *every* paid public service advertiser and *every* non-

candidate individual, organization, or political action committee that purchases

advertising to advocate for or against a candidate for any federal, state, or local

office—or simply to express views on any political issue—even though the chance of any advertiser being a foreign governmental entity is miniscule at best.

The Order suffers from overbreadth for another reason. The Commission exempted candidate political advertising "based largely on the fact that foreign nationals are prohibited from making contributions to political candidates." Order ¶ 47 (JA__). But foreign nationals are equally prohibited from making electioneering expenditures on behalf of political candidates. *See supra* at 41. As Commissioner Simington commented, it is "senseless" for the Commission to "require[e] foreign sponsorship identification for a subset of issue ads *already covered by the same FEC rules* prohibiting foreign sponsorship that [it] deemed justification to exclude candidate ads from foreign sponsorship identification." Simington Statement (JA__). The Commission's decision to define a category of "issue advertising" that encompasses both electoral advertising for or against candidates for office and conventional issue advocacy, *see* Order ¶ 47 (JA__), does not justify burdening the former kind of speech. Rather, it just shows that the lines the Commission drew are overly broad under the First Amendment. The Commission has not demonstrated a compelling interest in regulating third-party electoral advertising, issue advocacy, or paid PSAs, but even if it did, the Order is not a narrowly tailored means of serving that interest.

Even if the Commission were correct that its rules should be reviewed under a heightened rational basis test requiring a content-neutral broadcast regulation be "reasonably tailored to satisfying a substantial government interest," or under some form of intermediate scrutiny applicable to broadcasters, Order ¶ 58 & n. 160 (citing *Ruggiero v. FCC*, 317 F.3d 239 (D.C. Cir. 2003) and *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969)), that would not save the Order. There is neither proof of a substantial government interest—a real problem or even demonstrated risk of foreign governmental entanglement in political advertising or paid PSAs aired on broadcast stations—nor reasonable tailoring. The Order's onerous burdens bear no relation to the Commission's asserted interest.

The Order's certifications-or-screenshots corroboration requirements will be highly burdensome to broadcasters and advertisers alike. The burden upon broadcast licensees of complying with the rules in the field of political issue advertising is substantial given the number of transactions. Moreover, the rules require lessors and lessees alike to provide certifications based on applying multiple sections of the United States Code and the Code of Federal Regulations. Order Appendices C and D (JA__). That is a lawyer's task and competency, and most licensees and political and public service advertisers are laypersons who are not going to feel competent or comfortable to make the certifications on their own. NAB/MMTC Comments at 43-44 (JA__). If the lessee is an organization, internal

investigations may be necessary to ensure the accuracy of representations (not only as to the organization's status as a foreign governmental entity, but as to the organization's knowledge of whether a foreign governmental entity offered some consideration to induce broadcasting of the matter). Many lessees will either have to incur the extra expense of retaining a lawyer, or more likely will forego broadcast advertising (either not speaking at all or turning to newspaper, social media, or subscription TV/radio outlets that may be less desirable to that advertiser). Alternatively, the lessee will be burdened with having to learn to navigate the FARA database and the Commission's Section 722 website and provide screenshots, a hassle that will again only drive speakers to forego speech or shift to unregulated advertising vehicles.

The greater expense and risk will squelch speech, with no countervailing benefit. A full political advertising disclosure scheme is already in place, including specifically for issue advertisements aired on broadcast stations, *see* 47 U.S.C. § 315(e), 47 C.F.R. §§ 73.1212(d) & (e), and the Commission has not identified a single instance of foreign governmental entities purchasing political advertising or paid PSA spots on radio or television. The Commission has not remotely justified burdening the entire universe of non-candidate political advertisers and paid PSA sponsors based on the infinitesimally small possibility that an undisclosed foreign governmental sponsor might be unearthed. Moreover, as discussed more *infra* at

52-54, the Commission's poorly thought-out inquire-and-corroborate scheme will not enhance of detection of surreptitious foreign sponsors. The First Amendment bars extending the foreign-sponsor identification rules to non-candidate political advertising and paid PSAs.

**III.    The Commission Lacks the Statutory Authority to Impose Inquiry-And-Corroboration Requirements on Content Providers Who Lease Airtime**

The Commission also lacks statutory authority to impose inquiry-and-corroboration requirements on licensees and lessees.

**A.    Section 317 of the Communications Act Does Not Authorize the Commission to Require Broadcasters to Demand Corroboration from Lessees**

Section 317 of the Communications Act requires broadcaster announcements in two circumstances. First, if consideration for broadcasting any matter is paid or promised to, or charged or accepted by, "the station so broadcasting," the announcement shall identify the payor. 47 U.S.C. § 317(a)(1). Second, "[i]n any case *where a report has been made to a radio station*, as required by Section 508 of this title, of circumstances which would have required an announcement under this section had the consideration been received by such radio station, an appropriate announcement shall be made by such radio station." *Id.* § 317(b) (emphasis added). Section 508 of Title 47 imposes disclosure obligations on station employees, program producers and preparers, and program

suppliers to report money or consideration paid or accepted for broadcasting or for inclusion of any matter in the program. *Id.* § 508(a)-(c). Thus, a broadcast station has an affirmative duty under Section 317(a) to announce those who paid it money or other consideration for broadcasting; it only has a contingent duty to make an announcement regarding payments to others *if* a report has been made to the station by others that is required by Section 508. In either circumstance, "[t]he licensee of each radio station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement required by this section." 47 U.S.C. § 317(c) (emphasis added). The Act further grants the Commission authority "to prescribe appropriate rules and regulations to carry out the provisions of this section." *Id*. § 317(e).

Where the station receives the payment, subsections 317(a) and (c) together require the station licensee to exercise "reasonable diligence … to obtain" information necessary to announce the payor. Once the station obtains the necessary information, including whether the lessee is a foreign governmental entity, it has fulfilled its statutory duty. But just as Section 317(c) does not permit the Commission to require broadcasters to investigate the truth of the information obtained, *NAB*, 39 F.4th at 820, it does not permit the Commission to require broadcasters to demand corroboration in the form of screenshots and certifications

to establish that the lessee was not lying in denying that it is a foreign governmental entity.

The Commission claims corroboration demands are part of a station's Section 317(c) duty, Order ¶ 35 (JA__), but this Court rejected the same argument in relation to the prior investigation requirement:

> [The Commission] says that verifying information's accuracy is part of making a reasonably diligent effort to obtain that information from a source. But § 317(c) imposes a duty of inquiry, not a duty of investigation. *Loveday v. FCC*, 707 F.2d 1443, 1449 (D.C. Cir. 1983) (Section 317(c) "is satisfied by appropriate inquiries made by the station to the party that pays it for the broadcast"). It does not make broadcasters responsible for the truth of the information they obtain.

*NAB*, 39 F.4th at 820.

Furthermore, the required corroboration demands cannot remotely qualify as "reasonable diligence," 47 U.S.C. § 317(c). First, almost no lessees are foreign governmental entities. Lessees of broadcast airtime frequently include churches seeking to reach parishioners unable to attend services, high schools wanting to air sporting events, and local businesses. NAB/MMTC Comments at 36-38 (JA__). And under the Commission's expanded definition of leasing, it may include a local citizen's group's radio ad for a candidate for county sheriff, the U.S. Army's paid PSA to attract new recruits, or a local government's or hospital's paid PSA on a public health or safety concern. How is it "reasonable" for broadcasters to put

*every one* of perhaps hundreds of thousands of such lessees—where there is not even the slightest chance of foreign governmental involvement—through the paces of proving every year that they are not foreign governmental entities by (1) making certifications applying complex statutory and regulatory definitions, Order Appendices C and D (JA__), or (2) learning to navigate the FARA and Section 722 databases, and taking screenshots to prove that they are not registered there, and providing unspecified "other information" to prove they are not foreign governments or foreign political parties, which are not listed in the government databases. Order ¶¶ 22-25; Appendix A, modified 47 C.F.R. §73.1212(j)(3)(iv)(B). (JA__). (The latter requirement that lessees take screenshots to prove that they are not registered as a foreign media outlet on the Commission's Section 722 website is especially egregious make-work, since there are no such registrants now nor have there been since 2021.[10]).

Second, and most fundamentally, these arbitrary and capricious corroboration demands cannot be part of reasonable diligence because they do not achieve the intended purpose of deterring or catching foreign governmental propagandists. If a foreign governmental lessee is above board and registered

---

[10] *See* FCC, *United States-Based Foreign Media Outlets*, https://www.fcc.gov/united-states-based-foreign-media-outlets (last updated Nov. 14, 2024).

under FARA, it will already be complying with criminally enforced statutory to disclose it foreign principal in its programming/advertising, and will make the further disclosures of the country represented required by FCC rules, 47 C.F.R. § 73.1212(j)(1)(i). *See* Order ¶ 1 n.2 (JA__) (identifying examples). The corroboration requirements accomplish nothing. But if the foreign governmental entity is operating surreptitiously, it will not have registered with the U.S. government as a foreign agent (already breaking a law enforced by criminal sanction), and the rules do nothing to expose or stop the misconduct. That entity can simply comply with FCC rules by making a false certification, or producing a screenshot of a FARA database search showing (truthfully) that it is not a registered FARA agent, and escape detection! Reasonable diligence does not include costly universal corroboration requirements that contribute nothing to public information.

## B. The Commission Lacks Statutory Authority to Impose Inquiry-And-Corroboration Requirements Regarding Inducements Paid to Others in the Production and Distribution Chain

The Commission also lacks statutory authority to impose affirmative inquire-and-corroborate requirements regarding whether the lessee "knows if any individual/entity in the chain of producing or distributing the programming is a foreign governmental entity and has provided some type of inducement to air the programming." Order Appendices C and D (JA__, __). That does not involve a

station payment and thus is outside the scope of Section 317(a). And it is outside the scope of Section 317(b), which requires announcements only if the lessee reports a third-party payment pursuant to Section 508. *See* 47 U.S.C. § 317(a), (b). Because the duty of reasonable diligence only applies to obtaining information necessary to make an announcement "required by this section," *id.* § 317(c), broadcasters have no affirmative duty of reasonable diligence to inquire into or seek corroboration of third-party transactions in the production or distribution chain in the absence of a report.

Unsurprisingly, the Commission has no answer to the lack of statutory authority for this inquire-and-corroborate requirement. First, it says that the inquiry component was part of the former inquire-and-investigate rule, and NAB and other parties did not challenge it in the first rulemaking or appeal. Order ¶¶ 32-33 (JA__). But the APA is not concerned with party-specific forfeitures; it requires only that the agency must have the opportunity to address an issue, whether raised by a party or otherwise. *Nat. Res. Def. Council, Inc. v. U.S.E.P.A.*, 824 F.2d 1146, 1150-51 (D.C. Cir. 1987). An agency must address any challenge to its statutory authority of which it is aware. Regardless, the Commission has issued a new inquire-and-corroborate rule to replace the former inquire-and-investigate rule, and the agency must address any challenges to the new rule, even if some components are common and were not specifically noticed for reconsideration. *See Sierra Club*

*v. E.P.A.*, 705 F.3d 458, 466-67 (D.C. Cir. 2013) (incorporation of old elements into new rule exposes them to challenge). Furthermore, the Commission's (incorrect) recasting of the duty of inquiry as incorporating the duty to seek corroboration, Order ¶ 35 (JA__), opens the whole question to this Court's consideration. Even were that not so, at a minimum the Commission must address its authority to impose a new requirement upon broadcasters to seek corroboration from lessees of their responses.

Second, the Commission did ultimately address the merits. It acknowledged that Section 317(b) only imposes an announcement obligation on the station "if it receives a report that payments were made to employees, or persons involved in the production or preparation of the program, in regard to material included in the programming to be broadcast by the station." Order ¶ 36 (JA__). But the Commission held that it does "not interpret section 317(b) to be a limit on the inquiries the licensee must make pursuant to section 317(c)." *Id.* The Commission misreads Section 317(c); that subsection only requires the licensee to "exercise reasonable diligence to obtain … information to enable such licensee to make the announcement *required by this section*." 47 U.S.C. § 317(c) (emphasis added). If neither Section 317(a) nor (b) require an announcement, there is no duty to exercise reasonable diligence to obtain announcement information. And the Commission cannot use its rulemaking power to "carry out" Section 317, *id.*

§ 317(e), to "alter the specific choices Congress made" in that section. *NAB*, 39 F.4th at 820. Like the inquire-and-investigate requirement before it, this inquire-and-corroborate requirement is *ultra vires*.

### C. The Commission Lacks Statutory Authority to Impose Corroboration Requirements on Lessees

The Order imposes duties of corroboration on lessees. In describing one of the two corroboration options, the Commission declared that "both the licensee and *the lessee must complete* a written certification" of the factual representations required by the rules, and then reiterated that, "[u]nder our adopted certification option, both a licensee and *a lessee must complete* a certification reflecting the communications and inquiries required under the existing rules." Order ¶¶ 14, 19 (JA__, __) (emphases added); *see also* Order ¶ 21 (JA__) (discussing licensee and lessee "certification requirements" and mandating that "the lessee's certifications *must* be dated and signed by an employee or other representative of the entity who can attest to the fact that these actions were taken") (emphasis added). Alternatively, the lessee can satisfy its corroboration obligations by performing searches of the FARA database and the Commission's Section 722 website and providing screenshots to the station to prove that is not a foreign governmental entity. Order ¶¶ 22-25 (JA__).

