# UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

NATIONAL ASSOCIATION OF BROADCASTERS, *Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents*.

———————————

On Petition for Review from the Federal Communications Commission

———————————

## INITIAL BRIEF OF PETITIONER

———————————

<table>
<tr><td>

Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
stephenkinnaird@paulhastings.com

</td><td>

Richard Kaplan
Jerianne Timmerman
Erin L. Dozier
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, SE
Washington, DC  20003
(202) 429-5430
rkaplan@nab.org
jtimmerman@nab.org
edozier@nab.org

</td></tr>
<tr><td>

December 10, 2024

</td><td>

*Counsel for Petitioner National
Association of Broadcasters*

</td></tr>
</table>

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner the National Association of Broadcasters ("NAB") submits this certificate as to parties, rulings, and related cases.

**A.      Parties and *Amici*.** Because this case involves direct review of a final agency action, the requirement to furnish a list of parties, intervenors, and *amici* that appeared below is inapplicable. This case involves the following parties:

(i)      **Petitioner:** National Association of Broadcasters.

(ii)     **Respondents:** Federal Communications Commission and the United States of America.

(iii)    **Intervenors and *Amici*:** None.

**B.      Ruling Under Review.** The final agency action under review is *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, Second Report and Order, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) (JA__-__), published in the Federal Register on July 16, 2024. *See* 89 Fed. Reg. 57775 (JA__-__).

**C.      Related Cases.** This case has not previously been before this Court or any other court.

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioner NAB states as follows:

NAB is a nonprofit, incorporated association of radio and television stations. It has no parent company, and has not issued any shares or debt securities to the public; thus, no publicly held company owns ten percent or more of its stock. As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, the coalition is a trade association for purposes of D.C. Circuit Rule 26.1.

/s/ Stephen B. Kinnaird

Stephen B. Kinnaird
*Counsel for Petitioner*

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENTS ...................................... ii

GLOSSARY ........................................................................... ix

JURISDICTION ....................................................................... 1

STATUTES AND REGULATIONS .................................................. 1

STATEMENT OF THE ISSUES ..................................................... 1

INTRODUCTION .................................................................... 2

STATEMENT OF THE CASE ....................................................... 6

SUMMARY OF ARGUMENT ...................................................... 17

STANDING .......................................................................... 22

ARGUMENT ......................................................................... 22

I. Standard of Review ...................................................... 23

II. The Extension of the Foreign Sponsorship Identification Rules to Non-Candidate Political Advertising and Paid PSAs Is Unlawful ...................... 24

    A. The Commission Failed to Fulfill Notice-and-Comment Obligations in Expanding the Definition of "Lease" to Include Non-Candidate Political Advertising and Paid PSAs ................................... 25

        1. The Second NPRM Sought Comment Only on a Pending Clarification Request Relating to the Length of Advertisements ........................................... 26

        2. The Final Rules Are Not the Logical Outgrowth of the Second NPRM ................................................ 30

    B. The Commission Has Failed to Give a Reasoned Explanation for the New Rules ................................ 36

    C. The Commission's Content-Based Regulations That Discriminate Against Non-Candidate Political Advertising and Paid PSAs Violate the First Amendment ....................................... 42

III. The Commission Lacks the Statutory Authority to Impose Inquiry-And-Corroboration Requirements on Content Providers Who Lease Airtime .... 50

A. Section 317 of the Communications Act Does Not Authorize the Commission to Require Broadcasters to Demand Corroboration from Lessees ................................................................................50

B. The Commission Lacks Statutory Authority to Impose Inquiry-And-Corroboration Requirements Regarding Inducements Paid to Others in the Production and Distribution Chain .................................................54

C. The Commission Lacks Statutory Authority to Impose Corroboration Requirements on Lessees....................................................57

CONCLUSION ..........................................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[1]

**Page(s)**

CASES

*Allina Health Servs. v. Sebelius*,\*
746 F.3d 1102 (D.C. Cir. 2014) ...................................................... 25, 31

*Am. Libr. Ass'n v. FCC*,
401 F.3d 489 (D.C. Cir. 2005) .............................................................. 22

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................................................................................. 43

*Chesapeake Climate Action Network v. EPA*,
952 F.3d 310 (D.C. Cir. 2020) .............................................................. 33

*CSX Transp., Inc. v. Surface Transp. Bd.*,\*
584 F.3d 1076 (D.C. Cir. 2009) ................................................. 31, 32, 33

*Daimler Trucks North America LLC v. EPA*,
737 F.3d 95 (D.C. Cir. 2013) ................................................................ 32

*Environmental Integrity Project v. EPA*,\*
425 F.3d 992 (D.C. Cir. 2005) ................................................... 30, 32, 34

*FCC v. Fox Televisions Stations, Inc.*,\*
556 U.S. 502 (2009) ......................................................................... 36, 39

*Federal Election Comm'n v. Cruz*,\*
596 U.S. 289 (2022) ......................................................................... 42, 43

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.*,
551 U.S. 449 (2007) .............................................................................. 43

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005) ............................................................ 33

*Loper Bright Enters. v. Raimondo*,
144 S. Ct. 2244 (2024) .......................................................................... 23

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

v

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,\*
    463 U.S. 29 (1983) ...................................................................24, 36, 37

*Nat. Res. Def. Council, Inc. v. U.S.E.P.A.*,
    824 F.2d 1146 (D.C. Cir. 1987) ...........................................................55

*National Association of Broadcasters v. FCC*,\*
    39 F.4th 817 (D.C. Cir. 2022) .................................. 2, 4, 9, 15, 23, 28, 51, 52, 57

*Nat'l Fuel Gas Supply Corp. v. FERC*,
    909 F.2d 1519 (D.C. Cir. 1990) ...........................................................58

*Nat'l Lifeline Assoc. v. FCC*,
    921 F.3d 1102 (D.C. Cir. 2019) ...........................................................33

*Reed v. Town of Gilbert*,\*
    576 U.S. 155 (2015) ........................................................................45, 46

*Reno-Sparks Indian Colony v. U.S. E.P.A.*,
    336 F.3d 899 (9th Cir. 2003) ...............................................................23

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017) .............................................................25

*Sierra Club v. E.P.A.*,\*
    705 F.3d 458 (D.C. Cir. 2013) .............................................................56

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) .............................................................39

*TikTok, Inc. v. Garland*,
    No. 21-1113, 2024 WL 4996719 (Dec. 6, 2024) ...............................45

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) .............................................................................46

**STATUTES**

5 U.S.C.
    § 553 ......................................................................................................25
    § 706 ................................................................................................23, 36
    § 706(2)(A) ............................................................................................23

22 U.S.C.
    § 614(a) ........................................................................38
    § 614(b) ........................................................................38
    § 618(a)(1) ..................................................................38

28 U.S.C.
    § 2342(1) ........................................................................1
    § 2344............................................................................1

47 U.S.C.
    § 315.......................................................................13, 41
    § 315(b).........................................................................41
    § 317(a)(1) ............................................................6, 26, 50
    § 317(a).....................................................................51, 56
    § 317(b)...............................................................6, 50, 55, 56
    § 317(c) ....................................... 6, 8, 21, 51, 52, 55, 56
    § 317(e) ................................................................51, 57, 58
    § 508(c) .........................................................................58

52 U.S.C.
    § 30101(9), (17) ...........................................................41
    § 30104(f)(3) ................................................................41
    § 30109 .........................................................................41
    § 30121 ...................................................................12, 41

Administrative Procedure Act........... 1, 2, 6, 9, 12, 17, 23, 24, 25, 31, 32, 33, 35, 55

Communications Act of 1934 ..............................4, 6, 7, 13, 50

Section 722 of the Communications Act .........................7, 15, 49, 53, 57

Federal Election Campaign Act .............................12, 13, 14, 19

Foreign Agents Registration Act ...................... 7, 8, 15, 38, 49, 53, 54, 57

Foreign Missions Act ...................................................................7

## REGULATIONS

11 C.F.R. § 110.20 ....................................................12, 41

47 C.F.R. § 73.1212(d) ................................................49

§ 73.1212(e) ..............................................................................................49

§ 73.1212(f)..........................................................................................11, 13

§ 73.1212(j) (2021) ..................................................................................7

§ 73.1212(j)(1)(i)..............................................................................40, 54

§ 73.1212(j)(1)(ii) (2021) ......................................................................26

§ 73.1212(j)(2) ..........................................................................................7

§ 73.1212(j)(3)(iv)(A)............................................................................15

§ 73.1212(j)(3)(iv)(B)..................................................................15, 16, 53

89 Fed. Reg. 57775 (July 16, 2024)........................................................1

87 Fed. Reg. 68960 (Nov. 17, 2022)......................................................31

## LEGISLATIVE MATERIALS

Statement Before the Office of Management and Budget, OMB Control
Numbers 3060-0174 and 3060-0214 (Mar. 3, 2022), available at:
https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202201
-3060-012 .............................................................................................40

## CONSTITUTIONAL PROVISIONS

First Amendment...................................... 1, 4, 6, 9, 12, 19, 20, 42, 43, 44, 46, 47, 50

## OTHER AUTHORITIES

FCC, *United States-Based Foreign Media Outlets*,
https://www.fcc.gov/united-states-based-foreign-media-outlets (last
updated Nov. 14, 2024).........................................................................53

GAO, *Foreign Disinformation: Defining and Detecting Threats* (Sept. 26,
2024), https://www.gao.gov/assets/gao-24-107600.pdf .....................38

*With Sanctions Enforced, It's The End for Radio Sputnik on U.S. Stations*
(Oct. 17, 2024), https://www.insideradio.com/free/with-sanctions-
enforced-it-s-the-end-for-radio-sputnik-on-u-s-stations/article_cc2c01a2-
8c59-11ef-938d-8fbe3755db75.html ...................................................38

# GLOSSARY

| | |
|---|---|
| **2021 Order** | Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd 7702 (2021) |
| **APA** | Administrative Procedure Act |
| **Act** | Communications Act of 1934, as amended |
| **DOJ** | Department of Justice |
| **FARA** | Foreign Agents Registration Act |
| **FCC or Commission** | Federal Communications Commission |
| **FECA** | Federal Election Campaign Act |
| **JA** | Joint Appendix |
| **MMTC** | Multicultural Media, Telecom and Internet Council, Inc. |
| **NAB** | National Association of Broadcasters |
| **Order** | Second Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) |
| **PSA** | public service announcement |
| **Second NPRM** | Second Notice of Proposed Rulemaking, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 37 FCC Rcd 12004 (2022) |

## JURISDICTION

The Order under review, Second Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) ("Order") (JA__-__), is a final rule published in the Federal Register on July 16, 2024. *See* 89 Fed. Reg. 57775 (JA__-__). The FCC's jurisdiction rests on the Communications Act of 1934, 47 U.S.C. § 317. This Court's jurisdiction rests on 28 U.S.C. §§ 2342(1) and 2344. The petition for review was timely filed on September 13, 2024.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are reprinted in the separately bound Addendum.

