## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL ASSOCIATION OF BROADCASTERS,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

P. Michele Ellison
*General Counsel*

Jacob M. Lewis
*Deputy General Counsel*

Doha Mekki
*Acting Assistant
Attorney General*

Sarah E. Citrin
*Deputy Associate General Counsel*

Rachel Proctor May
*Counsel*

Robert B. Nicholson
Peter M. Bozzo
*Attorneys*

FEDERAL COMMUNICATIONS
COMMISSION

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) **Parties and Amici.**  All parties appearing in this Court are listed in the Brief for Petitioner National Association of Broadcasters.

(B) **Rulings Under Review.**  The petition for review challenges the following order of the Federal Communications Commission: Second Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) (JA276-327).

(C) **Related Cases.**  The order under review has not previously been before this Court or any other court.  Respondents are aware of no other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

**TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ............................................................. i

TABLE OF AUTHORITIES ....................................................... iv

GLOSSARY ............................................................................. viii

INTRODUCTION ....................................................................... 1

JURISDICTIONAL STATEMENT .............................................. 3

STATEMENT OF THE ISSUES .................................................. 3

PERTINENT STATUTES AND REGULATIONS ....................... 4

STATEMENT OF THE CASE....................................................... 4

    A.    Statutory Background................................................. 4

    B.    The Commission's Rules And The 2021 Order ....................... 5

    C.    The Affiliates' Petition For Clarification ............................... 9

    D.    The 2022 Notice Of Proposed Rulemaking .......................... 11

    E.    The Order Under Review ...................................................... 13

        1.    Certification/Screenshot Requirement ........................ 13

        2.    Scope Of The Rules And Exceptions ........................... 18

STANDARD OF REVIEW........................................................... 21

SUMMARY OF THE ARGUMENT .......................................... 22

ARGUMENT ............................................................................. 24

I.    IN ADOPTING THE CERTIFICATION/SCREENSHOT
REQUIREMENT, THE COMMISSION ACTED WITHIN ITS
AUTHORITY TO IMPLEMENT SECTION 317 ................................ 24

    A.    The Certification/Screenshot Rule Requires Licensees
To Exercise Reasonable Diligence........................................ 24

    B.    The Commission Has Authority To Require Licensees
To Request Information From Lessees In The Form Of
Certifications Or Screenshots.............................................. 28

# TABLE OF CONTENTS
## (continued)

C. NAB's Challenge To Rule 73.1212(j)(3)(iii) Is Not Before The Court, And In Any Event Is Without Merit ....... 30

II. THE ORDER SATISFIES THE ADMINISTRATIVE PROCEDURE ACT ............................................................................. 35

A. The Commission Gave Notice Of Its Intent To Clarify The Scope Of The Exception For Certain Advertisements .................................................... 35

B. The Commission's Decision To Exclude Political Candidate Advertisements But Not Issue Advertisements Or Paid PSAs Was Reasonable .................. 43

III. THE ORDER IS CONSISTENT WITH THE FIRST AMENDMENT ........ 48

A. The Order Adopts Broadcast Disclosure Rules To Which Reduced First Amendment Scrutiny Applies............ 49

B. The Rules Are Consistent With The First Amendment Even Under Intermediate Scrutiny ...................................... 53

1. The Commission Has A Compelling Interest In Protecting The Public From Undisclosed Foreign Broadcasts .................................................. 53

2. The Rules Are Appropriately Tailored To The Commission's Interest .................................................. 56

C. If The Exception For Political Candidate Advertising Did Not Comport With The First Amendment, The Remedy Would Be To Invalidate And Sever The Exception ...................................................... 62

CONCLUSION .................................................................. 63

CERTIFICATE OF COMPLIANCE ........................................... 64

# TABLE OF AUTHORITIES*

**Cases**

*Am. Hosp. Ass'n v. Azar*, 983 F.3d 528 (D.C. Cir. 2020) ................... 44, 56

*Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610 (2020) ................... 62

*Biggerstaff v. FCC*, 511 F.3d 178 (D.C. Cir. 2007) ............................ 31, 33

*Brennan v. Dickson*, 45 F.4th 48 (D.C. Cir. 2022).................................. 42

*Cellco P'ship v. FCC*, 357 F.3d 88 (D.C. Cir. 2004) ................................ 22

\* *China Telecom (Ams.) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022) ...... 44

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)............. 52

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 2024
    WL 3083338 (D.C. Cir. June 21, 2024) (unpublished judgment)....... 38

*Env't Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005)............... 39

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .............. 45, 46

*FCC v. League of Women Voters*, 468 U.S. 364 (1984)............... 49, 51, 52

*Fed. Election Comm'n v. Cruz*, 596 U.S. 289 (2022) ............................ 52

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*,
    551 U.S. 449 (2007) .............................................................. 53

*Great Lakes Commc'n Corp. v. FCC*,
    3 F.4th 470 (D.C. Cir. 2021) ................................................ 37, 39, 40

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) .......................... 54

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021) ............... 48

* *Authorities upon which we chiefly rely are marked with asterisks.*

*Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*,
512 U.S. 136 (1994) .........................................................56, 60

*In re Sealed Case*, 77 F.4th 815 (D.C. Cir. 2023) .............................53, 56

*Leflore Broad. Co. v. FCC*, 636 F.2d 454 (D.C. Cir. 1980) ....................51

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)...................21, 25

*Minority Television Project, Inc. v. FCC*,
736 F.3d 1192 (9th Cir. 2013) (en banc).............................52

*Moving Phones P'ship L.P. v. FCC*,
998 F.2d 1051 (D.C. Cir. 1993) ........................................54

*Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817 (D.C. Cir. 2022) ............9, 25

*Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*,
158 F.3d 135 (D.C. Cir. 1998) .................................31, 32, 33

*Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498 (D.C. Cir. 2020).....................22

*News Am. Pub., Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988)..................49

*Northeast Md. Waste Disposal Auth. v. EPA*,
358 F.3d 936 (D.C. Cir. 2004) (per curiam) .................................35, 39

*NRDC v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) ........................................33

*  *Nuvio Corp. v. FCC*, 473 F.3d 302 (D.C. Cir. 2006) ...............................35

*Pub. Emps. for Env't Resp. v. EPA*,
77 F.4th 899 (D.C. Cir. 2023) ........................................31, 33

*  *Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969) ...........................48, 49

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)........................................50

*  *Ruggiero v. FCC*, 317 F.3d 239 (D.C. Cir. 2003) ...............................49, 53

# TABLE OF AUTHORITIES
## (continued)

\* *Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981) ........................38, 39

*Sierra Club v. EPA*, 705 F.3d 458 (D.C. Cir. 2013) ................................32

\* *TikTok Inc. v. Garland*, 122 F.4th 930 (D.C. Cir. 2024), *aff'd per curiam*, *TikTok Inc. v. Garland*, No. 24-656 (U.S. Jan. 17, 2025) .....55

\* *TikTok Inc. v. Garland*, No. 24-656 (U.S. Jan. 17, 2025) ................55, 56

\* *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ...............53, 57, 59

*U.S. Cellular Corp. v. FCC*, 254 F.3d 78 (D.C. Cir. 2001) ......................28

*United States v. Hansen*, 599 U.S. 762 (2023).........................................60

*Vidal v. Elster*, 602 U.S. 286 (2024)........................................................51

*VoteAmerica v. Schwab*, 121 F.4th 822 (10th Cir. 2024) .......................51

*Wash. Post v. McManus*, 944 F.3d 506 (4th Cir. 2019) ..........................49

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015)..............................55

## Statutes

5 U.S.C. § 553 ......................................................................................35, 36

5 U.S.C. § 706 ......................................................................................22, 42

22 U.S.C. § 611...........................................................................................7

28 U.S.C. § 2342.....................................................................................3, 30

47 U.S.C. § 309.........................................................................................51

47 U.S.C. § 315.........................................18, 19, 40, 43, 44, 46, 47, 52, 58

47 U.S.C. § 317...................... 1, 4, 5, 8, 9, 21, 22, 24, 28, 29, 32, 34, 43, 58

47 U.S.C. § 402.................................................................3

47 U.S.C. § 405...............................................................27

47 U.S.C. § 508........................................................30, 34

47 U.S.C. § 624.................................................................7

47 U.S.C. § 2344............................................................30

## Regulations

47 C.F.R. § 73.1212 ..... 1, 5, 6, 8, 14, 16, 18, 19, 22, 30, 32, 33, 34, 37, 40, 50, 58, 59

## Administrative Materials

Notice of Proposed Rulemaking, *Sponsorship Identification Requirements for Foreign Government-Provided Programming,* 35 FCC Rcd. 12099 (2020 ) ...................................................4

Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming,* 36 FCC Rcd. 7702 (2021) ........... 6, 7, 8, 9, 30, 35, 36, 39, 40, 45, 47, 54

## Other Materials

Black's Law Dictionary (12th ed. 2024)...................................24

Form I-9, Emp. Eligibility Verification, U.S. Citizenship and Immigr. Servs.....................................................61

## GLOSSARY

| | |
|---|---|
| **APA** | Administrative Procedure Act |
| **FARA** | Foreign Agent Registration Act |
| **NAB** | National Association of Broadcasters |
| **PSA** | Public Service Announcement |

## INTRODUCTION

The longstanding principle that the public has a right to know the sponsors of broadcast content has taken on greater urgency in recent years, with evidence that countries such as China and Russia have paid to broadcast content without disclosing their involvement. Acting pursuant to its duty to implement the sponsorship disclosure requirements of 47 U.S.C. § 317, the Federal Communications Commission adopted rules in 2021 to fight the threat of undisclosed foreign sponsorship by defining particular inquiries that holders of broadcast licenses must make when third parties lease time on their stations. *See* 47 C.F.R. § 73.1212(j).

The Order under review enhances those rules in two ways. First, it adopts a new requirement that when broadcast licensees make the required inquiries as to foreign involvement in leased programming, they must either 1) certify that they made the required inquiries and asked the lessee to respond in the form of a certification, or 2) ask lessees to provide a screenshot of two websites. Second, it clarifies that the rules cover issue advertisements and paid public service announcements ("PSAs").

Petitioner National Association of Broadcasters' ("NAB's") challenges to the rules are without merit.

NAB's challenge to the certification/screenshot requirement rests on the mistaken premise that the requirement poses an unjustified burden. NAB argues that most lessees are "indisputably" not foreign governmental entities, Br. 20, and yet that it will be burdensome, and will probably take a lawyer, to certify to that fact. These arguments are plainly at odds with each other. As the Commission explained, in most cases it will be easy to make and respond to the required inquiries. And if it is not easy to tell whether a foreign governmental entity has been involved in sponsoring programming, the effort involved in ensuring compliance is justified.

NAB's challenge to the clarification regarding issue advertisements and paid PSAs is based on the flawed assumption that the 2021 Order included such content within its exception for "traditional, short-form advertising," and that the Commission has thus unlawfully reversed its prior position. But the 2021 Order did not address issue advertisements and paid PSAs, and NAB's interpretation of the exception is inconsistent with the 2021 Order's description of the scope of the rule and with its purpose: to make the public aware

whenever a foreign government is behind the programming on U.S. airwaves.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The Commission issued the Order on July 16, 2024, and the petition for review was timely filed on September 13, 2024.

## STATEMENT OF THE ISSUES

1. Whether the Commission's statutory duty to prescribe rules to carry out the requirement that broadcast licensees "exercise reasonable diligence to obtain" sponsorship information from third parties that lease U.S. airwaves authorizes the Commission to require licensees to ask lessees to certify to, or provide screenshots with, that information.

