# UNITED STATES COURT OF APPEALS

# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

NATIONAL ASSOCIATION OF BROADCASTERS, *Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

*Respondents*.

————————

On Petition for Review from the Federal Communications Commission

————————

# FINAL REPLY BRIEF OF PETITIONER

————————

Stephen B. Kinnaird
1701 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006
(202) 469-1691
skinnaird2000@icloud.com

Richard Kaplan
Jerianne Timmerman
Erin L. Dozier
NATIONAL ASSOCIATION OF
BROADCASTERS
1 M Street, SE
Washington, DC 20003
(202) 429-5430
rkaplan@nab.org
jtimmerman@nab.org
edozier@nab.org

January 31, 2025

*Counsel for Petitioner National
Association of Broadcasters*

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioner NAB states as follows:

NAB is a nonprofit, incorporated association of radio and television stations. It has no parent company, and has not issued any shares or debt securities to the public; thus, no publicly held company owns ten percent or more of its stock. As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, the coalition is a trade association for purposes of D.C. Circuit Rule 26.1.

/s/ Stephen B. Kinnaird

Stephen B. Kinnaird
*Counsel for Petitioner*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS ...................................................... ii

GLOSSARY ........................................................................................... vii

SUMMARY OF ARGUMENT ................................................................... 1

ARGUMENT ......................................................................................... 3

I. Extending the Foreign Sponsorship Rules to Non-Candidate Political Advertising and Paid PSAs Is Unlawful ........................................ 3

    A. The Commission Violated Notice-and-Comment Obligations in Expanding its "Lease" Definition ........................................... 3

        1. The Second NPRM Did Not Notify the Public That the Commission Proposed to Redefine "Lease" to Include Traditional, Short-Form Advertising. ......................................... 3

        2. The Second NPRM Did Not Give Notice That Non-Candidate Political Advertising and Paid PSAs Would Be Covered Leases. ................................................................................. 8

    B. The Commission Has Failed to Give a Reasoned Explanation for the New Rules ........................................................................... 11

    C. The Commission's Content-Based Regulations That Discriminate Against Non-Candidate Political Advertising and Paid PSAs Violate the First Amendment ........................................................... 17

        1. The Commission Adduced No Evidence of Foreign Sponsorship That Justifies Regulation of Speech .................... 17

        2. The Order Fails Strict Scrutiny. ................................. 18

        3. Intermediate Scrutiny Does Not Apply, But Is Fatal to the Order Regardless ................................................... 19

II. The Commission Lacks the Statutory Authority to Impose Inquiry-And-Corroboration Requirements on Content Providers Who Lease Airtime .... 24

    A. Section 317 of the Communications Act Does Not Authorize the Commission to Require Broadcasters to Demand Corroboration from Lessees ........................................................................... 25

B.  The Commission Lacks Authority to Impose Inquire-And-Corroborate Requirements Regarding Inducements Paid to Others in the Production and Distribution Chain................................................................27

C.  The Commission Lacks Statutory Authority to Impose Corroboration Requirements on Lessees................................................................29

CONCLUSION .................................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**Page(s)**

<small>**CASES**</small>

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ........................................................................ 11

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984) .......................................................................................... 18

*Bus. Guides, Inc. v. Chromatic Comms. Enters., Inc.*,
    498 U.S. 533 (1991) .......................................................................................... 26

*CSX Transp., Inc. v. Surface Transp. Bd.*,
    584 F.3d 1076 (D.C. Cir. 2009) ....................................................................... 3, 9

*Env't Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005) ...................................................................... 7, 8, 9

*FCC v. Fox Televisions Stations, Inc.*,
    556 U.S. 502 (2009) .......................................................................................... 15

*FCC v. League of Women Voters*,
    468 U.S. 364 (1984) ...................................................................................... 19, 20

*FEC v. Cruz*,
    596 U.S. 289 (2022) ...................................................................................... 17, 18

*H.L. Wabash Ry. Co. v. McDaniels*,
    107 U.S. 454 (1883) .......................................................................................... 26

*Leflore Broad. Co. v. FCC*,
    636 F.2d 454 (D.C. Cir. 1980) ......................................................................... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................................ 11

*NAACP v. Button*,
    371 U.S. 415 (1963) .......................................................................................... 17

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

*Nat'l Ass'n of Broad. v. FCC*,
  39 F.4th 817 (D.C. Cir. 2022)................................................25, 26, 29

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)........................................................................19

*Ruggiero v. FCC*,
  317 F.3d 239 (D.C. Cir. 2003).......................................................20

*Sanjour v. EPA*,
  56 F.3d 85 (D.C. Cir. 1995)...........................................................22

*Sierra Club v. EPA*,
  705 F.3d 458 (D.C. Cir. 2013).......................................................28

*TikTok Inc. v. Garland*,
  122 F.4th 930 (D.C. Cir. 2024)......................................................22

*Turner Broadcasting System, Inc. v. FCC*,
  520 U.S. 180 (1997)........................................................................18

*United States v. Hansen*,
  599 U.S. 762 (2023)........................................................................23

*Washington Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019).........................................................19

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015)........................................................................18

*Yee v. City of Escondido*,
  503 U.S. 519 (1992)........................................................................27

STATUTES

22 U.S.C. § 614(a)-(b) .....................................................................13

22 U.S.C. § 618(a)(1).......................................................................13

47 U.S.C. § 317(b) ...........................................................................29

47 U.S.C. § 317(c) ...........................................................2, 25, 26, 29

Administrative Procedure Act.............................................1, 6, 7, 8, 11

v

Foreign Agents Registration Act ...............................................................13, 21, 23

