# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 7, 2025          Decided August 1, 2025

No. 24-1296

NATIONAL ASSOCIATION OF BROADCASTERS,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of an Order
of the Federal Communications Commission

———

*Stephen B. Kinnaird* argued the cause for petitioner. With
him on the briefs were *Richard Kaplan*, *Jerianne Timmerman*,
and *Erin L. Dozier*.

*Bradley Craigmyle*, pro hac vice, Federal
Communications Commission, argued the cause for
respondents. On the brief were *Robert B. Nicholson* and *Peter
M. Bozzo*, Attorneys, U.S. Department of Justice, *Jacob M.
Lewis*, Deputy General Counsel, Federal Communications
Commission, *Sarah E. Citrin*, Deputy Associate General
Counsel, and *Rachel Proctor May*, Counsel. *William J. Scher*,
Attorney Advisor, entered an appearance.

2

Before: HENDERSON, KATSAS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAREN LeCRAFT HENDERSON

I.    BACKGROUND ................................................................4

    A.   Statutory Background .............................................4

    B.   Regulatory and Procedural Background .................7

        1.   2021 Rule ..................................................... 7

        2.   2024 Rule ................................................... 10

II.   ANALYSIS .................................................................12

    A.   Redefinition of Lease .............................................13

        1.   Notice-and-Comment Compliance................ 14

            a.   Commercial Ad Exemption................... 16

            b.   Political-Candidate-Ad Exemption ....... 18

        2.   Arbitrary-and-Capricious Review................. 22

        3.   First Amendment Compliance ..................... 25

            a.   Text...................................................... 26

            b.   Content-Based Versus Content-Neutral Regulation ............................................ 28

            c.   Appropriate Level of Scrutiny............... 30

            d.   Application of Exacting Scrutiny.......... 37

    B.   Reasonable Diligence Requirements ....................41

        1.   Corroboration Requirement .......................... 42

        2.   Inquiries Into Production and Distribution Chain ........................................................... 44

        3.   Regulation of Lessees ................................... 48

3

KAREN LECRAFT HENDERSON, *Circuit Judge*:  In 1844, from the old U.S. Supreme Court chambers in the Capitol basement, Samuel F.B. Morse transmitted the first message by telegraph in the United States:  "What hath God wrought?"  His success kicked off a transformation in communications.

Morse believed it would be "most natural" for the telegraph to operate under government control given its "rapid and regular transmission of intelligence" and so sought to sell the rights to the national government.  Ltr. From S. Morse to Levi Woodbury, Sec. of the Treasury (Sept. 27, 1837), *reprinted in* Alfred Vail, *The American Electro Magnetic Telegraph* 69–73 (1847),  [https://perma.cc/EK44-M62W].  The country opted instead for private development but the Civil War soon exposed the national security potential of the technology.  In short course, the federal government acted to prevent a foreign monopoly on transatlantic cables and, later, President Wilson temporarily nationalized the industry during the First World War.

When radio communications entered the national scene, the government drew on these lessons and elected to exercise a heavy regulatory hand.  Despite lobbying from the U.S. Navy, the Congress declined to fully nationalize radio transmissions but, given its wartime potential, the Congress created a strict licensing regime that forbade foreigners from the market.  Throughout the subsequent development of broadcast communications, fears of foreign influence over America's airwaves have remained.

Eventually, in 2021, the Federal Communications Commission (FCC) promulgated a rule requiring broadcasters to disclose if any of their programming was paid for by a foreign governmental entity.  The industry found the disclosure scheme onerous and, later that year, the National Association

4

of Broadcasters (NAB) successfully challenged a narrow portion of the rule. *See Nat'l Ass'n of Broads. v. FCC* ("*NAB I*"), 39 F.4th 817 (D.C. Cir. 2022). After that decision, the Commission went back to the drawing board and, in 2024, it issued an amended rule that altered both the covered programming and the required reasonable diligence steps. NAB now challenges several provisions of the 2024 Rule. As to the regulated programming, NAB argues the Rule violates the First Amendment as well as the Administrative Procedure Act (APA) twice over. As to the reasonable diligence requirements, NAB argues that the Commission exceeded its statutory authority.

We reject NAB's challenges. Procedurally, the rule complied with the APA's notice-and-comment requirements and did not exceed the Commission's statutory authority. Substantively, the rule is neither arbitrary nor capricious and passes First Amendment muster. Accordingly, as explained *infra*, we deny NAB's petition for review.

## I.   BACKGROUND

### A.   Statutory Background

As it developed, radio communication brought with it a tragedy of the commons: Finite broadcast frequencies lacking an allocation system caused users to interfere with one another's broadcasts.[1]  Each radio station "claim[ed] the right

---

[1] Tragedy of the commons occurs when a public resource—a commons—lacks a "[]centralized decisionmak[er]" and "the rational but independent pursuit by each decisionmaker of its own self-interest leads to results that leave all decisionmakers worse off than they would have been had they been able to agree collectively on a different set of policies." *Nat. Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1378 n.19 (D.C. Cir. 1977).

5

to send forth its electric waves through the ether at any time," creating "a state of chaos" in which communications were "drowned out . . . by numerous stations all trying to communicate at once." S. Rep. No. 61-659, at 4 (1910) (quoting Sec'y of the Navy (Mar. 30, 1910)). In response, the Congress passed the Radio Act of 1912, which required a license to use interstate radio communications. Pub. L. No. 62-264, ch. 287, 37 Stat. 302. The legislation did not give the government "general regulative power" nor "repose any [] discretion in [the department heads] in the matter of licenses." *Radio Commc'n Issuance of Licenses*, 29 Op. Att'y Gen. 579, 581 (1912). As a result, it left the government without tools to control the burgeoning radio broadcast industry.

In 1920, the first commercial broadcast was conducted from a U.S. radio station. Within four years, hundreds of commercial radio stations were operating in the U.S. Finite radio frequencies could not "be used by all," requiring "some who wish[ed] to use it [to] be denied." *NBC, Inc. v. United States*, 319 U.S. 190, 226 (1943). But the 1912 Act imposed a "mandatory" duty on the government to issue a license to any qualified broadcaster, *Hoover v. Intercity Radio Co.*, 286 F. 1003, 1007 (D.C. Cir. 1923), slowing down its effort to curb the growing problem of cross-use interference.

The Congress responded with the Radio Act of 1927, which established a multimember Federal Radio Commission to issue licenses to those broadcasters operating "in the public interest, convenience, or necessity." Pub. L. No. 69-632, ch. 169, §§ 3, 11, 44 Stat. 1162, 1162–63, 1167. Relevant here, the Radio Act also required a licensee to announce on air when any broadcast was paid for by another. *Id.* § 19, 44 Stat. at 1170. In 1934, the Congress folded the Federal Radio Commission into the newly created Federal Communications Commission and the Radio Act's disclosure requirement

6

became § 317 of the Communications Act of 1934. Pub. L. No. 73-416, Title III, § 317, 48 Stat. 1064, 1089, codified as amended at 47 U.S.C. § 317(a)(1).

In addition to requiring disclosure of broadcast content paid for by another, the FCC can, in its discretion, require a licensee to disclose if "any political program or . . . controversial issue" was broadcast on behalf of a third party "without charge or at a nominal charge." *Id.* § 317(a)(2). If a licensee later learns of "circumstances that would have required" a § 317 disclosure, it must make an "appropriate announcement." *Id.* § 317(b). A licensee must also "exercise reasonable diligence to obtain . . . information to enable" the requisite disclosures. *Id.* § 317(c). And the Commission is required to "prescribe appropriate rules and regulations to carry out" § 317's disclosure rules. *Id.* § 317(e). Pursuant to its rulemaking authority, the Commission has long allowed commercial advertisements to satisfy the Communications Act's general disclosure requirements with "an announcement stating the sponsor's corporate or trade name, or the name of the sponsor's product, when it is clear that the mention of the name of the product constitutes a sponsorship identification." 47 C.F.R. § 73.1212(f) (Commercial Ad Exemption).

From the outset, the Congress has "determin[ed] to 'safeguard the United States from foreign influence' in broadcasting." *Moving Phones P'ship L.P. v. FCC*, 998 F.2d 1051, 1055 (D.C. Cir. 1993) (quoting *Kansas City Broad. Co.*, 5 Rad. Reg. (P & F) 1057, 1093 (1952)). After studying the Japanese Navy's use of wireless communications during the 1904 Russo-Japanese War, the U.S. Interdepartmental Board of Wireless Telegraphy recommended that broadcast communication be controlled by the government due to its wartime potential. *See Wireless Telegraphy: Report of the Inter-Departmental Board* (1904), [https://perma.cc/9UEC-

7

5BT2].  The Congress recognized broadcast's national security implications but opted for a less drastic measure, with the 1912 Radio Act restricting broadcast licenses to U.S. citizens or companies.  *See* Pub. L. No. 62-264, §§ 1–2, 37 Stat. 302, 302–03.  Over time, even these restrictions proved insufficient. Foreign nationals obtained broadcast licenses through U.S. corporations, leading the Congress to bar aliens from serving as officers of licensee corporations and to limit foreign ownership to no more than twenty per cent of a licensee's stock.  Radio Act of 1927, Pub. L. No. 69-632, ch. 169, § 12, 44 Stat. 1162, 1167.

The Communications Act of 1934 tightened these restrictions.  Drawing on "lessons that the United States had learned from the foreign dominance of the cables and the dangers from espionage and propaganda disseminated through foreign-owned radio stations in the United States prior to and during [World War I]," *Hearings on H.R. 8301 before the H. Comm. on Interstate and Foreign Commerce*, 73d Cong. 54 (1934), the Act prohibited the FCC from granting a broadcast license to any foreign government or any person or entity under foreign control.  Pub. L. No. 73–416, § 310(a), 48 Stat. at 1086, codified as amended at 47 U.S.C. § 310(a)–(b).  Today, although foreigners may not obtain a broadcast license, they remain free to partner with U.S. licensees to broadcast their message, subject to § 317's disclosure requirements.