The Commission has no authority to regulate lessees. Section 317 only imposes duties on licensees. Section 508 does require a person supplying a

program for broadcast to disclose any information that he knows or receives of payments or other consideration for including any matter in the program. 47 U.S.C. § 508(c). But critically, this disclosure obligation is enforced by criminal sanction, *id.* § 508(g), and the Commission has no rulemaking authority comparable to its authority under 47 U.S.C. § 317(e). The Commission certainly has no power to impose certification and screenshot corroboration requirements on lessees that Section 508 does not require.

The Commission may point to an obscure sentence in a footnote that "the revised rule imposes no requirements on lessees." Order ¶ 35 n.89 (JA__). But that footnote cannot contradict the clear mandates in the Order that, if a licensee chooses a certification request, the lessee must certify its responses, and a similar obligation is implied if the screenshot option is chosen. *See id.* at ¶¶ 7, 14, 19, 21. Regardless, any reasonable lessee would understand a mandatory demand for certification or screenshot-corroboration of its status as, or knowledge of, foreign governmental entities pursuant to a Commission regulation as a legal requirement. The Commission has no power to mandate corroboration from lessees, or to require licensees to demand corroboration that the lessee is under no obligation to provide. *See National Fuel Gas Supply Corp. v. FERC*, 909 F.2d 1519, 1522 (D.C. Cir. 1990) (an agency cannot accomplish indirectly what it is forbidden to do directly).

**CONCLUSION**

For the foregoing reasons, this Court should set aside the Order.


Respectfully submitted,

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC 20036
(202) 551-1700
stephenkinnaird@paulhastings.com
*Counsel for Petitioner National Association of Broadcasters*

/s/ Richard Kaplan
Richard Kaplan
Jerianne Timmerman
Erin L. Dozier
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, SE
Washington, DC 20003


Dated: December 10, 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the word-count limitation of Fed. R. App. P. 32(e) and this Court's October 31, 2024 scheduling order. This brief contains 12,994 words, not counting the parts excluded by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

/s/ Richard Kaplan
Richard Kaplan
*Attorney for Petitioner National Association of Broadcasters*

# CERTIFICATE OF SERVICE

I, Richard Kaplan, hereby certify that on December 10, 2024, I filed the foregoing Initial Brief of Petitioner with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the electronic CM/ECF system which will serve participants in this case who are registered CM/ECF users.

/s/ Richard Kaplan
Richard Kaplan
*Attorney for Petitioner National Association of Broadcasters*

# ADDENDUM

## DECLARATION IN SUPPORT OF STANDING

Richard Kaplan, NAB ....................................................................... Add-1

## STATUTES AND REGULATIONS

5 U.S.C. § 553 ................................................................................ Add-5

5 U.S.C. § 706 ................................................................................ Add-7

22 U.S.C. § 614 .............................................................................. Add-8

22 U.S.C. § 618 ............................................................................ Add-10

47 U.S.C. § 315 ............................................................................ Add-12

47 U.S.C. § 317 ............................................................................ Add-16

47 U.S.C. § 508 ............................................................................ Add-18

52 U.S.C. § 30101 ........................................................................ Add-20

52 U.S.C. § 30104 ........................................................................ Add-32

52 U.S.C. § 30109 ........................................................................ Add-53

52 U.S.C. § 30121 ........................................................................ Add-62

11 C.F.R. § 110.20 ....................................................................... Add-63

47 C.F.R. § 73.1212 ..................................................................... Add-66

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF BROADCASTERS, | ) ) ) | |
| Petitioner, | ) ) | Case No. 24-1296 |
| v. | ) ) | |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA, | ) ) ) ) | |
| Respondents. | ) | |

**DECLARATION IN SUPPORT OF STANDING**

My name is Richard Kaplan. I am the Chief Legal Officer and Executive Vice President of the National Association of Broadcasters ("NAB"). I have personal knowledge of the facts set forth in this declaration.

1.      NAB is a nonprofit trade association that advocates on behalf of local radio and television stations and broadcast networks before Congress, the Federal Communications Commission ("FCC" or "Commission"), other federal agencies, and the courts.

2.      NAB and its members actively participated in the rulemaking proceeding that led to the Commission's adoption of the Order at issue in this case, *Sponsorship Identification Requirements for Foreign Government-Provided*

*Programming*, Second Report and Order, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) ("Order"), published in the Federal Register on July 16, 2024. *See* 89 Fed. Reg. 57775.

3.     Many NAB members air sponsored programming pursuant to leasing arrangements, political issue advertising, and paid public service announcements (PSAs.) The Order's requirements of inquiry, self-certification, corroboration, and documentation apply to all broadcasters that air programming pursuant to leases, issue advertising and/or paid PSAs. Order, ¶¶ 46-51, App. A (47 C.F.R. § 73.1212(j)).

4.     The unlawful Order injures NAB member broadcasters by coercing action and the expenditure of resources and violates their statutory and constitutional rights. Specifically, broadcasters will be forced to modify their existing methods of complying with the foreign sponsorship identification rules to satisfy the new mandates for broadcaster certifications, lessee/advertiser certifications (or other documentation), and the expansion of the rules' application to political issue advertising and paid PSAs. This will involve obtaining the advice of outside counsel, diverting staff time from other efforts to develop new compliance processes, and in some instances, providing training and education for staff that may be familiar with political advertising regulations but have little or no

knowledge of foreign sponsorship identification rules.[1] Once such processes and training are in place, it will involve completing the required diligence steps for what is likely hundreds of thousands of lessees, political advertisers, and sponsors of paid PSAs every year.[2]

5.    Because NAB advocates for the proper regulatory treatment of its members, the interests it seeks to protect by challenging the FCC's Order are germane to the association's purpose.

6.    Because the Order's requirements apply uniformly to all broadcasters that air programming pursuant to leases, political issue advertising, and/or paid PSAs, neither the claim asserted nor the relief requested requires the participation

---

[1] See Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (May 17, 2024) at 4.

[2] NAB filed data estimating that there are 200,000 leases in effect across the broadcast industry. *See* Comments of NAB and the Multicultural Media Telecom and Internet Council, MB Docket No. 20-299 (Jan. 9, 2023) at 15. Although data on the number of issue advertising transactions is not in the administrative record because of the lack of notice, NAB recently searched the FCC's online public inspection file database and found that 290,517 files identified as "non-candidate issue ads" have been uploaded by radio and television stations in 2024 as of December 6, 2024. Accordingly, NAB anticipates that broadcasters will complete the required diligence steps with respect to at least 475,000 leases and issue advertising orders per year during significant election years. The number of paid PSAs is unknown.

in the lawsuit of NAB's individual members.

_____

Richard Kaplan
Dated: December 10, 2024

**§553. Rule making**

(a) This section applies, according to the provisions thereof, except to the extent that there is involved-
>  (1) a military or foreign affairs function of the United States; or
>  (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include-
>  (1) a statement of the time, place, and nature of public rule making proceedings;
>  (2) reference to the legal authority under which the rule is proposed;
>  (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved; and
>  (4) the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).

>  Except when notice or hearing is required by statute, this subsection does not apply-
>  (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
>  (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules

are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except-

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

# 5 U.S.C. § 706

**§706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be-
>(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>(B) contrary to constitutional right, power, privilege, or immunity;
>(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>(D) without observance of procedure required by law;
>(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## § 614. Filing and labeling of political propaganda

(a) Copies to Attorney General; statement as to places, times, and extent of transmission
Every person within the United States who is an agent of a foreign principal and required to register under the provisions of this subchapter and who transmits or causes to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce any informational materials for or in the interests of such foreign principal (i) in the form of prints, or (ii) in any other form which is reasonably adapted to being, or which he believes will be, or which he intends to be, disseminated or circulated among two or more persons shall, not later than forty-eight hours after the beginning of the transmittal thereof, file with the Attorney General two copies thereof.

(b) Identification statement
It shall be unlawful for any person within the United States who is an agent of a foreign principal and required to register under the provisions of this subchapter to transmit or cause to be transmitted in the United States mails or by any means or instrumentality of interstate or foreign commerce any informational materials for or in the interests of such foreign principal without placing in such informational materials a conspicuous statement that the materials are distributed by the agent on behalf of the foreign principal, and that additional information is on file with the Department of Justice, Washington, District of Columbia. The Attorney General may by rule define what constitutes a conspicuous statement for the purposes of this subsection.

(c) Public inspection
The copies of informational materials required by this subchapter to be filed with the Attorney General shall be available for public inspection under such regulations as he may prescribe.

(d) Library of Congress
For purposes of the Library of Congress, other than for public distribution, the Secretary of the Treasury and the United States Postal Service are authorized, upon the request of the Librarian of Congress, to forward to the Library of Congress fifty copies, or as many fewer thereof as are available, of all foreign prints determined

to be prohibited entry under the provisions of section 1305 of title 19 and of all foreign prints excluded from the mails under authority of section 1717 of title 18.

Notwithstanding the provisions of section 1305 of title 19 and of section 1717 of title 18, the Secretary of the Treasury is authorized to permit the entry and the United States Postal Service is authorized to permit the transmittal in the mails of foreign prints imported for governmental purposes by authority or for the use of the United States or for the use of the Library of Congress.

(e) Information furnished to agency or official of United States Government
It shall be unlawful for any person within the United States who is an agent of a foreign principal required to register under the provisions of this subchapter to transmit, convey, or otherwise furnish to any agency or official of the Government (including a Member or committee of either House of Congress) for or in the interests of such foreign principal any political propaganda or to request from any such agency or official for or in the interests of such foreign principal any information or advice with respect to any matter pertaining to the political or public interests, policies or relations of a foreign country or of a political party or pertaining to the foreign or domestic policies of the United States unless the propaganda or the request is prefaced or accompanied by a true and accurate statement to the effect that such person is registered as an agent of such foreign principal under this subchapter.

(f) Appearances before Congressional committees
Whenever any agent of a foreign principal required to register under this subchapter appears before any committee of Congress to testify for or in the interests of such foreign principal, he shall, at the time of such appearance, furnish the committee with a copy of his most recent registration statement filed with the Department of Justice as an agent of such foreign principal for inclusion in the records of the committee as part of his testimony.

**§618. Enforcement and penalties**

(a) Violations; false statements and willful omissions

Any person who—

> (1) willfully violates any provision of this subchapter or any regulation thereunder, or
>
> (2) in any registration statement or supplement thereto or in any other document filed with or furnished to the Attorney General under the provisions of this subchapter willfully makes a false statement of a material fact or willfully omits any material fact required to be stated therein or willfully omits a material fact or a copy of a material document necessary to make the statements therein and the copies of documents furnished therewith not misleading, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both, except that in the case of a violation of subsection (b), (e), or (f) of section 614 of this title or of subsection (g) or (h) of this section the punishment shall be a fine of not more than $5,000 or imprisonment for not more than six months, or both.

(b) Proof of identity of foreign principal

In any proceeding under this subchapter in which it is charged that a person is an agent of a foreign principal with respect to a foreign principal outside of the United States, proof of the specific identity of the foreign principal shall be permissible but not necessary.

(c) Removal

Any alien who shall be convicted of a violation of, or a conspiracy to violate, any provision of this subchapter or any regulation thereunder shall be subject to removal pursuant to chapter 4 of title II of the Immigration and Nationality Act [8 U.S.C. 1221 et seq.].

(d) Repealed. Pub. L. 104–65, §9(8)(B), Dec. 19, 1995, 109 Stat. 700

(e) Continuing offense

Failure to file any such registration statement or supplements thereto as is required by either section 612(a) or section 612(b) of this title shall be considered a continuing offense for as long as such failure exists, notwithstanding any statute of limitation or other statute to the contrary.

(f) Injunctive remedy; jurisdiction of district court

Whenever in the judgment of the Attorney General any person is engaged in or about to engage in any acts which constitute or will constitute a violation of any

provision of this subchapter, or regulations issued thereunder, or whenever any agent of a foreign principal fails to comply with any of the provisions of this subchapter or the regulations issued thereunder, or otherwise is in violation of the subchapter, the Attorney General may make application to the appropriate United States district court for an order enjoining such acts or enjoining such person from continuing to act as an agent of such foreign principal, or for an order requiring compliance with any appropriate provision of the subchapter or regulation thereunder. The district court shall have jurisdiction and authority to issue a temporary or permanent injunction, restraining order or such other order which it may deem proper.

(g) Deficient registration statement

If the Attorney General determines that a registration statement does not comply with the requirements of this subchapter or the regulations issued thereunder, he shall so notify the registrant in writing, specifying in what respects the statement is deficient. It shall be unlawful for any person to act as an agent of a foreign principal at any time ten days or more after receipt of such notification without filing an amended registration statement in full compliance with the requirements of this subchapter and the regulations issued thereunder.

(h) Contingent fee arrangement

It shall be unlawful for any agent of a foreign principal required to register under this subchapter to be a party to any contract, agreement, or understanding, either express or implied, with such foreign principal pursuant to which the amount or payment of the compensation, fee, or other remuneration of such agent is contingent in whole or in part upon the success of any political activities carried on by such agent.