## STATEMENT OF THE ISSUES

1.  Whether the Commission's Order extending the foreign-sponsor identification regulations to non-candidate political advertising and paid public service announcements ("PSAs") is unlawful because (1) the Commission violated the notice-and-comment requirements of the Administrative Procedure Act ("APA"); (2) the Order is arbitrary and capricious; and (3) the Order violates the First Amendment.

2.  Whether the Commission lacked the statutory authority to impose the Order's inquire-and-corroborate requirements.

# INTRODUCTION

In *National Association of Broadcasters v. FCC*, 39 F.4th 817, 820 (D.C. Cir. 2022), NAB challenged and this Court vacated a portion of the Commission's foreign-sponsor identification rules insofar as they imposed *ultra vires* requirements that broadcast licensees investigate the veracity of program sponsors' representations.

The Commission has failed to comply with the law once again in issuing unnecessary new foreign-sponsor identification rules. It dramatically expanded the reach of the rules without giving the public notice of the changes and an opportunity to comment upon them, in violation of the APA. The 2021 rules applied solely to leases. A lease is an arrangement by which a licensee sells a block of time for another person to program, and is distinct from advertising. The Commission drew this distinction precisely because for broadcast matter other than leases—including specifically advertisements—there was *no* evidence of any foreign governmental sponsorship. But now the Commission has done an about-face; it redefined a "lease" of airtime to include all advertising on broadcast stations unless exempt, and then it exempted only commercial and candidate political advertising, but not non-candidate political advertising and paid PSAs.[1]

---

[1] While broadcasters collectively air millions of hours of free PSAs, some PSAs are sponsored. As examples, a hospital might sponsor PSAs concerning a health

The final rules radically increase the burdens on lessees, advertisers, and broadcasters by sweeping in hundreds of thousands of new transactions, including advertising spots, under the foreign-sponsor identification regime. As two Commissioners noted in dissent, the final rules are not a logical outgrowth of the FCC's second rulemaking notice, which had only asked for public comment on a pending clarification request about the *length* of advertisements excluded from the rules.

The expansion of the rules is also substantively unlawful. The Order is arbitrary and capricious because the Commission never acknowledged, much less justified, its change of the definition of a "lease" of airtime. Moreover, the Commission still has no evidence of any foreign governmental sponsorship of any form of advertising, including political advertising. The lack of such evidence was the reason for the wholesale exclusion of traditional, short-form advertising from the prior rules, and the Commission never explained why its analysis changed. The Commission has also adopted arbitrary distinctions. It excludes candidate electoral advertising from the rules' requirements because federal law prohibits foreign nationals from making contributions to support candidate advertising, but

---

issue, and some state and local government entities sponsor PSAs (such as a state highway or transportation department sponsoring PSAs to encourage seatbelt use, or an elections department sponsoring PSAs to explain available voting methods).

illogically includes non-candidate electoral advertising even though federal law likewise prohibits foreign nationals from making expenditures to support that type of advertising. For similar reasons, the Order violates the First Amendment. It imposes content-based regulation on the most highly protected forms of speech (including electoral speech and issue advocacy) and is subject to strict scrutiny. The Commission has no compelling interest in regulating speech without actual evidence of harm, and here there is none; conjecture about the possibility of undisclosed foreign governmental sponsorship does not suffice. And the burdensome and ineffectual requirements of the Order are not the least restrictive means of achieving whatever interest the Commission has.

Finally, the new rules, as applied to all leases, are *ultra vires*. This Court held that Section 317 of the Communications Act only imposes upon broadcast licensees a duty of inquiry regarding the information needed for a sponsorship announcement, and "[n]othing more," *NAB,* 39 F.4th at 820; the Commission cannot require broadcasters also to demand corroboration from lessees in the form of self-certifications or screenshots proving that the lessees are not listed in government databases as foreign governmental entities. The Commission also cannot impose affirmative inquire-and-corroborate requirements regarding possible foreign governmental involvement in the production and distribution chain; that subject matter is outside Section 317. Finally, the Commission only has

rulemaking power over broadcast licensees; the Commission has no authority to require lessees to make certifications or investigate government databases to corroborate that they are not foreign governmental entities.

In its actions, the Commission essentially ignored the undisputed benefits of leased programming arrangements. *See* Comments of NAB and MMTC, MB Docket No. 20-299 (Jan. 9, 2023), at 36-43 (NAB/MMTC Comments) (JA__). A wide range of entities enter into leases with local stations, including individuals, schools, sports teams/leagues, small businesses, and houses of worship, enabling them to share their informational, entertainment, promotional, or religious messages with local viewers or listeners. *Id.*[2] Leases also enable broadcasters to provide niche programming to underserved audiences where it would not otherwise be economically feasible to do so, *id.* at 42-43 (JA__), and many leases (*e.g.*, those for airing church services) involve very little remuneration to stations. *Id.* at 37, n. 73 (JA__). Almost no lessees are foreign governmental entities, but the FCC's rules nonetheless require extensive diligence for *every lease* to ensure that the impossible or at least highly improbable has not occurred. Now, by extending

_____

[2] *See also, e.g.,* Reply Comments of a Coalition of Religious Programmers, MB Docket No. 20-299 (Jan. 24, 2023) at 4-7, Exhibits 1-4 (JA__); Letter from Charles "Chip" Howard, Host of Chip Howard's Sports Talk, to Marlene H. Dortch, MB Docket No. 20-299 (Dec. 2, 2022) (JA__) (discussing lessees' reliance on broadcast stations to disseminate their messages).

the rules' coverage to include certain political advertising and paid PSAs, the Order brings exponentially more broadcast material within the rules' scope—and from sources just as unlikely to have foreign governmental sponsors, including federal, state, and local governments sponsoring PSAs or citizens' groups supporting local candidates. Accordingly, Petitioner requests that this Court set aside the Order as contrary to the APA, the Communications Act, and the First Amendment.

## STATEMENT OF THE CASE

The Communications Act requires broadcasters to identify on air the name of the person that has paid a station for the broadcast of any matter. *See* 47 U.S.C. § 317(a)(1). If the station receives reports required by federal law that payments have been made to others to broadcast programming, or to include matter in such programming, the station must likewise announce the payor. *Id.* § 317(b). A broadcaster must "exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement" required. *Id.* § 317(c).

On April 22, 2021, the Commission modified its sponsorship identification rules to address the handful of occasions where foreign governmental entities have paid U.S. broadcasters to air foreign propaganda. To bring more transparency to

this very limited practice, the FCC required broadcasters to provide standardized

on-air announcements specifically identifying the foreign governmental entity

involved, and the country represented, if programming is sponsored by a foreign

governmental entity pursuant to a lease of time. 47 C.F.R. § 73.1212(j) (2021).[3]

Consistent with industry practice, the Commission characterized the term "lease"

as "constitut[ing] any agreement in which a licensee makes a discrete block of

broadcast time on its station available to be programmed by another party in return

for some form of compensation," and then proceeded to state that "[i]n describing

a lease of time, . . . the Commission does not mean to suggest that traditional,

short-form advertising time constitutes a lease of airtime for these purposes." *Id.*

¶ 28 (JA__). The Commission explained that the lease limitation ensured that the

rules did not extend to "situations where there is no evidence of foreign

government sponsored programming." *Id.* ¶ 29 (JA__). The 2021 Order further

stated that "the record does not demonstrate that advertisements … are a

significant source of unidentified foreign sponsored programming." *Id.*

---

[3] A foreign governmental entity is defined as: 1) a "government of a foreign country" as defined by the Foreign Agents Registration Act ("FARA"); 2) a "foreign political party" as defined by FARA; 3) an "agent of a foreign principal" under FARA; 4) a "foreign mission" under the Foreign Missions Act; or 5) a "U.S. based foreign media outlet" under Section 722 of the Communications Act that has registered with the Commission. 47 C.F.R. § 73.1212(j)(2).

While the Commission does not typically define the steps necessary to meet the "reasonable diligence" standard set forth in Section 317(c) of the Act, the 2021 Order explained that all broadcasters must take the following steps when initiating or renewing a lease: (i) inform the lessee of the foreign-sponsorship disclosure requirement; (ii) inquire of the lessee whether it qualifies as a "foreign governmental entity"; (iii) inquire of the lessee whether it knows of a foreign governmental entity in the production or distribution chain that has provided inducement to air the programming; (iv) independently confirm the lessee's status by consulting the Department of Justice's FARA website and the Commission's U.S.- based foreign media outlets reports for the lessee's name; and (v) memorialize the above-listed inquiries and investigations to respond to any future Commission inquiry. *See* 2021 Order ¶¶ 38-43, 48 (JA__, __).

In July 2021, certain network affiliates associations (collectively, the Affiliates) filed a Petition for Clarification urging the Commission to clarify that the definition of "lease" in the 2021 Order excludes all advertising, regardless of the length of the advertisement. *See* ABC Television Affiliates Association et al., Petition for Clarification, MB Docket No. 20-299 (July 19, 2021) (JA__-__). The Affiliates stated that use of the phrase "traditional, short-form advertising," which the Commission distinguished from leasing, could cause confusion among

8

broadcasters since "short-form" did not have an established meaning. *Id.* at 3-4

(JA__). The Commission did not act on the petition.