2. Whether the Commission complied with the Administrative Procedure Act by:

a) providing sufficient notice that it intended to clarify the scope of an exception for "traditional, short-form advertising"; and

b) clarifying that issue advertisements and paid PSAs are not exempt from the foreign sponsorship identification rules.

3. Whether applying the rules to issue advertisements and paid PSAs is consistent with the First Amendment.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the statutory addendum bound with this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

Congress began requiring on-air disclosure of the sponsors of broadcast programming in 1927 based on "[t]he principle that the public has a right to know the identity of those that solicit their support." Notice of Proposed Rulemaking, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 35 FCC Rcd. 12099, 12099 ¶ 1 (2020); *see id.* at 12100-12105 ¶¶ 4-11 (describing the history of sponsorship disclosure regulation).  The current disclosure requirements are codified at 47 U.S.C. § 317.

With regard to content "for which any money, service or other valuable consideration is directly or indirectly paid," a holder of a broadcast license must announce at the time of broadcast that the content was "paid for or furnished," and by whom.  *Id.* § 317(a)(1).  The Commission may also require disclosures for "any political program or any program involving the discussion of any controversial issue" that a licensee receives from a third party and airs "without charge or at a

nominal charge." *Id.* § 317(a)(2). Section 317 also requires disclosures when a "report has been made" to a licensee that a lessee received consideration that "would have required an announcement under this section had the consideration been received by" the licensee. *Id.* § 317(b).

To ensure that stations make the necessary disclosures, a licensee has a statutory duty to "exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement required." *Id.* § 317(c). Congress directed the Commission to "prescribe appropriate rules and regulations to carry out the provisions" of Section 317. *Id.* § 317(e).

## B. The Commission's Rules And The 2021 Order

The Commission's rules implementing Section 317 are codified at 47 C.F.R. § 73.1212. Under a longstanding exception for commercial advertising, "[b]roadcast matter advertising commercial products or services" is deemed to have satisfied the disclosure requirements where the advertisement contains a clear mention of the sponsor's name or

product and makes "clear that the mention of the name of the product constitutes a sponsorship identification." *Id.* § 73.1212(f).

In 2021, the Commission added new requirements aimed at identification and disclosure of programming sponsored by foreign governmental entities. *Id.* § 73.1212(j). The rules were a response to evidence that the Chinese and Russian governments had arranged to have their programming aired on U.S. radio stations without disclosing that the programming had been sponsored by those governments. Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd. 7702, 7702 ¶ 1 n.1 (2021) ("2021 Order"); *id.* at 7704 n.9. As the Commission explained, even though "foreign governments and their representatives are restricted from holding a broadcast license directly," they are allowed to enter agreements to have broadcast licensees air their content. *Id.* at 7703 ¶ 1. And although the Commission's rules had required disclosure of the name of the sponsor of broadcast programming, up until then there had been no requirement for a licensee to determine or disclose "the relationship of that sponsor to a foreign country." *Id.* at 7705-06 ¶ 7. Audiences could thus remain unaware of foreign governmental involvement if the name of the sponsor did not make it obvious, or if the

sponsorship was "deliberately attenuated in an effort to obfuscate the true source of the programming."  *Id.*

In the 2021 Order, the Commission adopted rules requiring that broadcast licensees take specific steps to identify and disclose programs sponsored by a "foreign governmental entity."  *Id.* at 7706 ¶ 9.  It defined that term by reference to the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611, and a list of U.S.-based foreign media outlets the Commission maintains pursuant to 47 U.S.C. § 624.[1]  *Id.* at 7708 ¶ 14.  The Commission explained that the rules apply to "programming on U.S. broadcast stations pursuant to leasing agreements," a term that means "any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by another party in return for some form of compensation," "regardless of what those agreements are called, how they are styled, and whether they are

---

[1] The Foreign Agents Registration Act generally requires an "agent of a foreign principal" undertaking certain political and publicity activities in the United States on behalf of a foreign principal to register with the Department of Justice.  22 U.S.C. § 611(c).  Under the Communications Act, "U.S.-based foreign media outlets" must periodically file reports with the Commission, and the Commission must provide a report to Congress summarizing those filings.  47 U.S.C. § 624.

reduced to writing." 2021 Order, 36 FCC Rcd. at 7713-15 ¶¶ 25-28. The Commission added that "traditional, short-form advertising time" would not "constitute[] a lease of airtime for these purposes," *id.* at 7716 ¶ 28, but it did not define what would constitute "traditional, short-form advertising time."

The rules required a broadcast licensee to take five steps to demonstrate it had "exercise[d] reasonable diligence to obtain" information regarding potential foreign involvement. 47 U.S.C. § 317(c). Four of those requirements remain in place today. A licensee must

- "Inform[] the lessee of the foreign sponsorship disclosure requirement," 47 C.F.R. § 73.1212(j)(3)(i);

- "Inquir[e] of the lessee whether the lessee falls into any of the categories . . . that qualify the lessee as a foreign governmental entity," *id.* § 73.1212(j)(3)(ii);

- Inquire "whether the lessee knows if anyone involved in the production or distribution of the programming . . . qualifies as a foreign governmental entity and has provided some type of inducement to air the programming," *id.* § 73.1212(j)(3)(iii); and

- "Memorializ[e] the inquiries . . . to track compliance," "retaining such documentation in the licensee's records," *id.* § 73.1212(j)(3)(v).

A fifth provision required a licensee to "[i]ndependently confirm the lessee's status" by "consulting the Department of Justice's FARA website and the Commission's semi-annual U.S.-based foreign media outlets reports" for the lessee's name.  2021 Order, 36 FCC Rcd. at 7720 ¶ 35.  NAB sought review of that provision in this Court.  *See Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817 (D.C. Cir. 2022).

On review, this Court vacated the provision that a licensee independently confirm a lessee's foreign ownership status.  *Id.* at 820.  Instead, the Court held that Section 317(c) "is satisfied" "by appropriate inquiries made by the station to the party that pays it for the broadcast."  *Id.*  In doing so, the Court made clear that it was outside the scope of the Commission's statutory authority to require licensees to do more than "'obtain' . . . information 'from' employees and sponsors."  *Id.* at 819-20 (quoting 47 U.S.C. § 317(c)).

## C.     The Affiliates' Petition For Clarification

In 2021, a group of trade associations representing local television affiliates filed a petition with the Commission seeking "clarity

regarding the coverage of the [2021] rules."  Petition for Clarification at

2, MB Docket No. 20-299 (filed July 19, 2021) (JA054).  The affiliates

contended that because the term "traditional short-form advertising,"

which the Commission had used to describe programming exempt from

the foreign sponsorship identification rules, was "not defined," the

exemption "could be read narrowly, leaving various common forms of

broadcast advertising subject to the new rules."  *Id.* at 2 (JA054).  Thus,

the affiliates asserted, "[t]he only way [licensees could] be sure to

comply [would be] to assume the rules cover all advertisements."  *Id.* at

3-4 (JA055-056).

In seeking clarification, the affiliates explained that

advertisements sold to "businesses seeking to promote their goods and

services" come in a variety of lengths, including "infomercials" that can

be "as long as one or more hours."  *Id.* at 2-3 (JA054-055).  And while

the affiliates acknowledged that it is often "easy" to make "the

distinction between advertising and non-advertising content," they

recognized, too, that it can sometimes be "difficult to determine the

difference between an advertisement and a lease of time for

programming content."  *Id.* at 4 (JA056).  Answering that question, they

argued, should not "turn on the length of the programming segment

alone," but should consider instead "the relationship between the licensee and the purchaser of the airtime and the purpose of the content itself." *Id.* at 4-5 (JA056-057).

### D. The 2022 Notice Of Proposed Rulemaking

In October 2022, the Commission commenced a proceeding to "strengthen the process supporting the foreign sponsorship identification rules in the wake of the [this Court's] vacatur of" the independent verification requirement by "establishing a transparent mechanism to determine whether the licensee made the requisite inquiries of each lessee and that each lessee responded in a complete manner." Second Notice of Proposed Rulemaking, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 37 FCC Rcd. 12004, 12009-10 ¶¶ 12, 14 (2022) ("NPRM") (JA063-064).

The Commission "tentatively conclude[d] that the optimal mechanism for achieving this outcome" was to "require both licensee and lessee to certify their respective parts in this critical inquiry." *Id.* at 12010 ¶ 14 (JA064). The licensee would "certify that it has made the appropriate inquiry of each lessee" – i.e., asked the questions required by 47 C.F.R. § 73.1212(j)(3) – and that it "sought a certification from the

lessee" in response. *Id.* The lessee would certify that it did not meet the criteria requiring disclosure of foreign sponsorship or, if it did meet those criteria, it would provide the information to make the disclosure. *Id.* The Commission provided draft language for both certifications. *Id.* at 12012-15 ¶¶ 22-23 (JA066-069).

The Commission also sought comment on an "alternative approach" that a member of the panel in *NAB* had raised "[a]t oral argument." *Id.* at 12018 ¶ 31 (JA072). Instead of asking a licensee independently to verify information provided by its lessee by checking government databases (as the Commission had done in 2021), the new approach would "require a licensee to ask its lessee to provide the licensee with appropriate documentation (e.g., the relevant FARA page showing that its sponsors are not listed there)." *Id.*; *see id.* at 12018 n.66 (JA072) (citing relevant portions of the oral argument recording).[2]

The Commission also sought comment on the affiliates' petition for clarification. It explained that "the reference to 'traditional short-form advertising' as an exception" had "caused confusion . . . about what

---

[2] The oral argument recording may be found at https://perma.cc/2FJZ-BDPS. The relevant portion begins with a colloquy with NAB's counsel at 7:05.

type of programming arrangements are subject to the requirements."
*Id.* at 12018 ¶ 32 (JA072).  It asked "what criteria the Commission
might adopt to distinguish between advertising and programming
arrangements for the lease of airtime," including whether there were
"key characteristics" it could use to "distinguish[] advertising spots from
a lease of airtime," such as "duration, content, editorial control, or
differences in the nature of the contractual relationship."  *Id.*  It further
explained that the criteria should "ensure that the concept of
'advertising' does not subsume 'leased time' or vice versa."  *Id.*

### E.    The Order Under Review

With the benefit of the record developed in response to the NPRM,
the Commission revised its foreign sponsorship identification rules in
the Order under review.  Second Report and Order, *Sponsorship
Identification Requirements for Foreign Government-Provided
Programming*, MB Docket No. 20-299, FCC No. 24-61 (rel. June 10,
2024) (JA276-327) (the "Order").

#### 1.    Certification/Screenshot Requirement

The Commission first "fill[ed] the gap," *id.* ¶ 18 (JA284), left after
this Court's decision in *NAB* by providing two options for ensuring that

licensees make the inquiries required by Rule 73.1212(j)(3), and that they are able to elicit credible responses in return.