**REGULATIONS**

28 C.F.R. §§ 5.400(b), 5.402(d)..............................................................13

47 C.F.R. § 73.1212(j)(3)(i)...............................................................23, 25

47 C.F.R. § 73.1212(j)(3)(iii)..................................................................28

**CONSTITUTIONAL PROVISIONS**

First Amendment..............................................................2, 17, 18, 19, 20

**OTHER AUTHORITIES**

Department of Justice, Press Release, *Court Finds RM Broadcasting Must Register as a Foreign Agent* (May 13, 2019), https://www.justice.gov/opa/pr/court-finds-rm-broadcasting-must-register-foreign-agent...........................................................................13

Kathryn Cramer Brownell, *This is How Presidential Campaign Ads First Got on TV (*Time Aug. 30, 2016), https://time.com/4471657/political-tv-ads-history/..............................................................................................14

Open Secrets, *Candidate Counts*, https://www.opensecrets.org/elections-overview/candidate-counts ................................................................16

# GLOSSARY

| | |
|---|---|
| **2021 Order** | Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 36 FCC Rcd 7702 (2021) |
| **APA** | Administrative Procedure Act |
| **Act** | Communications Act of 1934, as amended |
| **DOJ** | Department of Justice |
| **FARA** | Foreign Agents Registration Act |
| **FCC or Commission** | Federal Communications Commission |
| **JA** | Joint Appendix |
| **MMTC** | Multicultural Media, Telecom and Internet Council, Inc. |
| **NAB** | National Association of Broadcasters |
| **Order** | Second Report and Order, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, MB Docket No. 20-299, FCC No. 24-61 (rel. Jun. 10, 2024) |
| **PSA** | public service announcement |
| **Second NPRM** | Second Notice of Proposed Rulemaking, *Sponsorship Identification Requirements for Foreign Government-Provided Programming*, 37 FCC Rcd 12004 (2022) |

# SUMMARY OF ARGUMENT

The Commission's defense of the Order falls far short. The Commission has violated the notice-and-comment requirements of the Administrative Procedure Act ("APA"). The 2022 Notice of Proposed Rulemaking ("Second NPRM") gave no notice that the Commission was fundamentally changing its definition of the key regulatory term "lease" from the 2021 Order. That 2021 Order defined leases consistent with industry practice as any compensated arrangements to make blocks of time available for *programming* by another party, and clarified that traditional, short-form advertising was *not* a lease. The current Order takes the opposite stance, now declaring *all* advertising to be leases unless exempt. But advertising spots do not program blocks of time, and the Commission could not unveil this radically altered definition only in the final rule. The new definition is not a logical outgrowth of the Second NPRM, which only inquired about the dividing line between when something is an advertisement and when it is a lease; the Commission was seeking only to resolve ambiguity as to advertising of such duration that it resembles programming "a block of time." Regardless, the Second NPRM gave no notice of the Order's new categorical lines, whereby commercial advertising and candidate political advertising are not "leases," but non-candidate political advertising and paid public service announcements ("PSAs") somehow are.

The Order is also arbitrary and capricious because the Commission never explained why the absence of evidence of foreign governmental sponsorship of advertising justified excluding that speech from the rules in 2021 but not in 2024, and because the Commission's stated reasons for excluding candidate advertising also apply to third-party advertising for candidates.

Furthermore, the Order violates the First Amendment. The Commission cannot regulate speech without evidence of actual harm; it has no evidence of foreign sponsorship of non-candidate political advertising or paid PSAs. The Order thus does not serve a compelling or even substantial government interest, and the Commission's new assertion that its rules protect national security is far-fetched. The Order is certainly not narrowly tailored. It is not limited to programming where there was at least some evidence of foreign sponsorship (conventional leases) or programming with national security implications; its reach is overinclusive; and its corroboration requirements are ineffectual in detecting undisclosed foreign governmental sponsors.

The Commission also lacks statutory authority to impose its new inquire-and-corroborate requirements on all leases. This Court has held that Section 317(c) of the Act imposes upon licensees only a narrow duty of inquiry to identify the sponsor; the Commission cannot affix additional duties like demanding lessee corroboration. It also cannot impose extra-statutory duties to solicit information

regarding inducements furnished by foreign governmental entities to others, nor impose corroboration duties on lessees, directly or indirectly.

## ARGUMENT

## I. Extending the Foreign Sponsorship Rules to Non-Candidate Political Advertising and Paid PSAs Is Unlawful

### A. The Commission Violated Notice-and-Comment Obligations in Expanding its "Lease" Definition

The Commission fails to defend the rules as a "logical outgrowth" of the Second NPRM. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009). Here, the Commission neglected to give the public the requisite notice both that (1) it would change the definition of "lease" to include all advertising unless exempted, and (2) it would exempt commercial and candidate-sponsored political advertising, but not all other political advertising and paid PSAs.

#### 1. The Second NPRM Did Not Notify the Public That the Commission Proposed to Redefine "Lease" to Include Traditional, Short-Form Advertising.

As two of the five Commissioners stated in dissent, the Commission "did not provide fair notice" in the Second NPRM that "it might redefine 'lease' in [a] fundamental way" to encompass "short-form advertisements." Statement of Commissioner Brendan Carr, Dissenting in Part ("Carr Statement") (JA325); Statement of Commissioner Nathan Simington, Dissenting ("Simington

Statement") (JA326-27) (Commission's new definition is "the *exact opposite* of what we said in 2021 and 2022").