## B.  Regulatory and Procedural Background

### 1.  2021 Rule

Public reporting in the mid to late 2010s indicated that two of America's chief geopolitical adversaries—Russia and China—were broadcasting foreign propaganda over U.S. airwaves while skirting the Communication Act's disclosure requirements.  *In re Sponsorship Identification Requirements*

8

*for Foreign Gov't-Provided Programming*, 36 FCC Rcd. 7702, 7702 ¶ 1 n.1, 7704 ¶ 3 n.9 (2021) (2021 Rule). Under the Commission's then-operative rules, broadcasters were required to disclose broadcast sponsors but not "the relationship of that sponsor to a foreign country." *Id.* at 7705–06 ¶ 7. To plug the gap, the Commission's 2021 Rule made two principal changes.

First, the FCC required a broadcaster to make an on-air foreign sponsorship identification for any programming provided by a "foreign governmental entity." *Id.* at 7708 ¶ 14. The Commission defined "foreign governmental entity" based on the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 *et seq.*, and on a separate list of foreign media outlets maintained by the Commission under § 722 of the Communications Act.[2] The 2021 Rule applied only to traditional leasing agreements, *id.* at 7713 ¶ 24, which the Commission defined as "a discrete block of broadcast time on [a licensee's] station available to be programmed by another party," called a lessee, for compensation. *Id.* at 7715–16 ¶ 28. The lease definition excluded "traditional, short-form advertising time." *Id.*

Second, the FCC prescribed five steps necessary to satisfy § 317(c)'s "reasonable diligence" requirement as applied to the 2021 Rule: A licensee must (i) inform a lessee of the foreign sponsorship disclosure requirement; (ii) inquire whether the lessee qualifies as a foreign governmental entity; (iii) inquire if the lessee knows if any entity involved in the production or distribution of the broadcast programming is a foreign

---

[2] Specifically, the 2021 Rule applied to (1) a "government of a foreign country," (2) a "foreign political party" or (3) an "agent of a foreign principal," as defined by FARA; or (4) a "U.S.-based foreign media outlet" as defined by the Communications Act. *Id.* at 7708–09 ¶ 14; *see* 22 U.S.C. § 611 (FARA definitions); 47 U.S.C. § 624(d)(2) (foreign media outlet definition).

9

governmental entity and provided an inducement for the programming; (iv) confirm independently the lessee's status by searching the lessee's name in the U.S. Justice Department's FARA website and the FCC's U.S.-based foreign media outlets reports; and (v) memorialize compliance with the preceding steps in order to respond to any Commission inquiry. *Id.* at 7720–24, ¶¶ 38–43.

NAB challenged the 2021 Rule and we held that it exceeded the Commission's rulemaking authority by requiring a licensee to search federal websites as part of its "reasonable diligence" duty. *See NAB I*, 39 F.4th at 820. Section 317(c) requires a broadcaster to "exercise reasonable diligence to obtain from *its employees*, and from *other persons with whom it deals directly* . . . information to enable [the broadcaster] to make" disclosure announcements, 47 U.S.C. § 317(c) (emphasis added), but the 2021 Rule also required "a broadcaster to seek information from two federal sources." *NAB I*, 39 F.4th at 820.

While NAB pursued its challenge to the 2021 Rule, several individual broadcasters petitioned the Commission to clarify the "short-form advertising" exception to the lease definition. *See* Pet. for Clarification, MB Dkt. No. 20-299 (July 19, 2021). In response, the FCC announced a proposed rulemaking to "strengthen . . . the foreign sponsorship identification rules in the wake of the D.C. Circuit's vacatur" and to decide "what criteria the Commission might adopt to distinguish between advertising and . . . the lease of airtime." Second Notice of Proposed Rulemaking (NPRM), *Sponsorship Identification Requirements for Foreign Gov't-Provided Programming*, 37 FCC Rcd. 12004, 12009 ¶ 12, 12038 ¶ 24 (proposed Oct. 6, 2022). The Commission NPRM expressed concern that "the concept of 'advertising' [] not subsume 'leased time'" and included several "key characteristics" that could serve as

10

distinguishing criteria, including "duration, content, editorial control, or differences in the nature of the contractual relationship between the licensee and the entity that purchases an advertising spot versus leasing airtime." *Id.* at 12038–39 ¶ 24.

### 2.   *2024 Rule*

Almost two years later, the Commission published its proposed final rule. *See* Second Report and Order, *Sponsorship Identification Requirements for Foreign Gov't-Provided Programming*, MB Dkt. No. 20-299, FCC No. 24-61, 2024 WL 2972402 (June 10, 2024) (2024 Rule). The 2024 Rule retained the core disclosure requirements for programming provided by a foreign governmental entity, with two material changes: It revised the distinction between leases and ads and amended the reasonable diligence requirements.

As to covered broadcast material, the 2024 Rule revised the advertising exemption. Rather than exclude "traditional, short-form advertising" from the Rule—which the broadcast industry had found "confusi[ng]"—the Commission instead drew the lease/advertisement divide around ads for commercial products or services. 2024 Rule ¶ 42. Specifically, if an ad falls under the FCC's longstanding Commercial Ad Exemption regulation, a licensee need not separately comply with the 2024 Rule. *Id.* ¶¶ 42–45. The Commission also exempted political candidate ads—that is, ads purchased by candidates for public office or their authorized committee—from the 2024 Rule. It explained that § 315 of the Communications Act already imposes disclosure requirements on political candidates, *see* 47 U.S.C. § 315(b)(2)(C)–(D), and that Federal Election Commission rules already prohibit foreign nationals from donating to political candidates, thus "greatly limiting" the need for the 2024 Rule in this respect. 2024 Rule ¶ 46.

11

The Commission further clarified that two categories of ads are not exempt from the revised disclosure rule: Paid public-service announcements (PSAs) and issue advertisements. *Id.* ¶ 47. The FCC defined an issue ad as "any paid political matter or matter involving the discussion of a controversial issue of public importance" unless "made by or on behalf of legally qualified candidates for public office or their authorized committees." *Id.* Thus, a broadcaster carrying an ad advocating for or against a cause or candidate is subject to the 2024 Rule, unless the ad runs from the candidate himself. The Commission offered several reasons for the distinction, including that (i) issue advertisements and PSAs are not subject to § 315 disclosure; (ii) the Congress evinced "a heightened concern about the source of issue advertisements" in § 317(a)(2)[3]; and (iii) although foreign nationals are prohibited from electoral expenditures on a candidate's behalf, no law restricts their funding of non-electoral issue advertisements. *Id.* ¶ 47–48.

As to reasonable diligence, the 2024 Rule readopted the 2021 Rule's requirements, minus the impermissible government database search. *See* 47 C.F.R. § 73.1212(j)(3), *revised by* 89 Fed. Red. 57,775-02, 57,793.[4] It also offered two alternate paths to a licensee to prove compliance with § 73.1212(j)(3). Under the "certification option," a licensee can provide the Commission with a written certification that it has complied with § 73.1212(j)(3) and has sought a written

---

[3] Section 317(a)(2) authorizes the Commission to require licensees to disclose if "any political program or . . . controversial issue" is broadcast on behalf of a third party, even if it is broadcast "without charge or at a nominal charge." *Id.* § 317(a)(2).

[4] The Commission's revisions to 47 C.F.R. § 73.1212(j)(3) are delayed pending review by the Office of Management and Budget. 89 Fed. Red. at 57,792–93.

12

certification from the lessee as to the same. *Id.*
§ 73.1212(j)(3)(iv)(A). The Rule includes two single-page
standard-form certifications but also allows licensees to "use
their own certification language, provided that language
addresses" § 73.1212(j)(3)'s requirements. 2024 Rule ¶ 20.
Under the "screenshot option," a licensee can ask a lessee to
search its own name in the FARA and U.S-based foreign media
outlet databases and provide a screenshot of the results. 47
C.F.R. § 73.1212(j)(3)(iv)(B). The licensee must also seek
"other information" from the lessee, including whether it
satisfies the foreign government sponsor criteria
notwithstanding the screenshot. *Id.* Under both options, a
licensee fulfills its obligation by simply asking the lessee for
the requisite information; the Rule does not require that the
lessee respond or respond truthfully. 2024 Rule ¶¶ 34–35 &
nn. 87, 89.

## II.  ANALYSIS

The Administrative Orders Review Act (Hobbs Act)
grants the federal courts of appeals "exclusive jurisdiction" to
review "all final orders of the [FCC] made reviewable by
section 402(a)" of the Communications Act. 28 U.S.C.
§ 2342(1). Section 402(a) covers "[a]ny proceeding to enjoin,
set aside, annul, or suspend any order of the Commission" in a
pre-enforcement challenge. 47 U.S.C. § 402(a); *see
McLaughlin Chiropractic Assoc., Inc. v. McKesson Corp.*, 606
U.S. __, slip op. at 4 (2025). Venue is proper under 28 U.S.C.
§ 2343.