# 47 U.S.C. § 315

**§315. Candidates for public office**

(a) Equal opportunities requirement; censorship prohibition; allowance of station use; news appearances exception; public interest; public issues discussion opportunities

If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any-

> (1) bona fide newscast,
> (2) bona fide news interview,
> (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
> (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

(b) Charges
> (1) In general
> The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his

campaign for nomination for election, or election, to such office shall not exceed-

    (A) subject to paragraph (2), during the forty-five days preceding the date of a primary or primary runoff election and during the sixty days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period; and

    (B) at any other time, the charges made for comparable use of such station by other users thereof.

(2) Content of broadcasts

    (A) In general

    In the case of a candidate for Federal office, such candidate shall not be entitled to receive the rate under paragraph (1)(A) for the use of any broadcasting station unless the candidate provides written certification to the broadcast station that the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office, in any broadcast using the rights and conditions of access under this chapter, unless such reference meets the requirements of subparagraph (C) or (D).

    (B) Limitation on charges

    If a candidate for Federal office (or any authorized committee of such candidate) makes a reference described in subparagraph (A) in any broadcast that does not meet the requirements of subparagraph (C) or (D), such candidate shall not be entitled to receive the rate under paragraph (1)(A) for such broadcast or any other broadcast during any portion of the 45-day and 60-day periods described in paragraph (1)(A), that occur on or after the date of such broadcast, for election to such office.

    (C) Television broadcasts

    A candidate meets the requirements of this subparagraph if, in the case of a television broadcast, at the end of such broadcast there appears simultaneously, for a period no less than 4 seconds-

    (i) a clearly identifiable photographic or similar image of the

candidate; and

(ii) a clearly readable printed statement, identifying the candidate and stating that the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast.

(D) Radio broadcasts

A candidate meets the requirements of this subparagraph if, in the case of a radio broadcast, the broadcast includes a personal audio statement by the candidate that identifies the candidate, the office the candidate is seeking, and indicates that the candidate has approved the broadcast.

(E) Certification

Certifications under this section shall be provided and certified as accurate by the candidate (or any authorized committee of the candidate) at the time of purchase.

(F) Definitions

For purposes of this paragraph, the terms "authorized committee" and "Federal office" have the meanings given such terms by section 30101 of title 52.

(c) Definitions

For purposes of this section-

(1) the term "broadcasting station" includes a community antenna television system; and

(2) the terms "licensee" and "station licensee" when used with respect to a community antenna television system mean the operator of such system.

(d) Rules and regulations

The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section.

(e) Political record

(1) In general

A licensee shall maintain, and make available for public inspection, a

complete record of a request to purchase broadcast time that-
> (A) is made by or on behalf of a legally qualified candidate for public office; or
>
> (B) communicates a message relating to any political matter of national importance, including-
>> (i) a legally qualified candidate;
>>
>> (ii) any election to Federal office; or
>>
>> (iii) a national legislative issue of public importance.

(2) Contents of record

A record maintained under paragraph (1) shall contain information regarding-
> (A) whether the request to purchase broadcast time is accepted or rejected by the licensee;
>
> (B) the rate charged for the broadcast time;
>
> (C) the date and time on which the communication is aired;
>
> (D) the class of time that is purchased;
>
> (E) the name of the candidate to which the communication refers and the office to which the candidate is seeking election, the election to which the communication refers, or the issue to which the communication refers (as applicable);
>
> (F) in the case of a request made by, or on behalf of, a candidate, the name of the candidate, the authorized committee of the candidate, and the treasurer of such committee; and
>
> (G) in the case of any other request, the name of the person purchasing the time, the name, address, and phone number of a contact person for such person, and a list of the chief executive officers or members of the executive committee or of the board of directors of such person.

(3) Time to maintain file

The information required under this subsection shall be placed in a political file as soon as possible and shall be retained by the licensee for a period of not less than 2 years.

## § 317. Announcement of payment for broadcast

(a) Disclosure of person furnishing

(1) All matter broadcast by any radio station for which any money, service or other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person: Provided, That "service or other valuable consideration" shall not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a broadcast unless it is so furnished in consideration for an identification in a broadcast of any person, product, service, trademark, or brand name beyond an identification which is reasonably related to the use of such service or property on the broadcast.

(2) Nothing in this section shall preclude the Commission from requiring that an appropriate announcement shall be made at the time of the broadcast in the case of any political program or any program involving the discussion of any controversial issue for which any films, records, transcriptions, talent, scripts, or other material or service of any kind have been furnished, without charge or at a nominal charge, directly or indirectly, as an inducement to the broadcast of such program.

(b) Disclosure to station of payments

In any case where a report has been made to a radio station, as required by section 508 of this title, of circumstances which would have required an announcement under this section had the consideration been received by such radio station, an appropriate announcement shall be made by such radio station.

(c) Acquiring information from station employees

The licensee of each radio station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement required by this section.

(d) Waiver of announcement

The Commission may waive the requirement of an announcement as provided in this section in any case or class of cases with respect to which it determines that the public interest, convenience, or necessity does not require the broadcasting of such announcement.

(e) Rules and regulations

The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section.

**§508. Disclosure of payments to individuals connected with broadcasts**

(a) Payments to station employees
Subject to subsection (d), any employee of a radio station who accepts or agrees to accept from any person (other than such station), or any person (other than such station) who pays or agrees to pay such employee, any money, service or other valuable consideration for the broadcast of any matter over such station shall, in advance of such broadcast, disclose the fact of such acceptance or agreement to such station.

(b) Production or preparation of programs
Subject to subsection (d), any person who, in connection with the production or preparation of any program or program matter which is intended for broadcasting over any radio station, accepts or agrees to accept, or pays or agrees to pay, any money, service or other valuable consideration for the inclusion of any matter as a part of such program or program matter, shall, in advance of such broadcast, disclose the fact of such acceptance or payment or agreement to the payee's employer, or to the person for whom such program or program matter is being produced, or to the licensee of such station over which such program is broadcast.

(c) Supplying of program or program matter
Subject to subsection (d), any person who supplies to any other person any program or program matter which is intended for broadcasting over any radio station shall, in advance of such broadcast, disclose to such other person any information of which he has knowledge, or which has been disclosed to him, as to any money, service or other valuable consideration which any person has paid or accepted, or has agreed to pay or accept, for the inclusion of any matter as a part of such program or program matter.

(d) Waiver of announcements under section 317(d)
The provisions of this section requiring the disclosure of information shall not apply in any case where, because of a waiver made by the Commission under section 317(d) of this title, an announcement is not required to be made under section 317 of this title.

(e) Announcement under section 317 as sufficient disclosure

The inclusion in the program of the announcement required by section 317 of this title shall constitute the disclosure required by this section.

(f) "Service or other valuable consideration" defined

The term "service or other valuable consideration" as used in this section shall not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a broadcast, or for use on a program which is intended for broadcasting over any radio station, unless it is so furnished in consideration for an identification in such broadcast or in such program of any person, product, service, trademark, or brand name beyond an identification which is reasonably related to the use of such service or property in such broadcast or such program.

(g) Penalties

Any person who violates any provision of this section shall, for each such violation, be fined not more than $10,000 or imprisoned not more than one year, or both.

## 52 U.S.C. §30101

### §30101. Definitions

When used in this Act:
(1) The term "election" means-

    (A) a general, special, primary, or runoff election;

    (B) a convention or caucus of a political party which has authority to nominate a candidate;

    (C) a primary election held for the selection of delegates to a national nominating convention of a political party; and

    (D) a primary election held for the expression of a preference for the nomination of individuals for election to the office of President.

(2) The term "candidate" means an individual who seeks nomination for election, or election, to Federal office, and for purposes of this paragraph, an individual shall be deemed to seek nomination for election, or election-

    (A) if such individual has received contributions aggregating in excess of $5,000 or has made expenditures aggregating in excess of $5,000; or

    (B) if such individual has given his or her consent to another person to receive contributions or make expenditures on behalf of such individual and if such person has received such contributions aggregating in excess of $5,000 or has made such expenditures aggregating in excess of $5,000.

(3) The term "Federal office" means the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress.

(4) The term "political committee" means-

    (A) any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year; or

    (B) any separate segregated fund established under the provisions of section 30118(b) of this title; or

    (C) any local committee of a political party which receives contributions

aggregating in excess of $5,000 during a calendar year, or makes payments exempted from the definition of contribution or expenditure as defined in paragraphs (8) and (9) aggregating in excess of $5,000 during a calendar year, or makes contributions aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

(5) The term "principal campaign committee" means a political committee designated and authorized by a candidate under section 30102(e)(1) of this title.

(6) The term "authorized committee" means the principal campaign committee or any other political committee authorized by a candidate under section 30102(e)(1) of this title to receive contributions or make expenditures on behalf of such candidate.

(7) The term "connected organization" means any organization which is not a political committee but which directly or indirectly establishes, administers or financially supports a political committee.

(8)
    (A) The term "contribution" includes-
        (i) any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or
        (ii) the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

    (B) The term "contribution" does not include-
        (i) the value of services provided without compensation by any individual who volunteers on behalf of a candidate or political committee;
        (ii) the use of real or personal property, including a church or community room used on a regular basis by members of a community for noncommercial purposes, and the cost of invitations, food, and beverages, voluntarily provided by an individual to any candidate or

any political committee of a political party in rendering voluntary personal services on the individual's residential premises or in the church or community room for candidate-related or political party-related activities, to the extent that the cumulative value of such invitations, food, and beverages provided by such individual on behalf of any single candidate does not exceed $1,000 with respect to any single election, and on behalf of all political committees of a political party does not exceed $2,000 in any calendar year;

(iii) the sale of any food or beverage by a vendor for use in any candidate's campaign or for use by or on behalf of any political committee of a political party at a charge less than the normal comparable charge, if such charge is at least equal to the cost of such food or beverage to the vendor, to the extent that the cumulative value of such activity by such vendor on behalf of any single candidate does not exceed $1,000 with respect to any single election, and on behalf of all political committees of a political party does not exceed $2,000 in any calendar year;

(iv) any unreimbursed payment for travel expenses made by any individual on behalf of any candidate or any political committee of a political party, to the extent that the cumulative value of such activity by such individual on behalf of any single candidate does not exceed $1,000 with respect to any single election, and on behalf of all political committees of a political party does not exceed $2,000 in any calendar year;

(v) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply to any cost incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines, or similar types of general public political advertising;

(vi) any payment made or obligation incurred by a corporation or a labor organization which, under section 30118(b) of this title, would not constitute an expenditure by such corporation or labor

organization;

(vii) any loan of money by a State bank, a federally chartered depository institution, or a depository institution the deposits or accounts of which are insured by the Federal Deposit Insurance Corporation, Federal Savings and Loan Insurance Corporation, or the National Credit Union Administration, other than any overdraft made with respect to a checking or savings account, made in accordance with applicable law and in the ordinary course of business, but such loan-

(I) shall be considered a loan by each endorser or guarantor, in that proportion of the unpaid balance that each endorser or guarantor bears to the total number of endorsers or guarantors;

(II) shall be made on a basis which assures repayment, evidenced by a written instrument, and subject to a due date or amortization schedule; and

(III) shall bear the usual and customary interest rate of the lending institution;

(viii) any legal or accounting services rendered to or on behalf of-

(I) any political committee of a political party if the person paying for such services is the regular employer of the person rendering such services and if such services are not attributable to activities which directly further the election of any designated candidate to Federal office; or

(II) an authorized committee of a candidate or any other political committee, if the person paying for such services is the regular employer of the individual rendering such services and if such services are solely for the purpose of ensuring compliance with this Act or chapter 95 or chapter 96 of title 26, but amounts paid or incurred by the regular employer for such legal or accounting services shall be reported in accordance with section 30104(b) of this title by the committee receiving such services;

(ix) the payment by a State or local committee of a political party of the costs of campaign materials (such as pins, bumper stickers,

handbills, brochures, posters, party tabloids, and yard signs) used by such committee in connection with volunteer activities on behalf of nominees of such party: *Provided*, That-

> (1) such payments are not for the costs of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, billboard, direct mail, or similar type of general public communication or political advertising;
> (2) such payments are made from contributions subject to the limitations and prohibitions of this Act; and
> (3) such payments are not made from contributions designated to be spent on behalf of a particular candidate or particular candidates;

(x) the payment by a candidate, for nomination or election to any public office (including State or local office), or authorized committee of a candidate, of the costs of campaign materials which include information on or referenced to any other candidate and which are used in connection with volunteer activities (including pins, bumper stickers, handbills, brochures, posters, and yard signs, but not including the use of broadcasting, newspapers, magazines, billboards, direct mail, or similar types of general public communication or political advertising): *Provided*, That such payments are made from contributions subject to the limitations and prohibitions of this Act;

(xi) the payment by a State or local committee of a political party of the costs of voter registration and get-out-the-vote activities conducted by such committee on behalf of nominees of such party for President and Vice President: *Provided*, That-

> (1) such payments are not for the costs of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, billboard, direct mail, or similar type of general public communication or political advertising;
> (2) such payments are made from contributions subject to the limitations and prohibitions of this Act; and
> (3) such payments are not made from contributions designated to be spent on behalf of a particular candidate or candidates;

(xii) payments made by a candidate or the authorized committee of a candidate as a condition of ballot access and payments received by

any political party committee as a condition of ballot access;

(xiii) any honorarium (within the meaning of section 30125 of this title); and

(xiv) any loan of money derived from an advance on a candidate's brokerage account, credit card, home equity line of credit, or other line of credit available to the candidate, if such loan is made in accordance with applicable law and under commercially reasonable terms and if the person making such loan makes loans derived from an advance on the candidate's brokerage account, credit card, home equity line of credit, or other line of credit in the normal course of the person's business.