In August 2021, NAB and others petitioned this Court to review the 2021

Order. The petition did not object to the requirement that broadcasters disclose

with uniform language foreign government-sponsored programming, but instead

challenged only the diligence obligations imposed by the 2021 Order as violating

Section 317, the APA, and the First Amendment. On July 12, 2022, the Court

unanimously agreed with NAB that the 2021 Order's requirement that broadcasters

independently investigate their lessees' representations by searching government

databases exceeded the Commission's authority under Section 317 of the Act.

*NAB*, 39 F.4th at 820.

In October 2022, the Commission issued a second rulemaking notice seeking

comment on proposals to refashion its diligence standards to, among other things,

require lessees and stations to complete written certifications or other

corroboration of the lessee's status as a foreign governmental entity. Second

Notice of Proposed Rulemaking, *Sponsorship Identification Requirements for

Foreign Government-Provided Programming*, 37 FCC Rcd 12004 ¶¶ 4, 12-20

(2022) ("Second NPRM") (JA __). It also sought comment on the Affiliates'

petition to clarify that all advertising be excluded from the rules, and asked "what

criteria the Commission might adopt to distinguish between advertising and

programming arrangements for the lease of airtime." *Id.* ¶ 32 (JA __). The FCC

asked whether there were "key characteristics" that would help make this

distinction, "such as duration, content, editorial control, or differences in the nature

of the contractual relationship between the licensee and the entity that purchases an

advertising spot versus leasing airtime for programming." *Id.* Nothing in the

Second NPRM sought comment on expanding application of the foreign-sponsor

identification rules to specific categories of "traditional, short-form advertising," or

even hinted that there would be implications for any form of political advertising.

NAB filed comments opposing the proposed rules. *See* NAB/MMTC

Comments (JA__). Given the lack of any evidence that foreign governments had

ever attempted to air foreign propaganda through advertisements of any length,

NAB urged the Commission to clarify that all advertising, regardless of length or

format, is not subject to the foreign sponsorship identification rules. NAB also

asked the Commission to narrow the application of its rules to exclude leases

involving religious and locally originated programming. *Id.* at 33-45 (JA__). NAB

further explained that the Commission lacked authority to impose the proposed

corroboration requirements. *Id.* at 10-13 (JA __). While many commenters

supported NAB's positions, none supported the Commission's proposed expansion

of the diligence requirements or otherwise expressed concerns about unidentified

foreign government-sponsored content on broadcast stations.

On February 21, 2024, the FCC Chairwoman circulated a non-public draft order among all the FCC Commissioners for a vote by the full Commission. NAB representatives participated in meetings with legal advisors to the Commissioners to urge them to adopt NAB's proposals. From those discussions, NAB gathered that, rather than simply granting the Affiliates' petition and clarifying that all advertising was exempt from the foreign sponsorship rules, the circulated order would adopt an entirely new view of the broadcast material to which the rule applies, exempting *only* commercial advertising that meets an existing exemption from all sponsorship identification requirements.[4]

Upon learning of this apparent significant departure from the Second NPRM, NAB scrambled to assess the implications of the FCC's new direction, and held additional meetings at the eleventh hour urging the Commission to ensure that the new rules did not (inadvertently or intentionally) treat material such as political advertising, including candidate and/or issue ads, paid PSAs, or any other form of advertising as "leases" for purposes of its foreign-sponsor identification rules.

---

[4] *See* 47 C.F.R. § 73.1212(f), which states: "In the case of broadcast matter advertising commercial products or services, an announcement stating the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification, shall be deemed sufficient for the purpose of this section and only one such announcement need be made at any time during the course of the broadcast."

NAB observed that political advertising is governed by its own complex statutory and regulatory system and would create implementation problems; no record evidence contradicted the Commission's prior conclusion that advertising was not a significant source of undisclosed foreign-sponsored programming; and so extending the rules would exceed the FCC's statutory authority and violate the APA and the First Amendment. Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (Mar. 21, 2024) at 5-6 (JA__); Letter to Marlene H. Dortch, FCC Secretary, from Erin L. Dozier, NAB, MB Docket No. 20-299 (Apr. 25, 2024) (JA__); Letter to Marlene H. Dortch, FCC Secretary, from Erin L. Dozier, NAB, MB Docket No. 20-299 (May 6, 2024) (JA__); Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (May 17, 2024) (JA__); Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (May 17, 2024) (JA__). NAB specifically explained that long-standing Federal Election Campaign Act ("FECA") prohibitions on foreign nationals paying for electoral communications made it extremely unlikely that foreign governmental entities would sponsor any political advertising. *Id*. at 3-4 & n.14 (JA__), *citing* 52 U.S.C. § 30121; 11 C.F.R. § 110.20.

On June 10, 2024, the Commission released the Order. Even though it had previously distinguished leases from advertising, the Commission now recast its

definition of leasing as including all advertising unless exempt. Order ¶ 48 (JA__).

Rather than distinguishing leasing from all traditional short-form advertising, as it

did in 2021, the Commission now asserted that leases included wide swaths of

traditional, short-form advertising. Indeed, it determined that only advertising

comporting with the pre-existing 47 C.F.R. § 73.1212(f) exemption from the

sponsorship identification rules (i.e., ads for commercial goods and services) and

ads run by political candidates would be outside the scope of its foreign

sponsorship identification rules. *Id.* ¶¶ 42-45 (JA__). On the latter exclusion, the

Commission explained that FECA already prohibits foreign nationals from making

contributions to political candidates, and that Section 315 of the Communications

Act requires federal candidates wanting to qualify for favorable advertising rates to

state that their authorized committee has paid for the ad and that the candidate

approves the ad (i.e., "stand by your ad" requirements). Order ¶¶ 46-47 & n.117

(JA__), citing 47 U.S.C. § 315(b)(2)(C) and (D).[5]

    The Commission, however, expressly subjected paid PSAs and what the

Commission called "political issue advertisements" to the foreign-sponsor

identification rules. It defined political issue advertisements "as any paid political

---

[5] The Order incorrectly implies that "stand by your ad" disclosures are mandatory for all candidates. *Id*. Rather, Section 315 applies only to federal candidates, and the disclosures are required only if candidates wish to obtain the benefit of the lowest unit rate for advertising.

matter or matter involving the discussion of a controversial issue of public importance, regardless of the length of the programming," but excluding "advertisements made by or on behalf of legally qualified candidates for public office or their authorized committees." Order ¶ 47 (JA__). This broad category includes not only conventional issue advocacy (*e.g.*, advertisements advocating Medicare reform without referencing elections or candidates), but also all electoral advertising run by non-candidates to support or oppose candidates (*e.g.*, ads run by unaffiliated political action committees and other entities and groups for and against federal, state or local candidates). The Commission acknowledged that FECA bars foreign nationals from making electoral expenditures on behalf of candidates, just as it bars foreign nationals from making contributions to support candidates' own advertising. *Id.* But the Commission ruled that since it was defining non-candidate electoral advertising to be a subset of issue advertisements, and "our definition encompasses issue advertisements unrelated to elections" that are not subject to such prohibitions, it would subject all issue advertisements, so defined, to its foreign-sponsor identification rules. *Id.* The Commission flatly denied that expanding the rules to political and other advertising was beyond the scope of the proceeding due to a lack of notice, would be unduly burdensome, or lacked justification despite the absence of any evidence that foreign governmental entities sponsor any form of advertising. Order ¶¶ 48-50 (JA__). The Commission

also refused to exempt leases for religious or locally originated programming from its foreign-sponsor identification rules. Order ¶¶ 52-59 (JA__).

Finally, despite this Court's ruling that Section 317 imposed only a duty of inquiry to obtain the information needed to make the statutorily mandated sponsorship announcements, *NAB*, 39 F.4th at 820, the Commission imposed new requirements that the licensee demand, and the lessee provide, corroboration of whether foreign governmental entities leased the air time or are known to have been involved in the production or distribution of the leased programming. To meet this standard, a lessee must either: (i) complete and provide to the broadcaster a certification of the accuracy of its foreign governmental status and whether it knows if any foreign governmental entity in the production or distribution chain has induced the inclusion of any matter in the programing, Order, Appendix A, modified 47 C.F.R. § 73.1212(j)(3)(iv)(A) (JA__), or (ii) if the lessee has stated that it is *not* a foreign governmental entity, search for its own name in each of the two governmental databases that were part of the original broadcaster diligence standard vacated by this court (the Department of Justice's FARA database and the FCC's section 722 website listing U.S.-based foreign media outlets), print screenshots of the search results, and provide them to the broadcaster. Order, Appendix A, modifying 47 C.F.R. § 73.1212(j)(3)(iv)(B) (JA__). The licensee must also seek from a lessee supplying screenshots unspecified "other

15

information" to corroborate that the lessee is not the government of a foreign country or a foreign political party, because those categories of foreign governmental entities would not be addressed by the screenshots. *Id.*

The Order includes certification templates for licensees and lessees to use for the first corroboration option. Order, Appendices C and D (JA__-__). Those templates highlight the complexity of what the rule requires of licensees and lessees—both of which are commonly non-lawyers.[6] The templates reference definitions in four separate parts of the U.S. Code as well as the Commission's regulation. Order, Appendices C and D (JA__). The Commission rejected NAB's arguments that the self-certification and corroboration requirements exceed the Commission's statutory authority. Order ¶¶ 34-36 (JA__). The Commission required such diligence to be conducted for each new lease and each lease renewal, although not more than once per year. Order ¶ 27 and Appendix A, modified 47 C.F.R. §73.1212(j)(3) (JA__, __).