*Certification Option.* Under the certification option, the licensee can choose to "complete a certification reflecting the communications and inquiries required under the existing rules." *Id.* ¶ 19 (JA284). To implement that option, the Commission provided standardized certification language, which consists of the "same inquiries" adopted in the 2021 Order and codified at 47 C.F.R. § 73.1212(j)(3)(i)-(iii), "formatted now as a certification." *Id.*

In addition, the certification option requires licensees to "request a certification" (for which the Commission provided similarly standardized language) from their lessees as to whether a lessee is a foreign governmental entity or whether the leased programming involves foreign sponsorship. *Id.* n.89 (JA292)*; see id.* ¶ 19 (JA284); *id.* App. A (adding 47 C.F.R. § 73.1212(j)(3)(iv)(A)) (JA309); *id.* App. D (providing standard certification language) (JA323). The Commission explained, however, that the regulations simply require the licensee to ask for the information; they "do not mandate that a licensee *obtain* a certification from its lessee." *Id.* n.87 (JA292).

The standard certification language was also "significantly simplifie[d] and shorten[ed]" to respond to concerns that the draft proposed in the NPRM was "complex and legalistic." *Id.* ¶¶ 50, 19 & n.48 (JA299, 284). Rather than the "two and a half page certifications proposed" in the NPRM, the Commission "developed one-page templates . . . based on a straightforward and familiar 'check box' format." *Id.* ¶ 19 (JA284). The standardized templates for licensee and lessee certification were attached as Appendix C and Appendix D to the Order and are reproduced in the Addendum to this brief. *See* Addendum 1-2.

The Commission anticipated that licensees and lessees could "complete the forms quickly and readily, based upon their existing knowledge and understanding." Order ¶ 19 (JA285). As the Commission observed, a lessee should "already know if it is a government of a foreign country or a foreign political party," or a "registered FARA agent, or . . . listed as a U.S.-based foreign media outlet on the Commission's website," because these registrations are self-reported. *Id.* And the Commission regarded it as "highly unlikely" that research would be required to respond to the inquiry regarding foreign governmental entity involvement "further back in the chain of producing and/or distributing the programming" because the lessee will

be "asked only about its actual knowledge at the time it signs the certification." *Id.* (JA285) (citing 47 C.F.R. § 73.1212(j)(3)(iii)).

Because some licensees had already "developed their own certifications based on the existing foreign sponsorship identification rules and [asserted] that revising these certifications would be costly," the Commission also allowed licensees to use their own certification language, provided the alternative language "addresses the points listed in [Rule] 73.1212(j)(3)(i)-(iii)." *Id.* ¶ 20 (JA285). The Commission found it "unlikely" that licensees would have to revise any language they had already developed, because the rules "encapsulate the extant information and inquiry requirements adopted in the [2021 Order]." *Id.* ¶ 21 (JA286).

*Screenshot Option.* As an alternative to the certification option, the Commission provided licensees with a second route for satisfying its rule: a licensee may ask the lessee to respond to its inquiries by searching for the lessee's name in the FARA and U.S.-based foreign media outlet databases and providing screenshots of the results. *Id.*

¶ 22 (JA286).[3]  Elaborating on this option, the Commission explained that licensees could direct lessees to the relevant page of the FARA website, which provides a search box for "Active Registrants."  *Id.* n.60 (JA287); *see* Addendum 3 (screenshot of FARA Active Registrants page). From there, lessees could enter "their *own names*" into "a search box," and provide a screenshot of the response.  *Id.* ¶¶ 23-24 (JA286-287).

Similarly, a search of the Commission's list of U.S.-based foreign media outlets would require only that the lessee take a screenshot of the "list [of] names of all the entities that have reported as U.S.-based foreign media outlets . . . to show whether the lessee's name appears on the list at the time of the licensee's required inquiries."  *Id.* ¶ 25 (JA287).

With either approach, the Commission made clear that licensees are not "responsible for the truth of the information they obtain" from lessees under the Commission's revised rules, and that they may "carry leased programming" even without "actually *obtaining* foreign sponsorship information from the lessee," so long as they have fulfilled

---

[3] The Commission observed that the screenshot option was "consistent with [a] hypothetical" from the panel during oral argument before this Court in *NAB*.  Order ¶ 22 & n.55 (JA286).

their duty of inquiry by asking for certifications/screenshots.  *Id.* ¶¶ 34-35 (JA291–292).[4]

### 2.   Scope Of The Rules And Exceptions

The Order also addressed the "confusion" reflected in the record regarding the scope of the exception to the foreign sponsorship identification rules for "traditional, short-form advertising time."  *Id.* ¶ 42 & n.111 (JA295).  The Commission "reverse[d] [its] previous decision to use that term," *id.* ¶ 42 (JA295), and instead defined the exclusion with regard to the pre-existing regulatory categories of "candidates for any public office" under 47 U.S.C. § 315, and "broadcast matter advertising commercial products or services" under 47 C.F.R. § 73.1212(f).

First, the Commission was persuaded that the foreign sponsorship identification rules should not apply to "broadcast matter advertising commercial products or services" governed by Rule 73.1212(f).  Order ¶ 43 (JA295).  It explained that "long-standing Commission

---

[4] If "a question arises later about whether a disclosure was needed," however, "the licensee must be able to demonstrate, in the event of a fact-specific inquiry by the Commission, that it exercised reasonable diligence in seeking the information."  Order ¶ 16 (JA283).

precedent" exempts such programming from required disclosures if it "include[s] the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification." *Id.* ¶¶ 41, 44-45 (JA294-296) (quoting 47 C.F.R.§ 73.1212(f)).

The Commission also exempted "the purchase of broadcast time by or on behalf of legally qualified candidates or their authorized committees pursuant to [47 U.S.C. § 315]." Order ¶ 46 & n.119 (JA296). Section 315 imposes recordkeeping and other requirements on the use of broadcast time by "a legally qualified candidate for any public office," 47 U.S.C. § 315(a), (e), and imposes specific disclosure requirements on certain advertisements by federal candidates, *id.* § 315(b)(2)(C) and (D). These disclosures "provide[] a level of transparency regarding the source of funding." Order ¶ 47 (JA297). This is because the "stand by your ad" requirements of Section 315 require "political candidates themselves to state that their authorized committee has paid for the advertisement and that the candidate approves the advertisement." *Id.* In addition, because foreign nationals are prohibited from donating to such candidates, the "likelihood that political candidate advertisements

would require disclosures under the foreign sponsorship identification rules is greatly limited." *Id.* ¶ 46 (JA297).

However, the Commission declined to exempt "paid PSAs" and "issue advertisements," the latter of which it defined as "any paid political matter or matter involving the discussion of a controversial issue of public importance, regardless of the length of the programming," unless "made by or on behalf of legally qualified candidates for public office or their authorized committees." *Id.* ¶ 47 (JA297).

The Commission explained that it is appropriate to treat issue advertisements and paid PSAs differently from political candidate advertisements for several reasons. First, the "level of transparency" provided by the Section 315 disclosures "is not available with issue advertising and paid PSAs." *Id.* (JA297). Second, although "foreign nationals also are prohibited from funding certain types of issue advertisements related to elections," that is not the case for "issue advertisements unrelated to elections." *Id.* Thus, the Commission "cannot be as assured of foreign noninvolvement with respect to issue advertisements." *Id.* ¶¶ 47-48 (JA297-298). Third, Congress demonstrated a "heightened concern about the source of issue

advertisements" by authorizing the Commission to require appropriate announcements for "any political program or any program involving the discussion of any controversial issue," even when aired without charge. *Id.* ¶ 48 (JA298) (citing 47 U.S.C. § 317(a)(2)). Thus, "[r]ather than adopt a definition that attempts to parse the different types of issue advertisements, and to ensure maximum transparency for viewers and listeners," the Commission determined that the rules should apply "to all issue advertisements and paid PSAs." *Id.* ¶ 47 (JA297).

## STANDARD OF REVIEW

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . ." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). "And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 413. "The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (cleaned up).

NAB bears a heavy burden to establish that the Order is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). Under the arbitrary-and-capricious standard, this Court "presumes the validity of agency action" and "must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment[.]" *Cellco P'ship v. FCC*, 357 F.3d 88, 93-94 (D.C. Cir. 2004).

The Court reviews constitutional challenges to agency action *de novo*. *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020).

## SUMMARY OF THE ARGUMENT

1. The Commission has authority under 47 U.S.C. § 317 to require broadcast licensees to ask lessees to respond to foreign sponsorship inquiries with certifications or screenshots. Section 317(c) imposes a duty on licensees to "exercise reasonable diligence to obtain" information necessary to make required disclosures. The Commission's rules define the inquiries that satisfy that requirement as to potential foreign sponsorship, 47 C.F.R. § 73.1212(j)(3), and the Order merely prescribes the way in which the licensee should memorialize its inquiries, and the format for responses it should request.

2. The rules also comply with the Administrative Procedure Act.

   a) The Commission provided ample notice that it intended to adopt new criteria for distinguishing between leased content that is

subject to the foreign sponsorship identification rules and the advertising that is not covered.  The 2021 Order excluded "traditional, short-form advertising time" from the rules, not "all advertising," and the Commission provided ample notice that it would reexamine that exclusion in the Order.

b)  The Order also reasonably treated issue advertisements and paid PSAs differently from political candidate advertisements because the former are not subject to heightened disclosure requirements, and because adopting a definition that attempted to parse the different kinds of issue advertisements would not have served the Commission's aim to minimize burden and maximize transparency.

3.  Applying the foreign sponsorship identification rules to issue advertisements and paid PSAs, while excluding political candidate advertisements, is consistent with the First Amendment.  Even if that exclusion looks to content, it is well established that lesser First Amendment scrutiny applies to broadcast regulations.  And because the foreign sponsorship identification rules are appropriately tailored to serve important – indeed, compelling – government interests, they comport with the First Amendment.

**ARGUMENT**

## I. IN ADOPTING THE CERTIFICATION/SCREENSHOT REQUIREMENT, THE COMMISSION ACTED WITHIN ITS AUTHORITY TO IMPLEMENT SECTION 317

### A. The Certification/Screenshot Rule Requires Licensees To Exercise Reasonable Diligence

The Commission's foreign sponsorship identification rules implement a statutory requirement that broadcast licensees "exercise reasonable diligence to obtain" the information necessary to make specified sponsorship disclosures. 47 U.S.C. § 317(c); *see id.* § 317(e) (directing the Commission to "prescribe appropriate rules and regulations"). The certification/screenshot requirement adopted in the Order merely "reduc[es] to written form" the "inquiry requirements established in the" 2021 Order. Order ¶ 34 (JA291).

These requirements are a lawful means of ensuring that licensees satisfy their obligation to use "reasonable diligence" to obtain the information required by the statute. 47 U.S.C. § 317(c). "Diligence" is "[t]he attention and care required from a person in a given situation; care; heedfulness." Black's Law Dictionary (12th ed. 2024). And the use of the term "reasonable" means Congress "authorized" the agency "to exercise a degree of discretion" in determining the diligence

required.  *Loper Bright Enters.*, 603 U.S. at 394-95.  The

certification/screenshot rule requires licensees to exercise reasonable

diligence by "remind[ing] lessees of the foreign sponsorship

identification rules" and prompting them to "provide above[-]board

sponsorship information."  Order ¶ 18 (JA284).

NAB argues that the certification/screenshot requirement exceeds

the Commission's authority under the statute (Br. 50-58).  This

argument lacks merit.  Having acknowledged before the agency that the

Commission "may prescribe what counts as reasonable diligence to

obtain information," NAB/MMTC Comments at 6 (Jan. 9, 2023)

(JA103), NAB now argues that requiring licensees to ask for responses

in the form of a certification or screenshots is a "corroboration

demand[]" that falls outside the "duty of inquiry" under Section 317(c).