The Commission denies changing the "lease" definition. It says "the 2021 Order … defined leases to cover all sales of 'broadcast time' to third parties." FCC Br. 39. The Commission maintains that "[t]he final Order kept the definition of 'lease' adopted in the 2021 Order," *id.* at 37, but "simply replaced the undefined exception for 'traditional, short-form advertising time' with exceptions defined by the boundaries of Rule 73.1212(f) and Section 315," *id.* at 40.

The Commission's account is wrong. It willfully ignores the full 2021 definition, which described a "lease" as "any agreement in which a licensee makes a discrete block of broadcast time on its station available *to be programmed by another party* in return for some form of compensation." 2021 Order ¶ 28 (JA014) (emphasis added). That definition comports with industry usage, in which a lease essentially turns the broadcaster's keys to its licensed spectrum over to the lessee to program a block of time. But that statement does not describe sales of ordinary 30- or 60-second advertising spots. Indeed, as the Commission explained in 2021, leasing agreements "give one party—the brokering party or programmer—the right and obligation to program the station licensed to the other party—the licensee or broadcaster," with the lessee "oftentimes also selling the advertising during such [leased] time and retaining the proceeds." *Id.* ¶ 27 (JA014). Advertisements

"appear in programming aired by the licensee or provided by a third-party programmer," *id.* ¶ 29 n.85 (JA015); they are not themselves leases of blocks of time for third-party programming.

The Commission never described, and no broadcaster would have considered, each sale of a 30- or 60-second advertising spot as a lease. Accordingly, after the Commission in 2021 defined the term "lease," it disclaimed "that traditional, short-form advertising time constitutes a lease of airtime for these purposes." *Id.* ¶ 28 (JA014 - JA015). The 2021 Order defined leases as distinct from short-form advertising, in keeping with industry usage. That Order did not define leases as all sales of station time, including advertising, subject to any policy-based "exceptions" that the Commission may devise, as it now contends (FCC Br. 40). Instead, the 2021 Order restricted the foreign-sponsor rules to leases, rather than applying to all broadcast matter as originally proposed, because there was no evidence of foreign sponsorship of other broadcast matter, including advertising. *Id.* ¶ 29 (JA015); NAB Br. 27-28. Leases and short advertising spots are different in kind, and the 2021 Order treated them as such.

The Commission claims support from the petition of certain network affiliates for clarification of the 2021 Order, FCC Br. 43-44, but misreads that petition, which never recognized conventional short advertising spots as leases. To the contrary, the affiliates declared that "[i]n nearly all cases, the distinction

between advertising and non-advertising content is an easy one for licensees to make." ABC Television Affiliates Association et al., Petition for Clarification, MB Docket No. 20-299, at 4 (July 19, 2021) (JA056). But the affiliates objected that the undefined phrase "traditional, short-form advertising" was not commonly used in the industry, which sells advertising of many different lengths. *Id.* at 3-4 (JA055-56). Without clarification, the affiliates expressed "concern[] that the term 'traditional short-form advertising' could be read narrowly, leaving various common forms of broadcast advertising subject to the new rules," and advocated that the foreign-sponsor rules should not apply to advertising of any duration, short-form or long. *Id.* at 2 (JA054). The affiliates never deemed all advertising to be leases; they acknowledged only that "*cases could arise* in which it is difficult to determine the difference between an advertisement and a lease of time for programming content," but that "the Commission did not have examples of leased capacity content masquerading as advertising before it in this proceeding, and it need not try to fashion a rule today that will resolve every future question." *Id.* at 4-5 (JA056-57) (emphasis added). The acknowledgement that there may conceivably be debatable cases at the margin does not remotely suggest that the 2021 Order defined a "lease" to include all advertising unless exempt.

The Commission next argues that, even if the 2024 Order adopted a new "lease" definition, it was a logical outgrowth of the Second NPRM. FCC Br. 47.

Not so. The Second NPRM asked for comment on the issues raised in the affiliates' petition—namely, whether all advertising should be excluded from the rules—and inquired as to "what criteria the Commission might adopt *to distinguish* between advertising and programming arrangements for the lease of airtime." Second NPRM ¶ 32 (JA072-73) (emphasis added). Specifically, the FCC asked whether there were "key characteristics that could assist in *distinguishing advertising spots from a lease of airtime* on a station, such as duration, content, editorial control, or differences in the nature of the contractual relationship between the licensee and the entity that purchases an advertising spot versus leasing airtime for programming." *Id.* (emphasis added). The Commission thus only notified the public that it was contemplating excluding all advertising from its rules or refining the leasing/advertising distinction. The public could not have gleaned that the Commission was considering a radical redefinition whereby all advertising is leasing unless exempt—"the exact opposite" of the 2021 Order and the Second NPRM. Simington Statement (JA326).

The Commission's abrupt about-face in its lease definition, without Federal Register notice, violates the APA. This case parallels *Environmental Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005). There, the EPA in its notice declared that sources could comply with its emission monitoring rules under two "separate regulatory standard[s]," but its final rule "switched course and adopted

the opposite position" that the regulations did not define separate standards and thus made compliance more restrictive. *Id.* at 995. This Court held that the concept of a logical outgrowth "certainly does not include the Agency's decision to repudiate its proposed interpretation and adopt its inverse." *Id.* at 997-98. So too here, the Commission's "surprise switcheroo," *id.* at 996, in interpreting the key term "lease," on which applicability of the foreign-sponsor rules depends, violates the APA.

> **2. The Second NPRM Did Not Give Notice That Non-Candidate Political Advertising and Paid PSAs Would Be Covered Leases.**

Even apart from the "lease" definition, the Commission failed to give published notice that it might subject non-candidate political advertising and paid PSAs to the foreign-sponsor requirements.