We review whether the FCC's rulemaking was "arbitrary,
capricious, an abuse of discretion, or otherwise not in
accordance with law." 5 U.S.C. § 706(2)(A). The Commission
satisfies arbitrary-and-capricious review so long as it
considered relevant information and drew "a rational

13

connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983) (quotations omitted). Whether the Commission exceeded its statutory authority is a question of law we review *de novo*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

NAB mounts five challenges to the 2024 Rule. As to airtime leases, NAB contends that the 2024 Rule (i) violates notice and comment because the Commission failed to identify its contemplated redefinition of exempted ads in the notice of proposed rulemaking; (ii) arbitrarily and capriciously creates regulatory categories unsupported by the evidence; and (iii) violates the First Amendment by drawing speaker- and content-based distinctions. As to the reasonable diligence requirements, NAB argues that the Commission exceeded its statutory authority by (iv) requiring broadcasters to corroborate their lessees' information and (v) imposing requirements on lessees, which entities and/or individuals fall outside the Commission's jurisdiction. We address each claim in turn.

## A.   Redefinition of Lease

Before proceeding to the merits of NAB's challenge, a threshold issue warrants discussion. The APA sets forth the procedures that federal agencies must follow when engaged in "rule making," which the APA defines as the "process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). A rule is an agency statement "designed to implement, interpret, or prescribe law or policy" prospectively. *Id.* § 551(4). But not all rules are cut from the same cloth.

Substantive rules—sometimes termed "legislative rules"—are agency rules that have "the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 & n.31 (1979) (quotations omitted). Because these rules can bind

14

private parties, they must adhere to heightened procedural safeguards:  The APA's notice-and-comment process. 5 U.S.C. § 553 (b), (d).  By contrast, interpretive rules set forth an agency's own interpretation of a statutory or regulatory term or phrase.  *See Shalala v. Guernsey Mem'l Hospital*, 514 U.S. 87, 99 (1995).  Because they are non-binding outside the agency, interpretive rules are exempt from section 553 notice-and-comment requirements.  5 U.S.C. § 553(b)(A).

The parties here apparently assume that the 2024 Rule is entirely substantive but that is not plain from the face of the Rule.[5]  Nevertheless, given the parties' assumption and following the FCC's recommendation, we assume without deciding that the entirety of the 2024 Rule is substantive.

### *1.  Notice-and-Comment Compliance*

Before an agency adopts a new substantive rule, the APA requires the agency to jump through certain procedural hoops that allow the public to weigh in on its proposal.  These hoops—the APA's notice-and-comment process—consist of four steps:  (i) Notice:  Publication of a "[g]eneral notice of proposed rulemaking," which specifies "either the terms or substance of the proposed rule or a description of the subjects

---

[5] To determine whether a rule is substantive, we consider whether the agency intended the rule to create legal effects or merely to explain preexisting legal rights or obligations.  *See Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021).  Portions of the 2024 Rule appear to meet hallmarks of substantive agency rulemaking.  The political-candidate exemption, for example, is published in the C.F.R.  *See* 47 C.F.R. § 73.1212(j)(8).  Other sections of the 2024 Rule do not.  The inclusion of PSAs and issue advertisements, for example, appear only in the preamble to the Rule and simply clarify the agency's understanding of the term "lease." 2024 Rule ¶ 47.

15

and issues involved," 5 U.S.C. § 553(b); (ii) Comment: An opportunity for the public "to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c); (iii) Rulemaking: Consideration of the comments and incorporation into the rule of a "concise general statement" of its "basis and purpose," *id.*; and (iv) Promulgation: Publication of the final rule, *id.* § 553(d).

Because notice and comment is designed to allow the public to participate in an agency's rulemaking, the agency often amends its rule between initial proposal and final publication. But if the agency's final rule strays too far from its initial outline, the process is defeated: Interested parties are stripped of their opportunity to comment meaningfully on the rule before it takes effect. To meet the notice requirement, the final rule "must be a logical outgrowth of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (citation modified).

There is no "precise definition of what counts as a 'logical outgrowth.'" *Nat'l Min. Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 531 (D.C. Cir. 1997) (per curiam). Consistent with the APA, an agency can "continue its deliberations and internal decisionmaking process after the close of public comment." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 953 (D.C. Cir. 2004) (per curiam) (quoting *Sierra Club v. Costle*, 657 F.2d 298, 353 (D.C. Cir. 1981)). But an agency cannot "pull a surprise switcheroo" on interested parties. *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). We have long looked to what a party can reasonably anticipate "in light of the initial notice" as a guidepost. *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 548 (D.C. Cir. 2006) (citing *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 548–49 (D.C. Cir. 1983)).

16

### a.    Commercial Ad Exemption

NAB argues that the final rule is not a logical outgrowth of the Second NPRM.  In its view, the 2021 Rule drew a crisp line between leases and advertisements:  The former were covered but the latter were categorically not, unless specified by the Commission.  The Second NPRM informed the public only that the Commission sought better ways to effectuate this bright line.  The Rule now includes "all advertising . . . unless the Commission exempts it."  NAB Br. 34.  This inversion of the earlier provision, NAB contends, violates the APA.  *See, e.g.*, *Env't Integrity Project*, 425 F.3d at 998 (no logical outgrowth if the agency "proposed [one] interpretation and [then] adopt[ed] its inverse").  But the 2021 and 2024 Rules do not flip the presumptive script.  The definition of a covered "lease" is identical in both rules.  Instead, the FCC altered the advertisement exception from a temporal metric to one rooted in longstanding Commission regulation and statute.  *See* 2024 Rule ¶ 46; 47 C.F.R. § 73.1212(f); 47 U.S.C. § 315.  That is not an inversion but a clarification.

Under the 2021 Rule, not all advertisements were exempt from the foreign government entity disclosure requirement.  Only traditional, short-form advertisements were excluded.  The broadcast industry itself recognized that this cutoff had no regulatory definition or industry usage.  *See* Second NPRM, 37 FCC Rcd. at 12009 ¶ 11.  The FCC then adopted a new metric to define the advertisement exception, one with a pedigree familiar to the regulated industry: The Commercial Ad Exemption to the Communication Act's disclosure requirement.  *See* 47 C.F.R. § 73.1212(f).

The Second NPRM noted that the industry affiliates' original petition for clarification "resulted in just two responses from commenters," both of which requested that the

17

Commission "clarify that all forms of advertising for commercial goods and services are not subject to the foreign sponsorship rules."  Second NPRM, 37 FCC Rcd. at 12009 ¶ 11.  In other words, the only public commentary on the affiliates' request for clarification drew the same line the Commission ultimately adopted.  And after the Commission issued its Second NPRM, numerous commenters again raised the Commercial Ad Exemption as a familiar differentiation to define the 2024 Rule's advertising exclusion.[6]  NAB cannot credibly claim, then, that it lacked fair notice that the Commercial Ad Exception was under consideration.

Nor can NAB claim surprise that the Commission went beyond the "length" of an advertisement to determine its exempt status.  In no uncertain terms, the Second NPRM stated that the Commission would look for "key characteristics" to distinguish leases from ads, including "duration, *content*, editorial control or differences in the nature of the contractual relationship."  Second NPRM, 37 FCC Rcd. at 12018–19 ¶ 32 (emphasis added).  Thus, the content of an advertisement was an express basis on which the Commission could exempt it.  And one possible—indeed, from the comments, likely—content-based distinction was advertising for commercial goods or services.

---

[6] *See* Gray Television Licensee, LLC, Comments at 11, MB Dkt. No. 20-299 (Jan. 9, 2023); Audacy, Inc. and Beasley Media Grp., Inc., Reply Comments at 7, MB Dkt. No. 20-299 (Jan. 24, 2023); Alpha Media USA LLC, et al., Reply Comments at 7, MB Dkt. No., 20-299 (Jan. 24, 2023) (fifteen commenters asking that the FCC "confirm that [] paid programming that advertises commercial products or services—regardless of length . . . fall[s] outside the scope of the FSID rules").

18

### b.  Political-Candidate-Ad Exemption

NAB finds no greater purchase in its objection to the political-candidate-advertising exemption.   Again, the Commission made plain that it could look to content in defining the lease-advertisement divide.   And after the close of the period for public comments, NAB filed a letter with the Commission requesting an exemption for "political advertising in the form of candidate and/or issue ads, [and] paid . . . PSAs," which NAB noted were subject to preexisting regulations. NAB Notice of Ex Parte Communication at 5, MB Dkt. No. 20-299 (Mar. 11, 2024).   The Commission's final rule was responsive to NAB's request.

The FCC closed the comment period on December 19, 2022, and closed the reply comment period on January 3, 2023. Sponsorship Identification Requirements for Foreign Government-Provided Programming, 87 Fed. Reg. 68,960 (Nov. 17, 2022).   After reviewing the comments, the FCC privately elected to replace the "traditional, short form advertising" exemption with the Commercial Ad Exemption and the Commission Chair circulated to the other commissioners a private draft to that effect.   After the draft's circulation, on March 7, 2024, the Office of Commissioner Geoffrey Starks held a closed meeting with NAB and other industry affiliates.   This was followed by a March 19 meeting with the Office of Commissioner Anna Gomez, an April 23 telephone call with the Office of Commissioner Gomez, an April 24 telephone call with then-Commissioner Brendan Carr and two May 2 meetings with Commissioner Gomez and her chief of staff and Commissioner Carr and his legal adviser, respectively.   All of these communications were private.

Throughout this period, the public was not privy to the Commission's draft rule or its revisions to the 2021 Rule.   But

19

NAB was. As early as March 11, NAB indicated its knowledge of how the Commission was shaping the scope of the new rule. And after each of the meetings recounted above, NAB sent an *ex parte* letter to the Commission in which it (i) made clear that it was aware how the FCC was planning to redefine the ad exemption; (ii) conveyed its opposition to the proposed change; and (iii) lobbied for favorable revisions to the tentative rule. Among the changes NAB sought were exemptions for candidate ads, issue ads and paid PSAs.