(9)

(A) The term "expenditure" includes-

(i) any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office; and

(ii) a written contract, promise, or agreement to make an expenditure.

(B) The term "expenditure" does not include-

(i) any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate;

(ii) nonpartisan activity designed to encourage individuals to vote or to register to vote;

(iii) any communication by any membership organization or corporation to its members, stockholders, or executive or administrative personnel, if such membership organization or corporation is not organized primarily for the purpose of influencing the nomination for election, or election, of any individual to Federal office, except that the costs incurred by a membership organization (including a labor organization) or by a corporation directly attributable to a communication expressly advocating the election or defeat of a clearly identified candidate (other than a communication primarily devoted to subjects other than the express advocacy of the election or defeat of a clearly identified candidate), shall, if such costs

exceed $2,000 for any election, be reported to the Commission in accordance with section 30104(a)(4)(A)(i) of this title, and in accordance with section 30104(a)(4)(A)(ii) of this title with respect to any general election;

(iv) the payment by a State or local committee of a political party of the costs of preparation, display, or mailing or other distribution incurred by such committee with respect to a printed slate card or sample ballot, or other printed listing, of 3 or more candidates for any public office for which an election is held in the State in which such committee is organized, except that this clause shall not apply to costs incurred by such committee with respect to a display of any such listing made on broadcasting stations, or in newspapers, magazines, or similar types of general public political advertising;

(v) any payment made or obligation incurred by a corporation or a labor organization which, under section 30118(b) of this title, would not constitute an expenditure by such corporation or labor organization;

(vi) any costs incurred by an authorized committee or candidate in connection with the solicitation of contributions on behalf of such candidate, except that this clause shall not apply with respect to costs incurred by an authorized committee of a candidate in excess of an amount equal to 20 percent of the expenditure limitation applicable to such candidate under section 30116(b) of this title, but all such costs shall be reported in accordance with section 30104(b) of this title;

(vii) the payment of compensation for legal or accounting services-

> (I) rendered to or on behalf of any political committee of a political party if the person paying for such services is the regular employer of the individual rendering such services, and if such services are not attributable to activities which directly further the election of any designated candidate to Federal office; or

> (II) rendered to or on behalf of a candidate or political committee if the person paying for such services is the regular employer of the individual rendering such services, and if such services are solely for the purpose of ensuring compliance with this Act or chapter 95 or chapter 96 of title 26, but amounts

paid or incurred by the regular employer for such legal or accounting services shall be reported in accordance with section 30104(b) of this title by the committee receiving such services;

(viii) the payment by a State or local committee of a political party of the costs of campaign materials (such as pins, bumper stickers, handbills, brochures, posters, party tabloids, and yard signs) used by such committee in connection with volunteer activities on behalf of nominees of such party: *Provided*, That-

    (1) such payments are not for the costs of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, billboard, direct mail, or similar type of general public communication or political advertising;

    (2) such payments are made from contributions subject to the limitations and prohibitions of this Act; and

    (3) such payments are not made from contributions designated to be spent on behalf of a particular candidate or particular candidates;

(ix) the payment by a State or local committee of a political party of the costs of voter registration and get-out-the-vote activities conducted by such committee on behalf of nominees of such party for President and Vice President: *Provided*, That-

    (1) such payments are not for the costs of campaign materials or activities used in connection with any broadcasting, newspaper, magazine, billboard, direct mail, or similar type of general public communication or political advertising;

    (2) such payments are made from contributions subject to the limitations and prohibitions of this Act; and

    (3) such payments are not made from contributions designated to be spent on behalf of a particular candidate or candidates; and

(x) payments received by a political party committee as a condition of ballot access which are transferred to another political party committee or the appropriate State official.

(10) The term "Commission" means the Federal Election Commission.

(11) The term "person" includes an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons, but such term does not include the Federal Government or any authority of the Federal Government.

(12) The term "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or a territory or possession of the United States.

(13) The term "identification" means-
    (A) in the case of any individual, the name, the mailing address, and the occupation of such individual, as well as the name of his or her employer; and
    (B) in the case of any other person, the full name and address of such person.

(14) The term "national committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level, as determined by the Commission.

(15) The term "State committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level, as determined by the Commission.

(16) The term "political party" means an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization.

(17) Independent expenditure.-The term "independent expenditure" means an expenditure by a person-
    (A) expressly advocating the election or defeat of a clearly identified candidate; and
    (B) that is not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents.

(18) The term "clearly identified" means that-
    (A) the name of the candidate involved appears;
    (B) a photograph or drawing of the candidate appears; or
    (C) the identity of the candidate is apparent by unambiguous reference.

(19) The term "Act" means the Federal Election Campaign Act of 1971 as amended.

(20) Federal election activity.-
    (A) In general.-The term "Federal election activity" means-
        (i) voter registration activity during the period that begins on the date that is 120 days before the date a regularly scheduled Federal election is held and ends on the date of the election;
        (ii) voter identification, get-out-the-vote activity, or generic campaign activity conducted in connection with an election in which a candidate for Federal office appears on the ballot (regardless of whether a candidate for State or local office also appears on the ballot);
        (iii) a public communication that refers to a clearly identified candidate for Federal office (regardless of whether a candidate for State or local office is also mentioned or identified) and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate); or
        (iv) services provided during any month by an employee of a State, district, or local committee of a political party who spends more than 25 percent of that individual's compensated time during that month on activities in connection with a Federal election.

    (B) Excluded activity.-The term "Federal election activity" does not include an amount expended or disbursed by a State, district, or local committee of a political party for-
        (i) a public communication that refers solely to a clearly identified candidate for State or local office, if the communication is not a Federal election activity described in subparagraph (A)(i) or (ii);
        (ii) a contribution to a candidate for State or local office, provided the contribution is not designated to pay for a Federal election activity

described in subparagraph (A);
(iii) the costs of a State, district, or local political convention; and
(iv) the costs of grassroots campaign materials, including buttons, bumper stickers, and yard signs, that name or depict only a candidate for State or local office.

(21) Generic campaign activity.-The term "generic campaign activity" means a campaign activity that promotes a political party and does not promote a candidate or non-Federal candidate.

(22) Public communication.-The term "public communication" means a communication by means of any broadcast, cable, or satellite communication, newspaper, magazine, outdoor advertising facility, mass mailing, or telephone bank to the general public, or any other form of general public political advertising.

(23) Mass mailing.-The term "mass mailing" means a mailing by United States mail or facsimile of more than 500 pieces of mail matter of an identical or substantially similar nature within any 30-day period.

(24) Telephone bank.-The term "telephone bank" means more than 500 telephone calls of an identical or substantially similar nature within any 30-day period.

(25) Election cycle.-For purposes of sections 30116(i) and 30117 of this title and paragraph (26), the term "election cycle" means the period beginning on the day after the date of the most recent election for the specific office or seat that a candidate is seeking and ending on the date of the next election for that office or seat. For purposes of the preceding sentence, a primary election and a general election shall be considered to be separate elections.

(26) Personal funds.-The term "personal funds" means an amount that is derived from-
(A) any asset that, under applicable State law, at the time the individual became a candidate, the candidate had legal right of access to or control over, and with respect to which the candidate had-
(i) legal and rightful title; or
(ii) an equitable interest;

(B) income received during the current election cycle of the candidate, including-

> (i) a salary and other earned income from bona fide employment;
> (ii) dividends and proceeds from the sale of the candidate's stocks or other investments;
> (iii) bequests to the candidate;
> (iv) income from trusts established before the beginning of the election cycle;
> (v) income from trusts established by bequest after the beginning of the election cycle of which the candidate is the beneficiary;
> (vi) gifts of a personal nature that had been customarily received by the candidate prior to the beginning of the election cycle; and
> (vii) proceeds from lotteries and similar legal games of chance; and

(C) a portion of assets that are jointly owned by the candidate and the candidate's spouse equal to the candidate's share of the asset under the instrument of conveyance or ownership, but if no specific share is indicated by an instrument of conveyance or ownership, the value of ½ of the property.

**§30104. Reporting requirements**

(a) Receipts and disbursements by treasurers of political committees; filing requirements

(1) Each treasurer of a political committee shall file reports of receipts and disbursements in accordance with the provisions of this subsection. The treasurer shall sign each such report.

(2) If the political committee is the principal campaign committee of a candidate for the House of Representatives or for the Senate-

(A) in any calendar year during which there is [1] regularly scheduled election for which such candidate is seeking election, or nomination for election, the treasurer shall file the following reports:

(i) a pre-election report, which shall be filed no later than the 12th day before (or posted by any of the following: registered mail, certified mail, priority mail having a delivery confirmation, or express mail having a delivery confirmation, or delivered to an overnight delivery service with an on-line tracking system, if posted or delivered no later than the 15th day before) any election in which such candidate is seeking election, or nomination for election, and which shall be complete as of the 20th day before such election;

(ii) a post-general election report, which shall be filed no later than the 30th day after any general election in which such candidate has sought election, and which shall be complete as of the 20th day after such general election; and

(iii) additional quarterly reports, which shall be filed no later than the 15th day after the last day of each calendar quarter, and which shall be complete as of the last day of each calendar quarter: except that the report for the quarter ending December 31 shall be filed no later than January 31 of the following calendar year; and

(B) in any other calendar year the treasurer shall file quarterly reports, which shall be filed not later than the 15th day after the last day of each calendar quarter, and which shall be complete as of the last day

of each calendar quarter, except that the report for the quarter ending December 31 shall be filed not later than January 31 of the following calendar year.

(3) If the committee is the principal campaign committee of a candidate for the office of President-

(A) in any calendar year during which a general election is held to fill such office-

(i) the treasurer shall file monthly reports if such committee has on January 1 of such year, received contributions aggregating $100,000 or made expenditures aggregating $100,000 or anticipates receiving contributions aggregating $100,000 or more or making expenditures aggregating $100,000 or more during such year: such monthly reports shall be filed no later than the 20th day after the last day of each month and shall be complete as of the last day of the month, except that, in lieu of filing the report otherwise due in November and December, a pre-general election report shall be filed in accordance with paragraph (2)(A)(i), a post-general election report shall be filed in accordance with paragraph (2)(A)(ii), and a year end report shall be filed no later than January 31 of the following calendar year;

(ii) the treasurer of the other principal campaign committees of a candidate for the office of President shall file a pre-election report or reports in accordance with paragraph (2)(A)(i), a post-general election report in accordance with paragraph (2)(A)(ii), and quarterly reports in accordance with paragraph (2)(A)(iii); and

(iii) if at any time during the election year a committee filing under paragraph (3)(A)(ii) receives contributions in excess of $100,000 or makes expenditures in excess of $100,000, the treasurer shall begin filing monthly reports under paragraph (3)(A)(i) at the next reporting period; and

(B) in any other calendar year, the treasurer shall file either-

(i) monthly reports, which shall be filed no later than the 20th day after the last day of each month and shall be complete as of the last day of the month; or

(ii) quarterly reports, which shall be filed no later than the 15th day after the last day of each calendar quarter and which shall be complete as of the last day of each calendar quarter.

(4) All political committees other than authorized committees of a candidate shall file either-

(A)

(i) quarterly reports, in a calendar year in which a regularly scheduled general election is held, which shall be filed no later than the 15th day after the last day of each calendar quarter: except that the report for the quarter ending on December 31 of such calendar year shall be filed no later than January 31 of the following calendar year;

(ii) a pre-election report, which shall be filed no later than the 12th day before (or posted by any of the following: registered mail, certified mail, priority mail having a delivery confirmation, or express mail having a delivery confirmation, or delivered to an overnight delivery service with an on-line tracking system, if posted or delivered no later than the 15th day before) any election in which the committee makes a contribution to or expenditure on behalf of a candidate in such election, and which shall be complete as of the 20th day before the election;

(iii) a post-general election report, which shall be filed no later than the 30th day after the general election and which shall be complete as of the 20th day after such general election; and

(iv) in any other calendar year, a report covering the period beginning January 1 and ending June 30, which shall be filed no later than July 31 and a report covering the period beginning July 1 and ending December 31, which shall be filed no later than January 31 of the following calendar year; or

(B) monthly reports in all calendar years which shall be filed no later than the 20th day after the last day of the month and shall be complete as of the last day of the month, except that, in lieu of filing the reports otherwise due in November and December of any year in which a regularly scheduled general election is held, a pre-general election report shall be filed in accordance with paragraph (2)(A)(i), a post-

general election report shall be filed in accordance with paragraph (2)(A)(ii), and a year end report shall be filed no later than January 31 of the following calendar year.