Two of the five Commissioners dissented from the Order or parts thereof. Commissioner Brendan Carr objected that the Commission had changed the definition of leasing, and subjected previously excluded non-candidate political advertising and paid PSAs to the foreign-governmental-sponsor identification

---

[6] While large broadcasting organizations have legal staffs, that is not true of many radio and television broadcasters.

requirements, without adhering to its notice-and-comment obligations. Statement of Commissioner Brendan Carr, Dissenting in Part ("Carr Statement") (JA__). Commissioner Nathan Simington likewise objected that the Commission had violated the APA's notice-and-comment requirements. He also objected to the Order's extension to non-candidate electoral advertising. He observed that it was "senseless" for the Commission to exclude candidate electoral advertising because the federal prohibition on foreign national involvement eliminated the risk of foreign governmental sponsorship, but include non-candidate electoral advertising that is subject to the same prohibition. Statement of Commissioner Nathan Simington, Dissenting ("Simington Statement") (JA__).

## SUMMARY OF ARGUMENT

The Order must be set aside, for multiple reasons.

1.     The Order's extension of the foreign-sponsor identification rules to non-candidate political advertising and paid PSAs is unlawful. First, the Commission violated the APA by not giving the public notice of, and an opportunity to comment on, this extension. In the existing rule, the Commission had defined leasing as it is commonly understood as any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by another party in return for some form of compensation. This plainly, and the Commission noted expressly, does not include traditional, short-

form advertising. In the Second NPRM, the Commission never suggested it was changing that definition. It instead asked only whether advertising of any duration should not be considered leasing (programming a "block of broadcast time"), and what criteria would distinguish leasing from advertising. The final rule, however, now treats all advertising, including 30- and 60-second spots, as leasing unless exempted. The final rule is not a logical outgrowth of the Second NPRM; no reasonable commenter could have discerned that the Commission was considering such an idiosyncratic and counterintuitive definition of leasing, much less an exemption for commercial and candidate political advertising, but not for non-candidate political advertising and paid PSAs.

Second, the Order is arbitrary and capricious because the Commission failed to give a reasoned explanation that accounts for its change of policy. The Commission originally restricted the rules to leasing and excluded advertising because there was no evidence of foreign governmental sponsorship of advertising of any kind; the only (scant) evidence of foreign sponsorship of broadcasting involved multi-hour leasing of blocks of time to air programming at a handful of local stations. There is still *no evidence* of foreign governmental sponsorship of advertising generally or political advertising or paid PSAs specifically, and yet the Commission now subjects all non-candidate political advertising and paid PSAs to the diligence rules.

Furthermore, the categorical distinctions the Commission drew make no sense. The Commission acknowledged that the same justification it gave for excluding candidate political advertising—the low risk of foreign governmental sponsorship given the statutory prohibition of foreign national involvement under FECA—applies to electoral advertising run by non-candidates. Yet the Commission proceeded to group together both non-candidate electoral advertising and issue advocacy not referencing elections/candidates into a defined category of "issue advertisements" for purposes of its expanded foreign-sponsor identification rules; observed that FECA does not prohibit foreign national involvement in the whole category; and therefore declared the right to regulate all so-called issue advertisements. The Commission's regulation of non-candidate electoral advertising is simply an artifact of its decision to group this speech with other speech in its definition of "issue advertisements." That kind of bootstrapping is not reasoned agency decision-making.

Third, the Order violates the First Amendment. The Order is a content-based regulation that burdens speech based on the speaker (candidates versus non-candidates) and the content (political "issue advertising" and paid PSAs versus all other advertising), and ironically regulates political speech that receives the highest constitutional protection. The Order is thus subject to strict scrutiny, which it cannot satisfy.

Before burdening protected speech, the government must produce actual evidence of harm that the regulation rectifies; conjecture about possible harm from political advertising or paid PSAs, which is all the Commission offers, is not enough. Indeed, the Commission has acknowledged that there is little risk of harm where federal election law bars foreign national involvement; that is true of non-candidate electoral advertising, and so the Commission has no compelling interest in regulating that speech. The Commission cannot manufacture a compelling interest by defining a broad category of "issue advertisements" that includes non-candidate electoral advertising; identifying other parts of that category where allegedly there is greater risk of foreign governmental involvement; and then asserting the right to regulate the entire self-defined category. Finally, the regulation is not narrowly tailored, much less the least restrictive means of serving any regulatory interest. The vast majority of lessees and covered political and public service advertisers are indisputably not foreign governmental entities. Putting the entire universe of lessees and covered advertisers through the paces of corroboration in hundreds of thousands of transactions based on the bare possibility that a foreign-governmental needle might be found in the haystack does not pass First Amendment muster. Moreover, because the Commission's chosen corroboration methods are highly unlikely to detect any surreptitious foreign governmental sponsorship, the Order fails the narrow tailoring requirement.

2.     The inquire-and-corroborate requirements of the Order also exceed the Commission's statutory authority as to all leases. Section 317(c) requires broadcast licensees to exercise reasonable diligence to obtain information from lessees; this Court has held the statute imposes a duty of inquiry only. Section 317 does not authorize corroboration requirements. Moreover, because the overwhelming majority of lessees are indisputably not foreign governmental entities, and the corroboration requirements are ineffective at uncovering any such entities, they are no part of the "reasonable diligence" commanded by the statute.

In all events, the Commission lacks authority to impose an inquire-and-corroborate requirement regarding the participation of foreign governmental entities in the production or distribution chain. Reasonable diligence need only be exercised to discover information necessary to make the announcements required by statute, and the broadcaster has no affirmative duty to ascertain or announce such facts.

Finally, the Commission only has rulemaking authority to impose requirements on broadcasters; it has no authority whatsoever to impose certification or other corroboration requirements on content providers who lease airtime for their constitutionally protected speech.

## STANDING

NAB is a nonprofit trade association that advocates on behalf of local radio and television stations and broadcast networks before Congress, the Commission, other federal agencies, and the courts. NAB and its members actively participated in the rulemaking. *See* NAB Declaration ¶¶ 1-2 (Add. 1-2).

NAB has associational standing. "Associations … have representational standing if: (1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). NAB's members would otherwise have standing to sue in their own right. Many NAB members lease airtime for programming and sell advertising spots for non-candidate political advertising and paid PSAs. The Order's requirements of inquiry and corroboration apply to all broadcasters that lease programming and air issue advertisements and paid PSAs; the unlawful Order injures NAB's member broadcasters by compelling action and the expenditure of resources and violates their statutory and constitutional rights. *See* NAB Declaration ¶¶ 3-4 (Add. 2-3). Because NAB advocates for the appropriate regulatory treatment of its members, the interests it seeks to protect here are germane to NAB's purpose. *See id.* ¶ 5 (Add. 3). Because the Order's requirements

apply uniformly to all broadcasters that lease programming, neither the claim

asserted nor the relief requested requires participation by any of NAB's individual

members. *See id.* ¶ 6 (Add. 3). This Court previously entertained a challenge from

NAB and other organizations to the earlier version of the foreign-governmental-

sponsor identification rules based on similar representations of associational

standing. *See National Association of Broadcasters v. FCC*, 39 F.4th 817 (D.C.

Cir. 2022).

## ARGUMENT

## I.    Standard of Review

Under the APA, this Court reviews whether an agency's rulemaking was

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). "The reviewing court shall decide all relevant

questions of law, interpret constitutional and statutory provisions, and determine

the meaning or applicability of the terms of an agency action," *id.* § 706,

performing those functions using "independent judgment" without deference to the

Commission. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). A

court of appeals "reviews de novo the agency's decision not to follow the APA's

notice and comment procedures. The agency is not entitled to deference because

complying with the notice and comment provisions when required by the APA is

not a matter of agency choice." *Reno-Sparks Indian Colony v. U.S. E.P.A.*, 336

F.3d 899, 909 n.11 (9th Cir. 2003) (cleaned up).

In applying the arbitrary-and-capricious standard, this Court examines whether the Commission has engaged in reasoned analysis, reviewing "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

## II. The Extension of the Foreign Sponsorship Identification Rules to Non-Candidate Political Advertising and Paid PSAs Is Unlawful

The Commission's extension of the foreign-sponsor identification rules to political advertising by non-candidates and paid PSAs is unlawful, for multiple reasons. First, the Commission has violated the APA by failing to follow mandatory notice-and-comment procedures in so extending the foreign-sponsor identification rules. Second, the Commission has acted arbitrarily and capriciously by failing to give a reasoned explanation for expanding the rules' coverage. Third, by imposing burdens only on certain forms of advertising (non-candidate political advertising and paid PSAs), the rules are an impermissible content-based regulation that ironically penalizes the most protected form of speech, even though the Commission has never identified a single instance where a foreign governmental entity has purchased political advertising or PSAs from a broadcast licensee.

## A. The Commission Failed to Fulfill Notice-and-Comment Obligations in Expanding the Definition of "Lease" to Include Non-Candidate Political Advertising and Paid PSAs

The Commission has violated the notice-and-comment requirements of the APA. When an agency proposes or amends a substantive rule, it must follow the procedures set out in 5 U.S.C. § 553. The agency must publish a notice of proposed rulemaking in the Federal Register, *id.* § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of comments, which the agency must consider." *Safari Club Int'l v. Zinke*, 878 F.3d 316, 331 (D.C. Cir. 2017) (cleaned up) (citing § 553(c)). "An agency may promulgate a rule that differs from a proposed rule only if the final rule is a logical outgrowth of the proposed rule. A final rule is a logical outgrowth if affected parties should have anticipated that the relevant modification was possible." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014) (cleaned up).

The Commission here violated the APA by failing to give the public any notice of, and an opportunity to comment upon, (1) the extension of the foreign sponsorship rules to all advertising unless exempted, and (2) the exemption of only commercial advertising and political candidate advertising, but not non-candidate political advertising and paid PSAs.

### 1. The Second NPRM Sought Comment Only on a Pending Clarification Request Relating to the Length of Advertisements

By statute, a broadcast station must announce the sponsor of "[a]ll matter broadcast" for which the station receives or demands payment. 47 U.S.C. § 317(a)(1). In 2021, the Commission required a specific announcement of the sponsor and the country represented if a program was provided by a foreign governmental entity, but only "[w]here the material broadcast … has been aired *pursuant to the lease of time* on the station …." 47 C.F.R. § 73.1212(j)(1)(ii) (2021) (emphasis added).