Br. 51-52 (citing *NAB*, 39 F.4th at 820).[5]  But as this Court has

recognized, a licensee's duty of inquiry is "satisfied by appropriate

---

[5] NAB makes no attempt to reconcile its current position with the
statement of its counsel at oral argument in *NAB* that the Commission
"absolutely" has the authority to require a lessee that states it is not a
"foreign governmental entity" to provide a screenshot of the relevant
FARA page showing that its name is not listed there.  Order n.55
(JA286).

inquiries made by the station to the party that pays it for the broadcast." *NAB*, 39 F.4th at 820. The certification/screenshot requirement is an "inquir[y]," *id.*, that simply asks for a response in a particular format. The requirement appropriately responds to concerns with accidental or deliberate failures to make required disclosures. *See* Order ¶ 18 (JA284). And it does not impose a "duty of investigation" on licensees, because the licensee is not obligated to fill in any gaps in the lessee's response, and the rules "allow licensees to carry leased programming even in the absence of actually *obtaining* foreign sponsorship information from the lessee." *Id.* ¶ 35 (JA292); *see id.* n.87 (JA292) ("[o]ur new regulations do not mandate that a licensee obtain a certification from its lessee, but do require a licensee to ask").

NAB argues that the Commission's certification/screenshot requirement does not promote "reasonable diligence" because "there is not even the slightest chance of foreign governmental involvement" in programming from many lessees, such as "churches," "local businesses," and "high schools." Br. 52-53 (internal quotation marks omitted). But the Commission does not have to await an example of foreign involvement with local business, church, or high school programming in order to adopt generally applicable protections. Order ¶ 54 (JA301)

("an agency need not suffer the flood before building the levee") (citation and internal quotation marks omitted). The rules are designed to address sponsorship that is *undisclosed*, which merits a "precautionary" approach. *Id.* ¶ 37 (JA293).

"Furthermore," the Commission explained, "providing a consistent set of rules for all leased programming streamlines the process of compliance for licensees." *Id.* ¶ 54 (JA301). If the rules applied to only certain kinds of entities or programming, licensees would need to engage in a more burdensome analysis to determine whether to make inquiries of a particular lessee. And a consistent approach "closes the door to any attempt to exploit loopholes that might arise from [those] exemptions." *Id.* (JA301).

NAB asserts that the certification/screenshot requirement is not "reasonable" because the rules will not prevent foreign governmental entities from deliberately evading detection. *See* Br. 53-54. At the outset, this argument is not before the Court because no party raised it before the Commission. *See* 47 U.S.C. § 405(a) (precluding judicial review of questions on which the Commission "has been afforded no opportunity to pass").

It is in any event without merit because the rules are also intended to address *inadvertent* noncompliance. *See* Order ¶ 18 (JA284) ("certifications have the value of reminding lessees of the foreign sponsorship identification rules and ensuring that they provide above[-]board sponsorship information to broadcasters"). An inquiry that addresses that concern is within the Commission's authority to promote "reasonable diligence" on the part of its licensees, 47 U.S.C. § 317(c), even if unregulated bad actors may still succeed in evading the reach of the rules (as can happen with any rule). *See U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 86 (D.C. Cir. 2001) ("agencies need not address all problems in one fell swoop").

## B. The Commission Has Authority To Require Licensees To Request Information From Lessees In The Form Of Certifications Or Screenshots

NAB also argues (Br. 57-58) that requiring a licensee to "ask its lessee for certifications/screenshots as a way of responding to [a] licensee's inquiries," Order n.87 (JA292), unlawfully "regulate[s]" lessees, over whom the Commission does not have Section 317 authority. That argument is misguided; the rules require licensees to inquire of their lessees, but they do not require lessees to answer.

Instead, they leave licensees free to air leased programming if they do not obtain the asked-for information.  *Id.* nn.87, 89 (JA292).

By directing every broadcast licensee to exercise "reasonable diligence to obtain from . . . persons with whom it deals directly" the information necessary to make the required sponsorship announcements, 47 U.S.C. § 317(c), Congress imposed a duty on licensees to take steps designed to prompt lessees (with whom they deal directly) to provide that information.  The certification/screenshot requirement defines licensees' duty of inquiry to include a request that lessees respond in a particular format.  *See* Order ¶ 34 (JA291).  The requirement therefore "carr[ies] out the provisions of" Section 317(c), as the Commission is authorized to do.  47 U.S.C. § 317(e).

Particularly given that the Order does not "mandate that a licensee *obtain* a certification from its lessee," Order n.87 (JA292); *see id.* ¶ 35 (JA292), the requirement that licensees request certifications (or screenshots) from their lessees does not impose an unauthorized obligation on those lessees.  To be sure, a different part of the Communications Act imposes on broadcast programmers, including programming lessees, an obligation (enforced by criminal sanction) to disclose information about payments or other consideration for the

broadcast of any matter.  *See* Br. 57-58 (discussing 47 U.S.C. § 508(c), (g)).  But that in no way undermines the Commission's authority to impose the requirements on broadcast *licensees* that it adopted in the Order.

### C.    NAB's Challenge To Rule 73.1212(j)(3)(iii) Is Not Before The Court, And In Any Event Is Without Merit

NAB also challenges the Commission's requirement that licensees "[i]nquir[e] . . . whether the lessee knows if anyone involved in the production or distribution of the programming . . . qualifies as a foreign governmental entity and has provided some type of inducement to air the programming."  47 C.F.R. § 73.1212(j)(3)(iii).  That challenge is untimely; it is also without merit.

The Commission adopted Rule 73.1212(j)(3)(iii) in the 2021 Order, 36 FCC Rcd. at 7719-26 ¶¶ 34-35, and neither NAB nor any other party challenged the rule during the 60-day period for petitions for review under the Hobbs Act.  *See* 28 U.S.C. §§ 2342, 2344.  NAB now argues that by adopting a requirement that licensees use certifications and/or screenshots in making the Rule 73.1212(j)(3) inquiries, the Commission reopened the underlying rule requiring such inquiries to challenge.  *See* Br. 54-55.  Not so.

Reopening is an "exception to statutory limits on the time for seeking review of an agency decision." *Pub. Emps. for Env't Resp. v. EPA*, 77 F.4th 899, 911 (D.C. Cir. 2023). Statutory time limits "reflect Congress's express preference for regulatory finality," which "would be frustrated by applying a lenient standard" to claims of reopening. *Id.* at 915. Thus, reopening is found only where the agency indicates that it has "undertaken a serious, substantive reconsideration of [an] existing rule," *id.* at 911, or demonstrated an "inten[t] to re-examine its statutory authority," *Biggerstaff v. FCC*, 511 F.3d 178, 186 (D.C. Cir. 2007).

NAB concedes that Rule 73.1212(j)(3)(iii) was not "noticed for reconsideration." Br. 55; *see Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 142 (D.C. Cir. 1998) ("*NARPO*") (reopening inquiry considers the "language of the NPRM"). To the contrary, the NPRM stated that this Court had left "untouched the bulk of the foreign sponsorship identification requirements," except the "independent verification" requirement, and sought "comment on establishing a transparent mechanism to determine whether the licensee made the requisite inquiries of each lessee and that each lessee responded in a complete manner." 37 FCC Rcd. at 12005, 12010 ¶¶ 3,

14 (JA059, 064); *see* Order ¶ 33 & n.82 (JA291). There was thus no "invitation to comment on [the] previously settled matter." *NARPO*, 158 F.3d at 142.

NAB asserts that the Commission reopened Rule 73.1212(j)(3)(iii) by – as NAB characterizes it – "recasting . . . the duty of inquiry as incorporating the duty to seek corroboration." Br. 56 (citing Order ¶ 35 (JA292)). But "invit[ing] debate on some aspects of a broad subject . . . does not automatically reopen all related aspects[,] including those already decided." *NARPO*, 158 F.3d at 142. Just as in *NARPO*, in which the Court held that the agency's proposal to address unsettled aspects of a regulatory regime did not reopen the entire regime to challenge, *id.* at 144, the Commission's new requirement to request responses in the form of a certification or screenshots does not reopen the inquiries that were already codified in Section 73.1212(j)(3), even though both requirements implement the "duty of inquiry" in Section 317(c).[6]

---

[6] *Sierra Club v. EPA*, 705 F.3d 458 (D.C. Cir. 2013), does not help NAB. In that case, the agency relied on a longstanding rule authorizing a certain kind of monitoring exemption to "establish[] a *new* monitoring exemption for a new pollutant." *Id.* at 466-67 (emphasis added). The

(cont'd)

That the Order responded to NAB's unsolicited comments challenging Rule 73.1212(j)(3)(iii), *see* Br. 56, is of no moment. When the agency "merely responds to an unsolicited comment by reaffirming its prior position, that response does not create a new opportunity for review." *Pub. Emps. for Env't Resp.*, 77 F.4th at 913. This Court has long emphasized that the reopening doctrine "is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue." *NARPO*, 158 F.3d at 143.[7] And for the same reasons, the Commission did not reopen settled issues by responding to NAB's comments arguing that

---

Court held that the creation of the new exemption reopened the question whether the agency "has authority to adopt" the exemption and "whether it used an appropriate method" for doing so. *Id.* Here, in contrast, Rule 73.1212(j)(3)(iii) played no role in authorizing the certification/screenshot requirement; it simply defines one of the inquiries that licensees must make. And *NRDC* v. *EPA*, 824 F.2d 1146, 1150 (D.C. Cir. 1987), cited at Br. 55, held that the challenge before it did not seek to reopen a previously established rule.

[7] "[T]he appropriate way in which to challenge a longstanding regulation on the ground that it is violative of statute" is a petition for rulemaking, not unsolicited comments. *Biggerstaff*, 511 F.3d at 184.

Rule 73.1212(j)(3)(iii) is barred by Section 317(b).  *See* Br. 56 (citing

Order ¶ 36 & n.90) (JA292)).

Even if the argument were before the Court, NAB is incorrect that

Rule 73.1212(j)(3)(iii) seeks information that would not require an

announcement under Section 317(a) or (b), and thus falls outside a

licensee's "'reasonable diligence to obtain . . . information to enable [a]

licensee to make the announcement *required by this section.*'"  Br. 55–56

(quoting with emphasis 47 U.S.C. § 317(c)).  Section 73.1212(j)(3)(iii)

requires licensees to ask lessees if they "know[] if anyone involved in

the production or distribution of the programming . . . qualifies as a

foreign governmental entity and has provided some type of inducement

to air the programming."  This is consistent with Section 317(b), which

requires a disclosure when lessees have received sponsorship payments

from third parties, and have reported that fact to licensees.  *See* 47

U.S.C. § 317(b) (requiring disclosure where a "report has been made. . .

as required by Section 508").  The fact that lessees are under a separate

obligation to *make* such a report, *id.* § 508(b)-(c), is beside the point.

Nothing in Section 317(b) suggests that the "report . . . required by

section 508," *id.*, must be unsolicited.  Thus, reasonable diligence

properly includes a simple inquiry into the lessee's "actual knowledge at

the time it signs the certification" that may prompt the lessee to make such a report.  Order ¶ 19 (JA284); *see id.* ¶ 36 (JA292).

## II.  THE ORDER SATISFIES THE ADMINISTRATIVE PROCEDURE ACT

### A.  The Commission Gave Notice Of Its Intent To Clarify The Scope Of The Exception For Certain Advertisements

The Commission satisfied the notice and comment requirements of the APA by providing notice that it intended to clarify the scope of the exception for certain advertising it had established in the 2021 Order. NAB's contentions to the contrary (Br. 25-35) are baseless.