The Commission characterizes the Order as the logical outgrowth of the Second NPRM because it supposedly gave notice that the Commission was re-evaluating the lease-advertising distinction based on programming "'content.'" FCC Br. 36-37. But the Second NPRM only mentioned "content" insofar as it "could assist in distinguishing advertising spots from a lease of airtime on a station." Second NPRM ¶ 32 (JA072-73). The content distinctions the Commission ultimately adopted—between candidates advertising and all other political advertising and paid PSAs, and between commercial and political advertising—are

not differentiators between leasing and advertising. The public could not have anticipated that the Commission might draw those lines, and therefore comment upon them.

The Commission's conception—that asking about the lease-advertising distinction generally allows it to draw any substantive lines it wants, FCC Br. 36-37—misunderstands the logical-outgrowth doctrine. "If the APA's notice requirements mean anything, they require that a reasonable commenter must be able to trust an agency's representations about which *particular* aspects of its proposal are open for consideration." *Env't Integrity Project*, 425 F.3d at 998. This Court repeatedly rejects logical-outgrowth claims when a rulemaking notice inquired about a general topic but did not alert the public to the specific provision ultimately adopted. *See* NAB Br. 32-35. "[A] final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX Transp., Inc.*, 584 F.3d at 1079-80 (cleaned up). Nothing in the Second NPRM suggested that conventional 30- and 60-second non-candidate political advertising or paid PSAs would suddenly be subject to the foreign-sponsor rules.

The Commission's other scattershot arguments lack force. It describes the Order as merely adopting "exceptions defined by the boundaries of Rule

73.1212(f) and Section 315 [of the Communications Act]," FCC Br. 40, but that is unavailing for two reasons. First, the Second NPRM never alerted the public that "exceptions" might be drawn along those lines, and indeed never mentioned Section 315. Second, Section 315 (which applies only to candidates for federal office who seek preferred advertising rates) does not define the boundaries of the candidate advertising exception (which applies to state and local candidates as well). *See* NAB Br. 41. The Commission 's suggestion that the Order was foreseeable to the public because it hewed to statutory or regulatory lines fails.

The Commission next observes that some commenters advocated excluding all commercial advertising from the foreign-governmental sponsor rules regardless of duration, and then draws the (unjustifiable) negative inference that those commenters accepted that political advertising were leases. FCC Br. 37-38. But those commenters mentioned commercial advertising because the only advertisements that were debatably leases were lengthy infomercials, which are almost always commercial advertising. These commenters were endorsing the affiliates' position that exclusion from the rules should not depend upon an ad's duration, not blessing inclusion of political advertising. Indeed, one such commenter declared that "[t]here is … no basis to include any types of advertisements within the scope of the rule." Comments of Gray Television Licensee, MB Docket No. 20-299, at 12 (Jan. 9, 2023) (JA158).

The Commission cannot deny that sweeping in political advertising "would doubtless have triggered an avalanche of comments" from affected broadcasters and political advertisers, which belies any claim of proper notice. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014). While an agency may assimilate comments and modify its proposal, this case is unlike *Sierra Club v. Costle*, where "a variable sliding scale percentage reduction requirement was generally understood to be a serious possibility from the start of the rulemaking," and the final numerical parameters were within the ranges considered. 657 F.2d 298, 355-56 (D.C. Cir. 1981) (cited FCC Br. 38). Here, no commenter advocated subjecting any political advertising (much less 30- and 60-second spots) or paid PSAs to the foreign-sponsor rules.

The Commission's failure to provide notice starkly violates the APA.

## B. The Commission Has Failed to Give a Reasoned Explanation for the New Rules

The Commission also failed to satisfy the arbitrary-and-capricious standard by not "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Commission maintains that "the Order reflects a reasonable response to evidence that licensees had aired material provided by the Chinese and Russian

governments without disclosing that fact," and that it was entitled to impose inquire-and-corroborate requirements for political advertising and paid PSAs even if no foreign government has ever sponsored them. FCC Br. 43. The Commission cites this Court's decision *China Telecom (Ams.) Corp. v. FCC* for the proposition that "conclusions must often be based on informed judgment rather than concrete evidence," 57 F.4th 256, 266 (D.C. Cir. 2022), but omits the limitation that this proposition applies "[i]n the national security context," *id.* The Order is not a national security rule. Furthermore, while the Commission in *China Telecom* did not have any direct evidence of cyberattacks by the carrier controlled by the Chinese government, its informed judgment that China Telecomm posed a national security risk was based on "compelling evidence that the Chinese government may use Chinese information technology firms as vectors of espionage and sabotage," including "a recent string of state-sponsored cyberattacks." *Id.* No comparable evidence here supports expanding the foreign-sponsor rules to political advertising and paid PSAs.

The Commission does not dispute that its evidence of *any* foreign governmental sponsorship of broadcasting is narrow. The only highly localized evidence of foreign sponsorship occurred at a handful of stations (fewer than 0.1%

of the nation's 12,000+ commercial broadcasters[1]), and only pursuant to conventional leases of multi-hour blocks of time. NAB Br. 37-38. While undisclosed foreign sponsorship of leased programming rarely occurred in the past, in 2019 the Department of Justice secured a court order requiring the sponsor of Russia's Sputnik radio programming to register with the Foreign Agents Registration Act ("FARA"). Department of Justice, Press Release, *Court Finds RM Broadcasting Must Register as a Foreign Agent* (May 13, 2019), https://www.justice.gov/opa/pr/court-finds-rm-broadcasting-must-register-foreign-agent; *see also* NAB Br. 38 (Radio Sputnik ceased operations in 2024). The Commission did not identify at the time of the Order any foreign governmental entity sponsoring broadcast programming that was not registered with FARA and not complying with FARA's disclosure obligations, which require agents to disclose their foreign principal in broadcast material and submit copies thereof to the Department of Justice, at pain of criminal sanction, *see* 22 U.S.C. §§ 614(a)-(b), 618(a)(1); 28 C.F.R. §§ 5.400(b), 5.402(d).