Then, on May 17, NAB sent a letter to the Commission in which it disclosed that it was aware that the Commission had added a new exemption for candidate sponsored ads. In fact, NAB went on to state that it was aware that the new draft rule already had "three votes registered in favor of approving it." JA267 n.1. At oral argument, NAB's counsel conceded that it had information "nobody else did" and suggested that its actions were standard operating procedure. Oral Arg. Tr. 9:4-9:19. NAB does not specify how it obtained its information, claiming only that it was "hearing whispers" and that "rumors of the proposed change began to swirl." NAB Br. 31 & n.7. The Commission says almost nothing about this sequence of events beyond acknowledging receipt of NAB's correspondence. FCC Br. 38. Yet the overwhelming inference from the record is that one or more members of the Commission leaked nonpublic details of the rulemaking as it transpired, taking the notion of "industry capture" to a new low.

Indeed, the very genesis for the candidate ad exemption that NAB now bemoans appears to stem from its private communications with the Commission. In explaining why the FCC should exempt all ads, NAB stated:

> The Commission must ensure that it does not inadvertently treat material such as political

20

advertising in the form of candidate and/or issue
ads, paid public service announcements (PSAs),
or any other form of advertising as leases.
Political advertising is governed by its own
complex statutory and regulatory system. An
overlay of new diligence and disclosure rules on
top of the existing political broadcasting regime
and/or the treatment of PSAs or any advertising
as "leases" would be beyond the scope of the
Notice in this proceeding and otherwise violate
the Administrative Procedure Act, the First
Amendment, and the Commission's statutory
authority.

JA227.  In response to NAB's lobbying, the Commission
granted a partial accommodation:  It agreed that, with respect
to candidate political ads, the existing regulatory regime
addressed the FCC's concerns and the 2024 Rule would thus
create needless paperwork.  But as to non-candidate political
ads and issue PSAs, the Commission indicated that other
disclosure rules did not address fully its foreign governmental
sponsorship concerns and so those categories would remain
subject to the Rule.  2024 Rule ¶¶ 46–47.

We do not suggest that private notice could cure a logical
outgrowth problem, particularly when such notice was given
after the close of the notice and comment period. But even
without regard to NAB's role in creating the fair notice
problem it now attacks, the Rule withstands muster.  Consistent
with the "flexibl[e]" approach embodied in the APA, the
Commission need not "provide a new round of notice and
comment" simply because it "modifies a proposed rule" in
response to a commenter's suggestion. *Fertilizer Inst. v. EPA*,
935 F.2d 1303, 1311 (D.C. Cir. 1991).  NAB at least "should
have anticipated" that the Commission might alter the 2024

21

Rule in response to NAB's own proposal. *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 952 (quotations omitted); *cf. Great Lakes Commc'n Corp. v. FCC*, 3 F.4th 470, 478 (D.C. Cir. 2021) (explaining that the FCC may properly "accept[ a] last-minute proposal from [a commenter]—too late for adverse comment").

NAB attempts to resist this conclusion with a smattering of logical-outgrowth cases that, it claims, are analogous to the circumstances here.[7]  All are plainly distinguishable.  Each holds that an agency that proposes one specific course of conduct but then adopts another fails the logical-outgrowth test.  That is materially distinct from the situation here, where the agency sought public input on a menu of possible options. The APA contemplates that more open-ended approach.  *See* 5 U.S.C. § 553(b) (requiring notice of "either the terms or substance of the proposed rule or a *description of the subjects and issues involved*") (emphasis added); *Air Transp. Ass'n of Am. v. Civil Aeronautics Bd.*, 732 F.2d 219, 224 (D.C. Cir. 1984) (holding that an outline of the methods to be used and the type of agency actions proposed satisfies notice and comment); *cf. Costle*, 657 F.2d at 352 (explaining that agencies

---

[7] *See* NAB Br. 32–33 (citing *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080–82 (D.C. Cir. 2009) (agency rule benchmarking data from four-year samples not a logical outgrowth of a rule proposing one-year samples); *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1116 (D.C. Cir. 2019) (no logical outgrowth when the agency's initial proposal covered towns or cities with populations over 10,000 and the final rule necessarily encompassed "some small towns of significantly less than . . . even 10,000 people [] despite contrary terms in the proposed rule"); *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259–61 (D.C. Cir. 2005) (final rule adopting a maximum air velocity cap not a logical outgrowth of proposed rule whose preamble stated it was not setting a maximum cap)).

22

are not required "to select a final rule from among the precise proposals under consideration during the comment period").

Accordingly, we conclude that the 2024 Rule is a logical outgrowth of the Second NPRM and that the FCC complied with the APA's notice-and-comment procedures.

### *2. Arbitrary-and-Capricious Review*

Agency action must satisfy the APA's arbitrary-and-capricious standard. *See* 5 U.S.C. § 706(a)(2)(A). That standard requires the Commission to consider the relevant information and draw "a rational connection between the facts found and the choice made." *State Farm Mut. Auto Ins.*, 463 U.S. at 43 (quotation omitted). NAB makes three arguments that, it says, support its position that the 2024 Rule fails arbitrary and capricious review. Each fails to hit its mark.

*First*, NAB claims that the FCC arbitrarily redefined the meaning of lease without giving notice of or acknowledging its alteration. We disagree. The 2024 Rule incorporates precisely the same definition of "lease" used in the 2021 Rule. Instead, the Commission redefined the advertising exception to the Rule. We do not ordinarily define changes to a rule by changes to its exceptions. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013) ("Exceptions to a general rule . . . do not in themselves delineate the scope of the rule"); *Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1293 n.7 (11th Cir. 2012) (same). Regarding the ad exception, the Commission gave express notice that it intended to alter the exception. *See* Second NPRM, 37 FCC Rcd. at 12038–39 ¶ 24 (informing the public that the FCC was looking for new "criteria . . . to distinguish between advertising and . . . lease[s]").

23

In a similar vein, NAB contends that, because the FCC's new policy "contradict[s] . . . its prior policy," the FCC must "provide 'a more detailed justification than what would suffice . . . on a blank slate.'" NAB Br. 36 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Again, we disagree. The Commission did not contradict its 2021 Rule; it doubled down on it. The Commission simply refined the parameters of an exempted advertisement. For that policy departure, the Commission emphatically "display[ed] awareness that it [was] changing position." *Fox Television Stations*, 556 U.S. at 515. And it provided "good reasons for the new policy." *Id.* As the Commission explained, broadcasters could not rely on a nebulous temporal cutoff to mark the lease-advertisement divide so it turned to a more precise—and familiar—definition: The Commercial Ad Exception. 2024 Rule ¶ 42. As to political and issue ads, the Commission offered several reasons to justify its policy, including the efficacy of existing regulations and heightened congressional concern with issue ads. *Id.* ¶¶ 46–47. The Commission "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that . . . the agency *believes* it to be better." *Fox Television Stations*, 556 U.S. at 515.

*Second*, NAB asserts that the 2024 Rule fails section 706 review because "there is not an iota of evidence that any foreign governmental entity ever purchased political ads or paid for PSAs." NAB Br. 38. In other words, it asserts that we should treat the absence of evidence as evidence of absence. We have never taken such a cabined view of the FCC's regulatory authority. Instead, we have made plain that the Commission "need not wait for a risk to materialize before" regulating. *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256, 266 (D.C. Cir. 2022); *accord Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 141 (D.C. Cir. 2005) (recognizing an agency's

24

authority to take "precautionary or prophylactic responses to perceived risks") (quotation omitted).  The lack of a robust evidentiary record is just as readily attributable to "limitations on [the FCC's] ability to monitor" this corner of the broadcast market as it is to a dearth of foreign governmental entity spending.  *TikTok Inc. v. Garland*, 122 F.4th 930, 960 (D.C. Cir. 2024).  Deference to the Commission's risk assessment aligns with the Congress's concern about foreign governments using U.S. airwaves and the executive branch's institutional competence to assess national security risks.  *See Ctr. for Nat. Sec. Stud. v. DOJ*, 331 F.3d 918, 932 (D.C. Cir. 2003); *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (noting the "constrained" nature of judicial "inquiry into matters of . . . national security").  NAB offers no basis to disturb the well-settled respect we accord to the political branches' national security judgments.

*Third*, NAB challenges the FCC's rationale for differentiating between candidate and non-candidate political ads.  As it notes, federal law prohibits foreign nationals from making direct (to the candidate) or indirect (to third parties) expenditures in support of a candidate yet the Commission regulated the latter but not the former.  That is unsurprising. Only the former are subject to personal disclosure requirements that require a candidate to certify that he or his committee has paid for an approved ad.  *See* 47 U.S.C. § 315(b)(2)(C)–(D).

NAB attempts to resist this critical difference by noting that § 315 applies to only a subset of candidates for public office:  Federal office seekers subject to a preferred advertising rate.  That could be a valid policy consideration for the agency but it is no basis for judicial intervention.  Under the APA's "deferential" standard of review, "a court may not substitute its own policy judgment for that of the agency."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The

25

Commission considered the problem, came to a reasonable conclusion and explained the bases for its distinctions. The APA requires no more and thus we require no more. *See Perez v. Mortgate Bankers Assn.*, 575 U.S. 92, 102 (2015) (warning courts not to impose "judge-made procedur[es]" on agencies).

### 3. First Amendment Compliance

Finally, NAB argues that the Commission's criteria for policing the lease-advertisement divide violates the First Amendment. Although the foreign sponsorship disclosure rule implicates the First Amendment, we conclude that it readily passes constitutional muster.

From its inception, broadcast has been full of speech restrictions that are unseen and constitutionally unaccepted in other media forums. *See* Douglas H. Ginsburg, *Regulation of Broadcasting* 419–20 (1979). With the 1912 Radio Act, the Congress assumed public ownership of the national airwaves and, in turn, broadcasting became a public benefit, not a private right. *See* John Harrison, *Public Rights, Private Privileges, and Article III*, 54 Ga. L. Rev. 143, 181–82 (2019). Public ownership, in the Congress's judgment, was necessitated by the limited radio—and later, television—spectrum. *See FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 n.2 (1940).