Notwithstanding the preceding sentence, a national committee of a political party shall file the reports required under subparagraph (B).

(5) If a designation, report, or statement filed pursuant to this Act (other than under paragraph (2)(A)(i) or (4)(A)(ii) or subsection (g)(1)) is sent by registered mail, certified mail, priority mail having a delivery confirmation, or express mail having a delivery confirmation, the United States postmark shall be considered the date of filing the designation, report or statement. If a designation, report or statement filed pursuant to this Act (other than under paragraph (2)(A)(i) or (4)(A)(ii), or subsection (g)(1)) is sent by an overnight delivery service with an on-line tracking system, the date on the proof of delivery to the delivery service shall be considered the date of filing of the designation, report, or statement.

(6)

(A) The principal campaign committee of a candidate shall notify the Secretary or the Commission, and the Secretary of State, as appropriate, in writing, of any contribution of $1,000 or more received by any authorized committee of such candidate after the 20th day, but more than 48 hours before, any election. This notification shall be made within 48 hours after the receipt of such contribution and shall include the name of the candidate and the office sought by the candidate, the identification of the contributor, and the date of receipt and amount of the contribution.

(B) Notification of expenditure from personal funds.-

(i) Definition of expenditure from personal funds.-In this subparagraph, the term "expenditure from personal funds" means-

(I) an expenditure made by a candidate using personal funds; and

(II) a contribution or loan made by a candidate using personal funds or a loan secured using such funds to the candidate's authorized committee.

(ii) Declaration of intent.-Not later than the date that is 15 days after the date on which an individual becomes a candidate for the office of Senator, the candidate shall file a declaration stating the total amount

of expenditures from personal funds that the candidate intends to make, or to obligate to make, with respect to the election that will exceed the State-by-State competitive and fair campaign formula with-

  (I) the Commission; and
  (II) each candidate in the same election.

(iii) Initial notification.-Not later than 24 hours after a candidate described in clause (ii) makes or obligates to make an aggregate amount of expenditures from personal funds in excess of 2 times the threshold amount in connection with any election, the candidate shall file a notification with-

  (I) the Commission; and
  (II) each candidate in the same election.

(iv) Additional notification.-After a candidate files an initial notification under clause (iii), the candidate shall file an additional notification each time expenditures from personal funds are made or obligated to be made in an aggregate amount that exceed [2] $10,000 with-

  (I) the Commission; and
  (II) each candidate in the same election.

Such notification shall be filed not later than 24 hours after the expenditure is made.

(v) Contents.-A notification under clause (iii) or (iv) shall include-

  (I) the name of the candidate and the office sought by the candidate;
  (II) the date and amount of each expenditure; and
  (III) the total amount of expenditures from personal funds that the candidate has made, or obligated to make, with respect to an election as of the date of the expenditure that is the subject of the notification.

(C) Notification of disposal of excess contributions.-In the next regularly scheduled report after the date of the election for which a candidate seeks nomination for election to, or election to, Federal office, the candidate or the candidate's authorized committee shall submit to the Commission a report indicating the source and amount of any excess contributions (as determined

under paragraph (1) of section 30116(i) of this title) and the manner in which the candidate or the candidate's authorized committee used such funds.

(D) Enforcement.-For provisions providing for the enforcement of the reporting requirements under this paragraph, see section 30109 of this title.

(E) The notification required under this paragraph shall be in addition to all other reporting requirements under this Act.

(7) The reports required to be filed by this subsection shall be cumulative during the calendar year to which they relate, but where there has been no change in an item reported in a previous report during such year, only the amount need be carried forward.

(8) The requirement for a political committee to file a quarterly report under paragraph (2)(A)(iii) or paragraph (4)(A)(i) shall be waived if such committee is required to file a pre-election report under paragraph (2)(A)(i), or paragraph (4)(A)(ii) during the period beginning on the 5th day after the close of the calendar quarter and ending on the 15th day after the close of the calendar quarter.

(9) The Commission shall set filing dates for reports to be filed by principal campaign committees of candidates seeking election, or nomination for election, in special elections and political committees filing under paragraph (4)(A) which make contributions to or expenditures on behalf of a candidate or candidates in special elections. The Commission shall require no more than one pre-election report for each election and one post-election report for the election which fills the vacancy. The Commission may waive any reporting obligation of committees required to file for special elections if any report required by paragraph (2) or (4) is required to be filed within 10 days of a report required under this subsection. The Commission shall establish the reporting dates within 5 days of the setting of such election and shall publish such dates and notify the principal campaign committees of all candidates in such election of the reporting dates.

(10) The treasurer of a committee supporting a candidate for the office of Vice President (other than the nominee of a political party) shall file reports in accordance with paragraph (3).

(11)

(A) The Commission shall promulgate a regulation under which a person required to file a designation, statement, or report under this Act-

(i) is required to maintain and file a designation, statement, or report for any calendar year in electronic form accessible by computers if the person has, or has reason to expect to have, aggregate contributions or expenditures in excess of a threshold amount determined by the Commission; and

(ii) may maintain and file a designation, statement, or report in electronic form or an alternative form if not required to do so under the regulation promulgated under clause (i).

(B) The Commission shall make a designation, statement, report, or notification that is filed with the Commission under this Act available for inspection by the public in the offices of the Commission and accessible to the public on the Internet not later than 48 hours (or not later than 24 hours in the case of a designation, statement, report, or notification filed electronically) after receipt by the Commission.

(C) In promulgating a regulation under this paragraph, the Commission shall provide methods (other than requiring a signature on the document being filed) for verifying designations, statements, and reports covered by the regulation. Any document verified under any of the methods shall be treated for all purposes (including penalties for perjury) in the same manner as a document verified by signature.

(D) As used in this paragraph, the term "report" means, with respect to the Commission, a report, designation, or statement required by this Act to be filed with the Commission.

(12) Software for filing of reports.-

(A) In general.-The Commission shall-

(i) promulgate standards to be used by vendors to develop software that-

(I) permits candidates to easily record information concerning receipts and disbursements required to be reported under this Act at the time of the receipt or disbursement;

(II) allows the information recorded under subclause (I) to be transmitted immediately to the Commission; and

(III) allows the Commission to post the information on the Internet immediately upon receipt; and

(ii) make a copy of software that meets the standards promulgated under clause (i) available to each person required to file a designation, statement, or report in electronic form under this Act.

(B) Additional information.-To the extent feasible, the Commission shall require vendors to include in the software developed under the standards under subparagraph (A) the ability for any person to file any designation, statement, or report required under this Act in electronic form.

(C) Required use.-Notwithstanding any provision of this Act relating to times for filing reports, each candidate for Federal office (or that candidate's authorized committee) shall use software that meets the standards promulgated under this paragraph once such software is made available to such candidate.

(D) Required posting.-The Commission shall, as soon as practicable, post on the Internet any information received under this paragraph.

(b) Contents of reports

Each report under this section shall disclose-

(1) the amount of cash on hand at the beginning of the reporting period;

(2) for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all receipts, and the total amount of all receipts in the following categories:

(A) contributions from persons other than political committees;

(B) for an authorized committee, contributions from the candidate;

(C) contributions from political party committees;

(D) contributions from other political committees;

(E) for an authorized committee, transfers from other authorized committees of the same candidate;

(F) transfers from affiliated committees and, where the reporting committee is a political party committee, transfers from other political party committees, regardless of whether such committees are affiliated;

(G) for an authorized committee, loans made by or guaranteed by the candidate;

(H) all other loans;

(I) rebates, refunds, and other offsets to operating expenditures;

(J) dividends, interest, and other forms of receipts; and

(K) for an authorized committee of a candidate for the office of President, Federal funds received under chapter 95 and chapter 96 of title 26;

(3) the identification of each-

(A) person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), or in any lesser amount if the reporting committee should so elect, together with the date and amount of any such contribution;

(B) political committee which makes a contribution to the reporting committee during the reporting period, together with the date and amount of any such contribution;

(C) authorized committee which makes a transfer to the reporting committee;

(D) affiliated committee which makes a transfer to the reporting committee during the reporting period and, where the reporting committee is a political party committee, each transfer of funds to the reporting committee from another political party committee, regardless of whether such committees are affiliated, together with the date and amount of such transfer;

(E) person who makes a loan to the reporting committee during the reporting period, together with the identification of any endorser or guarantor of such loan, and the date and amount or value of such loan;

(F) person who provides a rebate, refund, or other offset to operating expenditures to the reporting committee in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of such receipt; and

(G) person who provides any dividend, interest, or other receipt to the reporting committee in an aggregate value or amount in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with

the date and amount of any such receipt;

(4) for the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), the total amount of all disbursements, and all disbursements in the following categories:

> (A) expenditures made to meet candidate or committee operating expenses;
>
> (B) for authorized committees, transfers to other committees authorized by the same candidate;
>
> (C) transfers to affiliated committees and, where the reporting committee is a political party committee, transfers to other political party committees, regardless of whether they are affiliated;
>
> (D) for an authorized committee, repayment of loans made by or guaranteed by the candidate;
>
> (E) repayment of all other loans;
>
> (F) contribution refunds and other offsets to contributions;
>
> (G) for an authorized committee, any other disbursements;
>
> (H) for any political committee other than an authorized committee-
>
>> (i) contributions made to other political committees;
>>
>> (ii) loans made by the reporting committees;
>>
>> (iii) independent expenditures;
>>
>> (iv) expenditures made under section 30116(d) of this title; and
>>
>> (v) any other disbursements; and
>
> (I) for an authorized committee of a candidate for the office of President, disbursements not subject to the limitation of section 30116(b) of this title;

(5) the name and address of each-

> (A) person to whom an expenditure in an aggregate amount or value in excess of $200 within the calendar year is made by the reporting committee to meet a candidate or committee operating expense, together with the date, amount, and purpose of such operating expenditure;
>
> (B) authorized committee to which a transfer is made by the reporting committee;
>
> (C) affiliated committee to which a transfer is made by the reporting committee during the reporting period and, where the reporting

committee is a political party committee, each transfer of funds by the reporting committee to another political party committee, regardless of whether such committees are affiliated, together with the date and amount of such transfers;

(D) person who receives a loan repayment from the reporting committee during the reporting period, together with the date and amount of such loan repayment; and

(E) person who receives a contribution refund or other offset to contributions from the reporting committee where such contribution was reported under paragraph (3)(A) of this subsection, together with the date and amount of such disbursement;

(6)

(A) for an authorized committee, the name and address of each person who has received any disbursement not disclosed under paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), together with the date and amount of any such disbursement;

(B) for any other political committee, the name and address of each-

(i) political committee which has received a contribution from the reporting committee during the reporting period, together with the date and amount of any such contribution;

(ii) person who has received a loan from the reporting committee during the reporting period, together with the date and amount of such loan;

(iii) person who receives any disbursement during the reporting period in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), in connection with an independent expenditure by the reporting committee, together with the date, amount, and purpose of any such independent expenditure and a statement which indicates whether such independent expenditure is in support of, or in opposition to, a candidate, as well as the name and office sought by such candidate, and a certification, under penalty of

perjury, whether such independent expenditure is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such committee;

(iv) person who receives any expenditure from the reporting committee during the reporting period in connection with an expenditure under section 30116(d) of this title, together with the date, amount, and purpose of any such expenditure as well as the name of, and office sought by, the candidate on whose behalf the expenditure is made; and

(v) person who has received any disbursement not otherwise disclosed in this paragraph or paragraph (5) in an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office), from the reporting committee within the reporting period, together with the date, amount, and purpose of any such disbursement;

(7) the total sum of all contributions to such political committee, together with the total contributions less offsets to contributions and the total sum of all operating expenditures made by such political committee, together with total operating expenditures less offsets to operating expenditures, for both the reporting period and the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office); and

(8) the amount and nature of outstanding debts and obligations owed by or to such political committee; and where such debts and obligations are settled for less than their reported amount or value, a statement as to the circumstances and conditions under which such debts or obligations were extinguished and the consideration therefor.

(c) Statements by other than political committees; filing; contents; indices of expenditures

(1) Every person (other than a political committee) who makes independent expenditures in an aggregate amount or value in excess of $250 during a calendar year shall file a statement containing the information required under subsection (b)(3)(A) for all contributions received by such person.

(2) Statements required to be filed by this subsection shall be filed in accordance with subsection (a)(2), and shall include-

(A) the information required by subsection (b)(6)(B)(iii), indicating whether the independent expenditure is in support of, or in opposition to, the candidate involved;

(B) under penalty of perjury, a certification whether or not such independent expenditure is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such candidate; and

(C) the identification of each person who made a contribution in excess of $200 to the person filing such statement which was made for the purpose of furthering an independent expenditure.

(3) The Commission shall be responsible for expeditiously preparing indices which set forth, on a candidate-by-candidate basis, all independent expenditures separately, including those reported under subsection (b)(6)(B)(iii), made by or for each candidate, as reported under this subsection, and for periodically publishing such indices on a timely pre-election basis.

(d) Filing by facsimile device or electronic mail

(1) Any person who is required to file a statement under subsection (c) or (g) of this section, except statements required to be filed electronically pursuant to subsection (a)(11)(A)(i) may file the statement by facsimile device or electronic mail, in accordance with such regulations as the Commission may promulgate.