The Commission adopted the lease requirement to narrow the applicability of the foreign-sponsor identification requirements. The Commission's original notice of proposed rulemaking had proposed to apply the special disclosure requirements to all broadcast matter within the ambit of Section 317(a). First Notice of Proposed Rulemaking, *In the Matter of Sponsorship Identification Requirements for Foreign Government-Provided Programming*, MB Docket No. 20-299, ¶ 11 (Oct. 16, 2020) (JA__). But in promulgating the 2021 final rules, the Commission decided "to narrow [its] focus to address specifically those circumstances in which a foreign governmental entity is programming a U.S. broadcast station pursuant to the lease of airtime." 2021 Order ¶ 24 (JA__).

In the 2021 Order, the Commission characterized the term "lease" as "constitut[ing] any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by another party in return for some form of compensation," clarifying that "[i]n describing a lease of time, … the Commission does not mean to suggest that traditional, short-form advertising time constitutes a lease of airtime for these purposes." *Id.* ¶ 28 (JA__). Indeed, the industry has always understood leasing and advertising sales to be wholly different transactions. Leasing, as the Commission's definition indicated, enables a lessee to purchase a block of airtime for its programming, in contrast to the broadcast licensee's selling of advertising spots within or adjacent to its own or third-party programming.

The Commission justified narrowing the foreign-sponsor identification rules to apply only to leases because that would "ensure that the new disclosure obligations do not extend to situations where there is *no evidence* of foreign government sponsored programming." *Id.* ¶ 29 (emphasis added) (JA_). It noted that "the record does not demonstrate that *advertisements* . . . are a significant source of unidentified foreign sponsored programming." *Id.* (emphasis added). Moreover, the handful of broadcast stations airing foreign government-sponsored programming were doing so pursuant to leases. *Id.* ¶¶ 1-4, 25 (JA__). The FCC further reasoned that its rules would prevent foreign governments and their

representatives, which are barred from holding a U.S. broadcast license, from leasing time on a station without disclosure. *Id.* ¶ 26 (JA__), *citing* 47 U.S.C. § 310(a).

After this Court vacated part of the 2021 Order for imposing *ultra vires* investigation requirements on broadcasters, *NAB*, 39 F.4th at 820, the Commission proposed new rules in October 2022 that substituted corroboration requirements in the form of self-certifications or database screenshots for the invalidated investigation requirements. Second NPRM ¶ 4 (JA__). Critically, the Commission did not propose to alter the limitation of the foreign-sponsor identification requirements to leases of airtime, nor did it propose to alter the definition of "lease" as excluding traditional, short-term advertising.

The FCC's only mention of advertising in its Second NPRM concerned a pending clarification request about the length of advertisements. After issuance of the 2021 Order, certain network affiliates associations ("the Affiliates") had petitioned for "clarification regarding the applicability of the new foreign sponsorship identification rules to advertisements sold by local broadcast stations." ABC Television Affiliates Association et al., Petition for Clarification, MB Docket No. 20-299 (July 19, 2021) at 1 (JA__-__). The Affiliates noted that the Commission had distinguished leasing from "traditional, short-form advertising," but there was no definitive meaning of the term in the industry, which sells

advertising of varying lengths. *Id.* at 3 (JA__). The Affiliates advocated "that the Commission clarify its intention by explicitly confirming that the new rules do not apply to advertisements of any length." *Id.* at 4 (JA__). The Commission did not act on the Affiliates' petition before this Court vacated the 2021 Order in part.

In the Second NPRM, the Commission asked for comment pertaining to the question that the Affiliates had raised of excluding all advertising of any length from the foreign-governmental-sponsor rules. Second NPRM ¶ 11 (JA__). The Commission reported that "[i]n their petition, the Affiliates recommended that the foreign sponsorship identification rules not apply when a licensee sells time to advertisers in the normal course of business, no matter the length of the advertisement." *Id.* (JA__). The Commission also asked "what criteria the Commission might adopt to distinguish between advertising and programming arrangements for the lease of airtime in a way that does not jeopardize the Commission's goals in this proceeding." *Id.* ¶ 32 (JA__). It invited comment on the "key characteristics that could assist in distinguishing advertising spots from a lease of airtime on a station, such as duration, content, editorial control, or differences in the nature of the contractual relationship between the licensee and the entity that purchases an advertising spot versus leasing airtime for programming." *Id.* The Commission also inquired whether a safe harbor (such as a

presumption that any advertising of less than two minutes is short-form advertising) would be beneficial. *Id.*

### 2. The Final Rules Are Not the Logical Outgrowth of the Second NPRM

Contrary to the Commission's claims, Order ¶ 49 (JA__), those inquiries did not inform the public that the Commission was considering changing the definition of "lease" to now include all advertising unless exempted, and then exempting only commercial goods and services and political candidate advertising. The Second NPRM only addressed whether all advertising (as opposed to "traditional, short form advertising") should be excluded from the rule, and the criteria for differentiating advertising from leasing. Nothing in the Second NPRM put the public on notice that the Commission contemplated applying the rules to non-candidate political advertising and paid PSAs.

The final rules are not the logical outgrowth of the Second NPRM, and thus do not satisfy the Commission's notice-and-comment obligations. "[A] reasonable commenter must be able to trust an agency's representations about which particular aspects of its proposal are open for consideration." *Environmental Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005). "A final rule qualifies as a logical outgrowth if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject

*during the notice-and-comment period.*" *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009) (cleaned up and emphasis added).

It is telling that not a single commenter addressed the contours of the final rules during the comment period, even though broadcasters would have been highly interested in avoiding the extraordinary new burdens the final rules entailed. *Allina Health*, 746 F.3d at 1108 (no logical outgrowth where reversal of policy "would doubtless have triggered an avalanche of comments"). Here, the comment period closed on December 19, 2022, and the reply comment period on January 3, 2023. FCC, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 87 Fed. Reg. 68960 (Nov. 17, 2022). But the only filings contesting the vast expansion of the rules (and cited by the Commission) were ex parte notices hurriedly filed by NAB and other broadcast groups in Spring 2024, after rumors of the proposed changes began to swirl.[7] The APA is not satisfied by a rumor mill. Not only were broadcasters deprived of notice of the contemplated changes and the opportunity to establish a proper record opposing them, but, absent Federal Register notice, the Commission never heard from private citizens,

---

[7] *See supra* at 11-12; Letter to Marlene H. Dortch, FCC Secretary, from Rick Kaplan, NAB, MB Docket No. 20-299 (May 17, 2024) (JA__) at 1 (noting that NAB was "hearing whispers" of the changes in the rules and complaining of prejudice to it and others from lack of public notice); Order ¶¶ 46-50 & nn. 119-136 (citing ex parte letters on political advertising requirements from 2024) (JA__).

public interest organizations, political parties or action committees, or advertising companies and brokers that might have provided highly relevant input on the changed rules before they were adopted. *See Daimler Trucks North America LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) ("Notice of agency action is crucial to ensure that agency regulations are tested via exposure to diverse public comment, to ensure fairness to affected parties, and to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.") (cleaned up).

This circumstance parallels other cases in which this Court has found that the final rule was not the logical outgrowth of the noticed proposed rule. "[A] final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX*, 584 F.3d at 1080 (cleaned up). This includes circumstances in which "the proposed rule gave no indication that the agency was considering a different approach, and the final rule revealed that the agency had completely changed its position." *Id.* at 1081. In *Environmental Integrity Project*, this Court found no logical outgrowth where the agency, as here, "repudiate[d] its proposed interpretation and adopt[ed] its inverse." 425 F.3d at 998. And, in *CSX*, this Court found that a regulation permitting benchmark data from four-year samples of rail rates was not the logical

outgrowth of a proposed rule for using one-year samples. The NPRM "nowhere even hinted that the Board might consider expanding the number of years from which comparison groups could be derived," and the public could not have anticipated "which particular aspects of the Board's proposal were open for consideration." *CSX*, 584 F.3d at 1082 (cleaned up). Similarly, in *National Lifeline Association v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019), the Commission originally proposed to exclude towns with a population of over 10,000 from a tribal subsidy program, but the final rule excluded "urbanized areas" or "urban clusters" of over 25,000 population, which would have thereby denied subsidies to residents of small towns of less than 10,000 population found within those areas and clusters. *Id.* at 1116. Since the Commission did not put the public on notice that small towns could be excluded from the subsidy program, it violated the APA. *Id.; see also Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 320-21 (D.C. Cir. 2020) (no logical outgrowth where EPA did not propose setting emission standards based on best performing sources); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260-61 (D.C. Cir. 2005) (final rule capping maximum air velocity for mine ventilation not a logical outgrowth of proposed rule setting minimum air velocity).

The final rule here was a *volte face* in which the Commission "repudiate[d] its proposed interpretation [in the Second NPRM] and adopt[ed] its inverse."

*Environmental Integrity Project*, 425 F.3d at 998. The Second NPRM, like the

2021 Order, expressly treated leasing as distinct from advertising, and only asked

whether all advertising regardless of length should be excluded, or what criteria

could be used to differentiate advertising from leasing. Second NPRM ¶ 32 (JA__).

The Commission never notified the public it was considering taking a completely

different approach in its 2024 rules, whereby all advertising is leasing unless the

Commission exempts it as unlikely to be sponsored by foreign governmental

entities. *See* Order ¶ 48 (JA__) (claiming that the definition of leasing "is

sufficiently broad to cover issue advertising and paid PSAs" but declining to

exempt those categories from the rules because they allegedly "could be used by

foreign governmental entities to access U.S. airwaves to persuade the American

public"); *id.* ¶ 44 (JA__) (exempting commercial advertising); *id.* ¶ 46 (JA__)

(exempting political candidate advertising because it is unlikely to be sponsored by

foreign governmental entities).