The APA requires an agency, in soliciting public comment on a proposed rulemaking, to disclose "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).  Such notice "must be sufficient to fairly apprise interested parties of the issues involved, but it need not specify every precise proposal which [the agency] may ultimately adopt as a rule." *Nuvio Corp. v. FCC,* 473 F.3d 302, 310 (D.C. Cir. 2006).  An agency meets APA notice requirements "as long as its final rule is a 'logical outgrowth' of the rule it originally proposed."  *Northeast Md. Waste Disposal Auth. v. EPA,* 358 F.3d 936, 951-52 (D.C. Cir. 2004) (per curiam).

Those standards are satisfied here.  The 2021 Order stated that "traditional, short-form advertising time" would not "constitute[] a lease of airtime" for the purposes of the Commission's foreign sponsorship identification rules.  36 FCC Rcd. at 7715-16 ¶ 28.  In response to the affiliates' petition for clarification, the NPRM sought comment on "what criteria the Commission might adopt to distinguish between advertising and programming arrangements for the lease of airtime in a way that does not jeopardize the Commission's goals in this proceeding."  37 FCC Rcd. at 12018-19 ¶ 32 (JA072).  The NPRM specifically asked whether there were "key characteristics that could assist in distinguishing advertising spots from a lease of airtime on a station," "such as duration, *content*, editorial control, or differences in the nature of the contractual relationship between the licensee and the entity that purchases an advertising spot versus leasing airtime for programming."  *Id.* (JA073) (emphasis added).  And it made clear the Commission intended to "ensure that the concept of 'advertising' does not subsume 'leased time' or vice versa."  *Id.*

This "description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), put commenters on notice that the "traditional, short-form advertising time" exception would be reexamined; that the Commission

intended to draw a clear boundary between "leases" and "advertising"; and that the boundary might turn on the "content" of the programming at issue.  NPRM, 37 FCC Rcd. at 12019 ¶ 32 (JA073).

The final Order kept the definition of "lease" adopted in the 2021 Order but redefined the regulatory exclusion to encompass commercial advertising, as identified in 47 C.F.R. § 73.1212(f), and political candidate advertising under Section 315.  Order ¶¶ 46-48 (JA296-298). Because these categories did not include issue advertisements or paid PSAs, and because issue advertisements and paid PSAs otherwise meet the definition of a "lease" adopted in the 2021 Order, those categories remained subject to the foreign sponsorship identification rules.  *Id.*

The clarification that issue advertisements and paid PSAs are covered, not excluded from the rules, was easily a "logical outgrowth" of the NPRM.  *Great Lakes Commc'n Corp. v. FCC*, 3 F.4th 470, 478 (D.C. Cir. 2021).  Responding to the Commission's notice, a number of comments specifically proposed defining the exclusion by reference to the existing category of commercial advertisements described in Rule 73.1212(f).  *See, e.g.*, Audacy Reply Comments at 7 (Jan. 24, 2023) (JA166) (asking the Commission to clarify the exception by "categorically exclud[ing] advertising for commercial products and

services"); Alpha Media Reply Comments at 7 (Jan. 24, 2023) (JA174) ("paid programming that advertises commercial products or services – regardless of length" should be excluded); Comments of Gray Television Licensee at 11 (Jan. 9, 2023) (JA157) (arguing that "the Commission should exclude all commercial advertisements for goods and services from the definition of 'lease'").

The approach the Commission adopted reflected these comments, while also partially accommodating NAB's last-minute suggestion to not "treat material such as political advertising in the form of candidate and/or issue ads, paid public service announcements . . . , or any other form of advertising as leases" subject to the foreign sponsorship identification rules. NAB Ex Parte at 5 (Mar. 11, 2024) (JA227) (cited at Order n.119 (JA297)).

It was "entirely proper" for the Commission to "continue its deliberations and internal decisionmaking process . . . in order to assimilate those comments and arrive at a policy choice." *Sierra Club v. Costle*, 657 F.2d 298, 352–53 (D.C. Cir. 1981); *see, e.g.*, *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 2024 WL 3083338, at *3 (D.C. Cir. June 21, 2024) (unpublished judgment) (same). Because the Commission's notice described the matters it intended to address

without narrowly proposing any specific approach, as Section 553(b)(3) permits, NAB is not helped by cases in which a final rule differed from a proposed rule. *See* Br. 32-33 (citing, inter alia, *Env't Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005)).[8]

Nor is it "telling" (Br. 31) that no commenter proposed the precise "contours of the final rules." The Commission was not required "to select a final rule from among the precise proposals under consideration during the comment period." *Sierra Club*, 657 F.2d at 352; *see Great Lakes Commc'n Corp.*, 3 F.4th at 478 (agency properly "accepted the last-minute proposal" of a commenter); *Northeast Md. Waste Disposal Auth.*, 358 F.3d at 951 ("Agencies are free – indeed, they are encouraged – to modify proposed rules as a result of the comments they receive.").

NAB's primary argument in support of its notice challenge is that the Commission "change[d]" the definition of "lease" to "now include all advertising unless exempted." *See* Br. 30. This argument misapprehends the 2021 Order, which defined leases to cover all sales of "broadcast time" to third parties. 36 FCC Rcd. at 7715 ¶ 28

---

[8] Similarly, because the NPRM did not offer a "proposed interpretation," the Commission could not "repudiate" such an interpretation in the Order, as NAB asserts (Br. 33).

(describing a "lease" as "any agreement in which a licensee makes a discrete block of broadcast time on its station available to be programmed by another party in return for some form of compensation," and explaining that this includes "any time the licensee permits the airing on its station of programming either provided, or selected, by the programmer in return for some form of compensation"). The Order preserved that definition. Order ¶ 48 (JA298). The Commission simply replaced the undefined exception for "traditional, short-form advertising time" with exceptions defined by the boundaries of Rule 73.1212(f) and Section 315. *Id.* ¶ 46 (JA296).

NAB also argues that the 2021 Order excluded "all advertising" from the scope of the rules. *See* Br. 25. This argument again misreads the 2021 Order, which excluded only "traditional, short-form advertising time." 36 FCC Rcd. at 7715-16 ¶ 28. The descriptor "traditional, short-form" necessarily meant that the sale of any "advertising time" *other than* "traditional" and "short-form" advertising *was* a "lease . . . for these purposes," even under the 2021 Order. *Id.* It was "foreseeable" that drawing a new boundary would likewise result in the exclusion of some advertising. *Great Lakes Commc'n Corp.*, 3 F.4th at 478.

Even if the Order could be construed as changing the definition of "lease," that would be a logical outgrowth of the need to clearly "distinguish between advertising and programming arrangements for the lease of airtime in a way that [did] not jeopardize the Commission's goals in [its] proceeding." NPRM, 37 FCC Rcd. at 12018 ¶ 32 (JA072). While NAB argues that "the industry has always understood leasing and advertising sales to be wholly different transactions," Br. 27, the comments showed no such clarity.[9] For example, the affiliates' petition for clarification explained that, although it is "easy" to see that "[a] spot for the George For[e]man Grill is an advertisement," it can be "difficult to determine the difference between an advertisement and a lease of time for programming content." Petition for Clarification at 4 (JA056); *see supra* at 38 (citing comments suggesting the exclusion should apply

---

[9] NAB's attempt to articulate the distinction between the categories of leases and advertising, *see* Br. 27, suffers the very boundary-drawing issues that the Order aimed to solve. For example, it is unclear whether a transaction to air an hour-long PSA would be a "block of airtime for [the third party's] programming," or a purchase of an "advertising spot[] . . . adjacent to [the licensee's] or third-party programming." *Id.*

to commercial advertising).[10]  The petition for clarification thus was not limited to the question of the "length" of advertisements that should be excluded, as NAB erroneously asserts.  *See* Br. 26.  Even if it were, the NPRM made clear that, in identifying criteria "that could assist in distinguishing advertising spots from a lease of airtime," the Commission planned to consider characteristics other than "duration." 37 FCC Rcd. at 12019 ¶ 32 (JA073).  The final Order properly reflects that consideration.  *See Brennan v. Dickson*, 45 F.4th 48, 69 (D.C. Cir. 2022) ("[T]he very premise of agencies' duty to solicit, consider, and respond appropriately to comments is that rules evolve from conception to completion.").

---

[10] NAB offers no reason (Br. 32) to conclude that additional parties would have commented if the Commission's notice had been even more explicit.  *See* 5 U.S.C. § 706 (APA takes "due account" of the "rule of prejudicial error").  NAB does not identify any such parties that offered comments in response to the 2020 NPRM, which – as NAB recognizes (Br. 26) – would have applied the foreign sponsorship identification rules to "all broadcast matter within the ambit of Section 317(a)," without an exception for any kind of advertising.

## B. The Commission's Decision To Exclude Political Candidate Advertisements But Not Issue Advertisements Or Paid PSAs Was Reasonable

NAB additionally contends that "the Commission offered no evidence to support the expansion of the rules," and that "the distinctions it drew between exempt and non-exempt advertising make no sense." Br. 36. These arguments, too, are unpersuasive.

The Order reflects a reasonable response to evidence that licensees had aired material provided by the Chinese and Russian governments without disclosing that fact. *See* Order ¶ 1 & n.2 (JA276-277). Recognizing Congress' concern with transparency in the sponsorship of political material, the Commission sensibly concluded that "ensuring that audiences are accurately informed when foreign governmental entities sponsor issue advertisements and paid PSAs is equally important as it is in the case of other types of paid programming." *Id.* ¶ 48 (JA298) (citing 47 U.S.C. § 317(a)(2)).

The Commission also reasonably explained why political candidate advertising subject to 47 U.S.C. § 315 merits different treatment. The Commission excluded such advertisements from the reach of the foreign sponsorship identification rules not only because "foreign nationals are prohibited from making contributions to political

candidates," but also because Section 315 "provides a level of transparency regarding the source of funding for political candidate advertising that is not available with issue advertising and paid PSAs." Order ¶ 47 (JA297). This is so because Section 315 "requires political candidates themselves to state that their authorized committee has paid for the advertisement and that the candidate approves the advertisement." *Id.*; *see* 47 U.S.C. § 315(b)(2)(C) and (D). The Commission therefore offered a "satisfactory explanation" for the revised scope of the exception to its foreign sponsorship identification rules. *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 537 (D.C. Cir. 2020).

NAB argues that applying the foreign sponsorship identification rules to issue advertisements and paid PSAs was arbitrary absent "evidence" that a "foreign governmental entity ever purchased political [advertisements] or paid for PSAs on broadcast stations." Br. 38. But this Court has repeatedly recognized that, in the context of foreign government involvement in U.S. communications, "conclusions must often be based on informed judgment rather than concrete evidence." *China Telecom (Ams.) Corp. v. FCC*, 57 F.4th 256, 266 (D.C. Cir. 2022). And, as the Commission stated, "almost by definition when foreign governmental sponsorship is *undisclosed*, neither [the agency] nor the

American public will know about it." Order ¶ 37 (JA293). It was perfectly appropriate for the Commission to adopt reasonable protections against the potential (even if as yet unrealized) undisclosed foreign sponsorship of issue advertisements and PSAs.