Even if *arguendo* possible surreptitious foreign governmental sponsorship justifies some form of universal-disclosure regime, as the Commission insists (Br. 27), it should be limited to the type of programming in which foreign sponsorship

---

[1] Notice of Ex Parte Communication, NAB, MB Docket No. 20-299 (Oct. 11, 2022) (JA094).

has occurred previously (*i.e.*, conventional leases). It is arbitrary to extend the rules to non-candidate political advertising and paid PSAs—which have very different audiences, formats, economics, and purposes—where foreign sponsorship has not occurred.

Indeed, the Commission originally limited the foreign-sponsor rules to leased programming to exclude broadcast matter "where there is no evidence of foreign government sponsored programming," identifying "advertisements" as not "a significant source of unidentified foreign sponsored programming." 2021 Order ¶ 29 (JA015). The Commission attempts a two-step around this statement. First, it claims (without basis) that the statement refers to "traditional, short-form advertising." FCC Br. 45. But the 2021 Order used the latter phrase only in clarifying its definition of a "lease," 2021 Order ¶ 28 (JA014-15), not in discussing the evidence. Regardless, that would not cure the Order's arbitrariness, since it sweeps in advertising that primarily consists of 30- and 60- second spots. That leads the FCC to its second step, which is to urge that "'traditional' advertising is best read to refer to commercial advertising." FCC Br. 45. The 2021 Order never says that, and the gloss is untenable. Short-form political advertising spots date from the early decades of broadcasting; for example, Dwight Eisenhower famously conducted a mass-media campaign of 30-second broadcast advertising spots in 1952. *See* Kathryn Cramer Brownell, *This is How Presidential Campaign Ads First*

*Got on TV* (Time Aug. 30, 2016), https://time.com/4471657/political-tv-ads-history/. Notably, broadcasters never treated political advertising as within the 2021 Order, and the Commission never enforced that unfounded interpretation. But the Commission's gloss is irrelevant; the bottom line is that the Commission adduced no evidence of foreign meddling in non-candidate political advertising or paid PSAs.

That alone makes the Order arbitrary, but so too does the unexplained shift in policy rationales: lack of evidence of foreign sponsorship was a basis for exclusion from the rules in 2021, but not in 2024. "[A] reasoned explanation is needed for disregarding facts and circumstances that underlay … the prior policy." *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

The Commission compounded its error by never considering the costs of extending its disclosure regime to hundreds of thousands of new transactions. NAB Br. 40. The Commission's rejoinder that it relaxed or simplified certain requirements (FCC Br. 46) misses the mark; the Commission never analyzed whether the universal burdens it did impose were justified by the bare (and unlikely) possibility of detecting a foreign sponsor.

Finally, it is "senseless" to *exclude* one category of speech (candidate advertising) because of federal law prohibitions on foreign-party involvement, but *include* another (non-candidate advertising for a candidate) subject to the same

prohibitions. *See* Simington Statement (JA327). The Commission counters that the exclusion of candidate advertising is also justified by the disclosures required by Section 315 of the Communications Act, FCC Br. 46-47, but that only applies to candidates for federal office who seek preferred advertising rates, which is only a small subset of the federal, state, and local candidates whose advertising is exempt under the Order. NAB Br. 41; *see* Open Secrets, *Candidate Counts,* https://www.opensecrets.org/elections-overview/candidate-counts (listing 52,065 candidates for the U.S. House and Senate versus 225,265 candidates for statewide office, 1980-2024; not listing local candidates).

The Commission also argues it may treat third-party advertising for candidates differently because it grouped that speech with traditional issue advocacy into a category it (mis)labeled political "issue advertisements," and federal law does not prohibit foreign sponsorship of the whole of that invented category. FCC Br. 20, 45-46. But the Commission's artificial grouping does not undo the arbitrariness of treating third-party candidate advertising differently from the candidate's own advertising. NAB Br. 19, 41.

The absence of evidence of foreign governmental sponsorship of the covered advertising and paid PSAs; the lack of justification for the vast expansion of affected transactions; and the arbitrariness of the Commission's lines are all fatal to

the Order's extension of the foreign-sponsor requirements to non-candidate political advertising and paid PSAs.

### C. The Commission's Content-Based Regulations That Discriminate Against Non-Candidate Political Advertising and Paid PSAs Violate the First Amendment

The Commission also fails to justify the Order under the First Amendment.

#### 1. The Commission Adduced No Evidence of Foreign Sponsorship That Justifies Regulation of Speech.

Whatever freedom an administrative agency generally has to adopt prophylactic measures, the inquiry differs when the Government burdens constitutionally protected speech. *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect."). The threshold question—under any constitutional standard—is whether the government has established that the speech restriction prevents actual harm. "Because the Government is defending a restriction on speech as necessary to prevent an anticipated harm, it must do more than simply posit the existence of the disease sought to be cured. It must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (internal citation omitted). The Courts have "never accepted mere conjecture as adequate to carry a First Amendment burden." *Id.*

The Commission does not dispute that it has no evidence of foreign sponsorship of non-candidate political advertising or paid PSAs, but maintains that

its (very scant) evidence of foreign governmental sponsorship of conventional multi-hour leased programming suffices. FCC Br. 55-56. It does not. Thirty- and 60-second political advertising spots and paid PSAs, the overwhelming majority of the affected transactions, are not leased programming. This Court must independently determine whether the Commission had substantial evidence of foreign governmental sponsorship justifying the wholesale regulation of non-candidate political advertising and paid PSAs, *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 207-08 (1997), and not accept the Commission's false fiat that all advertisements are leases. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510-11 (1984).