These two factors—public ownership and resource scarcity—led the Supreme Court to uphold government restrictions (via licenses) on who may broadcast and the conditions under which they may do so. *See NBC, Inc.*, 319 U.S. at 227. As the Court put it, "broadcasting is clearly a medium affected by a First Amendment interest" but its "differen[t] . . . characteristics" require "differences in the First Amendment standards applied to" it. *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 386 (1969). In particular, the Court subordinated "the right of the broadcasters" to "the right of the

26

viewers and listeners," *id.* at 390, to "receiv[e] a balanced presentation of views on diverse matters of public concern," *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 380 (1984). In some respects, broadcast's character gives the FCC a wider regulatory berth than might otherwise be accorded the government.

In other respects, however, the FCC's ambit is far more constrained. The Commission "works in the shadow of the First Amendment," *Fox Television Stations*, 556 U.S. at 556 (Breyer, J., dissenting), and must therefore walk a "tightrope" to avoid violating the Constitution, "a task of . . . great delicacy and difficulty." *CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 102, 117 (1973); *accord Banzhaf v. FCC*, 405 F.2d 1082, 1095–96 (D.C. Cir. 1968) (raising a similar point); *Commission Programming Inquiry*, 44 FCC 2303, 2313 (1960) (Report and Statement of Policy) (en banc) (explaining that the Commission balances "the public interest in station operation, on the one hand, and the prohibition laid on it by the First Amendment . . . on the other"). The Commission has emphasized that "it is not the national arbiter of the truth," *Complaints Covering CBS Program "Hunger in America,"* 20 FCC 2d 143, 151 (1969), and the Congress by statute has stripped it of any authority to "interfere with the right of free speech by means of radio communications." 47 U.S.C. § 326. As described *infra*, this history informs the scope of our analysis.

### a.   Text

We begin our constitutional analysis, as we must, with the text of the First Amendment. The text is read according to its original meaning at the time of enactment and against the backdrop of its "original history," which can "elucidate[] how contemporaries understood the text." *United States v. Rahimi*,

27

602 U.S. 680, 738–39 (2024) (Barrett, J., concurring).  The
First Amendment provides that "Congress shall make no law
. . . abridging the freedom of speech, or of the press."  U.S.
Const. amend. I.

The text's reference to "*the* freedom"—a freedom that is
nowhere else defined—reflects that the Constitution codified a
preexisting legal right.    The Free Press Clause
constitutionalized at least the common-law rule against
enjoining a publisher from disseminating its material pre-
publication, constituting a prior restraint.  *See* 4 William
Blackstone, *Commentaries on the Laws of England* \*150–53;
4 Joseph Story, *Commentaries on the Constitution of the
United States* § 1880; *cf.* James Madison, Report of 1800 (Jan.
7, 1800), *in* Founders Online, [https://perma.cc/2D3N-N64Z]
(arguing that Press Clause also prohibits "penalties on printed
publications" based on the structural considerations).    This
protection applies with equal force to the technological heirs of
the printing press:  Broadcast, the Internet and other modes of
mass communication.  *See District of Columbia v. Heller*, 554
U.S. 570, 582 (2008).

The contours of the Free Speech Clause are far more
contested.  At its core, however, the Clause likely shields
political discourse necessary for our republican form of
government.  An early draft of the text protected the people's
"right to speak, to write, or to publish their sentiments."
Madison Resolution (June 8, 1789), *in* Founders Online,
[https://perma.cc/9CFH-X4F7].    The Founding-era public
"widely embraced the idea that the government could not
prohibit well-intentioned statements of one's thoughts."  Judd
Campbell, *Natural Rights and the First Amendment*, 127 Yale
L.J. 246, 280 (2017).  And the first grand test of the First
Amendment—the Sedition Act—involved an ill-fated attempt
to stifle criticism against the President and the Congress.  Act

28

of July 14, 1798, ch. 74, 1 Stat. 596. The ensuing public backlash swept President Adams from office and the Federalist party from the Congress and resulted in pardons and remittances for all charged under the Act.

Above all, then, the communication of political thought lies at the heart of the First Amendment. Modern precedent confirms as much. *See Stromberg v. California*, 283 U.S. 359, 369 (1931) ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people . . . is a fundamental principle of our constitutional system"); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (the First Amendment guarantees "uninhibited, robust, and wide-open" discussion of public issues).[8]

### b.   Content-Based Versus Content-Neutral Regulation

To effectuate the First Amendment's free-speech guarantee, the Supreme Court "distinguish[es] between content-based and content-neutral regulations of speech." *Nat'l Inst. of Fam. and Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 766 (2018). A regulation is content-based if it "target[s] speech based on its communicative content," *i.e.*, the regulation applies only "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Even a facially neutral regulation is content-based if it "cannot be justified without reference to the content of the regulated speech or . . . w[as] adopted by the government because of disagreement with the message the speech conveys." *Id.* at 164 (citation modified).

---

[8] As explained *infra*, this insight can help color the appropriate level of scrutiny for disclosure laws that implicate (or not) political speech.

29

NAB claims that the 2024 Rule is saddled with content-based speech distinctions and thus triggers strict scrutiny. The Commission disputes that its regulations hinge on content but argues that, even if they do, strict scrutiny is unsuitable here given broadcast's unique First Amendment strictures.

The 2024 Rule applies to any lease of airtime, which the Commission defines as "a discrete block of broadcast time on [a broadcaster's] station available to be programmed by another party in return for some form of compensation." 2024 Rule ¶ 48. The Commission crafted two exemptions to the foreign sponsorship disclosure rule: (i) ads for commercial goods and services and (ii) political-candidate ads. 2024 Rule ¶¶ 42, 46. But it declined to add a third exemption for paid PSAs and issue ads. As a result, a non-candidate political ad is subject to the 2024 Rule, yet the same message is exempt if run by a candidate for public office. The Rule plainly turns on the content of speech: An advertisement is regulated, or not, based on the identity of the speaker and the content of his message.[9] *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011); *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 94–95 (1972) (finding a general ban on picketing content-based because it excluded labor picketing).

The Commission offers a fainthearted defense that the exemptions should not trigger heightened scrutiny. But if a rule's exemptions "are based on content, the restriction itself is based on content." *Nat'l Advert. Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir. 1988) (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 520 (1981)); *accord Barr v. Am.*

---

[9] NAB does not challenge the constitutionality of the Commercial Ad Exemption. Nor does it argue that the Rule impermissibly compels broadcaster speech. Our inquiry is thus limited to whether the political-candidate exception makes an impermissible content-based distinction.

30

*Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619–20 (2020) (plurality op.) (concluding that a prohibition on robocalls was content based due to an exception for robocalls collecting government-held debts); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428–29 (1993) (holding that a newspaper exception to a general prohibition on commercial handbills turned a regulation into a content-based restriction).

Were we to consider a rule in a vacuum—divorced from its exemptions—the government might be able to pick and choose winners in the marketplace of ideas. *But see R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) ("The government may not regulate . . . based on hostility—*or favoritism*—towards the underlying message expressed") (emphasis added). It is no answer, as the FCC urges, that the political-candidate exemption is rooted in a desire to reduce regulatory burdens. "[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 576 U.S. at 166.

### c.    Appropriate Level of Scrutiny

Ordinarily, content-based speech distinctions must survive strict scrutiny. *Id.* at 171. The Commission argues that we should instead apply a "middle ground" of scrutiny between rational basis and intermediate scrutiny. FCC Br. 49 (quoting *Ruggiero v. FCC*, 317 F.3d 239, 245 (D.C. Cir. 2003) (en banc)); *see also News Am. Pub., Inc. v. FCC*, 844 F.2d 800 (D.C. Cir. 1988). Its cited caselaw is distinguishable.

In *Ruggiero*, this Court upheld an FCC ban on low-power radio station licenses for "anyone who engaged in the unlicensed operation of any [broadcast] station." 317 F.3d at 241 (citation modified). We explained that rational basis review applies "to the indirect effect upon speech that may attend 'structural' regulation of the broadcast industry," such

31

as limitations on cross-ownership of broadcast and print media within the same community. *Id.* at 244–45. Yet rational basis was too forgiving a standard for the FCC regulation at issue there, which foreclosed a "would-be speaker's []ability to broadcast." *Id.* at 245. Even so, intermediate scrutiny was too rigorous because "the qualification [was] triggered solely by the applicant's conduct" and applied "*without regard to any content*." *Id.* at 244 (emphasis added). We therefore applied a "middle ground" approach between the two standards of review. *Id.* at 245. Because the 2024 Rule is content-based, *Ruggiero* does not control.

The Commission's other authority is further afield. In *News America Publishing*, our Court reviewed a rider in an appropriations bill that targeted the ownership structure of a single broadcaster. 844 F.2d at 802. We held that something more than "minimum rationality" was required but we did not decide what standard applied because the proviso failed under any standard. *Id.* at 814. Moreover, that statute, like the regulation in *Ruggiero*, did not draw content-based distinctions. The Commission points us to no other authority that supports its "middle ground" approach.