(2) The Commission shall make a document which is filed electronically with the Commission pursuant to this paragraph accessible to the public on the Internet not later than 24 hours after the document is received by the Commission.

(3) In promulgating a regulation under this paragraph, the Commission shall provide methods (other than requiring a signature on the document being filed) for verifying the documents covered by the regulation. Any document verified under any of the methods shall be treated for all purposes (including penalties for perjury) in the same manner as a document verified by signature.

(e) Political committees

(1) National and congressional political committees

The national committee of a political party, any national congressional campaign committee of a political party, and any subordinate committee of

either, shall report all receipts and disbursements during the reporting period.

(2) Other political committees to which section 30125 of this title applies

(A) In general

In addition to any other reporting requirements applicable under this Act, a political committee (not described in paragraph (1)) to which section 30125(b)(1) of this title applies shall report all receipts and disbursements made for activities described in section 30101(20)(A) of this title, unless the aggregate amount of such receipts and disbursements during the calendar year is less than $5,000.

(B) Specific disclosure by State and local parties of certain non-Federal amounts permitted to be spent on Federal election activity

Each report by a political committee under subparagraph (A) of receipts and disbursements made for activities described in section 30101(20)(A) of this title shall include a disclosure of all receipts and disbursements described in section 30125(b)(2)(A) and (B) of this title.

(3) Itemization

If a political committee has receipts or disbursements to which this subsection applies from or to any person aggregating in excess of $200 for any calendar year, the political committee shall separately itemize its reporting for such person in the same manner as required in paragraphs (3)(A), (5), and (6) of subsection (b).

(4) Reporting periods

Reports required to be filed under this subsection shall be filed for the same time periods required for political committees under subsection (a)(4)(B).

(f) Disclosure of electioneering communications

(1) Statement required

Every person who makes a disbursement for the direct costs of producing and airing electioneering communications in an aggregate amount in excess of $10,000 during any calendar year shall, within 24 hours of each disclosure date, file with the Commission a statement containing the information described in paragraph (2).

(2) Contents of statement

Each statement required to be filed under this subsection shall be made

under penalty of perjury and shall contain the following information:

    (A) The identification of the person making the disbursement, of any person sharing or exercising direction or control over the activities of such person, and of the custodian of the books and accounts of the person making the disbursement.

    (B) The principal place of business of the person making the disbursement, if not an individual.

    (C) The amount of each disbursement of more than $200 during the period covered by the statement and the identification of the person to whom the disbursement was made.

    (D) The elections to which the electioneering communications pertain and the names (if known) of the candidates identified or to be identified.

    (E) If the disbursements were paid out of a segregated bank account which consists of funds contributed solely by individuals who are United States citizens or nationals or lawfully admitted for permanent residence (as defined in section 1101(a)(20) of title 8) directly to this account for electioneering communications, the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to that account during the period beginning on the first day of the preceding calendar year and ending on the disclosure date. Nothing in this subparagraph is to be construed as a prohibition on the use of funds in such a segregated account for a purpose other than electioneering communications.

    (F) If the disbursements were paid out of funds not described in subparagraph (E), the names and addresses of all contributors who contributed an aggregate amount of $1,000 or more to the person making the disbursement during the period beginning on the first day of the preceding calendar year and ending on the disclosure date.

(3) Electioneering communication

For purposes of this subsection-

    (A) In general

        (i) The term "electioneering communication" means any broadcast, cable, or satellite communication which-

            (I) refers to a clearly identified candidate for Federal office;

(II) is made within-

(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

(ii) If clause (i) is held to be constitutionally insufficient by final judicial decision to support the regulation provided herein, then the term "electioneering communication" means any broadcast, cable, or satellite communication which promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate. Nothing in this subparagraph shall be construed to affect the interpretation or application of section 100.22(b) of title 11, Code of Federal Regulations.

(B) Exceptions

The term "electioneering communication" does not include-

(i) a communication appearing in a news story, commentary, or editorial distributed through the facilities of any broadcasting station, unless such facilities are owned or controlled by any political party, political committee, or candidate;

(ii) a communication which constitutes an expenditure or an independent expenditure under this Act;

(iii) a communication which constitutes a candidate debate or forum conducted pursuant to regulations adopted by the Commission, or which solely promotes such a debate or forum and is made by or on behalf of the person sponsoring the debate or forum; or

(iv) any other communication exempted under such regulations

as the Commission may promulgate (consistent with the requirements of this paragraph) to ensure the appropriate implementation of this paragraph, except that under any such regulation a communication may not be exempted if it meets the requirements of this paragraph and is described in section 30101(20)(A)(iii) of this title.

(C) Targeting to relevant electorate

For purposes of this paragraph, a communication which refers to a clearly identified candidate for Federal office is "targeted to the relevant electorate" if the communication can be received by 50,000 or more persons-

    (i) in the district the candidate seeks to represent, in the case of a candidate for Representative in, or Delegate or Resident Commissioner to, the Congress; or

    (ii) in the State the candidate seeks to represent, in the case of a candidate for Senator.

(4) Disclosure date

For purposes of this subsection, the term "disclosure date" means-

    (A) the first date during any calendar year by which a person has made disbursements for the direct costs of producing or airing electioneering communications aggregating in excess of $10,000; and

    (B) any other date during such calendar year by which a person has made disbursements for the direct costs of producing or airing electioneering communications aggregating in excess of $10,000 since the most recent disclosure date for such calendar year.

(5) Contracts to disburse

For purposes of this subsection, a person shall be treated as having made a disbursement if the person has executed a contract to make the disbursement.

(6) Coordination with other requirements

Any requirement to report under this subsection shall be in addition to any other reporting requirement under this Act.

(7) Coordination with title 26

Nothing in this subsection may be construed to establish, modify, or otherwise affect the definition of political activities or electioneering activities (including the definition of participating in, intervening in, or

influencing or attempting to influence a political campaign on behalf of or in opposition to any candidate for public office) for purposes of title 26.

(g) Time for reporting certain expenditures

    (1) Expenditures aggregating $1,000

        (A) Initial report

        A person (including a political committee) that makes or contracts to make independent expenditures aggregating $1,000 or more after the 20th day, but more than 24 hours, before the date of an election shall file a report describing the expenditures within 24 hours.

        (B) Additional reports

        After a person files a report under subparagraph (A), the person shall file an additional report within 24 hours after each time the person makes or contracts to make independent expenditures aggregating an additional $1,000 with respect to the same election as that to which the initial report relates.

    (2) Expenditures aggregating $10,000

        (A) Initial report

        A person (including a political committee) that makes or contracts to make independent expenditures aggregating $10,000 or more at any time up to and including the 20th day before the date of an election shall file a report describing the expenditures within 48 hours.

        (B) Additional reports

        After a person files a report under subparagraph (A), the person shall file an additional report within 48 hours after each time the person makes or contracts to make independent expenditures aggregating an additional $10,000 with respect to the same election as that to which the initial report relates.

    (3) Place of filing; contents

A report under this subsection-

        (A) shall be filed with the Commission; and

        (B) shall contain the information required by subsection (b)(6)(B)(iii), including the name of each candidate whom an expenditure is intended to support or oppose.

    (4) Time of filing for expenditures aggregating $1,000

Notwithstanding subsection (a)(5), the time at which the statement under paragraph (1) is received by the Commission or any other recipient to whom

the notification is required to be sent shall be considered the time of filing of the statement with the recipient.

(h) Reports from Inaugural Committees

The Federal Election Commission shall make any report filed by an Inaugural Committee under section 510 of title 36 accessible to the public at the offices of the Commission and on the Internet not later than 48 hours after the report is received by the Commission.

(i) Disclosure of bundled contributions

(1) Required disclosure

Each committee described in paragraph (6) shall include in the first report required to be filed under this section after each covered period (as defined in paragraph (2)) a separate schedule setting forth the name, address, and employer of each person reasonably known by the committee to be a person described in paragraph (7) who provided 2 or more bundled contributions to the committee in an aggregate amount greater than the applicable threshold (as defined in paragraph (3)) during the covered period, and the aggregate amount of the bundled contributions provided by each such person during the covered period.

(2) Covered period

In this subsection, a "covered period" means, with respect to a committee-

(A) the period beginning January 1 and ending June 30 of each year;

(B) the period beginning July 1 and ending December 31 of each year; and

(C) any reporting period applicable to the committee under this section during which any person described in paragraph (7) provided 2 or more bundled contributions to the committee in an aggregate amount greater than the applicable threshold.

(3) Applicable threshold

(A) In general

In this subsection, the "applicable threshold" is $15,000, except that in determining whether the amount of bundled contributions provided to a committee by a person described in paragraph (7) exceeds the applicable threshold, there shall be excluded any contribution made to the committee by the person or the person's spouse.

(B) Indexing

In any calendar year after 2007, section 30116(c)(1)(B) of this

title shall apply to the amount applicable under subparagraph (A) in the same manner as such section applies to the limitations established under subsections (a)(1)(A), (a)(1)(B), (a)(3), and (h) of such section, except that for purposes of applying such section to the amount applicable under subparagraph (A), the "base period" shall be 2006.

(4) Public availability

The Commission shall ensure that, to the greatest extent practicable-

(A) information required to be disclosed under this subsection is publicly available through the Commission website in a manner that is searchable, sortable, and downloadable; and

(B) the Commission's public database containing information disclosed under this subsection is linked electronically to the websites maintained by the Secretary of the Senate and the Clerk of the House of Representatives containing information filed pursuant to the Lobbying Disclosure Act of 1995 [2 U.S.C. 1601 et seq.].

(5) Regulations

Not later than 6 months after September 14, 2007, the Commission shall promulgate regulations to implement this subsection. Under such regulations, the Commission-

(A) may, notwithstanding paragraphs (1) and (2), provide for quarterly filing of the schedule described in paragraph (1) by a committee which files reports under this section more frequently than on a quarterly basis;

(B) shall provide guidance to committees with respect to whether a person is reasonably known by a committee to be a person described in paragraph (7), which shall include a requirement that committees consult the websites maintained by the Secretary of the Senate and the Clerk of the House of Representatives containing information filed pursuant to the Lobbying Disclosure Act of 1995;

(C) may not exempt the activity of a person described in paragraph (7) from disclosure under this subsection on the grounds that the person is authorized to engage in fundraising for the committee or any other similar grounds; and

(D) shall provide for the broadest possible disclosure of activities described in this subsection by persons described in paragraph (7) that is consistent with this subsection.

(6) Committees described

A committee described in this paragraph is an authorized committee of a candidate,

a leadership PAC, or a political party committee.

(7) Persons described

A person described in this paragraph is any person, who, at the time a contribution is forwarded to a committee as described in paragraph (8)(A)(i) or is received by a committee as described in paragraph (8)(A)(ii), is-

> (A) a current registrant under section 4(a) of the Lobbying Disclosure Act of 1995 [2 U.S.C. 1603(a)];

> (B) an individual who is listed on a current registration filed under section 4(b)(6) of such Act [2 U.S.C. 1603(b)(6)] or a current report under section 5(b)(2)(C) of such Act [2 U.S.C. 1604(b)(2)(C)]; or

> (C) a political committee established or controlled by such a registrant or individual.

(8) Definitions

For purposes of this subsection, the following definitions apply:

> (A) Bundled contribution

> The term "bundled contribution" means, with respect to a committee described in paragraph (6) and a person described in paragraph (7), a contribution (subject to the applicable threshold) which is-

>> (i) forwarded from the contributor or contributors to the committee by the person; or

>> (ii) received by the committee from a contributor or contributors, but credited by the committee or candidate involved (or, in the case of a leadership PAC, by the individual referred to in subparagraph (B) involved) to the person through records, designations, or other means of recognizing that a certain amount of money has been raised by the person.

> (B) Leadership PAC

> The term "leadership PAC" means, with respect to a candidate for election to Federal office or an individual holding Federal office, a political committee that is directly or indirectly established, financed, maintained or controlled by the candidate or the individual but which is not an authorized committee of the candidate or individual and which is not affiliated with an authorized committee of the candidate or individual, except that such term does not include a political committee of a political party.

**§30109. Enforcement**

(a) Administrative and judicial practice and procedure

(1) Any person who believes a violation of this Act or of chapter 95 or chapter 96 of title 26 has occurred, may file a complaint with the Commission. Such complaint shall be in writing, signed and sworn to by the person filing such complaint, shall be notarized, and shall be made under penalty of perjury and subject to the provisions of section 1001 of title 18. Within 5 days after receipt of a complaint, the Commission shall notify, in writing, any person alleged in the complaint to have committed such a violation. Before the Commission conducts any vote on the complaint, other than a vote to dismiss, any person so notified shall have the opportunity to demonstrate, in writing, to the Commission within 15 days after notification that no action should be taken against such person on the basis of the complaint. The Commission may not conduct any investigation or take any other action under this section solely on the basis of a complaint of a person whose identity is not disclosed to the Commission.

(2) If the Commission, upon receiving a complaint under paragraph (1) or on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities, determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed, or is about to commit, a violation of this Act or chapter 95 or chapter 96 of title 26, the Commission shall, through its chairman or vice chairman, notify the person of the alleged violation. Such notification shall set forth the factual basis for such alleged violation. The Commission shall make an investigation of such alleged violation, which may include a field investigation or audit, in accordance with the provisions of this section.