Furthermore, the Commission failed in its obligation to identify "which

particular aspects of its proposal are open for consideration." *Environmental*

*Integrity Project*, 425 F.3d at 998. The public had no inkling that the Commission

was considering defining all political issue advertising and paid PSAs as "leases"

subject to the rules—even 30-second or 60-second spots that are indubitably

traditional, short-form advertising previously excluded from their reach, and that

have never been considered leases by the industry. And it had no idea that the Commission was considering exempting political candidate advertising but no other kind of political advertising.

The Commission should have heeded Commissioners Brendan Carr and Nathan Simington, who dissented because of the Commission's failure to satisfy its notice-and-comment obligations. Commissioner Carr noted that the Order "changes the 2021 definition of 'lease' by eliminating the 'short-form advertisement' exception." Carr Statement (JA__). "[T]he FCC did not provide fair notice that it might redefine 'lease' in this fundamental way." *Id*. The Affiliates had asked for "a clearer and less burdensome definition" of the advertising exception, "not to eliminate the exception altogether." *Id.* And the Second NPRM "did not contemplate eliminating the 'short-form advertisement' carveout." *Id.* Accordingly, the Commission was obligated to issue a further or supplemental notice of rulemaking, but did not. *Id.* Commissioner Simington put it more bluntly: the Commission has "nowhere noticed that, by the terms 'lease of airtime' and 'short-form advertising' we meant the *exact opposite* of what we said in 2021 and 2022." Simington Statement (JA__). "[S]pontaneous self-reversal is an Administrative Procedure Act violation." *Id.*

**B.     The Commission Has Failed to Give a Reasoned Explanation for the New Rules**

The Commission also failed to engage in reasoned decision-making, and its extension of the rules must be set aside as arbitrary and capricious. 5 U.S.C. § 706. When the Commission changes course, it has a duty to explain why it abandoned its prior position. Here, the Commission did not even *acknowledge* that it was changing the definition of "lease," and the reason for excluding advertising in the 2021 Order—that there is no evidence of significant foreign governmental sponsorship of advertising—still holds. Moreover, the Commission offered no evidence to support the expansion of the rules, and the distinctions it drew between exempt and non-exempt advertising make no sense.

For a rule to survive judicial scrutiny under the arbitrary-and-capricious standard, the agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. And the agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, the Commission acted arbitrarily and capriciously by not even acknowledging that it was changing the definition of leases "in [a] fundamental way," Carr Statement (JA__), to "mean[] the *exact opposite*" of its previous

definition, Simington Statement (JA_). In defining leases in the 2021 Order, the Commission stated that "we do not mean to suggest that traditional, short-form advertising time constitutes a lease of airtime for these purposes." 2021 Order ¶ 28 (JA__). While there is ambiguity as to the metes and bounds of the term "traditional, short-form advertising," the Commission and the entire industry understood under any reading that, for example, all traditional 30- and 60-second advertising spots were not leases. As the Commission explained in the 2021 Order, the purpose of leasing agreements "is to give one party—the brokering party or programmer—the right and obligation to program the station licensed to the other party—the licensee or broadcaster," with the lessee "often times also selling the advertising during such [leased] time and retaining the proceeds." 2021 Order ¶ 21 (JA__). Advertising spots are not programming. For the Commission to declare now that all advertising sales are leases of airtime unless exempted is simply an arbitrary and unexplained about-face.

The Commission also failed to "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As an initial matter, the Commission has provided only scant evidence of *any* leased programming sponsored by foreign governments, which has only ever been identified on a handful of local stations out of the 12,000-plus commercial radio and TV stations across the country, *see* Order ¶ 1 & n.2 (JA__), even before

Russia's Radio Sputnik disappeared from the two full power radio stations previously airing it. *With Sanctions Enforced, It's The End for Radio Sputnik on U.S. Stations* (Inside Radio, Oct. 17, 2024), https://www.insideradio.com/free/with-sanctions-enforced-it-s-the-end-for-radio-sputnik-on-u-s-stations/article_cc2c01a2-8c59-11ef-938d-8fbe3755db75.html. The principal risk of foreign disinformation is on the Internet and in particular social media. *See* GAO, *Foreign Disinformation: Defining and Detecting Threats*, GAO-24-107600, at 1-2 (Sept. 26, 2024), https://www.gao.gov/assets/gao-24-107600.pdf. Nor is undisclosed foreign sponsorship of broadcasting likely. FARA requires agents of foreign governments to register with the Department of Justice and disclose their representation of the foreign principal in any broadcast information they provide, at pain of criminal sanction, *see* 22 U.S.C. §§ 614(a)-(b), 618(a)(1), which protects against surreptitious foreign propaganda on the airwaves.

Most importantly, there is not an iota of evidence that any foreign governmental entity ever purchased political ads or paid for PSAs on broadcast stations. Rather than gather and evaluate actual evidence, the Commission resorted to conjecture: "Certainly, paid PSAs and issue advertising could be used by foreign governmental entities to access U.S. airwaves to persuade the American public." Order ¶ 48 (JA__), ¶ 49 (JA__) ("there is a risk that contributions to such [non-candidate political advertising] programming might have been made by foreign

governmental entities"). "Though an agency's predictive judgments ... are entitled to deference ... deference to such ... judgments must be based on some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (cleaned up). The Commission rejoins that "'[a]n agency need not suffer the flood before building the levee,'" Order ¶ 54 (JA__) (quoting *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009)), but there must at least be rational, evidence-based grounds for predicting the flood. One does not build a levee for an anticipated trickle.

Furthermore, "a reasoned explanation is needed for disregarding facts and circumstances that underlay … the prior policy." *Fox Television Stations*, 556 U.S. at 516. The 2021 Order limited the reach of the foreign-sponsor identification rules to leases and excluded advertising (including political advertising) to "ensure that the new disclosure obligations do not extend to situations where there is no evidence of foreign government sponsored programming." 2021 Order ¶ 28 (JA__). There is still *no* such evidence. The Commission does not explain why the lack of such evidence justified excluding all traditional, short-form advertising from the rules in 2021 but not in 2024.

By not inquiring into the extent of the problem or the risk, the Commission also did not rationally assess whether the significant burdens of this dramatic regulatory expansion were warranted. The Commission had (under)estimated that

the 2021 Order as applying to approximately 5,500 leases a year.[8] But whatever the number of leases, extending the burdensome, universal inquire-and-corroborate regime to political issue advertising and paid PSAs sweeps in additional transactions numbering in the hundreds of thousands in election years.[9] The Commission never evaluated whether that was justified, or whether less burdensome regulation would have been adequate (for example, simply notifying lessees that if they are foreign governmental entities, the advertising had to include the special announcement prescribed in 47 C.F.R. § 73.1212(j)(1)(i)).

Finally, the Commission's rationale for exempting some advertising and not others does not hold water. The Commission stated that the "exemption from the foreign sponsorship identification rules for political candidate advertisements is based largely on the fact that foreign nationals are prohibited from making

---

[8] See FCC Supporting Statement Before the Office of Management and Budget, OMB Control Numbers 3060-0174 and 3060-0214 (Mar. 3, 2022) at 7-8, n. 7, available at: https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202201-3060-012.

[9] Although data on the number of transactions involved is not in the administrative record because of the lack of notice, NAB recently searched the FCC's online public inspection file database and found that 290,517 files identified as "non-candidate issue ads" have been uploaded by radio and television stations in 2024 as of December 6, 2024 (and since an advertising order may cover multiple advertising spots, the number of actual ads is far larger). The number of paid PSAs is unknown.

contributions to political candidates." Order ¶ 47 (JA__). But political ads run by non-candidates to support or oppose candidates are subject to the *same* prohibition. Foreign nationals cannot make expenditures to influence an election, expenditures expressly advocating the election or defeat of a candidate, or electioneering communications mentioning a candidate in specified periods before an election. *See* 52 U.S.C. § 30121; § 30101(9), (17); § 30104(f)(3); *see also* 11 C.F.R. §110.20; Order ¶ 47 & n.120 (JA__). These provisions are subject to both civil and criminal enforcement. *See* 52 U.S.C. § 30109. The Commission made no inquiries and did no investigating to determine if the candidate versus non-candidate distinction was justified. As Commissioner Simington pointed out, a substantial portion of third-party political advertising supports candidates and is already illegal if paid for by foreign nationals; thus, the Commission has created categorical distinctions that are nonsensical. Simington Statement (JA__).

The Commission also relied on the transparency of Section 315, 47 U.S.C. § 315, that purportedly "requires political candidates themselves to state that their authorized committee has paid for the advertisement and that the candidate approves the advertisement. Order ¶ 47 (JA__). But Section 315 applies only to candidates for federal office, and only those seeking a preferred advertising rate, 47 U.S.C. § 315(b); it does not support the categorical lines the Commission drew.

The Commission also did not investigate the many issues that arise from sweeping certain forms of advertising into the rules: *e.g.*, for example, the improbability that highly regulated political action committees who place issue ads would be foreign governmental entities or solicit programming from such entities; the utility of these inquiries given other notice requirements; the confusion and delay inherent in advertisers and broadcasters dealing with multiple disclosure regimes; the exacerbation of problems with compliance that already exist; the competitive effects on broadcasters of onerous compliance requirements that do not apply to pay TV, satellite radio, or social media rivals in the advertising market; and the possible deterrence of speech because of excessive paperwork. *See* Letter to Marlene Dortch, FCC Secretary, from Erin L. Dozier, NAB, MB Docket No. 20-299 (May 6, 2024) (JA___). The record does not justify the rules' extension to non-candidate political advertising and paid PSAs.

### C. The Commission's Content-Based Regulations That Discriminate Against Non-Candidate Political Advertising and Paid PSAs Violate the First Amendment

The Order also violates the First Amendment. The First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Federal Election Comm'n v. Cruz*, 596 U.S. 289, 302 (2022) (cleaned up). The Supreme Court "has recognized only one permissible ground for restricting political speech: the prevention of 'quid pro quo' corruption or its

appearance," and has "consistently rejected attempts to restrict campaign speech based on other legislative aims." *Id.* at 305. "However well intentioned such proposals may be, the First Amendment … prohibits such attempts to tamper with the 'right of citizens to choose who shall govern them,'" *id.* at 306 (cleaned up), and safeguards issue advocacy as well as electioneering, *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 474 (2007). "The First Amendment right to speak one's mind on all public institutions includes the right to engage in vigorous advocacy no less than abstract discussion." *Buckley v. Valeo*, 424 U.S. 1, 48 (1976) (cleaned up).