The clarification also does not "'rest[] upon factual findings that contradict those which underlay [the Commission's] prior policy,'" as NAB asserts. Br. 36 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). In explaining the "traditional, short-form advertising time" exception in the 2021 Order, the Commission stated that the record then before it "d[id] not demonstrate that advertisements . . . are a significant source of unidentified foreign sponsored programming." 36 FCC Rcd. at 7715 ¶ 29. But this statement was referring to "traditional, short-form advertising," *id.* ¶ 28, and "traditional" advertising is best read to refer to commercial advertising, as comments in this proceeding demonstrate. *See supra* at 28. The statement on which NAB relies thus cannot be read as a finding that issue advertisements and paid PSAs do not present the risks the foreign sponsorship identification rules aim to address.

Moreover, the Order explained in detail why the Commission elected to apply the rules to issue advertisements and paid PSAs, which

present the same risk of foreign involvement as other types of programming. *See* Order ¶¶ 46-50 (JA296-300). This "reasoned explanation" satisfies the Commission's obligations even if there were a reversal (which there was not). *Fox Television Stations*, 556 U.S. at 516.

Contrary to NAB's assertion, the Commission "evaluated whether . . . less burdensome regulation would have been adequate." Br. 40. The Commission addressed concerns about burden by minimizing the effort required to comply with its sponsorship identification requirements. Among other things, it simplified the standardized certification to a one-page check-box form; permitted licensees to use language of their own choosing; allowed lessees to respond with screenshots; eliminated a requirement to upload responses to a Commission website; and provided that, in the case of recurring leases, certifications need be performed only once a year. Order ¶¶ 14-30 (JA282-289).

Nor is there anything arbitrary about excluding political candidate advertisements covered by 47 U.S.C. § 315 while applying the rules to issue advertisements and paid PSAs. The foreign sponsorship identification rules recognize that "the linkage between the foreign

governmental entity and the entity providing the programming may be deliberately attenuated in an effort to obfuscate the true source of the programming." 2021 Order, 36 FCC Rcd. at 7705-06 ¶ 7. In light of that concern, the Commission properly took into account that the "stand by your ad" disclosures that federal candidates make in order to qualify for lower advertising rates under Section 315 provide "a level of transparency regarding the source of funding for political candidate advertising that is not available with issue advertising and paid PSAs." Order ¶ 47 (JA297) (citing 47 U.S.C. § 315(b)(2)(C) and (D)). That decision was reasonable even though advertisements for state and local candidates, which are covered by Section 315, are not subject to the heightened disclosure requirements of Sections 315(b)(2)(C) and (D). *See* Br. 41. Defining the exclusion using a regulatory category already delineated in the Communications Act serves the Commission's goals.

It was likewise not arbitrary – contrary to NAB's assertion (Br. 41) – to decline to exclude issue advertisements and paid PSAs from the scope of the foreign sponsorship identification rules, even though foreign entities cannot legally pay for election-related issue advertisements. The Commission's definition "encompasses issue advertisements unrelated to elections." Order ¶ 47 (JA297). "Rather

than adopt[ing] a definition that" would require licensees and lessees to "parse the different types of issue advertisements," the Commission chose to apply the rules "to all issue advertisements and paid PSAs." *Id.* (JA297); *see id.* ¶ 54 (JA301).  It was entirely reasonable to draw a line that provided clear boundaries and minimized the burden on lessees.  *See Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 451 (5th Cir. 2021) (Commission reasonably adopted a "broad rule," rather than a narrower one, where it  "would promote ease of administration and compliance" and prevent "bad actors" from exploiting exceptions).[11]

## III.  THE ORDER IS CONSISTENT WITH THE FIRST AMENDMENT

The Supreme Court has long recognized that "differences in the characteristics" of broadcast, as compared to other kinds of media, "justify differences in the First Amendment standards applied to them." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 386 (1969).  This is in part

---

[11] NAB also asserts that the Commission failed to investigate various "issues" that could arise from "onerous" rules.  Br. 42.  But as explained above, the Commission addressed the issue of burden, and therefore had no need to address issues that could potentially arise from rules that were onerous.  *See, e.g.*, Order ¶ 50 (JA299-300) (explaining that the Commission had modified the final rule to address burdens); *id.* ¶ 40 (JA294) (explaining that the Commission had "minimize[ed] the overall burden of compliance on broadcasters").

because "[b]roadcast frequencies are a scarce resource [that] must be portioned out among applicants," so the government has "wider latitude in regulating what is said on them." *Wash. Post v. McManus*, 944 F.3d 506, 519 (4th Cir. 2019) (quoting *FCC v. League of Women Voters*, 468 U.S. 364, 377 (1984)). Doing so serves "the First Amendment goal of producing an informed public capable of conducting its own affairs." *Red Lion Broad.*, 395 U.S. at 392.

The appropriate level of scrutiny for the foreign sponsorship identification rules is therefore a "middle ground" that is "something more than minimal rationality," but less than intermediate scrutiny. *Ruggiero v. FCC*, 317 F.3d 239, 245 (D.C. Cir. 2003); *News Am. Pub., Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988) ("more is required than minimum rationality," but less than intermediate scrutiny, to uphold cross-ownership prohibition). The rules here amply satisfy that standard, and they would also pass muster even if a more demanding level of intermediate scrutiny applied.

## A. The Order Adopts Broadcast Disclosure Rules To Which Reduced First Amendment Scrutiny Applies

The foreign sponsorship identification rules apply to "any agreement in which a licensee makes a discrete block of broadcast time

on its station available to be programmed by another party in return for some form of compensation." Order ¶ 48 (JA298). The rules are therefore content-neutral, because they do not "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). They apply to programming that is broadcast pursuant to a "lease" agreement as defined in the Order – a category that includes issue ads and paid PSAs. Order ¶ 48 (JA298). NAB does not argue that the rules' application to leased programming generally is content-based. Instead, it argues that the *exception* for political candidate advertising renders the rules content-based, because it means that programming content has to be examined to determine whether the rules apply, or whether the programming falls within the exception.[12]

Even if the exception rendered the otherwise content-neutral rules content-based, however, strict First Amendment scrutiny would not apply because the "different nature of the broadcasting industry . . . justif[ies] forms of content-based regulation." *See Leflore Broad. Co. v.*

---

[12] NAB does not challenge the exclusion for commercial advertising under Rule 73.1212(f).

*FCC*, 636 F.2d 454, 457 (D.C. Cir. 1980); *League of Women Voters*, 468 U.S. at 376 ("we . . . have never gone so far as to demand that [broadcast] regulations serve 'compelling' governmental interests").

Broadcast stands among the regulatory areas whose "uniquely content-based nature" cautions against the application of strict scrutiny. *Vidal v. Elster*, 602 U.S. 286, 300 (2024) (declining to apply strict scrutiny to a content-based trademark rule); *see, e.g.*, *VoteAmerica v. Schwab*, 121 F.4th 822, 848 (10th Cir. 2024) (holding that a prohibition on sending partially pre-filled mail-in ballots is among the "group of content-based but viewpoint-neutral regulations subject only to intermediate scrutiny").

For example, courts have long approved the Commission's use of content in fulfilling its duty to grant and renew licenses "in the public interest." *See Leflore Broad. Co.*, 636 F.2d at 458 (rejecting a challenge to the Commission's refusal to renew the license of a broadcaster that, by changing the content of its programming, "failed to operate its facility 'in the public interest'"); *see also* 47 U.S.C. § 309(a) (requiring licenses to be granted "in the public interest"). Advertising (including political and issue advertising) is restricted in public broadcasting. *Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1197-1211 (9th

Cir. 2013) (en banc).  Broadcast disclosure requirements also consider the characteristics of different kinds of content, such as the heightened need for transparency in advertising by political candidates.  *See* 47 U.S.C. § 315(b)(2)(C), (D).  These and other broadcast regulations serve "the public's First Amendment interest in receiving a balanced presentation of views on diverse matters of public concern."  *League of Women Voters*, 468 U.S. at 380.

The foreign sponsorship identification rules thus serve First Amendment values by helping citizens "make informed choices in the political marketplace" and in other aspects of their lives.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 367 (2010) (upholding disclosure requirements applicable to election-related spending).  As the Commission observed, "[c]omplete and accurate disclosure regarding the source of programming is critical to allowing audiences to determine the reliability and credibility of the information they receive."  Order ¶ 59 (JA304).[13]

---

[13] *Federal Election Comm'n v. Cruz*, 596 U.S. 289 (2022), cited at Br. 42, is inapposite.  The case did not involve broadcast regulation; it concerned a "restriction" on speech, 596 U.S. at 307, not a disclosure; and the government's evidence did not relate to a "permissible interest"

(cont'd)

## B. The Rules Are Consistent With The First Amendment Even Under Intermediate Scrutiny

Under *Ruggiero*, broadcasting rules are subject to a "middle ground" of scrutiny, under which the restriction must be "reasonably tailored to satisfying a substantial government interest." 317 F.3d at 245. The rules also satisfy intermediate scrutiny because they "advance[] important governmental interests unrelated to the suppression of free speech and [do] not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) ("*Turner II*").

### 1. The Commission Has A Compelling Interest In Protecting The Public From Undisclosed Foreign Broadcasts

NAB does not deny the importance of the Commission's goal of preventing undisclosed sponsorship of broadcast programming by foreign governments. Nor could it. "[N]o governmental interest is more compelling than the security of the Nation." *In re Sealed Case*, 77 F.4th 815, 830 (D.C. Cir. 2023). The rules have a "national security purpose,"

---

under the First Amendment, *id*. at 305, 308. Likewise, *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 465 (2007) (cited at Br. 43) involved "banning" speech.

because they support the prohibition on foreign ownership of broadcast stations by disclosing foreign sponsorship of broadcast programming. *See Moving Phones P'ship L.P. v. FCC*, 998 F.2d 1051, 1055-57 (D.C. Cir. 1993) (upholding an application of the Communications Act's "ban on alien ownership" of radio licenses "to safeguard the United States from foreign influence in broadcasting"). They thus help "ensure that audiences of broadcast stations are aware when a foreign government, or its representatives, are seeking to persuade the American public." 2021 Order, 36 FCC Rcd. at 7703 ¶ 2.

NAB argues instead that there is "by definition no compelling interest justifying" the rules because the Commission has not provided "evidence" of foreign sponsorship of issue advertisements or PSAs. Br. 46. But the Commission pointed to evidence that foreign governments had succeeded in broadcasting undisclosed content on U.S. stations. *See* Order n.2 (JA277). And it explained that "almost by definition when foreign governmental sponsorship is *undisclosed*, neither we nor the American public will know about it." *Id.* ¶ 37 (JA293). The Commission thus properly relied on its "informed judgment." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34-35 (2010). Courts have repeatedly recognized that, in the context of national security, "specific

evidence" is unnecessary to demonstrate a compelling First Amendment interest where "information [is] difficult to obtain." *Id.* And a lack of "specific evidence" may simply "reflect limitations on [the government's] ability to monitor." *TikTok Inc. v. Garland*, 122 F.4th 930, 960 (D.C. Cir. 2024), *aff'd per curiam*, *TikTok Inc. v. Garland*, No. 24-656 (U.S. Jan. 17, 2025).

NAB argues (Br. 46) that the Commission must show evidence of foreign sponsorship that specifically involves issue advertisements or paid PSAs. But the foreign sponsorship identification rules broadly apply to third-party programming aired pursuant to a "lease," and requiring the Commission to justify separately each subcategory of broadcast matter to which that definition applies would present the same kind of "unworkable" line-drawing that the Supreme Court rejected in *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 453 (2015) (assessing the compelling interest in a general prohibition on "personal appeals for money by a judicial candidate," even though the petitioner argued that a particular form of personal appeal did not implicate that interest). The fact that undisclosed sponsorship has been shown to exist in some kinds of leased programming means the concern is not "mere conjecture" (Br. 43-44) as to other kinds. The risk is – at a

minimum – "potentially real, not purely hypothetical." *Ibanez v. Fla.*

*Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994).