The Commission (FCC Br. 55) relies on *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015), but that case is inapposite. It addresses the precision of relief, *see id.* at 453-54, not whether the Government must have evidence of harm in the first place. The record does not demonstrate the need to extend the foreign-sponsor rules to non-candidate political advertising or paid PSAs, and thus the expansion cannot be squared with the First Amendment. *Cruz*, 596 U.S. at 307.

### 2. The Order Fails Strict Scrutiny.

NAB also demonstrated that the Order is a content-based regulation that fails strict scrutiny. NAB Br. 44-46. The Commission erroneously claims that the Order is content-neutral because it is not does "not 'appl[y] to particular speech

because of the topic discussed or the idea or message expressed,'" FCC Br. 50 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)), but never explains why that is so. To the contrary, the applicability of the Order clearly turns on program content: namely, (1) whether it is commercial advertising versus political advertising or a paid PSA, and (2) within political advertising, whether the content of the advertising is a political candidate advocating his or her own election, as opposed to a third party promoting the election of another or engaging in issue advocacy. Regulations that treat certain political speech differently are not content-neutral. *Reed*, 576 U.S. at 169; *Washington Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019) ("content-based regulations that target *political* speech are especially suspect"). The Commission does not dispute NAB's showing that the Order is unconstitutional under strict scrutiny. NAB Br. 46-47.

### 3. Intermediate Scrutiny Does Not Apply, But Is Fatal to the Order Regardless

The Commission contends that, even if the Order is content-based, broadcast regulation is always subject to reduced scrutiny. FCC Br. 50-52. There is no such categorical rule. Courts in some circumstances have afforded reduced First Amendment protection of broadcaster speech because of spectrum scarcity that limits speech access. *See Leflore Broad. Co. v. FCC*, 636 F.2d 454, 457 (D.C. Cir. 1980); *FCC v. League of Women Voters*, 468 U.S. 364, 376-81 (1984). But the Order here does not broaden speakers' access to the airwaves; it instead burdens

the speech of content providers to whom broadcasters are giving access. Moreover, the expanded foreign-sponsor rules do not just burden broadcasters—they also burden political speakers wanting to get their messages out to the public via candidate endorsements, issue advocacy, and PSAs. Those speakers and their messages should not receive lesser First Amendment protections.

Even if reduced scrutiny were warranted, it would not be (as the FCC contends, FCC Br. 49) the standard of *Ruggiero v. FCC*, 317 F.3d 239 (D.C. Cir. 2003), which applies only to content-neutral regulations, *id.* at 245. If any standard other than strict scrutiny were appropriate, it would be intermediate scrutiny, in which broadcast restrictions will be "upheld only" if "narrowly tailored to further a substantial governmental interest." *League of Women Voters*, 468 U.S. at 380; *Ruggiero*, 317 F.3d at 245 (noting that intermediate scrutiny applies to content-based broadcast regulations).

There is no substantial governmental interest in extending the foreign-sponsor rules to non-candidate political advertising and paid PSAs, when there is no evidence that any foreign governmental entity has *ever* sponsored that type of speech. *See League of Women Voters*, 468 U.S. at 391 (finding no substantial interest where the identified risk of harm was "speculative at best"). Moreover, the Commission's newly minted assertion that the Order protects national security, FCC Br. 54-55, dilutes that concept beyond recognition. The Commission made no

showing that any past foreign-sponsored programming posed national security risks, and the Order is not limited to such programming. Advertising that advocates election of a given candidate for a state or local office does not jeopardize national security, and the Order covers all topics of issue advocacy and paid PSAs, and thus innumerable issues having nothing to do with national security (*e.g.*, highway safety or Medicare reform).

Even if there were a substantial interest, the utterly ineffectual Order does not further it. Foreign governments and their agents who are above board comply with FARA and already disclose their principals in the sponsored programming; corroboration requirements are not needed for them to make the additional disclosure of the country represented. Any surreptitious foreign sponsors (if they exist) already committing the crime of violating FARA will simply ignore the certification option or (better yet) truthfully produce screenshots verifying that they are not registered in the FARA database, thus escaping detection. NAB Br. 49-50, 53-54. And, for the screenshot option, the additional requirement that hundreds of thousands of political advertisers and PSA sponsors supply screenshots of the Commission's Section 624 website annually to prove they are not registered U.S.-based foreign media outlets, when no such entities exist, is perverse. NAB Br. 53.

Even if the Order could be said to advance a government interest, it is not narrowly tailored. While a regulation need not be the least restrictive means under

intermediate scrutiny, the "means chosen [must] not burden substantially more speech than is necessary to further the government's legitimate interests." *Turner Broad.*, 512 U.S. at 662; *TikTok Inc. v. Garland*, 122 F.4th 930, 948-49 (D.C. Cir. 2024), *aff'd* 604 U.S. ---, 2025 WL 222571 (Jan. 17, 2025). Here, the Commission had no reason to impose inquire-and-corroborate requirements upon hundreds of thousands of transactions selling non-candidate political advertising and paid PSAs absent any demonstrated risk of foreign sponsorship; it could have protected any asserted interest by limiting its rule to actual leases. *See Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995) ("If the government has a substantial interest with respect to only a subcategory of the restricted speech, then its interest will not readily outweigh the burden imposed on the larger category of speech subject to regulation."). If its objective were protecting national security, as it now asserts, it could have limited the Order to programming with national security implications. And, because its corroboration requirements are ineffective, the Commission could have burdened less speech in accomplishing its goals by limiting the broadcaster's duty to inquiring as to foreign governmental identity. Lastly, the Order is overinclusive because it includes a category of speech (third-party advertising about candidates) that the Commission acknowledges has no more risk of undisclosed foreign sponsorship than an excluded category (candidate advertising),

at least as to state and local candidates and federal candidates who do not seek preferred rates under Section 315. NAB Br. 41.