But a content-based restriction does not mechanically subject the Rule to the strict scrutiny standard of review. The Supreme Court has "identified numerous situations in which th[e] risk" of content-based distinctions "is inconsequential, so that strict scrutiny is unwarranted." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007). As relevant here, a longstanding regulation of a communications medium can inform our analysis of the appropriate level of scrutiny. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 75 (2022); *NIFLA*, 585 U.S. at 767 (allowing for content-based speech restriction if there is "persuasive evidence of a long (if heretofore unrecognized) tradition to that effect")

32

(citation modified). From the industry's earliest days, the government has used a heavy regulatory hand on broadcast communications—one that "necessarily" implicates "First Amendment principles." *CBS, Inc.*, 412 U.S. at 122. Yet broadcast content itself has "never" automatically triggered heightened scrutiny. *League of Women Voters*, 468 U.S. at 376.[10]

Rather, the "different nature of the broadcasting industry" can sometimes "justify forms of content-based regulation" that would be impermissible in other contexts. *Leflore Broad. Co. v. FCC*, 636 F.2d 454, 457 (D.C. Cir. 1980) (citation modified). Because broadcasters "serve in a sense as fiduciaries for the public," they "operate[] under restraints not imposed upon other media." *League of Women Voters*, 468 U.S. at 377, 380. *League of Women Voters* itself noted that the Supreme Court "ha[s] never gone so far as to demand that [broadcast] regulations serve 'compelling' governmental interests" before applying intermediate scrutiny to a "ban . . . defined solely on

---

[10] Some courts have treated historical tradition as dispositive in constitutional adjudication. But history *simpliciter* does not control the meaning or application of the fixed Constitution. A regulatory tradition that traces its lineage to the Founding (or near thereto) can inform how contemporaries understood the original public meaning of the Constitution and thus affect our interpretation, *see Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 791 (2011), but history that long postdates enactment of the Constitution has a far more limited ambit. If text does not fully provide the answer when applied to a new medium, courts may consider a longstanding, unbroken practice of the political branches "because they embody a constitutional judgment—made by generations of legislators and by the American people as whole—that commands our respect." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2316 (2025); *see also Field v. Clark*, 143 U.S. 649, 691 (1892) (same). It is in this more limited sense that we take account of the unbroken history of content-based broadcast regulations.

33

the basis of the content of the suppressed speech." *Id.* at 376, 383.[11]

Two historic pillars have traditionally buttressed some forms of content-based broadcast regulations. The first is spectrum scarcity. *See id.* at 377. Because of broadcast's limited bandwidth, the government has restricted access and, in the process, engaged in forms of content-based regulation. The second is the nature of the medium. The Commission administers a commons—the national airwaves—over which broadcasters are granted a public benefit subject to greater regulatory control. *See* 47 U.S.C. §§ 301, 304. The government often conditions licenses and other public benefits on a recipient's waiver of the right to a judicial forum or—as relevant here—the recipient's agreement to public disclosures.[12]

_____

[11] This Court, sitting *en banc*, applied strict scrutiny to a content-based regulation of broadcasters' speech in a pre-*League of Women Voters* decision. *See Cmty.-Serv. Broad. of Mid-Am., Inc. v. FCC*, 593 F.2d 1102, 1111–112 (D.C. Cir. 1978) (en banc). Still, *League of Women Voters* did not squarely repudiate our approach nor did it hold that strict scrutiny should never apply to content-based broadcast regulations. Moreover, recent Supreme Court precedent has drawn a sharper line for content-based restrictions. The decision thus does not squarely control the appropriate level of scrutiny here.

[12] *See, e.g.*, 29 U.S.C. § 1401 (agreement to arbitrate); 49 U.S.C. § 14708 (same); 15 U.S.C. §§ 77e(c), 78m (requiring an SEC license in order to be listed as a publicly licensed company and conditioning approval on quarterly and annual disclosures); *id.* § 80b-4 (conditioning investment adviser licenses on public disclosures); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 592 (1985) (upholding scheme requiring a registrant to "explicitly consent[] to have his rights determined by arbitration"); *Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122, 125–26 (2023)

34

Of course, that does not mean the government can ignore constitutional rights in its allotment of licenses. At the extreme, licenses could be wielded to "impose invidious discrimination on disfavored subjects." *NIFLA*, 585 U.S. at 773 (citation modified). But the Supreme Court has recognized that—in conferring public benefits—the government has significant regulatory leeway to impose speech restrictions that might otherwise be forbidden as a direct regulation of private conduct. *See, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 192–200 (1991); *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 204–07 (2003) (plurality op.); *Garcetti v. Ceballos*, 547 U.S. 410, 417–26 (2006). That consideration is particularly strong here, where the Commission grants limited access to a public resource and where the challenged First Amendment conduct is simply public disclosure. The law has long recognized that—in regulating a licensed industry—the state may permissibly seek to combat "ignorance . . . deception and fraud" on the public. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). Disclosure of a foreign governmental entity's otherwise undisclosed involvement in a public broadcast fits within that tradition and counsels against application of strict scrutiny.

Strict scrutiny also matches up poorly with the reason for the Rule's promulgation. The "rationale of [strict scrutiny] is that content discrimination 'raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace of ideas.'" *Davenport*, 551 U.S. at 188 (quoting *R.A.V.*, 505 U.S. at 387). When "that risk is inconsequential . . . strict scrutiny is unwarranted." *Id.* The threat is wholly absent here. The FCC is not attempting to regulate the content of programming, *see Anti-Defamation*

---

(upholding a state's conditional license to do business within its borders on a company's submission to general personal jurisdiction).

35

*League of B'nai B'rith v. FCC*, 403 F.2d 169, 172 (D.C. Cir. 1968), nor does its Rule "carr[y] the seeds of the general authority to censor . . . ." *Banzhaf*, 405 F.2d at 1095. Instead, the differential treatment between candidate and non-candidate speakers is "'justified by [a] special characteristic of' the particular [speaker]"—namely, candidates for office are subject to preexisting disclosure requirements that non-candidates are not. *Turner I*, 512 U.S. at 660–61 (quoting *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983)).

Insofar as there is any diminution in speech, *see* NAB Br. 49 (warning that the Rule "will squelch speech"), it is more of an "incidental burden" of the Rule than a result of the Commission's attempt to suppress speech. *See Turner I*, 512 U.S. at 642, 662 (explaining that intermediate scrutiny is appropriate if regulations "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."). The 2024 Rule is a disclosure requirement—not a speech restriction. The former is routinely subject to lesser scrutiny. *See, e.g.*, *NIFLA*, 585 U.S. at 768 (explaining that the Supreme Court has routinely "applied a lower level of scrutiny to laws that compel disclosures in certain contexts," including those "limited to purely factual and uncontroversial information") (quotations omitted); *Dwyer v. Cappell*, 762 F.3d 275, 281 (3d Cir. 2014) ("disclosure requirements receive less rigorous scrutiny than restrictions on speech").

In sum, the history of broadcast regulation, coupled with both the objective and the effect of the Commission's content-based distinction, indicate that strict scrutiny is an improper fit for the Rule.

Two other tiers of scrutiny are potentially applicable. Following *League of Women Voters*, intermediate scrutiny may

36

be the correct lens through which to assess the 2024 Rule. Alternatively, the Supreme Court has sometimes applied "exacting scrutiny" to compulsory disclosure laws, a tier of scrutiny that lies between the more familiar intermediate and strict scrutiny. *See Citizens United v. FEC*, 538 U.S. 310, 366 (2010); *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021).

There are reasons to doubt whether exacting scrutiny is proper here. First, exacting scrutiny often applies to laws that implicate political speech or that carry the risk of the government impermissibly targeting members of a disfavored domestic association. *See Americans for Prosperity Found.*, 594 U.S. at 607–08. As explained *supra* II.A.3.a., such concerns lie at the heart of the Free Speech Clause. The 2024 Rule applies only if the speaker is a foreign governmental entity and requires no more than disclosure of that fact. Second, NAB does not challenge the 2024 Rule as an impermissible compelled disclosure. It argues only that the political-candidate-ad exception makes the Rule content-based, thereby triggering strict scrutiny. Third, as explained, the Supreme Court has repeatedly treated broadcast regulation as subject to "unique considerations" that do not follow "the same approach that [the Court] ha[s] applied to other media." *League of Women Voters*, 468 U.S. at 376. On the other hand, *League of Women Voters* was decided before the Court had fully crystalized its content-based precedents. And *Americans for Prosperity Foundation* signaled a more bright-line rule for scrutinizing compelled disclosure requirements. But we need not resolve which of these two tiers applies today. Because the 2024 Rule "passes muster even under the more demanding standard," we will assume without deciding that exacting scrutiny applies. *TikTok Inc.*, 122 F.4th at 948–49 (quotations omitted).

37

### d.  Application of Exacting Scrutiny

Under exacting scrutiny, a regulation satisfies the First Amendment if there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and the disclosure requirement is "narrowly tailored to the interest it promotes." *Americans for Prosperity Found.*, 594 U.S. at 611 (cleaned up).

*First*, the Commission's asserted interest is real.  It cannot justify its regulations based on "unsupported assertions," *Ibanez v. Florida Dept. of Bus. & Prof. Reg.*, 512 U.S. 136, 143 (1994), or "anecdotal evidence and educated guesses."  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 490 (1995).  But the Commission has solid evidence of ongoing and threatened manipulation of the U.S. airwaves remediable only by further disclosure.  NAB argues that the threat is illusory because "the Commission cannot point to a single instance in which a foreign governmental entity has engaged in undisclosed political or public service advertising on broadcast."  NAB Br. 44, 46.  That argument misapprehends the Commission's Rule as well as its supporting evidence.  The Rule applies to *all* leases of broadcast time.  And the Commission pointed to ample evidence of undisclosed foreign governmental programming.  *See* 2024 Order ¶ 1 n.2; 2021 Rule ¶ 1 n.1.