(3) The general counsel of the Commission shall notify the respondent of any recommendation to the Commission by the general counsel to proceed to a vote on probable cause pursuant to paragraph (4)(A)(i). With such notification, the general counsel shall include a brief stating the position of the general counsel on the legal and factual issues of the case. Within 15 days of receipt of such brief, respondent may submit a brief stating the position of such respondent on the legal and factual issues of the case, and replying to the brief of general counsel. Such briefs shall be

filed with the Secretary of the Commission and shall be considered by the Commission before proceeding under paragraph (4).

(4)

    (A)

        (i) Except as provided in clauses [1] (ii) and subparagraph (C), if the Commission determines, by an affirmative vote of 4 of its members, that there is probable cause to believe that any person has committed, or is about to commit, a violation of this Act or of chapter 95 or chapter 96 of title 26, the Commission shall attempt, for a period of at least 30 days, to correct or prevent such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with any person involved. Such attempt by the Commission to correct or prevent such violation may continue for a period of not more than 90 days. The Commission may not enter into a conciliation agreement under this clause except pursuant to an affirmative vote of 4 of its members. A conciliation agreement, unless violated, is a complete bar to any further action by the Commission, including the bringing of a civil proceeding under paragraph (6)(A).

        (ii) If any determination of the Commission under clause (i) occurs during the 45-day period immediately preceding any election, then the Commission shall attempt, for a period of at least 15 days, to correct or prevent the violation involved by the methods specified in clause (i).

    (B)

        (i) No action by the Commission or any person, and no information derived, in connection with any conciliation attempt by the Commission under subparagraph (A) may be made public by the Commission without the written consent of the respondent and the Commission.

        (ii) If a conciliation agreement is agreed upon by the Commission and the respondent, the Commission shall make public any conciliation agreement signed by both the Commission and the respondent. If the

Commission makes a determination that a person has not violated this Act or chapter 95 or chapter 96 of title 26, the Commission shall make public such determination.

(C)

(i) Notwithstanding subparagraph (A), in the case of a violation of a qualified disclosure requirement, the Commission may-

(I) find that a person committed such a violation on the basis of information obtained pursuant to the procedures described in paragraphs (1) and (2); and

(II) based on such finding, require the person to pay a civil money penalty in an amount determined, for violations of each qualified disclosure requirement, under a schedule of penalties which is established and published by the Commission and which takes into account the amount of the violation involved, the existence of previous violations by the person, and such other factors as the Commission considers appropriate.

(ii) The Commission may not make any determination adverse to a person under clause (i) until the person has been given written notice and an opportunity to be heard before the Commission.

(iii) Any person against whom an adverse determination is made under this subparagraph may obtain a review of such determination in the district court of the United States for the district in which the person resides, or transacts business, by filing in such court (prior to the expiration of the 30-day period which begins on the date the person receives notification of the determination) a written petition requesting that the determination be modified or set aside.

(iv) In this subparagraph, the term "qualified disclosure requirement" means any requirement of-

(I) subsections [2] (a), (c), (e), (f), (g), or (i) of section 30104 of this title; or

(II) section 30105 of this title.

(v) This subparagraph shall apply with respect to violations that relate to reporting periods that begin on or after January 1, 2000, and that end on or before December 31, 2033.

(5)

(A) If the Commission believes that a violation of this Act or of chapter 95 or chapter 96 of title 26 has been committed, a conciliation agreement entered into by the Commission under paragraph (4)(A) may include a requirement that the person involved in such conciliation agreement shall pay a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation.

(B) If the Commission believes that a knowing and willful violation of this Act or of chapter 95 or chapter 96 of title 26 has been committed, a conciliation agreement entered into by the Commission under paragraph (4)(A) may require that the person involved in such conciliation agreement shall pay a civil penalty which does not exceed the greater of $10,000 or an amount equal to 200 percent of any contribution or expenditure involved in such violation (or, in the case of a violation of section 30122 of this title, which is not less than 300 percent of the amount involved in the violation and is not more than the greater of $50,000 or 1,000 percent of the amount involved in the violation).

(C) If the Commission by an affirmative vote of 4 of its members, determines that there is probable cause to believe that a knowing and willful violation of this Act which is subject to subsection (d), or a knowing and willful violation of chapter 95 or chapter 96 of title 26, has occurred or is about to occur, it may refer such apparent violation to the Attorney General of the United States without regard to any limitations set forth in paragraph (4)(A).

(D) In any case in which a person has entered into a conciliation agreement with the Commission under paragraph (4)(A), the Commission may institute a civil action for relief under paragraph (6)(A) if it believes that the person has violated any provision of such conciliation agreement. For the

Commission to obtain relief in any civil action, the Commission need only establish that the person has violated, in whole or in part, any requirement of such conciliation agreement.

(6)

(A) If the Commission is unable to correct or prevent any violation of this Act or of chapter 95 or chapter 96 of title 26, by the methods specified in paragraph (4), the Commission may, upon an affirmative vote of 4 of its members, institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order (including an order for a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation) in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business.

(B) In any civil action instituted by the Commission under subparagraph (A), the court may grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation, upon a proper showing that the person involved has committed, or is about to commit (if the relief sought is a permanent or temporary injunction or a restraining order), a violation of this Act or chapter 95 or chapter 96 of title 26.

(C) In any civil action for relief instituted by the Commission under subparagraph (A), if the court determines that the Commission has established that the person involved in such civil action has committed a knowing and willful violation of this Act or of chapter 95 or chapter 96 of title 26, the court may impose a civil penalty which does not exceed the greater of $10,000 or an amount equal to 200 percent of any contribution or expenditure involved in such violation (or, in the case of a violation of section 30122 of this title, which is not less than 300 percent of the amount involved in the violation and is not more than the greater of $50,000 or 1,000 percent of the amount involved in the violation).

(7) In any action brought under paragraph (5) or (6), subpenas for witnesses who are required to attend a United States district court may run into any other district.

(8)

> (A) Any party aggrieved by an order of the Commission dismissing a complaint filed by such party under paragraph (1), or by a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed, may file a petition with the United States District Court for the District of Columbia.

> (B) Any petition under subparagraph (A) shall be filed, in the case of a dismissal of a complaint by the Commission, within 60 days after the date of the dismissal.

> (C) In any proceeding under this paragraph the court may declare that the dismissal of the complaint or the failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days, failing which the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint.

(9) Any judgment of a district court under this subsection may be appealed to the court of appeals, and the judgment of the court of appeals affirming or setting aside, in whole or in part, any such order of the district court shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

(10) Repealed. Pub. L. 98–620, title IV, §402(1)(A), Nov. 8, 1984, 98 Stat. 3357 .

(11) If the Commission determines after an investigation that any person has violated an order of the court entered in a proceeding brought under paragraph (6), it may petition the court for an order to hold such person in civil contempt, but if it believes the violation to be knowing and willful it may petition the court for an order to hold such person in criminal contempt.

(12)

> (A) Any notification or investigation made under this section shall not be made public by the Commission or by any person without the written

consent of the person receiving such notification or the person with respect to whom such investigation is made.

(B) Any member or employee of the Commission, or any other person, who violates the provisions of subparagraph (A) shall be fined not more than $2,000. Any such member, employee, or other person who knowingly and willfully violates the provisions of subparagraph (A) shall be fined not more than $5,000.

(b) Notice to persons not filing required reports prior to institution of enforcement action; publication of identity of persons and unfiled reports

Before taking any action under subsection (a) against any person who has failed to file a report required under section 30104(a)(2)(A)(iii) of this title for the calendar quarter immediately preceding the election involved, or in accordance with section 30104(a)(2)(A)(i) of this title, the Commission shall notify the person of such failure to file the required reports. If a satisfactory response is not received within 4 business days after the date of notification, the Commission shall, pursuant to section 30111(a)(7) of this title, publish before the election the name of the person and the report or reports such person has failed to file.

(c) Reports by Attorney General of apparent violations

Whenever the Commission refers an apparent violation to the Attorney General, the Attorney General shall report to the Commission any action taken by the Attorney General regarding the apparent violation. Each report shall be transmitted within 60 days after the date the Commission refers an apparent violation, and every 30 days thereafter until the final disposition of the apparent violation.

(d) Penalties; defenses; mitigation of offenses

(1)

(A) Any person who knowingly and willfully commits a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure-

(i) aggregating $25,000 or more during a calendar year shall be fined under title 18, or imprisoned for not more than 5 years, or both; or

(ii) aggregating $2,000 or more (but less than $25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.

(B) In the case of a knowing and willful violation of section 30118(b)(3) of this title, the penalties set forth in this subsection shall apply to a violation involving an amount aggregating $250 or more during a calendar year. Such violation of section 30118(b)(3) of this title may incorporate a violation of section 30119(b), 30122, or 30123 of this title.

(C) In the case of a knowing and willful violation of section 30124 of this title, the penalties set forth in this subsection shall apply without regard to whether the making, receiving, or reporting of a contribution or expenditure of $1,000 or more is involved.

(D) Any person who knowingly and willfully commits a violation of section 30122 of this title involving an amount aggregating more than $10,000 during a calendar year shall be-

(i) imprisoned for not more than 2 years if the amount is less than $25,000 (and subject to imprisonment under subparagraph (A) if the amount is $25,000 or more);

(ii) fined not less than 300 percent of the amount involved in the violation and not more than the greater of-

(I) $50,000; or

(II) 1,000 percent of the amount involved in the violation; or

(iii) both imprisoned under clause (i) and fined under clause (ii).

(2) In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of title 26, any defendant may evidence their lack of knowledge or intent to commit the alleged violation by introducing as evidence a conciliation agreement entered into between the defendant and the Commission under subsection (a)(4)(A) which specifically deals with the act or failure to act constituting such violation and which is still in effect.

(3) In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of title 26, the court before which such action is brought shall take into account, in weighing the seriousness of the violation and in considering the appropriateness of the penalty to be imposed if the defendant is found guilty, whether-

(A) the specific act or failure to act which constitutes the violation for which the action was brought is the subject of a conciliation agreement entered into between the defendant and the Commission under subparagraph (a)(4)(A);

(B) the conciliation agreement is in effect; and

(C) the defendant is, with respect to the violation involved, in compliance with the conciliation agreement.

**§30121. Contributions and donations by foreign nationals**

(a) Prohibition

It shall be unlawful for-

    (1) a foreign national, directly or indirectly, to make-

        (A) a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;

        (B) a contribution or donation to a committee of a political party; or

        (C) an expenditure, independent expenditure, or disbursement for an electioneering communication (within the meaning of section 30104(f)(3) of this title); or

    (2) a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.

(b) "Foreign national" defined

As used in this section, the term "foreign national" means-

    (1) a foreign principal, as such term is defined by section 611(b) of title 22, except that the term "foreign national" shall not include any individual who is a citizen of the United States; or

    (2) an individual who is not a citizen of the United States or a national of the United States (as defined in section 1101(a)(22) of title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(20) of title 8.

## § 110.20 Prohibition on contributions, donations, expenditures, independent expenditures, and disbursements by foreign nationals

(a) Definitions. For purposes of this section, the following definitions apply:

(1) Disbursement has the same meaning as in 11 CFR 300.2(d).

(2) Donation has the same meaning as in 11 CFR 300.2(e).

(3) Foreign national means—

(i) A foreign principal, as defined in 22 U.S.C. 611(b); or

(ii) An individual who is not a citizen of the United States and who is not lawfully admitted for permanent residence, as defined in 8 U.S.C. 1101(a)(20); however,

(iii) Foreign national shall not include any individual who is a citizen of the United States, or who is a national of the United States as defined in 8 U.S.C. 1101(a)(22).

(4) Knowingly means that a person must:

(i) Have actual knowledge that the source of the funds solicited, accepted or received is a foreign national;

(ii) Be aware of facts that would lead a reasonable person to conclude that there is a substantial probability that the source of the funds solicited, accepted or received is a foreign national; or

(iii) Be aware of facts that would lead a reasonable person to inquire whether the source of the funds solicited, accepted or received is a foreign national, but the person failed to conduct a reasonable inquiry.

(5) For purposes of paragraph (a)(4) of this section, pertinent facts include, but are not limited to:

(i) The contributor or donor uses a foreign passport or passport number for identification purposes;

(ii) The contributor or donor provides a foreign address;

(iii) The contributor or donor makes a contribution or donation by means of a check or other written instrument drawn on a foreign bank or by a wire transfer from a foreign bank; or

(iv) The contributor or donor resides abroad.

(6) Solicit has the same meaning as in 11 CFR 300.2(m).

(7) Safe Harbor. For purposes of paragraph (a)(4)(iii) of this section, a person shall be deemed to have conducted a reasonable inquiry if he or she

seeks and obtains copies of current and valid U.S. passport papers for U.S. citizens who are contributors or donors described in paragraphs (a)(5)(i) through (iv) of this section. No person may rely on this safe harbor if he or she has actual knowledge that the source of the funds solicited, accepted, or received is a foreign national.