The first constitutional flaw of the Order is that the Commission establishes no need to extend the foreign government sponsorship rules to non-candidate political advertising (which includes express advocacy for or against candidates by third parties and political action committees) and paid PSAs. The threshold question—under any constitutional standard—is whether the government has established that the speech restriction prevents actual harm. "Because the Government is defending a restriction on speech as necessary to prevent an anticipated harm, it must do more than simply posit the existence of the disease sought to be cured. It must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *Cruz*, 596 U.S. at 307 (internal citation omitted). The Courts have "never accepted mere conjecture as

adequate to carry a First Amendment burden." *Id.* As noted above, the Commission cannot point to a single instance in which a foreign governmental entity has engaged in undisclosed political or public service advertising on broadcast television and/or radio; indeed, in the 2021 Order, the Commission excluded advertising from the rules' coverage because "the record does not demonstrate that advertisements … are a significant source of unidentified foreign sponsored programming." 2021 Order ¶ 29 (JA__).

The Order identifies no change in that regard. That may be because, as noted above, federal law prohibits foreign nationals—including foreign governmental entities—from participating in any person's election-related activities or providing substantial assistance to elections (including independent expenditures promoting candidates, which are now needlessly covered by the FCC's revised rules). *See supra* at 41. Not only is it illegal, but the political fallout if political ads were ever to be disclosed as paid by foreign governmental entities ensures little risk of this conjectural harm.

Even if the Commission's rules addressed any actual harm, they cannot withstand constitutional scrutiny. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face'

draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted). A rule distinguishing advertising based on its content—whether it contains a political or public service message as opposed to a commercial one, or election of a third person instead of the advertiser—is clearly content-based, and thus subject to strict scrutiny, even if the Commission had no illicit motive. *Id.* at 165-66, 170-71. Indeed, in *Reed*, the Supreme Court found that a content-based sign ordinance that regulated political signs more stringently than other forms of signs failed strict scrutiny. *Id.* at 169. The Commission misses the mark in stating that "[t]he rules at issue here are content-neutral" because "they apply to broadcast programming provided by any foreign governmental entity, regardless of whether the entity's interests are directly at odds with the United States." Order ¶ 58 (JA__). The rules regulate speech based on its content: they impose burdensome corroboration requirements on non-candidate political ads and paid PSAs, but not candidate ads or commercial advertising. This is not a content-neutral regulation that "'is justified without reference to the content of the regulated speech.'" *See TikTok, Inc. v. Garland*, No. 21-1113, 2024 WL 4996719, at *12 (Dec. 6, 2024) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576

U.S. at 171. Because there is no actual problem of foreign governmental entities

sponsoring political issue advertising or paid PSAs on broadcast stations, there is

by definition no compelling interest justifying the FCC's revised regulations. But

the modifications adopted in the Order would also not be narrowly tailored because

they fail to "advance the State's compelling interest through the least restrictive

means." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015). The Order's

elaborate certification measures are entirely unnecessary, and as discussed in the

next section, ineffective. *Infra* at 52-54. Given the absence of any evidence of

foreign government sponsors of political advertising or paid PSAs, the

Commission has not established the need for any special corroboration of denials

of foreign governmental entity status or involvement in the production of political

issue ads or paid PSAs. Even if there were, ordinary due diligence—whereby the

broadcaster could inquire of the persons with whom it deals whether any foreign

governmental entity paid for or furnished the advertisement—would suffice.

Especially given the lack of established harm, the First Amendment does not

permit the Commission to impose burdensome corroboration requirements on

broadcasters' transactions with *every* paid public service advertiser and *every* non-

candidate individual, organization, or political action committee that purchases

advertising to advocate for or against a candidate for any federal, state, or local

office—or simply to express views on any political issue—even though the chance of any advertiser being a foreign governmental entity is miniscule at best.

The Order suffers from overbreadth for another reason. The Commission exempted candidate political advertising "based largely on the fact that foreign nationals are prohibited from making contributions to political candidates." Order ¶ 47 (JA__). But foreign nationals are equally prohibited from making electioneering expenditures on behalf of political candidates. *See supra* at 41. As Commissioner Simington commented, it is "senseless" for the Commission to "require[e] foreign sponsorship identification for a subset of issue ads *already covered by the same FEC rules* prohibiting foreign sponsorship that [it] deemed justification to exclude candidate ads from foreign sponsorship identification." Simington Statement (JA__). The Commission's decision to define a category of "issue advertising" that encompasses both electoral advertising for or against candidates for office and conventional issue advocacy, *see* Order ¶ 47 (JA__), does not justify burdening the former kind of speech. Rather, it just shows that the lines the Commission drew are overly broad under the First Amendment. The Commission has not demonstrated a compelling interest in regulating third-party electoral advertising, issue advocacy, or paid PSAs, but even if it did, the Order is not a narrowly tailored means of serving that interest.

Even if the Commission were correct that its rules should be reviewed under a heightened rational basis test requiring a content-neutral broadcast regulation be "reasonably tailored to satisfying a substantial government interest," or under some form of intermediate scrutiny applicable to broadcasters, Order ¶ 58 & n. 160 (citing *Ruggiero v. FCC*, 317 F.3d 239 (D.C. Cir. 2003) and *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969)), that would not save the Order. There is neither proof of a substantial government interest—a real problem or even demonstrated risk of foreign governmental entanglement in political advertising or paid PSAs aired on broadcast stations—nor reasonable tailoring. The Order's onerous burdens bear no relation to the Commission's asserted interest.

The Order's certifications-or-screenshots corroboration requirements will be highly burdensome to broadcasters and advertisers alike. The burden upon broadcast licensees of complying with the rules in the field of political issue advertising is substantial given the number of transactions. Moreover, the rules require lessors and lessees alike to provide certifications based on applying multiple sections of the United States Code and the Code of Federal Regulations. Order Appendices C and D (JA__). That is a lawyer's task and competency, and most licensees and political and public service advertisers are laypersons who are not going to feel competent or comfortable to make the certifications on their own. NAB/MMTC Comments at 43-44 (JA__). If the lessee is an organization, internal

investigations may be necessary to ensure the accuracy of representations (not only as to the organization's status as a foreign governmental entity, but as to the organization's knowledge of whether a foreign governmental entity offered some consideration to induce broadcasting of the matter). Many lessees will either have to incur the extra expense of retaining a lawyer, or more likely will forego broadcast advertising (either not speaking at all or turning to newspaper, social media, or subscription TV/radio outlets that may be less desirable to that advertiser). Alternatively, the lessee will be burdened with having to learn to navigate the FARA database and the Commission's Section 722 website and provide screenshots, a hassle that will again only drive speakers to forego speech or shift to unregulated advertising vehicles.

The greater expense and risk will squelch speech, with no countervailing benefit. A full political advertising disclosure scheme is already in place, including specifically for issue advertisements aired on broadcast stations, *see* 47 U.S.C. § 315(e), 47 C.F.R. §§ 73.1212(d) & (e), and the Commission has not identified a single instance of foreign governmental entities purchasing political advertising or paid PSA spots on radio or television. The Commission has not remotely justified burdening the entire universe of non-candidate political advertisers and paid PSA sponsors based on the infinitesimally small possibility that an undisclosed foreign governmental sponsor might be unearthed. Moreover, as discussed more *infra* at

52-54, the Commission's poorly thought-out inquire-and-corroborate scheme will not enhance of detection of surreptitious foreign sponsors. The First Amendment bars extending the foreign-sponsor identification rules to non-candidate political advertising and paid PSAs.

**III.      The Commission Lacks the Statutory Authority to Impose Inquiry-And-Corroboration Requirements on Content Providers Who Lease Airtime**

The Commission also lacks statutory authority to impose inquiry-and-corroboration requirements on licensees and lessees.

**A.      Section 317 of the Communications Act Does Not Authorize the Commission to Require Broadcasters to Demand Corroboration from Lessees**

Section 317 of the Communications Act requires broadcaster announcements in two circumstances. First, if consideration for broadcasting any matter is paid or promised to, or charged or accepted by, "the station so broadcasting," the announcement shall identify the payor. 47 U.S.C. § 317(a)(1). Second, "[i]n any case *where a report has been made to a radio station*, as required by Section 508 of this title, of circumstances which would have required an announcement under this section had the consideration been received by such radio station, an appropriate announcement shall be made by such radio station." *Id.* § 317(b) (emphasis added). Section 508 of Title 47 imposes disclosure obligations on station employees, program producers and preparers, and program

suppliers to report money or consideration paid or accepted for broadcasting or for inclusion of any matter in the program. *Id.* § 508(a)-(c). Thus, a broadcast station has an affirmative duty under Section 317(a) to announce those who paid it money or other consideration for broadcasting; it only has a contingent duty to make an announcement regarding payments to others *if* a report has been made to the station by others that is required by Section 508. In either circumstance, "[t]he licensee of each radio station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement required by this section." 47 U.S.C. § 317(c) (emphasis added). The Act further grants the Commission authority "to prescribe appropriate rules and regulations to carry out the provisions of this section." *Id*. § 317(e).

Where the station receives the payment, subsections 317(a) and (c) together require the station licensee to exercise "reasonable diligence … to obtain" information necessary to announce the payor. Once the station obtains the necessary information, including whether the lessee is a foreign governmental entity, it has fulfilled its statutory duty. But just as Section 317(c) does not permit the Commission to require broadcasters to investigate the truth of the information obtained, *NAB*, 39 F.4th at 820, it does not permit the Commission to require broadcasters to demand corroboration in the form of screenshots and certifications

51

to establish that the lessee was not lying in denying that it is a foreign governmental entity.