## 2. The Rules Are Appropriately Tailored To The Commission's Interest

To survive intermediate scrutiny, "a regulation need not be the

least speech-restrictive means of advancing the Government's

interests," it need only "promote[] a substantial government interest

that would be achieved less effectively absent the regulation" and not

"burden substantially more speech than is necessary" to further that

interest. *TikTok*, No. 24-656, slip op. at 16. This does not require a

"perfect means-ends fit," or "the best conceivable option"; it requires

only that the "fit [be] reasonable." *Azar*, 983 F.3d at 541.[14]

The Commission applied the foreign sponsorship identification

rules to issue advertisements and paid PSAs for a number of reasons.

Because such content "lack[s] the additional transparency" provided by

the heightened statutory disclosure requirements governing political

candidate advertisements, the Commission cannot be equally "assured

of foreign noninvolvement" with respect to those categories of

---

[14] Narrow tailoring would require that "less restrictive alternatives" would not "accomplish the government's goals equally or almost equally effectively." *In re Sealed Case*, 77 F.4th at 830.

programming. Order ¶ 47 (JA297). The Commission also aimed, in the Order, to "streamline[] the process of compliance for licensees and close[] the door to any attempt to exploit loopholes that might arise from . . . exemptions." *Id.* ¶ 54 (JA301).

The Commission also "took steps to confine the . . . burden of the regulatory scheme." *Turner II*, 520 U.S. at 216. Licensees can comply with the final rule simply by filling out the Commission's one-page, check-box form and asking lessees to do the same. *See* Order n.128 (JA298) (noting that many of NAB's members already use a standardized form for "political broadcasting agreements"). The Commission also allowed licensees to use their own certification language or ask for screenshots; removed a proposed requirement that licensees upload completed forms to a website; and significantly reduced the frequency with which certifications/screenshots must be sought for certain recurring leases. *See* Order ¶¶ 27, 50, n.164 (JA288, 299, 304). The Commission also made clear that the Order does not "mandate that a licensee *obtain* a certification from its lessee," but simply requires the licensee to make the request. *Id.* n.87 (JA292); *see id.* n.89 (JA292).

And it decided not to adopt a proposed requirement that licensees "report such non-responses to the Commission." *Id.* ¶ 28 (JA288).[15]

NAB argues that the Order is insufficiently tailored because part of the Commission's rationale for the "political candidate advertising" exception was that foreign nationals are prohibited from paying for such advertisements, but the same rationale would apply to certain election-related issue advertisements.[16] *See* Br. 41, 47. But excluding only election-related issue advertisements would have imposed its own

---

[15] NAB's argument that it will be burdensome to "learn to navigate" the FARA and U.S.-based foreign media outlet websites is based on the kind of "erroneous assumption" the Commission rejected in the Order. Order ¶ 22 (JA286). The screenshot option requires "merely entering a name in a search box" on the FARA website, and taking a screenshot of the list of entities on the Commission's U.S.-based foreign media outlet website. *Id.* ¶¶ 23-25 (JA286-287).

[16] NAB also argues (Br. 49) that 47 U.S.C. § 315(e) and its implementing regulations provide a "full political advertising disclosure scheme" that obviates the benefits of the foreign sponsorship identification rules. This is incorrect. Section 315(e) and 47 C.F.R. § 73.1212(e) require stations to keep records of election-related advertisements, but do not require an on-air disclosure for non-candidate advertisements, and thus do not meaningfully "inform audiences about the source of any such programming so that they may be more informed and savvy consumers of the material." Order ¶ 5 (JA279). And although Rule 73.1212(d) implements one of the disclosure obligations under Section 317, the point of the foreign sponsorship identification rules is to ensure that Section 317 disclosures are accurately made.

burdens, because it would have required licensees and lessees to "parse" the different types of issue advertisements in order to determine whether the Rule 73.1212(j)(3) inquiries are required in a particular case. Order ¶ 47 (JA297). Thus, neither adopting a definition that distinguishes between the different kinds of issue advertisements, nor excluding all issue advertisements from the scope of the rules, would have addressed the Commission's concerns as effectively as the line the Commission drew. The fact that "some imaginable alternative . . . might be less burdensome on speech" does not render the rule "invalid." *Turner II*, 520 U.S. at 217.

Finally, NAB asserts (Br. 49) that the Commission has not justified "burdening the entire universe of non-candidate political advertisers and paid PSA sponsors," and that the rules will cause lessees to "forego broadcast advertising." This overbreadth argument, which rests on the burdens to third parties,[17] could prevail only if NAB could show (which it cannot) that unconstitutional applications are "realistic, not fanciful," and that the number of such applications is

---

[17] The burden on licensees is simply a duty of inquiry; as we have explained, the rules do not obligate licensees to force lessees to respond. *See supra* at 26.

"substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023).

NAB does not show that the rules will be "highly burdensome" to either licensees or lessees. Br. 48. As to licensees, an across-the-board requirement is less burdensome than one that would require them to "parse" different types of issue advertising, as explained above.[18] *See supra* at 27. And as to lessees, it does not take a "lawyer's task and competency," Br. 48, to certify whether the lessee is a foreign governmental entity or knows if anyone involved in the production or distribution of the programming was such an entity. *See* Order ¶ 19 (JA284). Laypeople routinely respond to government requests for information that contain legally operative terminology, such as the employment eligibility forms that must be completed upon hiring of any "employee," a term that does not include "independent contractors" or

---

[18] Because the certification or screenshots require little effort, the situation is unlike those in which a disclosure requirement would "effectively rule[] out" any speech. *Ibanez,* 512 U.S. at 146 (rule requiring detailed disclosures to accompany professional designation "effectively rule[d] out" using that designation in formats such as letterhead and business cards).

workers "engaged in certain casual domestic employment."[19]  Many, if not most, employers and new hires will readily understand that the hire is an "employee" without having to delve into the nuances of "independent contractors" or "casual domestic employment."

Here, too, there will ordinarily be no reason to explore whatever nuance may exist in the terms "government of a foreign country," "foreign political party," "agent of a foreign principal," or "U.S.-based foreign media outlet."  *See* Order Appendix D (JA323).  And if it should prove difficult, in an individual case, to determine whether a foreign governmental entity has been involved in providing or paying for an issue advertisement or paid PSA, then the effort involved in determining whether a disclosure is required serves the Commission's interest in avoiding the inadvertent (or deliberate) broadcast of undisclosed foreign-sponsored content.

---

[19] Form I-9, Employment Eligibility Verification, U.S. Citizenship and Immigration Services, https://www.uscis.gov/sites/default/files/document/forms/i-9instr.pdf (last accessed Jan. 3, 2025).

## C. If The Exception For Political Candidate Advertising Did Not Comport With The First Amendment, The Remedy Would Be To Invalidate And Sever The Exception

Finally, if this Court were to conclude that the political candidate advertising exception prevents the foreign sponsorship identification rules from meeting First Amendment scrutiny, the remedy would be to "invalidate the . . . exception, and sever [it] from the remainder," not to invalidate the rules altogether. *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 623 (2020). In *Barr*, the plaintiff challenged a statutory exception to a general prohibition on robocalls that was applicable to certain debt collection calls. The Court held that the exception rendered the rule content-based and subject to strict First Amendment scrutiny, which the rule could not satisfy. Applying "general severability principles," including "a strong presumption of severability," the Supreme Court invalidated the exception, but not the entire law. *Id.* at 623, 625.

As with *Barr*, the "generally applicable" foreign sponsorship identification requirements, which apply to leases of programs of whatever content, readily satisfy the First Amendment. *Id.* at 633. If the exception for political candidate advertising would otherwise render

the rule an unconstitutional content-based restriction on speech, the "strong presumption of severability" warrants severing the exception, because the foreign sponsorship identification rules would remain "fully operative" without it. *Id.* at 628.

## CONCLUSION

The petition for review should be denied.

Dated: January 17, 2025

Respectfully submitted,

/s/ *Rachel Proctor May*

P. Michele Ellison
*General Counsel*

Jacob M. Lewis
*Deputy General Counsel*

Doha Mekki
*Acting Assistant
Attorney General*

Robert B. Nicholson
Peter M. Bozzo
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

Sarah E. Citrin
*Deputy Associate General Counsel*

Rachel Proctor May
*Counsel*

FEDERAL COMMUNICATIONS
COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

**CERTIFICATE OF COMPLIANCE**

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

    ☒  this document contains <u>12,185</u> words, *or*

    ☐  this document uses a monospaced typeface and contains <u>    </u> lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒  this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐  this document has been prepared in a monospaced spaced typeface using <u>        </u> with <u>        </u>.

    */s/  Rachel Proctor May*
    Rachel Proctor May
    *Counsel for Respondents*

# Addendum 1

**APPENDIX C**

**Approved Template for Licensee Certification**

Name of Licensee: _____

Name of Lessee: _____

Name of Program: _____

Nature of Lease:     New _____    Renewal: _____

_____ Licensee informed Lessee that FCC regulations require that a disclosure accompany programming that is sponsored, paid for, or furnished by a foreign governmental entity.

_____ Licensee asked Lessee whether Lessee is a foreign governmental entity. A foreign governmental entity can be a foreign government, a foreign political party, an agent of a foreign principal, or a U.S.-based foreign media outlet.[1]

_____ Licensee asked Lessee whether it knows if any individual/entity in the chain of producing or distributing the programming is a foreign governmental entity and has provided some type of inducement to air the programming.[2]

_____ Licensee sought from Lessee a written response certifying Lessee's answers. Lessee did _____ did not _____ provide a written certification.

_____ If applicable, Licensee obtained from Lessee the information needed to add the following disclosure to Lessee's programming: "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]."

On behalf of Licensee, I certify that the above statements are accurate.

_____    _____    _____

Name and Position                  Signature                       Date

---

[1] *See* 47 CFR § 73.1212(j). If more information is needed regarding the definition of a foreign governmental entity, see the FCC's rules at 47 CFR § 73.1212(j)(2)(i)-(iv), which provide that:

(i) The term "government of a foreign country" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611(e);

(ii) The term "foreign political party" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611(f);

(iii) The term "agent of a foreign principal" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(c)), and who is registered as such with the Department of Justice, and whose "foreign principal" is a "government of a foreign country," a "foreign political party," or directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a "government of a foreign country" or a "foreign political party" as defined in subsection 73.1212(j)(2)(i) and (ii), and that is acting in its capacity as an agent of such "foreign principal;" and

(iv) The term "United States-based foreign media outlet" has the meaning given such term in Section 722(a) of the Communications Act of 1934 (47 U.S.C. § 624(a)).

[2] If the programming is political in nature, or involves the discussion of a controversial issue, the FCC disclosure requirements apply even if no compensation or payment, other than the programming itself, was provided as an inducement to air the program.

# Addendum 2

**APPENDIX D**

**Approved Template for Lessee Certification**

Name of Licensee:    _____

Name of Lessee:    _____

Name of Program:    _____

Nature of Lease:    New _____    Renewal: _____

1.    Lessee is a foreign governmental entity. A foreign governmental entity can be a foreign government, a foreign political party, an agent of a foreign principal, or a U.S.-based foreign media outlet[1]    Yes: _____       No: _____

        If Yes, Lessee is an entity of the country of _____.