The Commission improperly ignores the systemic burdens upon both licensees and advertisers/PSA sponsors of the foreign-sponsor rules' expansion. FCC Br. 59-60. The latter's burdens are relevant because all applications of the Order to non-candidate political advertising and paid PSAs are unconstitutional, and thus the Order's overbreadth is substantial relative to its potentially legitimate sweep. *United States v. Hansen*, 599 U.S. 762, 770 (2023). The Commission's attempt to discount the burdens on licensees and advertisers/PSA sponsors falls short. The licensee must train its staff on the new requirements. The rules also impose a duty on the licensee to educate each advertiser/sponsor on the regulatory requirements, including the two corroboration requirements. 47 C.F.R. § 73.1212(j)(3)(i). For the regulations to work as intended, the potential advertiser/sponsor will need to devote resources to understanding the rules and the certification and screenshot requirements, understanding FARA and the complex legal definitions drawn therefrom, and the navigation of government websites. Even though very few (if any) advertisers/sponsors are foreign governmental entities, most laypersons and organizations will be wary of making legal certifications involving complex statutory definitions (or corroborations pursuant to a federal regulation) without review by a lawyer. This will lead many to forego

broadcast advertising in favor of rival media without these hassles; deterring advertisers/sponsors from their using a chosen forum burdens them and broadcasters alike. And the cumulative burdens of these activities across hundreds of thousands of transactions annually is all for nought; not only are virtually none of the affected parties undisclosed foreign governmental entities, but the Order would not catch any that are. The Order is unconstitutional.

Lastly, abolishing the exception for candidate advertising would not cure the violation (see FCC Br. 62-33). Such a modified regulation would still be content-based because it applies to advertising based on its content (political versus commercial). Furthermore, the gravamen of the constitutional violation is the complete lack of evidence of foreign sponsorship of *any* political advertising or paid PSAs justifying the Order's burdens on speech. Expanding the Order to encompass an additional category of speech (candidate advertising) that the Commission acknowledges has no risk of foreign sponsorship would not fix the Order's constitutional flaws.

## II. The Commission Lacks the Statutory Authority to Impose Inquiry-And-Corroboration Requirements on Content Providers Who Lease Airtime

The Commission also fails to rebut NAB's showing that it lacks statutory authority to impose inquiry-and-corroboration requirements on licensees and lessees, including certain advertisers.

**A.    Section 317 of the Communications Act Does Not Authorize the Commission to Require Broadcasters to Demand Corroboration from Lessees**

Section 317(c) provides that "[t]he licensee of each radio station shall exercise reasonable diligence *to obtain … information* to enable such licensee to make the announcement required by this section." 47 U.S.C. § 317(c) (emphasis added). This Court has held that "the 'to obtain' clause means broadcasters do not need to exercise diligence in general," but "simply need to be diligent in their efforts 'to obtain' the necessary information 'from' employees and sponsors. . . . Nothing more." *Nat'l Ass'n of Broad. v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022) ("*NAB*") (internal citation omitted). Accordingly, Section 317(c) imposes only a "narrow duty of inquiry" upon broadcasters: to obtain information necessary to make the announcements required by Sections 317(a) and (b). *Id.* at 820.

The FCC has exercised its rulemaking authority to pronounce that disclosure of a foreign governmental sponsor requires disclosure of both its name and the country. 47 C.F.R. § 73.1212(j)(3)(i). Thus, when the station inquires as to the sponsor's name, whether it is a foreign governmental entity, and, if so, the name of the country, it has met its statutory duty.

Just as the Commission cannot require the station to investigate the veracity of the responses, *NAB*, 39 F.4th at 820, it cannot require the station to demand

corroboration from the sponsor, whether in the form of legal certifications or screenshots from government databases.

The Commission characterizes corroboration as part of Section 317(c)'s duty of inquiry, but that duty is limited "*to obtain[ing] … information* to enable such licensee to make the announcement required by this section." 47 U.S.C. § 317(c). This Court rejected the Commission's claim that investigation is part of the duty of inquiry, *NAB*, 39 F.4th at 820, and should do the same with corroboration. If the broadcaster has obtained the requisite announcement information, it has satisfied Section 317(c)'s "narrow duty of inquiry," even absent corroboration.