Granted, the Commission's definition of "lease" includes non-candidate political ads and paid PSAs.  And true, the Commission did not unearth evidence of covert foreign influence as to those two categories of ads.  But a regulation need not be necessary in every conceivable application to be valid.[13]  Creating carveouts for every type of broadcast lacking

---

[13] *See Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 467–68 (4th Cir. 2018) (upholding FCC rule that "may be overinclusive" because "'the mere fact that a regulation

38

evidence of foreign governmental interference would cripple the efficacy of the Rule, which at its core aims to unearth "*undisclosed*" foreign governmental sponsorship.  2024 Order ¶ 37; *see TikTok Inc.*, 122 F.4th at 960 (rejecting the argument that the government's concerns regarding covert foreign manipulation were too "speculative" absent "specific [examples]" because it "may simply reflect limitations on its ability to monitor").

*Second*, the Commission's interest is significant.  Our nation's history is replete with concerns over foreign interference in domestic affairs.  In his Farewell Address, President Washington warned the country against the "insidious wiles of foreign influence," which "mislead public opinion" and pose "one of the most baneful foes of Republican Government."  George Washington, Farewell Address to the People of the United States (Sept. 19, 1796).  In his First Annual Message to Congress, President Grant sounded the alarm over foreign control of submarine telegraphy cables, which risked "subjecting all messages conveyed thereby to the scrutiny and control of [a foreign] Government."  Ulysses S. Grant, *First Annual Message* (Dec. 6, 1869), [https://perma.cc/VU5H-95YA].  And as recounted *supra* I.A., the Congress has evinced a "long-standing determination to

---

operates overbroadly does not render it invalid" (quoting *Friedman v. Heckler*, 765 F.2d 383, 388 (2d Cir. 1985)), *vacated and remanded on other grounds*, 588 U.S. 1 (2019); *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984) ("[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge"); *cf. EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 524 (2014) (noting that "[t]he possibility that [a] rule, in uncommon particular applications, might exceed [an agency's] statutory authority does not warrant judicial condemnation of the rule in its entirety").

39

safeguard the United States from foreign influence in broadcasting." *Moving Phones P'ship*, 998 F.2d at 1055 (internal quotations omitted).

In recent years, the threat has metastasized. For example, an arm of the Chinese government masked its identity "through a subsidiary to lease almost all of the airtime on a Washington, D.C. area station and broadcast pro-Chinese government programming . . . without disclosing the linkage to the Chinese government." 2021 Rule ¶ 1 n.1. As we recently underscored, such efforts are part of a multifaceted campaign by the People's Republic of China to manipulate domestic public discourse and undermine U.S. national security. *TikTok Inc.*, 122 F.4th at 958. China is not alone in these endeavors. The Commission also received information that Russia is paying middlemen to broker U.S. airtime for Russian state-owned media. 2021 Rule ¶ 1 n.1. Such messages are meant to "influence activities in the United States" to Russia's advantage while hiding the source of the message. 2024 Rule ¶ 1 n.2; 2021 Rule ¶ 1 n.1. And those are just the known threats, as a critical facet of the threat is its surreptitious nature.

Although we "do not defer to Government's reading of the First Amendment," we do give credence to the Commission's assessment of the risks posed in areas of "national security and foreign affairs." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010). The record demonstrates that the issues that animate its concerns are genuine. And the government's interest is at its zenith in combating adversary nations. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("[N]o governmental interest is more compelling than the security of the Nation"); The Federalist No. 23, at 163 (A. Hamilton) (Clinton Rossiter ed., 1961) ("The principal purposes to be answered by union are these—the common defense of the members; the

40

preservation of the public peace, as well against internal convulsions as external attacks").

*Third*, the regulation is appropriately tailored to meet the government's interest. The FCC did not use the threat of foreign propaganda as a pretext to "control the flow of ideas to the public." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 306 (1965). Rather, the Commission took only a modest step: Disclosing the messenger without trampling on the message. Compulsory disclosure is, of course, not without cost in the marketplace of ideas. Because the core of the First Amendment protects "voluntary" speech, it "necessarily" protects "a concomitant freedom not to speak." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 559 (1985) (citation modified); *see also Riley v. Nat'l Fed. of the Blind of N.C., Inc.,* 487 U.S. 781, 796–97 (1988) (explaining that the First Amendment protects "both what to say and what *not* to say"). Still, disclosure can also enhance First Amendment principles by allowing "each person [to] decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner I*, 512 U.S. at 641. The Commission's Rule here neatly removes the risk that a listener will be deceived about the source of a broadcast without saddling the broadcaster's right to speak in the manner it wishes.

The Supreme Court has repeatedly emphasized that "disclosure" is the "less restrictive alternative" to combat misleading speech. *Citizens United*, 558 U.S. at 369. The Congress agrees. The Foreign Agents Registration Act—which undergirds the regulatory framework of the 2024 Rule—proves the point. Faced with "increased attempts by foreign agents at the systematic manipulation of mass attitudes," the Congress "add[ed] requirements to keep our Government and people informed of the nature, source, and extent of political

41

propaganda distributed." *Meese v. Keene*, 481 U.S. 465, 487 (1987) (Blackmun, J., dissenting in part) (citation modified). It was the Congress's judgment that "a label of information of foreign origin" would not "in any way impair [First Amendment] rights" but would simply ensure that the body politic "not be deceived by the belief that [] information comes from a disinterested source." *Id.* at 480 n.15. So too here.

The 2024 Rule imposes minimal burdens on broadcasters. In complying with the Rule, they need not "betray[] their convictions" or "endorse ideas they find objectionable." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 893 (2018). Instead, they must share no more than the identity of the speaker whose message they are disseminating. And a broadcaster satisfies its obligations by electing to do one of two minimally invasive procedures. It can fill out a single-page form attesting to its compliance and ask its lessees to do the same. Or it can ask a lessee to search its name on the FARA and FCC websites and then provide a screenshot of the results. In either event, the broadcaster is not responsible for a lessee's failure to comply.

Because the FCC has a *bona fide* and substantial interest in combatting foreign governmental obfuscation, and because the Rule is narrowly tailored to that end, it satisfies exacting scrutiny.

## B.  Reasonable Diligence Requirements

We turn next to NAB's challenge to the Rule's reasonable diligence requirements. NAB contends that these requirements exceed the Commission's authority under the Communications Act. Recall, the 2024 Rule readopted the key pillars of the 2021 diligence requirements: A licensee must inform the lessee of the foreign sponsorship disclosure rule and inquire whether the lessee is a foreign governmental entity or knows of

42

any such entities involved in the production or distribution of the programming. 47 C.F.R. § 73.1212(j)(3). In response to *NAB I*, the 2024 Rule modified the acceptable forms of proof-of-compliance (the corroboration requirement). Under the certification option, a licensee may provide the Commission with a standard-form certificate attesting to its compliance with the regulations. *Id.* § 73.1212(j)(3)(iv)(A). Under the screenshot option, a licensee may ask a lessee to search its own name in the FARA database and provide a screenshot of the results. *Id.* § 73.1212(j)(3)(iv)(B).

### 1. Corroboration Requirement

Section 317(c) requires a broadcaster to "exercise reasonable diligence to obtain . . . information to enable" it to make the required disclosures set forth in Commission regulations. 47 U.S.C. § 317(c), (e). According to NAB, the statute runs out once "the station obtains the necessary information" and thus the broadcaster cannot be required to check the veracity of any lessee's representations. NAB Br. 51–52. In its view, this Court confirmed as much in *NAB I*, when we explained that "§ 317(c) imposes a duty of inquiry, not a duty of investigation . . . . It does not make broadcasters responsible for the truth of the information they obtain." 39 F.4th at 820.

Nothing in the Commission's 2024 Rule is inconsistent with *NAB I*. There, we explained that the plain text of § 317(c) requires broadcasters to obtain information only "from [their] employees and sponsors." *Id.* at 819–20 (quoting 47 U.S.C. § 317(c)). So the Commission cannot compel a broadcaster to conduct independent research on government websites. But it can require the broadcaster to make inquiries "to the party that pays it for the broadcast," *i.e.*, the lessee. *Id.* at 820 (quoting *Loveday v. FCC*, 707 F.2d 1443, 1449 (D.C. Cir. 1983)). A

43

broadcaster's duty of inquiry under the Rule is *vis à vis* its lessees.

The Communications Act does not define what constitutes "reasonable diligence" in obtaining information from a lessee; instead, it leaves the metes and bounds of diligence to the Commission's rulemaking authority. *See* 47 U.S.C. § 317(e); *Loper Bright Enters.*, 603 U.S. at 394–95 (explaining that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion," including a statute that uses terms "such as 'reasonable'" or "empower[s] an agency to prescribe rules to 'fill up the details'"). The certification and screenshot options are permissible exercises of that delegated authority. Contrary to NAB's argument, these options do not put the burden on a broadcaster "to establish that the lessee was not lying." NAB Br. 52. The Commission could not have been clearer. Nothing in the Rule "make[s] licensees responsible for the truth of the information they obtain from lessees." 2024 Rule ¶ 35 (quotations omitted). NAB's members must ask the right questions, not require the right answers.

Next, NAB attacks the reasonableness of the Commission's corroboration requirements. In its words, the corroboration procedures "cannot remotely qualify as 'reasonable diligence'" because "almost no lessees are foreign governmental entities" and therefore they will "not achieve the[ir] intended purpose." NAB Br. 52–53 (quoting 47 U.S.C. § 317(c)). NAB's theory is sweeping: Because *most* lessees are not foreign government entities, the Commission cannot seek disclosures from *any* lessees, lest it impose incidental burdens on domestic actors. *Id.* NAB offers no authority for restricting the Commission in this manner. There is none. "The Government has long required [industry-wide] commercial disclosures" to root out bad actors. *Am. Meat Inst. v. Dep't of Agric.*, 760 F.3d 18, 31 (D.C. Cir. 2014)

44

(Kavanaugh, J., concurring).  Because disclosure rules aim to inform regulators "about what dangers exist and how these dangers can be avoided," *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 28 (1990), they are necessarily applicable to the industry writ large.