(b) Contributions and donations by foreign nationals in connection with elections. A foreign national shall not, directly or indirectly, make a contribution or a donation of money or other thing of value, or expressly or impliedly promise to make a contribution or a donation, in connection with any Federal, State, or local election.

(c) Contributions and donations by foreign nationals to political committees and organizations of political parties. A foreign national shall not, directly or indirectly, make a contribution or donation to:

> (1) A political committee of a political party, including a national party committee, a national congressional campaign committee, or a State, district, or local party committee, including a non-Federal account of a State, district, or local party committee, or
> (2) An organization of a political party whether or not the organization is a political committee under 11 CFR 100.5.

(d) Contributions and donations by foreign nationals for office buildings. A foreign national shall not, directly or indirectly, make a contribution or donation to a committee of a political party for the purchase or construction of an office building. See 11 CFR 300.10 and 300.35.

(e) Disbursements by foreign nationals for electioneering communications. A foreign national shall not, directly or indirectly, make any disbursement for an electioneering communication as defined in 11 CFR 100.29.

(f) Expenditures, independent expenditures, or disbursements by foreign nationals in connection with elections. A foreign national shall not, directly or indirectly, make any expenditure, independent expenditure, or disbursement in connection with any Federal, State, or local election.

(g) Solicitation, acceptance, or receipt of contributions and donations from foreign nationals. No person shall knowingly solicit, accept, or receive from a foreign national any contribution or donation prohibited by paragraphs (b) through (d) of this section.

(h) Providing substantial assistance.
>    (1) No person shall knowingly provide substantial assistance in the solicitation, making, acceptance, or receipt of a contribution or donation prohibited by paragraphs (b) through (d), and (g) of this section.
>    (2) No person shall knowingly provide substantial assistance in the making of an expenditure, independent expenditure, or disbursement prohibited by paragraphs (e) and (f) of this section.

(i) Participation by foreign nationals in decisions involving election-related activities. A foreign national shall not direct, dictate, control, or directly or indirectly participate in the decision-making process of any person, such as a corporation, labor organization, political committee, or political organization with regard to such person's Federal or non-Federal election-related activities, such as decisions concerning the making of contributions, donations, expenditures, or disbursements in connection with elections for any Federal, State, or local office or decisions concerning the administration of a political committee.

(j) Donations by foreign nationals to inaugural committees. A foreign national shall not, directly or indirectly, make a donation to an inaugural committee, as defined in 11 CFR 104.21(a)(1). No person shall knowingly accept from a foreign national any donation to an inaugural committee.

**§ 73.1212 Sponsorship identification; list retention; related requirements.[3]**

(a) When a broadcast station transmits any matter for which money, service, or other valuable consideration is either directly or indirectly paid or promised to, or charged or accepted by such station, the station, at the time of the broadcast, shall announce:

> (1) That such matter is sponsored, paid for, or furnished, either in whole or in part, and
> (2) By whom or on whose behalf such consideration was supplied: *Provided, however,* That "service or other valuable consideration" shall not include any service or property furnished either without or at a nominal charge for use on, or in connection with, a broadcast unless it is so furnished in consideration for an identification of any person, product, service, trademark, or brand name beyond an identification reasonably related to the use of such service or property on the broadcast.

> > (i) For the purposes of this section, the term "sponsored" shall be deemed to have the same meaning as "paid for."

> > (ii) In the case of any television political advertisement concerning candidates for public office, the sponsor shall be identified with letters equal to or greater than four percent of the vertical picture height that air for not less than four seconds.

> > (b) The licensee of each broadcast station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any matter for broadcast, information to enable such licensee to make the announcement required by this section.

---

[3] The Commission did not publish modifications to Section 73.1212 to reflect this Court's vacatur of 47 C.F.R. § 73.1212(j)(3)(iii) and (iv) in *National Association of Broadcasters, et al., v. FCC*, 39 F.4th 817 (D.C. Cir. 2022).

(c) In any case where a report has been made to a broadcast station as required by section 507 of the Communications Act of 1934, as amended, of circumstances which would have required an announcement under this section had the consideration been received by such broadcast station, an appropriate announcement shall be made by such station.

(d) In the case of any political broadcast matter or any broadcast matter involving the discussion of a controversial issue of public importance for which any film, record, transcription, talent, script, or other material or service of any kind is furnished, either directly or indirectly, to a station as an inducement for broadcasting such matter, an announcement shall be made both at the beginning and conclusion of such broadcast on which such material or service is used that such film, record, transcription, talent, script, or other material or service has been furnished to such station in connection with the transmission of such broadcast matter: *Provided, however,* That in the case of any broadcast of 5 minutes' duration or less, only one such announcement need be made either at the beginning or conclusion of the broadcast.

(e) The announcement required by this section shall, in addition to stating the fact that the broadcast matter was sponsored, paid for or furnished, fully and fairly disclose the true identity of the person or persons, or corporation, committee, association or other unincorporated group, or other entity by whom or on whose behalf such payment is made or promised, or from whom or on whose behalf such services or other valuable consideration is received, or by whom the material or services referred to in paragraph (d) of this section are furnished. Where an agent or other person or entity contracts or otherwise makes arrangements with a station on behalf of another, and such fact is known or by the exercise of reasonable diligence, as specified in paragraph (b) of this section, could be known to the station, the announcement shall disclose the identity of the person or persons or entity on whose behalf such agent is acting instead of the name of such agent. Where the material broadcast is political matter or matter involving the discussion of a controversial issue of public importance and a corporation, committee, association or other unincorporated group, or other entity is paying for or furnishing the broadcast matter, the station shall, in addition to making the announcement required by this section, require that a list of the chief executive

officers or members of the executive committee or of the board of directors of the corporation, committee, association or other unincorporated group, or other entity shall be made available for public inspection at the location specified under § 73.3526. If the broadcast is originated by a network, the list may, instead, be retained at the headquarters office of the network or at the location where the originating station maintains its public inspection file under § 73.3526. Such lists shall be kept and made available for a period of two years.

(f) In the case of broadcast matter advertising commercial products or services, an announcement stating the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification, shall be deemed sufficient for the purpose of this section and only one such announcement need be made at any time during the course of the broadcast.

(g) The announcement otherwise required by section 317 of the Communications Act of 1934, as amended, is waived with respect to the broadcast of "want ad" or classified advertisements sponsored by an individual. The waiver granted in this paragraph shall not extend to a classified advertisement or want ad sponsorship by any form of business enterprise, corporate or otherwise. Whenever sponsorship announcements are omitted pursuant to this paragraph, the licensee shall observe the following conditions:

> (1) Maintain a list showing the name, address, and (where available) the telephone number of each advertiser;

> (2) Make this list available to members of the public who have a legitimate interest in obtaining the information contained in the list. Such list must be retained for a period of two years after broadcast.

(h) Any announcement required by section 317(b) of the Communications Act of 1934, as amended, is waived with respect to feature motion picture film produced initially and primarily for theatre exhibition.

Note:
The waiver heretofore granted by the Commission in its Report and Order adopted

November 16, 1960 (FCC 60-1369; 40 F.C.C. 95), continues to apply to programs filmed or recorded on or before June 20, 1963, when § 73.654, the predecessor television rule, went into effect.

(i) Commission interpretations in connection with the provisions of the sponsorship identification rules are contained in the Commission's Public Notice, entitled "Applicability of Sponsorship Identification Rules," dated May 6, 1963 (40 F.C.C. 141), as modified by Public Notice, dated April 21, 1975 (FCC 75-418). Further interpretations are printed in full in various volumes of the Federal Communications Commission Reports.

(j)

(1)

(i) Where the material broadcast consistent with paragraph (a) or (d) of this section has been aired pursuant to the lease of time on the station and has been provided by a foreign governmental entity, the station, at the time of the broadcast, shall include the following disclosure:

The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country].

(ii) If the material broadcast contains a "conspicuous statement" pursuant to the Foreign Agents Registration Act of 1938 (FARA) (22 U.S.C. 614(b)), such conspicuous statement will suffice for purposes of this paragraph (j)(1) if the conspicuous statement also contains a disclosure about the foreign country associated with the individual/entity that has sponsored, paid for, or furnished the material being broadcast.

(2) The term "foreign governmental entity" shall include governments of foreign countries, foreign political parties, agents of foreign principals, and United States-based foreign media outlets.

(i) The term "government of a foreign country" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. 611(e)).

(ii) The term "foreign political party" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. 611(f)).

(iii) The term "agent of a foreign principal" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. 611(c)), and who is registered as such with the Department of Justice, and whose "foreign principal" is a "government of a foreign country," a "foreign political party," or directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a "government of a foreign country" or a "foreign political party" as defined in paragraphs (j)(2)(i) and (ii) of this section, and that is acting in its capacity as an agent of such "foreign principal".

(iv) The term "United States-based foreign media outlet" has the meaning given such term in section 722(a) of the Communications Act of 1934 (47 U.S.C. 624(a)).

(3) The licensee of each broadcast station shall exercise reasonable diligence to ascertain whether the foreign sponsorship disclosure requirements in paragraph (j)(1) of this section apply at the time of the lease agreement and at any renewal thereof, including:

(i) Informing the lessee of the foreign sponsorship disclosure requirement in paragraph (j)(1) of this section;

(ii) Inquiring of the lessee whether the lessee falls into any of the categories in paragraph (j)(2) of this section that qualify the lessee as a foreign governmental entity;

(iii) Inquiring of the lessee whether the lessee knows if anyone involved in the production or distribution of the programming that

will be aired pursuant to the lease agreement, or a sub-lease, qualifies as a foreign governmental entity and has provided some type of inducement to air the programming;

(iv) Independently confirming the lessee's status, by consulting the Department of Justice's FARA website and the Commission's semi-annual U.S.-based foreign media outlets reports, if the lessee states that it does not fall within the definition of "foreign governmental entity" and that there is no separate need for a disclosure because no one further back in the chain of producing/transmitting the programming falls within the definition of "foreign governmental entity" and has provided an inducement to air the programming; and

(v) Memorializing the inquiries in paragraphs (j)(3)(i) through (iv) of this section to track compliance therewith and retaining such documentation in the licensee's records for either the remainder of the then-current license term or one year, whichever is longer, so as to respond to any future Commission inquiry.

(4) In the case of any video programming, the foreign governmental entity and the country represented shall be identified with letters equal to or greater than four percent of the vertical picture height that air for not less than four seconds.

(5) At a minimum, the announcement required by paragraph (j)(1) of this section shall be made at both the beginning and conclusion of the programming. For programming of greater than sixty minutes in duration, an announcement shall be made at regular intervals during the broadcast, but no less frequently than once every sixty minutes.

(6) Where the primary language of the programming is other than English, the disclosure statement shall be made in the primary language of the programming. If the programming contains a "conspicuous statement" pursuant to the Foreign Agents Registration Act of 1938 (22 U.S.C. 614(b)), and such conspicuous statement is in a language other than English so as to conform to the Foreign Agents Registration Act of 1938 (22 U.S.C. 611 *et*

*seq.*), an additional disclosure in English is not needed.

(7) A station shall place copies of the disclosures required by this paragraph (j) and the name of the program to which the disclosures were appended in its online public inspection file on a quarterly basis in a standalone folder marked as "Foreign Government-Provided Programming Disclosures." The filing must state the date and time the program aired. In the case of repeat airings of the program, those additional dates and times should also be included. Where an aural announcement was made, its contents must be reduced to writing and placed in the online public inspection file in the same manner.

(8) The requirements contained in this paragraph (j) shall not apply to "uses" of broadcast stations by legally qualified candidates pursuant to 47 U.S.C. 315.

(k) Where any material delivered to foreign broadcast stations under an authorization pursuant to section 325(c) of the Communications Act (47 U.S.C. 325(c)) has been sponsored by a foreign governmental entity; paid for by a foreign governmental entity; furnished for free by a foreign governmental entity to the section 325(c) permit holder as an inducement to air the material on the foreign station; or provided by the section 325(c) permit holder to the foreign station where the section 325(c) permit holder is a foreign governmental entity, the material must include, at the time of broadcast, the following disclosure, in conformance with the terms of paragraphs (j)(4) through (6) of this section: "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]." A section 325(c) permit holder shall ensure that the foreign station will broadcast the disclosures along with the material and shall place copies of the disclosures required along with the name of the program to which the disclosures were appended in the International Communications Electronic Filing System (ICFS) under the relevant ICFS section 325(c) permit file. The filing must state the date and time the program aired. In the case of repeat airings of the program, those additional dates and times should also be included. Where an aural announcement was made, its contents must be reduced to writing and placed in the ICFS in the same manner. The section 325(c) permit holder shall exercise reasonable diligence

to ascertain whether the foreign sponsorship disclosure requirements of paragraphs (j)(1) and (4) through (6) of this section apply to any material delivered to a foreign broadcast station, including obtaining from its employees, and from other persons with whom it deals directly in connection with any matter for broadcast, and in the same manner prescribed for broadcast stations in paragraph (j)(3) of this section, information to enable the permit holder to include the announcement required by this section; memorializing its conduct of such reasonable diligence; and retaining such documentation in its records for either the remainder of the then-current permit term or one year, whichever is longer, so as to respond to any future Commission inquiry. The term *foreign governmental entity* shall have the meaning set forth in paragraph (j)(2) of this section.