The Commission claims corroboration demands are part of a station's Section 317(c) duty, Order ¶ 35 (JA__), but this Court rejected the same argument in relation to the prior investigation requirement:

> [The Commission] says that verifying information's accuracy is part of making a reasonably diligent effort to obtain that information from a source. But § 317(c) imposes a duty of inquiry, not a duty of investigation. *Loveday v. FCC*, 707 F.2d 1443, 1449 (D.C. Cir. 1983) (Section 317(c) "is satisfied by appropriate inquiries made by the station to the party that pays it for the broadcast"). It does not make broadcasters responsible for the truth of the information they obtain.

*NAB*, 39 F.4th at 820.

Furthermore, the required corroboration demands cannot remotely qualify as "reasonable diligence," 47 U.S.C. § 317(c). First, almost no lessees are foreign governmental entities. Lessees of broadcast airtime frequently include churches seeking to reach parishioners unable to attend services, high schools wanting to air sporting events, and local businesses. NAB/MMTC Comments at 36-38 (JA__). And under the Commission's expanded definition of leasing, it may include a local citizen's group's radio ad for a candidate for county sheriff, the U.S. Army's paid PSA to attract new recruits, or a local government's or hospital's paid PSA on a public health or safety concern. How is it "reasonable" for broadcasters to put

*every one* of perhaps hundreds of thousands of such lessees—where there is not even the slightest chance of foreign governmental involvement—through the paces of proving every year that they are not foreign governmental entities by (1) making certifications applying complex statutory and regulatory definitions, Order Appendices C and D (JA__), or (2) learning to navigate the FARA and Section 722 databases, and taking screenshots to prove that they are not registered there, and providing unspecified "other information" to prove they are not foreign governments or foreign political parties, which are not listed in the government databases. Order ¶¶ 22-25; Appendix A, modified 47 C.F.R. §73.1212(j)(3)(iv)(B). (JA__). (The latter requirement that lessees take screenshots to prove that they are not registered as a foreign media outlet on the Commission's Section 722 website is especially egregious make-work, since there are no such registrants now nor have there been since 2021.[10]).

Second, and most fundamentally, these arbitrary and capricious corroboration demands cannot be part of reasonable diligence because they do not achieve the intended purpose of deterring or catching foreign governmental propagandists. If a foreign governmental lessee is above board and registered

---

[10] *See* FCC, *United States-Based Foreign Media Outlets*, https://www.fcc.gov/united-states-based-foreign-media-outlets (last updated Nov. 14, 2024).

under FARA, it will already be complying with criminally enforced statutory to disclose it foreign principal in its programming/advertising, and will make the further disclosures of the country represented required by FCC rules, 47 C.F.R. § 73.1212(j)(1)(i). *See* Order ¶ 1 n.2 (JA__) (identifying examples). The corroboration requirements accomplish nothing. But if the foreign governmental entity is operating surreptitiously, it will not have registered with the U.S. government as a foreign agent (already breaking a law enforced by criminal sanction), and the rules do nothing to expose or stop the misconduct. That entity can simply comply with FCC rules by making a false certification, or producing a screenshot of a FARA database search showing (truthfully) that it is not a registered FARA agent, and escape detection! Reasonable diligence does not include costly universal corroboration requirements that contribute nothing to public information.

B. **The Commission Lacks Statutory Authority to Impose Inquiry-And-Corroboration Requirements Regarding Inducements Paid to Others in the Production and Distribution Chain**

The Commission also lacks statutory authority to impose affirmative inquire-and-corroborate requirements regarding whether the lessee "knows if any individual/entity in the chain of producing or distributing the programming is a foreign governmental entity and has provided some type of inducement to air the programming." Order Appendices C and D (JA__, __). That does not involve a

station payment and thus is outside the scope of Section 317(a). And it is outside the scope of Section 317(b), which requires announcements only if the lessee reports a third-party payment pursuant to Section 508. *See* 47 U.S.C. § 317(a), (b). Because the duty of reasonable diligence only applies to obtaining information necessary to make an announcement "required by this section," *id.* § 317(c), broadcasters have no affirmative duty of reasonable diligence to inquire into or seek corroboration of third-party transactions in the production or distribution chain in the absence of a report.

Unsurprisingly, the Commission has no answer to the lack of statutory authority for this inquire-and-corroborate requirement. First, it says that the inquiry component was part of the former inquire-and-investigate rule, and NAB and other parties did not challenge it in the first rulemaking or appeal. Order ¶¶ 32-33 (JA__). But the APA is not concerned with party-specific forfeitures; it requires only that the agency must have the opportunity to address an issue, whether raised by a party or otherwise. *Nat. Res. Def. Council, Inc. v. U.S.E.P.A.*, 824 F.2d 1146, 1150-51 (D.C. Cir. 1987). An agency must address any challenge to its statutory authority of which it is aware. Regardless, the Commission has issued a new inquire-and-corroborate rule to replace the former inquire-and-investigate rule, and the agency must address any challenges to the new rule, even if some components are common and were not specifically noticed for reconsideration. *See Sierra Club*

*v. E.P.A.*, 705 F.3d 458, 466-67 (D.C. Cir. 2013) (incorporation of old elements into new rule exposes them to challenge). Furthermore, the Commission's (incorrect) recasting of the duty of inquiry as incorporating the duty to seek corroboration, Order ¶ 35 (JA__), opens the whole question to this Court's consideration. Even were that not so, at a minimum the Commission must address its authority to impose a new requirement upon broadcasters to seek corroboration from lessees of their responses.

Second, the Commission did ultimately address the merits. It acknowledged that Section 317(b) only imposes an announcement obligation on the station "if it receives a report that payments were made to employees, or persons involved in the production or preparation of the program, in regard to material included in the programming to be broadcast by the station." Order ¶ 36 (JA__). But the Commission held that it does "not interpret section 317(b) to be a limit on the inquiries the licensee must make pursuant to section 317(c)." *Id.* The Commission misreads Section 317(c); that subsection only requires the licensee to "exercise reasonable diligence to obtain … information to enable such licensee to make the announcement *required by this section*." 47 U.S.C. § 317(c) (emphasis added). If neither Section 317(a) nor (b) require an announcement, there is no duty to exercise reasonable diligence to obtain announcement information. And the Commission cannot use its rulemaking power to "carry out" Section 317, *id.*

§ 317(e), to "alter the specific choices Congress made" in that section. *NAB*, 39 F.4th at 820. Like the inquire-and-investigate requirement before it, this inquire-and-corroborate requirement is *ultra vires*.

### C. The Commission Lacks Statutory Authority to Impose Corroboration Requirements on Lessees

The Order imposes duties of corroboration on lessees. In describing one of the two corroboration options, the Commission declared that "both the licensee and *the lessee must complete* a written certification" of the factual representations required by the rules, and then reiterated that, "[u]nder our adopted certification option, both a licensee and *a lessee must complete* a certification reflecting the communications and inquiries required under the existing rules." Order ¶¶ 14, 19 (JA__, __) (emphases added); *see also* Order ¶ 21 (JA__) (discussing licensee and lessee "certification requirements" and mandating that "the lessee's certifications *must* be dated and signed by an employee or other representative of the entity who can attest to the fact that these actions were taken") (emphasis added). Alternatively, the lessee can satisfy its corroboration obligations by performing searches of the FARA database and the Commission's Section 722 website and providing screenshots to the station to prove that is not a foreign governmental entity. Order ¶¶ 22-25 (JA__).

The Commission has no authority to regulate lessees. Section 317 only imposes duties on licensees. Section 508 does require a person supplying a

program for broadcast to disclose any information that he knows or receives of payments or other consideration for including any matter in the program. 47 U.S.C. § 508(c). But critically, this disclosure obligation is enforced by criminal sanction, *id.* § 508(g), and the Commission has no rulemaking authority comparable to its authority under 47 U.S.C. § 317(e). The Commission certainly has no power to impose certification and screenshot corroboration requirements on lessees that Section 508 does not require.

The Commission may point to an obscure sentence in a footnote that "the revised rule imposes no requirements on lessees." Order ¶ 35 n.89 (JA__). But that footnote cannot contradict the clear mandates in the Order that, if a licensee chooses a certification request, the lessee must certify its responses, and a similar obligation is implied if the screenshot option is chosen. *See id.* at ¶¶ 7, 14, 19, 21. Regardless, any reasonable lessee would understand a mandatory demand for certification or screenshot-corroboration of its status as, or knowledge of, foreign governmental entities pursuant to a Commission regulation as a legal requirement. The Commission has no power to mandate corroboration from lessees, or to require licensees to demand corroboration that the lessee is under no obligation to provide. *See National Fuel Gas Supply Corp. v. FERC*, 909 F.2d 1519, 1522 (D.C. Cir. 1990) (an agency cannot accomplish indirectly what it is forbidden to do directly).

## CONCLUSION

For the foregoing reasons, this Court should set aside the Order.

Respectfully submitted,

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
PAUL HASTINGS LLP
2050 M Street, NW
Washington, DC  20036
(202) 551-1700
stephenkinnaird@paulhastings.com
*Counsel for Petitioner National Association of Broadcasters*

/s/ Richard Kaplan
Richard Kaplan
Jerianne Timmerman
Erin L. Dozier
NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street, SE
Washington, DC  20003

Dated: December 10, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the word-count limitation of Fed. R. App. P. 32(e) and this Court's October 31, 2024 scheduling order. This brief contains 12,994 words, not counting the parts excluded by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

/s/ Richard Kaplan
Richard Kaplan
*Attorney for Petitioner National*
*Association of Broadcasters*

# CERTIFICATE OF SERVICE

I, Richard Kaplan, hereby certify that on December 10, 2024, I filed the
foregoing Initial Brief of Petitioner with the Clerk of the Court for the United
States Court of Appeals for the District of Columbia Circuit using the electronic
CM/ECF system which will serve participants in this case who are registered
CM/ECF users.

/s/ Richard Kaplan
Richard Kaplan
*Attorney for Petitioner National
Association of Broadcasters*