2.    Lessee knows of an individual/entity in the chain of producing or distributing the programming that is a foreign governmental entity and has provided some type of inducement to air the programming.[2]    Yes: _____       No: _____

        If Yes, the name of the individual/entity is _____.

        If Yes, the name of the country is _____.

3.    If applicable, Lessee has provided Licensee with the information needed to append the following disclosure to lessee's programming, consistent with the FCC's rules at 47 CFR § 73.1212(j)(1)(i):

        "The [following/preceding] programming was [sponsored, paid for, or furnished], either in whole or in part, by [name of foreign governmental entity] on behalf of [name of foreign country]."

On behalf of Lessee, I certify that the above statements are accurate.


_____    _____    _____

Name and Position                 Signature                      Date

---

[1] *See* 47 CFR § 73.1212(j). If more information is needed regarding the definition of a foreign governmental entity, see the FCC's rules at 47 CFR § 73.1212(j)(2)(i)-(iv), which provide that:

(i) The term "government of a foreign country" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611(e);

(ii) The term "foreign political party" has the meaning given such term in the Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C. § 611(f);

(iii) The term "agent of a foreign principal" has the meaning given such term in the Foreign Agents Registration Act of 1938 (22 U.S.C. § 611(c)), and who is registered as such with the Department of Justice, and whose "foreign principal" is a "government of a foreign country," a "foreign political party," or directly or indirectly operated, supervised, directed, owned, controlled, financed, or subsidized by a "government of a foreign country" or a "foreign political party" as defined in subsection 73.1212(j)(2)(i) and (ii), and that is acting in its capacity as an agent of such "foreign principal;" and

(iv) The term "United States-based foreign media outlet" has the meaning given such term in Section 722(a) of the Communications Act of 1934 (47 U.S.C. § 624(a)).

[2] If the programming is political in nature, or involves the discussion of a controversial issue, the FCC disclosure requirements apply even if no compensation or payment, other than the programming itself, was provided as an inducement to air the program.

# Addendum 3

**Addendum 3**

**Screenshot of FARA "Active Registrants" Page**

The following is a screenshot of the "Active Registrants" page, showing the search box into which lessees should enter their names (next to the "magnifying glass" icon that typically accompanies search boxes).



*See* https://efile.fara.gov/ords/fara/f?p=1381:17:2750717921668 (last accessed Jan. 3, 2025).

The result of typing a name into the search box is below (here using the example, "Federal Communications Commission"); this is the screenshot that lessees would provide to licensees.



**STATUTORY ADDENDUM**

# Contents

**5 U.S.C. § 553**................................................................ADD. 2

**47 U.S.C. § 315**................................................................ADD. 3

**47 U.S.C. § 317**................................................................ADD. 8

**47 U.S.C. § 405**................................................................ADD. 9

**47 U.S.C. § 508**...............................................................ADD. 11

# 5 U.S.C. § 553

## § 553. Rule making

\* \* \*

**(b)** General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

>**(1)** a statement of the time, place, and nature of public rule making proceedings;

>**(2)** reference to the legal authority under which the rule is proposed;

>**(3)** either the terms or substance of the proposed rule or a description of the subjects and issues involved; and

>**(4)** the Internet address of a summary of not more than 100 words in length of the proposed rule, in plain language, that shall be posted on the Internet website under section 206(d) of the E-Government Act of 2002 (44 U.S.C. 3501 note) (commonly known as regulations.gov).

Except when notice or hearing is required by statute, this subsection does not apply--

>**(A)** to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

>**(B)** when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

\* \* \*

## § 315. Candidates for public office

## (a) Equal opportunities requirement; censorship prohibition; allowance of station use; news appearances exception; public interest; public issues discussion opportunities

If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided*, That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any--

**(1)** bona fide newscast,

**(2)** bona fide news interview,

**(3)** bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

**(4)** on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

**(b) Charges**

**(1) In general**

The charges made for the use of any broadcasting station by any person who is a legally qualified candidate for any public office in connection with his campaign for nomination for election, or election, to such office shall not exceed--

**(A)** subject to paragraph (2), during the forty-five days preceding the date of a primary or primary runoff election and during the sixty days preceding the date of a general or special election in which such person is a candidate, the lowest unit charge of the station for the same class and amount of time for the same period; and

**(B)** at any other time, the charges made for comparable use of such station by other users thereof.

**(2) Content of broadcasts**

**(A) In general**

In the case of a candidate for Federal office, such candidate shall not be entitled to receive the rate under paragraph (1)(A) for the use of any broadcasting station unless the candidate provides written certification to the broadcast station that the candidate (and any authorized committee of the candidate) shall not make any direct reference to another candidate for the same office, in any broadcast using the rights and conditions of access under this chapter, unless such reference meets the requirements of subparagraph (C) or (D).

**(B) Limitation on charges**

If a candidate for Federal office (or any authorized committee of such candidate) makes a reference described in subparagraph (A) in any broadcast that does not meet the requirements of subparagraph (C) or (D), such candidate

shall not be entitled to receive the rate under paragraph (1)(A) for such broadcast or any other broadcast during any portion of the 45-day and 60-day periods described in paragraph (1)(A), that occur on or after the date of such broadcast, for election to such office.

## (C) Television broadcasts

A candidate meets the requirements of this subparagraph if, in the case of a television broadcast, at the end of such broadcast there appears simultaneously, for a period no less than 4 seconds--

> **(i)** a clearly identifiable photographic or similar image of the candidate; and

> **(ii)** a clearly readable printed statement, identifying the candidate and stating that the candidate has approved the broadcast and that the candidate's authorized committee paid for the broadcast.

## (D) Radio broadcasts

A candidate meets the requirements of this subparagraph if, in the case of a radio broadcast, the broadcast includes a personal audio statement by the candidate that identifies the candidate, the office the candidate is seeking, and indicates that the candidate has approved the broadcast.

## (E) Certification

Certifications under this section shall be provided and certified as accurate by the candidate (or any authorized committee of the candidate) at the time of purchase.

## (F) Definitions

For purposes of this paragraph, the terms "authorized committee" and "Federal office" have the meanings given such terms by section 30101 of Title 52.

**(c) Definitions**

For purposes of this section--

> **(1)** the term "broadcasting station" includes a community antenna television system; and

> **(2)** the terms "licensee" and "station licensee" when used with respect to a community antenna television system mean the operator of such system.

**(d) Rules and regulations**

The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section.

**(e) Political record**

> **(1) In general**

> A licensee shall maintain, and make available for public inspection, a complete record of a request to purchase broadcast time that--

>> **(A)** is made by or on behalf of a legally qualified candidate for public office; or

>> **(B)** communicates a message relating to any political matter of national importance, including--

>>> **(i)** a legally qualified candidate;

>>> **(ii)** any election to Federal office; or

>>> **(iii)** a national legislative issue of public importance.

> **(2) Contents of record**

> A record maintained under paragraph (1) shall contain information regarding--

>> **(A)** whether the request to purchase broadcast time is accepted or rejected by the licensee;

>> **(B)** the rate charged for the broadcast time;

**(C)** the date and time on which the communication is aired;

**(D)** the class of time that is purchased;

**(E)** the name of the candidate to which the communication refers and the office to which the candidate is seeking election, the election to which the communication refers, or the issue to which the communication refers (as applicable);

**(F)** in the case of a request made by, or on behalf of, a candidate, the name of the candidate, the authorized committee of the candidate, and the treasurer of such committee; and

**(G)** in the case of any other request, the name of the person purchasing the time, the name, address, and phone number of a contact person for such person, and a list of the chief executive officers or members of the executive committee or of the board of directors of such person.

## (3) Time to maintain file

The information required under this subsection shall be placed in a political file as soon as possible and shall be retained by the licensee for a period of not less than 2 years.

## § 317. Announcement of payment for broadcast

### (a) Disclosure of person furnishing

**(1)** All matter broadcast by any radio station for which any money, service or other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person: *Provided*, That "service or other valuable consideration" shall not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a broadcast unless it is so furnished in consideration for an identification in a broadcast of any person, product, service, trademark, or brand name beyond an identification which is reasonably related to the use of such service or property on the broadcast.

**(2)** Nothing in this section shall preclude the Commission from requiring that an appropriate announcement shall be made at the time of the broadcast in the case of any political program or any program involving the discussion of any controversial issue for which any films, records, transcriptions, talent, scripts, or other material or service of any kind have been furnished, without charge or at a nominal charge, directly or indirectly, as an inducement to the broadcast of such program.

### (b) Disclosure to station of payments

In any case where a report has been made to a radio station, as required by section 508 of this title, of circumstances which would have required an announcement under this section had the consideration been received by such radio station, an appropriate announcement shall be made by such radio station.

### (c) Acquiring information from station employees

The licensee of each radio station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals

directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement required by this section.

**(d) Waiver of announcement**

The Commission may waive the requirement of an announcement as provided in this section in any case or class of cases with respect to which it determines that the public interest, convenience, or necessity does not require the broadcasting of such announcement.

**(e) Rules and regulations**

The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section.

# 47 U.S.C. § 405

**§ 405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order**

**(a)** After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the

Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided,* That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

* * *

## § 508. Disclosure of payments to individuals connected with broadcasts

### (a) Payments to station employees

Subject to subsection (d), any employee of a radio station who accepts or agrees to accept from any person (other than such station), or any person (other than such station) who pays or agrees to pay such employee, any money, service or other valuable consideration for the broadcast of any matter over such station shall, in advance of such broadcast, disclose the fact of such acceptance or agreement to such station.

### (b) Production or preparation of programs

Subject to subsection (d), any person who, in connection with the production or preparation of any program or program matter which is intended for broadcasting over any radio station, accepts or agrees to accept, or pays or agrees to pay, any money, service or other valuable consideration for the inclusion of any matter as a part of such program or program matter, shall, in advance of such broadcast, disclose the fact of such acceptance or payment or agreement to the payee's employer, or to the person for whom such program or program matter is being produced, or to the licensee of such station over which such program is broadcast.

### (c) Supplying of program or program matter

Subject to subsection (d), any person who supplies to any other person any program or program matter which is intended for broadcasting over any radio station shall, in advance of such broadcast, disclose to such other person any information of which he has knowledge, or which has been disclosed to him, as to any money, service or other valuable

consideration which any person has paid or accepted, or has agreed to pay or accept, for the inclusion of any matter as a part of such program or program matter.

## (d) Waiver of announcements under section 317(d)

The provisions of this section requiring the disclosure of information shall not apply in any case where, because of a waiver made by the Commission under section 317(d) of this title, an announcement is not required to be made under section 317 of this title.

## (e) Announcement under section 317 as sufficient disclosure

The inclusion in the program of the announcement required by section 317 of this title shall constitute the disclosure required by this section.

## (f) "Service or other valuable consideration" defined

The term "service or other valuable consideration" as used in this section shall not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a broadcast, or for use on a program which is intended for broadcasting over any radio station, unless it is so furnished in consideration for an identification in such broadcast or in such program of any person, product, service, trademark, or brand name beyond an identification which is reasonably related to the use of such service or property in such broadcast or such program.

## (g) Penalties

Any person who violates any provision of this section shall, for each such violation, be fined not more than $10,000 or imprisoned not more than one year, or both.