Even if *arguendo* corroboration is part of the duty of inquiry, the Order still violates the statute, which requires only "reasonable diligence" in obtaining announcement information. 47 U.S.C. § 317(c). While the Commission has some prescriptive latitude with this term, it cannot disregard its limits. Reasonable diligence is always a function of what is reasonable under the circumstances. *Bus. Guides, Inc. v. Chromatic Comms. Enters., Inc.*, 498 U.S. 533, 551 (1991) (standard for "reasonable inquiry" is "reasonableness under the circumstances"); *H.L. Wabash Ry. Co. v. McDaniels*, 107 U.S. 454, 460 (1883) ("reasonable diligence" depends on circumstances). For virtually all lessees under the Commission's definition—the local church broadcasting Sunday services, the high school broadcasting football games, organizations endorsing a candidate for

sheriff, or the local government making a paid PSA—there is no colorable risk of foreign governmental sponsorship, and corroboration of that non-fact is no part of reasonable diligence. Perhaps the Commission could have prescribed corroboration for leases with a demonstrable substantial risk of foreign governmental involvement (*e.g.*, where the sponsor is a foreign national), but its universal corroboration rule is not within the broadcaster's statutory duty of reasonable diligence. That is especially so when the corroboration methods are wholly ineffective at detecting surreptitious foreign sponsors. NAB Br. 53-54.[2] The Commission's argument that corroboration requirements "remind" lessees of their disclosure requirements (FCC Br. 28) is a non-sequitur and insufficient to justify a universal rule.

### B. The Commission Lacks Authority to Impose Inquire-And-Corroborate Requirements Regarding Inducements Paid to Others in the Production and Distribution Chain

The Commission also lacks statutory authority to impose inquire-and-corroborate requirements regarding inducements by foreign governmental entities in the production and distribution chain. NAB Br. 54-57.

---

[2] The Commission is wrong (FCC Br. 27) that NAB did not raise this point in its comments. *See* Comments of NAB and MMTC, MB Docket No. 20-299, at 12 (Jan. 9, 2023) (JA109) (discussing ineffectiveness of corroboration rules in ensuring accuracy of disclosure). Regardless, waiver applies to issues, not arguments. *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992).

The Commission contends that this issue is time-barred because NAB did not challenge Rule 73.1212(j)(3)(iii) in its petition to review the 2021 Order. FCC Br. 30-32. But NAB is not using a new regulation to review a different and unaffected regulation. The Commission has imposed a brand-new corroboration requirement to seek formal certification that the lessee does not know of such foreign governmental entity involvement, which was no part of the prior regulation. NAB is entitled to challenge the statutory authority for that new requirement. Even if the Commission is correct that corroboration should be considered a broadening of the duty of inquiry (which is also extended now to political advertising and paid PSAs), that expansion makes its statutory authority fair game for challenge. That is the teaching of *Sierra Club v. EPA*, 705 F.3d 458 (D.C. Cir. 2013). In that case, the EPA had long used standards for measuring particulate-matter concentration to exempt sources from air-quality monitoring requirements. The Court found no time bar to a challenge to those standards because the EPA broadened their use to a new pollutant. By so doing, it exposed its unchanged particulate-matter screening regulations to a challenge for lack of statutory authority. *Id.* at 466-67. The Commission's broadening of the duty of inquiry to include corroboration and to apply to a new set of transactions does the same.

On the merits, the Commission has no answer. Section 317(c) requires the licensee to "exercise reasonable diligence to obtain … information to enable such licensee to make the announcement *required by this section*." 47 U.S.C. § 317(c) (emphasis added). Announcements of inducements to third parties are only required if a "report *has been made to a radio station*" of such an inducement pursuant to statute. *Id.* § 317(b) (emphasis added). Absent such a report, a station has no duty to exercise reasonable diligence to obtain announcement information. The Commission cannot extend reasonable diligence to soliciting reports, FCC Br. 34-35, for that would "alter the specific choices Congress made." *NAB*, 39 F.4th at 820. This inquire-and-corroborate requirement is *ultra vires*.

## C. The Commission Lacks Statutory Authority to Impose Corroboration Requirements on Lessees

The Commission does not contest that it lacks authority to regulate lessees.[3] The Commission improperly disregards the mandates to lessees in the Order, NAB Br. 57, relying instead on a footnote stating that the Order only obliges licensees to seek corroboration. FCC Br. 28-29 (citing Order ¶ 35 n.89 (JA292)). The Commission does not address the argument that any reasonable lessee would

---

[3] As the Commission points out, FCC Br. 25 n.5, NAB counsel at oral argument in the appeal of the 2021 Order responded affirmatively to the question whether the Commission could require lessees to supply screenshots. When the Second NPRM formally proposed the screenshot option, analysis of the statutes revealed the answer to be mistaken, and NAB apprised the Commission of its lack of authority. But the Commission is not here asserting the authority to regulate lessees.

understand the corroboration requests to be mandatory, and broadcasters should not be directed to mislead lessees; the Commission cannot accomplish indirectly what it is forbidden to do directly. NAB Br. 58.

## CONCLUSION

This Court should set aside the Order.

Respectfully submitted,

/s/ Stephen B. Kinnaird
Stephen B. Kinnaird
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 469-1691
skinnaird2000@icloud.com
*Counsel for Petitioner National Association of Broadcasters*

/s/ Richard Kaplan
Richard Kaplan
Jerianne Timmerman
Erin L. Dozier
NATIONAL ASSOCIATION OF BROADCASTERS
1 M Street, SE
Washington, DC 20003

Dated: January 31, 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the word-count limitation of Fed. R. App. P. 32(e) and this Court's October 31, 2024 scheduling order. This brief contains 6,480 words, not counting the parts excluded by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

/s/ Richard Kaplan
Richard Kaplan
*Attorney for Petitioner National Association of Broadcasters*

**CERTIFICATE OF SERVICE**

I, Richard Kaplan, hereby certify that on January 31, 2025, I filed the

foregoing Initial Brief of Petitioner with the Clerk of the Court for the United

States Court of Appeals for the District of Columbia Circuit using the electronic

CM/ECF system which will serve participants in this case who are registered

CM/ECF users.

<div style="margin-left:50%;">

/s/ Richard Kaplan
Richard Kaplan
*Attorney for Petitioner National*
*Association of Broadcasters*

</div>