The Commission reasonably concluded that general disclosures are necessary to flush out foreign actors.  And despite NAB's hyperbolic portrait of crippling industry burden, compliance is unusually simple:  A licensee must complete a one-page certification and ask its lessee to do the same or ask its lessee to search the lessee's name on a website.

### 2.    *Inquiries Into Production and Distribution Chain*

NAB next argues that the Commission cannot ask a broadcaster to inquire of lessees whether they know of any foreign governmental entity that has provided an inducement for and been involved in the production or distribution of programming.  We find that challenge time-barred under the Hobbs Act.

The 2024 Rule requires broadcasters to ask lessees whether they "know[] if anyone involved in the production or distribution of the programming . . . qualifies as a foreign governmental entity and has provided some type of inducement to air the programming."  47 C.F.R. § 73.1212(j)(3)(iii).  That requirement was adopted root-and-branch from the 2021 Rule.  *See* 2021 Rule at 7719–26 ¶ 31.  For this reason, the Commission questions the timeliness of NAB's challenge to § 73.1212(j)(3)(iii).

The *sine qua non* of the Hobbs Act is rapid, conclusive and nationwide dispute resolution.  The Act achieves these aims by establishing a strict sixty-day filing deadline, placing judicial review in the courts of appeals and allowing for consolidation

45

of multiple disputes in a single circuit.    28 U.S.C.
§§ 2112(a)(3), 2342(1), 2344, 2348.  The filing deadline sets
"an outer limit on the right to bring a civil action," after which
any pre-enforcement challenge to an FCC final rule is barred,
"even if this period ends before the plaintiff has suffered a
resulting injury."  *Corner Post, Inc. v. Bd. of Governors of Fed.
Rsrv. Sys.*, 603 U.S. 799, 812 (2024) (citation modified).

Often, however, an agency adopts a new rule that builds
on an earlier one.  In those circumstances, the new rule can start
a new sixty-day clock and a challenger may yet contest the
earlier rule through the reopening doctrine.  *See Graceba Total
Commc'ns, Inc. v. FCC*, 115 F.3d 1038, 1040 (D.C. Cir. 1997)
(explaining that the doctrine permits "challenges to an agency's
. . . reconsideration of a previously promulgated rule, even if
the period for review of the initial rulemaking has expired").
To take advantage of the reopening doctrine, a challenger must
point to a "clear" agency intention to "reopen[] consideration
of its authority" to adopt the earlier rule.  *Bigstaffer v. FCC*,
511 F.3d 178, 185 (D.C. Cir. 2007).  We "look to the entire
context of the rulemaking" to assess whether "the agency has
opened the issue up anew."  *Pub. Citizen v. NRC*, 901 F.2d 147,
150 (D.C. Cir. 1990) (citation omitted).  That includes "[t]he
language of the NPRM itself," such as whether it contains an
"invitation to comment on a previously settled matter" and
the "agency's response to comments."    *Nat'l Ass'n of
Reversionary Prop. Owners (NARPO) v. Surface Transp. Bd.*,
158 F.3d 135, 142–43 (D.C. Cir. 1998).

NAB takes scattershot aim but not one of its arguments
hits the mark.    *First*, NAB contends that the APA is
unconcerned with a party-specific forfeiture when it comes to
challenges to an agency's statutory authority.  But the issue is
not one of forfeiture but of timeliness.  Indeed, the case NAB
cites—*Natural Resources Defense Council v. EPA*—draws

46

precisely this distinction.  824 F.2d 1146, 1150–51 (D.C. Cir. 1987) (contrasting a rule that goes unchallenged within 60 days with one that is timely challenged but by a different party, finding the latter timely but not the former).

*Second*, NAB asserts that the Commission must defend any challenge to a new regulation, even one that carries the old soil of an earlier rule.  Again, NAB's cited authority shows why that is not so.  In *Sierra Club v. EPA*, we allowed a challenge to EPA's statutory authority decades after the agency first claimed the regulatory power.  705 F.3d 458, 466 (D.C. Cir. 2013).  In so doing, we distinguished between two scenarios.  A new agency regulation that relies on a preexisting methodology does not reopen the agency's underlying methodology to challenge, even if applied to new facts.  *Id.* (citing *Med. Waste Inst. and Energy Recovery Council v. EPA*, 645 F.3d 420 (D.C. Cir. 2011)).  By contrast, if an agency overhauls the underlying rule itself, it may be challenged afresh.  *Id.* at 467; *see also Nat'l Ass'n of Mfrs. v. Dep't of Interior*, 134 F.3d 1095, 1104–05 (D.C. Cir. 1998) (explaining that "substantial revisions" to an old rule that "significantly alter[] the 'regulatory context'" and "the stakes of judicial review" reopen a rule to challenge).[14]

---

[14] On *Sierra Club*'s facts, the EPA created an entirely "new monitoring exemption for a new pollutant" and thus reopened whether the EPA had authority to create exemptions.  705 F.3d at 466–67.  This was not simply the application of the longstanding rule to a new set of facts but a rework of the rule itself.  Here, the 2021 Rule's diligence requirements (less the portion vacated by this Court) were not altered.  The Commission simply created procedures—the corroboration requirements—to establish compliance with the earlier rule.  And regarding the production and distribution chain, it is the substance of the Rule—not proof of compliance therewith—that NAB seeks to resurrect for a fresh assault.

NAB analogizes this case to the second scenario because the Commission replaced the 2021 Rule with the 2024 Rule. But the production and distribution chain *inquiry* remains the same. The change to the diligence requirements is to the steps necessary to *corroborate* that inquiry. NAB cannot bootstrap an untimely challenge to the inquiry rules to its timely challenge to the corroboration requirement. *See NARPO*, 158 F.3d at 142 ("invit[ing] debate on some aspects of a broad subject . . . does not automatically reopen all related aspects"); *Nat'l Ass'n of Mfrs.*, 134 F.3d at 1103 ("an agency need not subject settled policy or established statutory interpretation to renewed legal challenge whenever it revises a regulation").

*Third*, NAB claims that the Commission implicitly reopened the 2021 Rule to challenge by addressing the merits of NAB's critiques during the rulemaking. We disagree. The FCC narrowly addressed NAB's comments; it did not solicit challenges to the 2021 Rule. The Second NPRM informed the public that the Commission left in place most of the 2021 Rule and invited "comment on establishing a transparent mechanism to determine whether the licensee made the requisite inquiries of each lessee and that each lessee responded in a complete manner." Second NPRM, 377 FCC Rcd. at 12005, 12010 ¶¶ 3, 14. In other words, the Commission sought comment on the reopened corroboration requirements, not the settled inquiry rules. In response to NAB's off-topic comments, the Commission in a single paragraph refuted NAB's argument about the scope of the Commission's statutory authority, *see* 2024 Rule ¶ 36, but did not squarely address the merits of the downstream production requirement. Instead, it expressly stated that it "decline[s] to address challenges by commenters to the existing rules not under review in the Second NPRM," including complaints that "inquire about the status of lessees and those further back in the chain of production and

48

distributing of programming." 2024 Rule ¶ 31; *see also id.* ¶¶ 32–33 (same).

In any event, an agency "does not create a new opportunity for review" simply by "respond[ing] to an unsolicited comment [and] reaffirming its prior position." *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996). As we have cautioned, "the reopening rule . . . is not a license for bootstrap procedures by which petitioners can comment on matters other than those actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had re-opened the issue." *Nat'l Ass'n of Mfrs.*, 134 F.3d at 1103–04 (citation modified).

This does not mean NAB is without recourse. It may still "fil[e] a petition for amendment or rescission of the agency's regulations, and challeng[e] the denial of that petition" in this Court. *Pub. Citizen*, 901 F.2d at 152. What it cannot do, however, is collaterally attack the 2021 Rule long after the statutory sixty-day deadline has passed.

### 3. *Regulation of Lessees*

Finally, NAB argues that the Commission lacks authority to regulate lessees under its § 317 authority. It contends that because § 317 of the Communications Act relates exclusively to the obligations of licensees, and § 508—which covers lessees' obligations—contains no comparable FCC rulemaking power to the one included in § 317(e), the corroboration requirements are invalid because they compel lessees to disclose information absent Commission authority. But the 2024 Rule does not directly regulate lessees.

Throughout the 2024 Rule, the Commission repeatedly stated that a licensee's duty is to ask for information, not to receive it. *See, e.g.*, 2024 Rule ¶¶ 28, 34–35 & nn.87, 89.

49

Seeking to resist this conclusion, NAB clings to stray remarks in the 2024 Rule that describe what a lessee "must" do to comply with the certification option. Specifically, the 2024 Rule—in describing the certification option—states that "both the licensee and the lessee must complete a written certification." 2024 Rule ¶¶ 14, 19. It is hard to think of a more circuitous path the Commission could take to regulate lessee conduct. In context, these "musts" simply describe the information that the Commission wants licensees to obtain from lessees. *See id.* (explaining that the "musts" describe how licensees should "seek to obtain from lessees the information needed"). In other words, the "must" signals what a licensee must ask for; not what a lessee must do. The Rule neither expressly nor by implication purports to regulate lessees directly. Indeed, NAB does not even attempt to find a lessee command in the equally available screenshot option. Because the 2024 Rule does not regulate lessee conduct, NAB has no colorable claim that the Commission exceeded its statutory mandate and, accordingly, its APA claim fails.

\* \* \*

For the foregoing reasons, NAB's petition for review is denied.

*So ordered.*